**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

Gregory Boyer, as Administrator of the Estate
of Christine Boyer, and on his own behalf,

                Plaintiff,

       v.

Advanced Correctional Healthcare, Inc., *et
al.*,

              Defendants.

Case No: 20-cv-1123

Judge James D. Peterson

Magistrate Judge Stephen L. Crocker

**<u>PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS IN PART</u>**

Plaintiff, through his undersigned counsel, submits this memorandum in opposition to the

motions to dismiss filed by the defendants in this case, ECF 105 & 107, and in response to the

arguments advanced in the defendants' memorandums in support, ECF 106 & 108.  For the

reasons set out herein, Plaintiff respectfully submits that the defendants' motions should be

denied in their entirety.

The defendants make three basic arguments.  Each is wrong.  ***First***, they argue that at the

pleading stage, a Section 1983 complaint alleging that a municipal defendant has a *de facto*

policy of unlawful conduct must identify multiple, specific, similar incidents of similar conduct

in order to satisfy Rule 8.  That is incorrect:  alleging multiple similar incidents is *one* way to

plead a *Monell* claim, but the courts have explained that a *Monell* complaint also satisfies Rule 8

if it describes the *de facto* policy in sufficient detail to provide the defendant notice of the policy

that the plaintiff alleges.  ***Second***, the defendants argue that Plaintiff's complaint has made only

generic and conclusory allegations of a *de facto* policy.  But this simply ignores what Plaintiff

has alleged:  his complaint charges that the defendants have a *de facto* policy of discouraging

1

referrals of people detained in the jail to outside medical providers, even when outside care is medically indicated, in order to avoid the expense of such outside referrals. Multiple courts have held that such allegations state a cognizable claim under *Monell*. **Third**, the defendants argue that the numerous medical incidents that Plaintiff has identified are not sufficiently similar, either because they do not involve chest pain and heart attacks, or because they occurred in other jurisdictions. But where the policy at issue is a refusal to refer patients to outside care, the specific ailment is not the issue–unmet medical need is. And multiple courts have held that when *Monell* claims are asserted against national correctional healthcare vendors like ACH, examples of inappropriate medical care from other facilities serviced by the vendor are relevant to proving a *Monell* claim. The defendants' remaining, ancillary arguments fare no better, as Plaintiff explains herein. The Court should reject the defendants' motions in their entirety.

**FACTS**

Plaintiff's complaint alleges that Christine Boyer was booked into the Monroe County jail on Saturday, December 21, 2019. *See* ECF 102 ¶ 15. At booking she told staff that she suffered from congestive heart failure and high blood pressure and took numerous medications for these conditions, but that she did not have them with her. *Id.* ¶¶ 17-18. Jail staff called Lisa Pisney, ACH's off-site practitioner, who made no effort to determine what those medications were, yet decided that Ms. Boyer could do without them until Monday. *Id.* ¶¶ 21-22.

Around 3:00 p.m. on Sunday December 22, Ms. Boyer developed shortness of breath and extremely high blood pressure. *Id.* ¶ 23. The jail did not provide nurses on Sundays, so staff again called Ms. Pisney, who told them to dose Ms. Boyer with clonidine. *Id.* (The complaint also alleges that Ms. Fennigkoh, an ACH nurse, was at the jail over the course of the afternoon and was aware of Ms. Boyer's condition, but made no effort to send her to the hospital or secure

her medications, *see id.* ¶¶ 26-27.)  A few hours later, around 8:00 p.m., Ms. Boyer alerted jail staff that she had constant, stabbing chest pain and pain in her left shoulder, that she was short of breath, and that she was nauseous and dizzy–all signs of a potential heart attack.  *Id.* ¶ 30.  Ms. Boyer reiterated that she had congestive heart failure and high blood pressure, and she identified multiple, specific medications for those conditions that she was prescribed but was not receiving. *Id.*  Staff again contacted Ms. Pisney, who could have directed them to send Ms. Boyer to the emergency room across the street from the jail, but instead told staff to give her aspirin.  *Id.*  Ms. Boyer suffered a fatal heart attack a few hours later.  *Id.* ¶ 37.

Besides alleging various individuals provided Ms. Boyer with inadequate medical care, the complaint further alleges that the inadequate care, in particular the failure to obtain Ms. Boyer's prescribed medications and send her to the ER, was the result of policies and practices that "prioritize low costs for jailers, and profits for ACH, at the expense of the health and lives of people who are detained in jails serviced by ACH, including Monroe County."  ECF 102 ¶ 96.

The complaint then details the factual basis for that charge.  It explains that ACH, which is a national vendor of jail medical care services, has a business model focused on volume: it underbids competing providers by promising jailors that it will keep their healthcare costs down, and it accomplishes the low costs it promises by implementing severe cost control measures at the jails it services.  *Id.* ¶ 97.  The complaint notes that ACH's CEO has described this business model to its jailer-customers explicitly, explaining that reducing detainee visits to hospitals keeps ACH's jailor-customers "happy," which helps ACH expand its business, which has helped ACH increase its profits.  *Id.* ¶ 98.  The complaint alleges that ACH is able to operate in this manner because jury verdicts for medical misconduct in jails and prisons are typically a fraction of the verdicts for comparable misconduct in the free world, meaning that ACH can minimize

care—particularly by minimizing trips to outside medical providers—and yet continue to operate in the same cost-cutting manner. *See id.* ¶¶ 97-99.

The complaint alleges that ACH offers insurance coverage to indemnify jailor-customers, with a result that jailors are willing to hire ACH despite its poor track record in providing appropriate medical care. *Id.* ¶ 100. Because they are indemnified by ACH's insurance, the complaint alleges, jailors like Monroe County can afford to be indifferent to ACH's practice of providing poor medical care—particularly its practice of keeping the jailer-customer's costs down by minimizing referrals to outside medical providers. *Id.* ¶¶ 97-98, 100.

The complaint also explains *how* ACH implements its cost-control measures on the ground as well. It alleges that ACH orients its employees to discount medical concerns raised by detained persons as complaints flowing from a desire to be "comfortable," even if the same complaint by a person in the outside world would call for medical attention. *Id.* ¶¶ 101-104. ACH also pressures practitioners in the field to reduce care, medications, or testing that require payments to outside medical providers. *Id.* ¶ 105. The complaint provides an example of such pressure at the Monroe County jail itself: ACH nurse Fennigkoh, with the approval of the jail's administrator, Capt. Hendrickson, emailed ACH practitioner Lisa Pisney's supervisor to pressure her to make fewer hospital referrals—including for chest pain—to reduce costs below the level of care deemed necessary in the free world, and otherwise sought to have jail staff pressure Ms. Pisney to order fewer safety measures—such as reducing the frequency of blood pressure monitoring—in order to keep down the jail's expenses in providing medical care. *Id.* ¶¶ 106-07. "*In this way*," the complaint alleges, defendants "conspired to pr *Id.* ¶ 108ovide inadequate medical care to detainees at the Monroe County Jail, including Ms. Boyer." (emphasis added).

The complaint further alleges that while ACH pressures its staff to cut back on care, it turns a blind eye to negative and even catastrophic medical outcomes that predictably result from such practices. *Id.* ¶ 116. Even though the leading standard-setting body in the correctional healthcare industry recommends that mortality reviews should be performed after adverse events in order to identify potential deficiencies in care, ACH does not conduct mortality reviews following a death or a catastrophic event—except to assess its exposure to litigation. *See id.* ¶¶ 112-15. Indeed, the complaint alleges, during the relevant period ACH made no effort to track deaths at its facilities at all. *Id.*

As a result of these policies, Plaintiff alleges, ACH employees prioritize cost-reduction at the expense of providing adequate healthcare, including by discounting reports by patients of objectively serious medical needs and by failing or refusing to arrange for detained people to be treated at outside facilities, even when such treatment is medically indicated. *Id.* ¶ 125. ACH and Monroe County facilitated this cost-saving scheme through an explicit policy that prohibited jail staff from sending detainees to the emergency room, instead requiring them to go through ACH medical staff—the medical staff whom ACH has oriented and pressured to reduce off-site medical referrals in order to save money and keep its jailor-clients' costs down *see id.* ¶¶ 101-07, 125, 132-33. The complaint alleges that these policies and practices were the moving force behind and proximate cause of Ms. Boyer's injuries. *Id.* ¶¶ 126, 136.

The complaint further alleges that these same policies and practices have resulted in numerous other instances of inadequate medical care, in which an outside referral was indicated but not provided, *id.* ¶ 96, both nationally at facilities that ACH services, *see id.* ¶ 76, and at the Monroe County jail itself, *see id.* ¶ 39. It points to 20 such incidents at other facilities, *id.* ¶¶ 40-75, and 19 such incidents at Monroe County, *id.* ¶¶ 77-95.

## LEGAL STANDARD

"The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits." *Triad Assocs., Inc. v. Chicago Hous. Auth.*, 892 F.2d 583, 586 (7th Cir. 1989). In considering a motion to dismiss, the courts "construe the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in her favor." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

The Seventh Circuit has explained that under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554 (2007), a complaint need to pass only "two easy-to-clear hurdles" to survive a defendants' motion to dismiss: (1) it "must  describe the claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds on which it rests"; and (2) "its allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level.'" *Id.* at 1084 (quoting *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007). "Plausibility" does not mean that the court "should decide whose version to believe, or which version is more likely than not." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) (citing *Twombly*, 550 U.S. at 570; *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). Rather, a complaint merely needs to "give enough details about the subject-matter of the case to present a story that holds together.  In other words, the court will ask itself *could* these things have happened, not *did* they happen." *Id.* at 404 (emphasis original).  At the Rule 12 stage, "the court must construe all of the plaintiff's factual allegations as true, and must draw all reasonable inferences in plaintiff's favor." *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011) (citing *Iqbal*, 556 U.S. at 680). Dismissal for failure to state a claim under Rule 12(b)(6) is proper only where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Id.* (citing *Twombly*, 550 U.S. at 558).

In turn, Rule 8 requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). A "complaint [may] not contain all of the facts that will be necessary to prevail, but a filing under Rule 8 is not supposed to do that; it should be 'short and plain' and suffices if it notifies the defendant of the principal events . . . ." *Patterson v. World Wrestling Ent., Inc.*, No. 03-cv-0374, 2005 WL 8162784, at *4 (E.D. Wis. Feb. 8, 2005) (citing *Hoskins v. Poelstra*, 320 F.3d 761, 764 (7th Cir. 2003)). *Accord Walker-Dabner v. Dart*, No. 15-cv-942, 2015 WL 9259883, at *5 (N.D. Ill. Dec. 18, 2015) (same; quoting *Hoskins*).

Under *Twombly* and *Iqbal*, notice pleading is still the standard under the Federal Rules. The Seventh Circuit has interpreted those decisions "to be admonishing those plaintiffs who merely parrot the statutory language of the claims that they are pleading," which is "something that anyone could do, regardless of what may be prompting the lawsuit . . . ." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). This does not mean that the Supreme Court repudiated the general notice-pleading regime of Rule 8 after *Twombly* and *Iqbal*; rather, those decisions instructed that Rule 8 "'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence' supporting the plaintiff's allegations." *Id.* (quoting *Twombly*, 550 U.S. at 556). As such, "'[a]ny district judge (for that matter, any defendant) tempted to write "this complaint is deficient because it does not contain [X]" should stop and think: What rule of law *requires* a complaint to contain that allegation?'" *Foremost Farms USA, Coop. v. Diamond V Mills, Inc.*, No. 16-CV-551-JDP, 2017 WL 1390699, at *4 (W.D. Wis. Apr. 18, 2017) (Peterson, J.) (quoting *Vincent v. City Colls. of Chi.*, 485 F.3d 919, 923-24 (7th Cir. 2007) (emphasis and bracket in the original)). A "'decision declaring "this complaint is deficient because it does not allege X" is a candidate for summary reversal, unless X is on the list in Fed. R. Civ. P. 9(b),'" *id.* (quoting *Vincent*, 485 F.3d at 923), because "[e]ven in the new world of

7

pleading after *Twombly* and *Iqbal*, Rule 8 requires a plaintiff to give only adequate notice of the scope of, and basis for[,] the asserted claims. *Id.* (quotation omitted)).

**ARGUMENT**

A.     **If a complaint's factual allegations otherwise plausibly support an inference that a municipality has an unlawful *de facto* policy, Rule 8 does not require the complaint to identify other violations in order to state a *Monell* claim.**

The complaint alleges that ACH and Monroe County are principally liable for Ms. Boyer's death under *Monell v. Department of Social Services*, 436 U.S. 658 (1978) because the two entities have *de facto* policies that discourage staff from referring incarcerated people for outside care, even when they need it. Both defendants argue that at the pleading stage, it is not enough for a *Monell* plaintiff to describe a municipality's widespread practices in their complaint. No matter how detailed or plausible the allegations describing the municipality's *de facto* policy, the defendants say, a *Monell* complaint only states a *de facto* policy claim under Rule 8 if it identifies multiple, specific instances of similar constitutional violations. *See* ECF 108 at 12-15. This argument lacks authoritative support. The defendants have not identified binding precedent that requires a *complaint* to identify other specific constitutional violations to state a *Monell* claim, where the complaint's factual allegations otherwise plausibly support an inference that the defendant has a widespread unconstitutional practice. To the contrary, the authorities holding on the question have held the opposite.

Any analysis of the defendants' contention must begin with *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163 (1993), in which the Supreme Court rejected the precise pleading requirement that the defendants ask the Court to impose in this case. In *Palmer v. City of San Antonio, Texas*, 810 F.2d 514 (5th Cir. 1987), the Fifth Circuit had affirmed dismissal of a plaintiff's *Monell* claim at the pleading stage because

the [complaint's] assertion of a single incident is not sufficient to show that a policy or custom exists on the part of a municipality. Palmer *failed to allege that there are prior incidents which, if taken as true, would reveal the existence of an unconstitutional custom* on the part of San Antonio. Accordingly, we affirm the district court's order of dismissal with respect to the city of San Antonio.

810 F.2d 514, 516–17 (5th Cir. 1987) (citations omitted; emphasis added). *Leatherman* singled out *Palmer* as creating "a more demanding rule for pleading a [Section 1983] complaint . . . . against municipal corporations," 507 U.S. at 167 (citing *Palmer*) and then rejected that approach, holding, "[w]e think that it is impossible to square the 'heightened pleading standard' applied by the Fifth Circuit . . . with the liberal system of 'notice pleading' set up by the Federal Rules." *Id.* at 168. Specifically, *Leatherman* held, the Fifth Circuit's standard effectively imposed the pleading requirements imposed by Rule 9, but while Rule 9 requires "particularity in pleading certain actions," these do not include "complaints alleging municipal liability under § 1983." *Id.* *Leatherman* explained that for *Monell* claims—like most claims brought in federal court—Rule 8's liberal standard of pleading controls. *Id.*

When Monroe County moved to dismiss Plaintiff's *Monell* claim previously, ECF 47, Plaintiff responded by pointing specifically to *Leatherman*'s rejection of the Fifth Circuit's *Palmer v. City of San Antonio* decision requiring identification of multiple instances of misconduct. *See* ECF 56 at 8-9. That portion of *Leatherman* unambiguously contradicts the rule that the defendants invite the Court to impose here, yet their briefs do not mention *Leatherman* at all. The conceit of the defendants' renewed Rule 12 motions, therefore, presumably is that *Leatherman* was overruled *sub silentio* by the Supreme Court's *Twombly* and *Iqbal* decisions.

The problem with that position is that the defendants cannot identify a single Seventh Circuit decision after *Twombly* and *Iqbal* that has abandoned *Leatherman* to impose such a requirement. To the contrary, the very Seventh Circuit decisions that the defendants cite provide

that where a complaint's factual allegations otherwise plausibly support an inference that a municipal defendant has a widespread practice, Rule 8 does *not* require a plaintiff to identify other specific constitutional violations in order to state a *Monell* claim.

As an initial matter, the defendants do cite numerous Seventh Circuit decisions stating that multiple incidents are required to advance a *Monell* widespread practice claim. But nearly all of those decisions are rulings at summary judgment or trial. *See Cornfield v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316 (7th Cir. 1993) (cited ECF 108 at 12-13; summary judgment); *Palmer v. Marion County*, 327 F.3d 588 (7th Cir. 2003) (cited ECF 108 at 13; summary judgment); *Wilson v. Cook County*, 742 F.3d 775 (7th Cir. 2014) (cited ECF 108 at 13; summary judgment); *Thomas v. Cook County Sheriff's Department*, 604 F.3d 293 (7th Cir. 2010) (cited ECF 108 at 16; post-trial); *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647 (7th Cir. 2021) (cited ECF 106 at 3; judgment as a matter of law after granting of motions *in limine*); *Connick v. Thompson*, 563 U.S. 51 (2011) (cited ECF 106 at 12; summary judgment); *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214 (7th Cir. 2021) (cited ECF 106 at 12; post-trial). The municipal defendant in *Barwicks v. Dart*, No. 14-CV-8791, 2016 WL 3418570, at *4 (N.D. Ill. June 22, 2016) tried the same maneuver, seeking dismissal of a complaint based principally on summary judgment decisions requiring multiple incidents to prove a *Monell* claim. *Barwicks* rejected that effort, explaining that while "Defendants are correct that at summary judgment Plaintiff's single incident cannot give rise to a *Monell* claim," at the pleading stage, "Plaintiff need only *allege* a pattern or practice, not put forth the full panoply of evidence from which a reasonable factfinder could conclude such a pattern exists." *Id.* at *4 (emphasis original). The defendants here do not attempt to explain *why* the requirements for proof at trial should govern notice pleading under Rule 8. Plaintiff already alerted defendants to this problem when

responding to Monroe County's Rule 12(c) motion, *see* ECF 56 at 5-7, and it fell to the defendants to explain why the Court should collapse the two different standards. Nowhere do they attempt to do so. With no explanation as to why the Court should take such a step, Plaintiff submits the Court should look to Rule 12 decisions for guidance instead.

The defendants' reliance on trial decisions is understandable, because the Seventh Circuit's Rule 12 decisions do not support their argument. ACH cites *Stauss v. City of Chicago*, 760 F.2d 765 (7th Cir. 1985) for the rule that a *Monell* plaintiff must identify other specific incidents at the pleading stage, *see* ECF 106 at 12, but multiple courts "in the Seventh Circuit have recognized that the Supreme Court disapproved *Strauss* when it rejected a heightened pleading standard for § 1983 claims against a municipality in its unanimous opinion in *Leatherman*[.]" *McDonald v. Obaisi*, No. 16-CV-5417, 2017 WL 4046351, at *4 (N.D. Ill. Sept. 13, 2017) (collecting cases).

Monroe County points to *McCauley v. City of Chicago*, 671 F.3d 611 (7th Cir. 2011) and *Gill v. City of Milwaukee*, 850 F.3d 335 (7th Cir. 2017), *see* ECF 108 at 17, but neither of those decisions support the proposition that other incidents *must* be identified at the *Monell* pleading stage, either. It is certainly true that a Section 1983 plaintiff *may* identify other instances of misconduct as the factual basis of a widespread-practice claim. *Gill* says as much, noting that a *Monell* plaintiff could have supported widespread practice claim with "examples of other Milwaukee police officers taking actions similar to those complained of here." 850 F.3d at 344. But *Gill* explains, citing *McCauley*, that is not the only way to plead a *Monell* claim; a *Monell* complaint also satisfies Rule 8 if it "plausibly allege[s] that such examples exist." *Id.*

*McCauley*, in turn, makes clear that a complaint can state a *Monell* claim via this second avenue with a sufficient *description* of the alleged municipal policy. In *McCauley*, the complaint

11

made a series of legal "allegations" regarding a municipal policy, which the court termed a recitation of "legal elements" that could be disregarded for purposes of analyzing the motion to dismiss. 671 F.3d at 617-18. Then, however, *McCauley* turned to the complaint's "*factual* allegations*," which it assessed to determine whether the complaint stated a *Monell* claim. *Id.* at 618 (emphasis added). Those allegations were not about similar incidents, but rather described the alleged municipal policy and how it worked.[1] *McCauley* ultimately held that these allegations did not state a claim, but that was not because they lacked factual content or were conclusory. Rather, it was because the policies and practices alleged did not plausibly establish the plaintiff's particular *Monell* theory, which involved a claim about the selective withdrawal of police protection. *Id.* at 619. Nowhere did *McCauley* fault the plaintiff for failing to allege other incidents similar to the one experienced by the plaintiff. Indeed if such allegations were essential to a *Monell* claim, the *McCauley* complaint would have failed at the outset and there would have been no point to the policy-description analysis that the *McCauley* court performed.

The defendants also cite two other Rule 12 decisions in support of their other-incidents pleading requirement: *Jackson v. Marion County*, 66 F.3d 151 (7th Cir. 1995) and *Calderone v. City of Chicago*, 979 F.3d 1156 (7th Cir. 2020). *See* ECF 106 at 13; ECF 108 at 13, 15-16, 22. Neither of those decisions help defendants, either. In *Calderone* the plaintiff did not allege a widespread practice at all; she alleged either that the city's "express" policies violated the Second Amendment "as applied to her." 979 F.3d at 1164. The *Calderone* court did observe that one means of stating a *Monell* claim–which the plaintiff did not satisfy–would be to "show a series of [similar] bad acts[.]" *Id.* In the first instance, however, *Calderone* held that the plaintiff

---

[1]  For example, *McCauley* treated as "factual" allegations that the city "maintain[ed] a policy or custom of failing to timely arrest violators of protective  orders," "maintain[ed] a custom and practice of failing to adequately train officers  concerning the necessity of promptly arresting individuals guilty of violating protective orders," and "maintain[ed] a policy or custom of failing to have safeguards in place to ensure that violators of protective orders were timely arrested." *McCauley*, 671 F.3d at 618.

could prevail at the pleading stage by "demonstrating that the policy is itself unconstitutional." *Id.* It was *"because* she cannot do so" that *Calderone* noted the alternative route of pointing to numerous bad acts. *Id. Calderone* simply never reached the question of whether a *Monell* complaint's factual description of a *de facto* policy is enough to satisfy Rule 8 on its own.

*Jackson*, meanwhile, stands for the opposite proposition that the defendants claim. The *Jackson* court was reviewing the dismissal of a *Monell* claim for pleading "only an allegation of an isolated instance of misconduct." 66 F.3d at 152. In discussing the trial court's order, *Jackson* does note that proof of a *de facto* municipal policy is often made through showing a "series of bad acts," *id.* But that discussion is *dicta* about the evidentiary structures of different *Monell* theories, not the rule for pleading a *Monell* claim under Rule 8. *Jackson* says as much in the next paragraph, where dispensed with that discussion, stating: "moreover," "[i]n requiring greater specificity of pleading . . . the district court overlooked *Leatherman*[,] which, in the specific context of a section 1983 suit alleging municipal liability . . . rejects . . . the imposition of heightened pleading requirements in cases governed by the Federal Rules of Civil Procedure unless required by the rules themselves, which is to say by Rule 9." *Id.* at 153. If anything, *Jackson* represents a recognition that *Leatherman* prohibits courts to insist on incident-pleading.

This line of decisions leads to *White v. City of Chicago*, 829 F.3d 837 (7th Cir. 2016), in which the Seventh Circuit applied *Leatherman* in light of *Twombly* and *Iqbal*. In *White*, the complaint alleged that "[i]n accordance with [the city's] widespread practice," a police officer had sought an arrest warrant based on conclusory allegations. 829 F.3d at 844. By way of describing that practice, the complaint appended a printed warrant application form that did not require factual support to apply for a warrant. *Id.* The district court dismissed the complaint for failing to identify other examples of the same misconduct, *id.* at 843, but the *White* court held

this was an error.  *Leatherman*, the court explained, held that courts "may not apply a 'heightened pleading standard . . . in civil rights cases alleging municipal liability under [Section] 1983,'" *id.* at 844 (quoting *Leatherman*, 507 U.S. at 168)), and "[t]he *Leatherman* holding has survived . . . *Iqbal* and *Twombly*, which require the pleader to allege a 'plausible' claim." *Id.* (citing *Twombly* and *Iqbal*).  As such, held *White*, where the complaint had plausibly described the alleged policy, the *White* plaintiff "was not required to identify every other or even one other individual who had been arrested pursuant to a warrant obtained through the complained-of process." *Id.*

The defendants discuss *White* in a footnote in Monroe County's brief, *see* ECF 108 at 13 n.5, and they attempt to confine it strictly to its facts.  Focusing on the *White* plaintiff's appending of a printed form to his complaint, the defendants say that *White* creates a "narrow exception" to the similar-incident pleading requirement that applies only when a complaint points to "direct evidence" of a municipal policy.  *Id.*  This argument does not withstand scrutiny.  The proposition that *White* announced a pleading exception for complaints that contain "direct evidence" is unmoored from Rule 8, which requires only "a short and plain *statement* of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Whether the statement includes "evidence," "direct" or otherwise, is irrelevant under the rule.  Instead, what matters is whether the factual allegations in the complaint "give enough details about the subject-matter of the case to present a story that holds together." *Swanson*, 614 F.3d at 404 .

If a complaint's description of a municipality's policy meets this standard, *White* teaches that the complaint need not *also* allege instances of similar misconduct.  *See McDonald v. Obaisi*, No. 16-cv-5417, 2017 WL 4046351, at *4 (N.D. Ill. Sept. 13, 2017) (holding that where a complaint had sufficiently described the allegedly unlawful municipal practice, the plaintiff

"might get extra credit for identifying additional incidents supporting his alleged policies and custom, but his complaint passes the Rule 8(a) test without them under *White*."). The defendants tacitly admit as much, conceding that a *Monell* plaintiff must *either* allege a factual "'context creating an inference of a widespread policy or custom, as in *White*, . . . [or] allege more than his own single experience.'" ECF 108 at 13 n.5 (quoting *Hutton v. City of Chicago*, No. 20-cv-03997, 2021 WL 809731, at *4 (N.D. Ill. Mar. 3, 2021)). Whether a complaint alleges such a "context" is governed by the pleading standards of Rule 8, not a "direct evidence" rule.

A number of district court decisions so hold. *See, e.g.*, *Barwicks v. Dart*, No. 14-cv-8791, 2016 WL 3418570, at *4 (N.D. Ill. June 22, 2016) ("Defendants are correct that at summary judgment Plaintiff's single incident cannot give rise to a *Monell* claim. . . . [But at the pleading stage], Plaintiff need only *allege* a pattern or practice, not put forth the full panoply of evidence from which a reasonable factfinder could conclude such a pattern exists. Plaintiff's single incident can give rise to a *Monell* claim if Plaintiff pleads that incident is representative of other intra-inmate violence at the Cook County Jail and that such violence was caused by a widespread pattern or practice by Sheriff Dart."); *Mack v. City of Chicago*, No. 19-cv-4001, 2020 WL 7027649, at **5-6 (N.D. Ill. Nov. 30, 2020) (rejecting city's motion to dismiss on grounds that the plaintiff's Monell claim "'is not supported by any specific factual allegations evidencing similar constitutional violations' . . . . Since *White*, many courts have declined to grant motions to dismiss that are premised on the argument that the complaint does not contain allegations beyond those relating to the plaintiff. At summary judgment or trial, Plaintiff will have to offer evidence of widespread unlawful practices and its failure to train officers, and demonstrate how those practices and failures caused the alleged wrongdoing in this case. He need not do so at the pleading stage." (collecting cases)); *Howard v. Evans*, No. 19-cv-5146, 2020 WL 5630430, at *3

(N.D. Ill. Sept. 21, 2020) ("At summary judgment, evidence of just a few isolated incidents of constitutional violations are likely to be found insufficient to support a *Monell* claim based on a widespread unconstitutional practice. But Defendants have not cited any precedent that requires a plaintiff to identify other specific constitutional violations to state a *Monell* claim, where the complaint's allegations otherwise plausibly support an inference that the defendant has a widespread practice about which decision makers are aware.").  Plaintiff has gathered similar decisions in ECF 56 at 10-12.  This is the weight of authority in the Seventh Circuit.

The defendants cite a handful of district court decisions dismissing a complaint for failing to identify other similar examples. *See* ECF 108 at 17 (collecting cases).  Most of these citations are unexplained, however, and do not describe what exactly was lacking in the complaint.  The defendants do examine *Terry v. County of Milwaukee*, No. 17-cv-1112, 2018 WL 2567721 (E.D. Wis.  Jun. 4, 2018), and argue that it supports the multiple-incident requirement that they seek to impose in this case.  *See* ECF 106 at 7-8; ECF 108 at 19-20.  *Terry*, however, reached that conclusion because it held that the plaintiff had failed to *describe* the municipality's policy with any specificity, instead alleging generically that the defendant had a "widespread custom or practice of ignoring inmates' serious medical needs."  *Id.* at *1.  *Terry* held that this was insufficient under *Monell* because "[t]he challenged policy or custom cannot merely be the abstract one of violating citizens' constitutional rights." *Id.* at *8.  While *Terry* focused on the plaintiff's failure to identify a sufficient number of similar incidents, that analysis flowed from *Terry*'s conclusion that the plaintiff's alleged policy was undefined, and effectively amounted to a generic claim that the municipal defendants "should have noticed the repeated failure to provide medical care and should have done something to remedy it."  *Id.* at *13 n. 9.  *Terry*, in other words, ends up in the same place as the district court decisions Plaintiff has gathered *supra*,

which permit a *Monell* claim to be pleaded *either* through allegations of a particular "context creating an inference of a widespread policy or custom, as in *White*, . . . [*or*] allege more than [the plaintiff's] own single experience.'"  *Hutton*, 2021 WL 809731 at *4 .  The multiple incident pleading requirement that the defendants suggest the Court should invent is simply not the law in the Seventh Circuit.  The Court should decline the invitation.

> **B.**     **Plaintiff has alleged facts that plausibly support an inference that ACH and Monroe County, and Capt. Hendrickson have *de facto* unconstitutional practices, such that pleading specific incidents is unnecessary.**

The defendants next argue that Plaintiff's complaint does not describe any cognizable policy, and instead has made merely "generic and conclusory" claims amounting to little more than "conclusory statements and recitals of the elements of a claim." ECF 108 at 17. *Accord* ECF 106 at 8 (arguing Plaintiff's complaint has failed to "articulate what the problem is," such that "it cannot be said  that tolerating the problem amounted to a conscious choice" (quoting *Terry*)).

The defendants can make these arguments only by ignoring the policy allegations set out in the complaint.  Plaintiff has summarized those allegations above–he alleges that ACH has a volume business model in which it underbids rivals by cutting back on referrals of sick detainees to outside care providers. ACH does this, among other things, by orienting its employees to discount the medical concerns of jail detainees and pressuring them to reduce outside referrals. ACH then blinds itself to the obvious consequences of these policies in that it does not track deaths or conduct mortality reviews, which are intended to determine whether an adverse medical event indicates a problem in the delivery of care.  Monroe County, which benefits from ACH's low prices, enables ACH's scheme by prohibiting its own employees from sending people to the emergency room.  Instead it requires them to go through ACH employees, who have been trained and are under pressure to minimize such outside referrals.  *See supra*.

The Court will search the defendants' briefs in vain for meaningful engagement with these allegations.  At the very end of its brief ACH labels the complaint's policy allegations as unsupported, *see* ECF 106 at 17, but ACH makes little effort to develop this argument or explain what it means.  ACH does say that its contract with Monroe County does not provide for ACH to profit by refusing to provide medical care, *id.*, but the complaint does not allege that the contract contains such explicit terms.  Rather, it sets out in detail why ACH is motivated to reduce outside referrals, including statements by ACH's CEO that reducing such referrals keep its customers happy and enable it to succeed.  The question at this stage of the case is whether Plaintiff's allegations "give enough details about the subject-matter of the case to present a story that holds together," *Swanson*, 614 F.3d at 404, drawing all reasonable inferences in Plaintiff's favor.  The complaint's allegations easily satisfy that requirement.  *Cf. Bost v. Wexford Health Sources, Inc.*, No. 15-cv-3278, 2022 WL 4290528, at *52 (D. Md. Sept. 16, 2022) ("Bost does not assert *Monell* liability based on a generic claim of substandard medical care to prisoners. Since the inception of this litigation, plaintiff has steadfastly pressed the claim that Neal died due to defendants' failure to obtain timely emergency medical care." (cleaned up)).

Monroe County and Capt. Hendrickson, for their part, concede that the complaint does make some specific allegations, *see* ECF 108 at 9-10, but examine these policies in isolation and then argue that each one, standing alone, is anodyne.  *Id.* at 16-17.  That is not the proper frame for examining the complaint's policy allegations.  The complaint alleges, for example, that Monroe County prohibits jail staff from making ER referrals, requiring them to go through ACH staff instead.  ECF 102 ¶ 133.  Considered in isolation, such a policy might not appear unlawful.  But Plaintiff has alleged that this policy was a component of the defendants' improper efforts reduce outside referrals, by forcing ER referrals to be routed through ACH staff who had been

oriented and pressured to avoid making such referrals, even when they would have done so for a patient in the outside world. *Supra*. *Cf. Bost*, 2022 WL 4290528, at *48 (rejecting challenge to similar *Monell* claim:  "Bost's claim is not merely that Wexford required its medical staff to obtain prior approval before sending an inmate off-site for emergency care. Rather, Bost contends that Wexford waged a campaign to reduce the use of off-site emergency services, and its policy to require medical staff to obtain prior approval before sending a patient off-site was just one component the larger effort to avoid the use of off-site emergency services.").

> **C.    Plaintiff has alleged facts that plausibly support an inference that the defendants' alleged policies were the proximate cause of Ms. Boyer's injuries.**

The defendants also argue that the complaint lacks allegations that permit any reasonable inference that their alleged policies were a proximate cause of Ms. Boyer's injuries.  ECF 108 at 13.  Once again, this argument requires them to ignore the policies that the complaint describes. The complaint explains why, and how, the defendants have adopted a policy of reducing referrals to off-site care.  These allegations permit the reasonable inference that Christine Boyer was harmed by that very policy: her chest pain symptoms indicated a need for emergent hospital care, but Lisa Pisney, whom ACH had recently pressured to reduce hospital referrals for chest pain, prescribed her aspirin instead.  *Supra*.  It is reasonable to infer that a policy of discouraging off-site medical referrals even when they are medically indicated would lead Ms. Pisney not to make such a referral for Ms. Boyer, which caused Ms. Boyer's death.

In all events Plaintiff is not required to plead causation in any great level of detail. *See, e.g.*, *Whitlock v. Brueggemann*, 682 F.3d 567, 582-83 (7th Cir. 2012) (endorsing pleadings of but-for and proximate causation in general terms). "Whether or not the defendant's conduct proximately caused the plaintiff's injury ordinarily is a question for the finder of fact to decide; only rarely are the facts so clear that the court can resolve the issue as a matter of law." *Palay v.*

*United States*, 349 F.3d 418, 432–33 (7th Cir. 2003). Even at summary judgment, "[p]roximate cause is a question to be decided by a jury" unless the plaintiff offers "no evidence" in support. *Gayton v. McCoy*, 593 F.3d 610, 624 (7th Cir. 2010). The complaint pleads causation.

*    *    *

The defendants are simply wrong that a *Monell* (or supervisor liability) plaintiff must identify other specific incidents in the complaint. Rule 8 does not require that; it requires allegations that describe the alleged policy in enough detail for the defendant to understand the problem being alleged. Plaintiff's complaint does this. Under Rule 8 that is enough, and while Plaintiff has also provided examples of the policy in action which are discussed herein, the Court should deny the defendants' motions at this threshold.

### D.    Plaintiff has identified multiple specific instances of misconduct that support his *Monell* allegations.

In addition to describing the municipal defendants' policies and how they injured Ms. Boyer, the complaint describes multiple instances in which those impacted other people in jails, both at Monroe County itself and at other jails serviced by ACH. *Supra*. The defendants raise a host of arguments that the Court should disregard these examples. Those arguments, which Plaintiff reviews herein, either misstate the facts or misunderstand the law.

### 1.    The comparator incidents identified in the complaint are plausibly the result of a policy that discourages referrals to outside medical care.

The defendants claim that the numerous medical incidents identified in the complaint are not sufficiently similar to Ms. Boyer's case. *See* ECF 108 at 14-15; ECF 109 at 6-9. They emphasize that only a few are related to heart attacks or chest pain, and as such the incidents are tied together only by "generic assertions that the defendants violated . . . a duty to provide 'adequate medical care,'" *See* ECF 108 at 14-15; ECF 109 at 6-9, which fails to "'articulate

what the problem is'" with the defendants' policies.  *Id.* at 108-09 (quoting *Terry*, 2018 WL 2567721 at \*8).  *Accord* ECF 109 at 7 (arguing that Plaintiff's complaint has merely "inventori[ed] alleged 'bad outcomes' as a substitute for identifying an unconstitutional practice").  Plaintiff, they say, offers nothing more than a "scattershot recitation of anecdotal cases" that do not make out a cognizable policy under *Monell*.  *See* ECF 106 at 8.

This argument, again, ignores the policy Plaintiff has alleged, which is to discourage referrals to outside medical care.  When such an alleged policy is at issue, the particular medical condition it affects is irrelevant.  In *Bost*, 2022 WL 4290528, a woman had suffered a stroke while detained at a jail, and the plaintiff claimed she died because Wexford, the jail's medical contractor, had a policy discouraging ER visits for jail detainees.  The court rejected Wexford's objection "that only a few of the [example] cases . . . involve . . . neurological events," because "the issue here is whether Wexford had a pattern and practice of failing promptly to procure off-site emergency care for an inmate whose symptoms suggested such care was medically necessary. For this claim, it makes no difference whether the patient's need for emergency care was the result of a heart attack, a stroke, or some other medical condition." *Id.* at \*53.

Similarly, in *Davies v. Israel*, 342 F. Supp. 3d 1302 (S.D. Fla. 2018), a man who had been detained at a jail alleged that employees of Armor, the jail's medical contractor, delayed transferring him to an emergency room after he suffered a head injury. 342 F. Supp. 3d at 1306. Pursuant to *Monell*, he charged that Armor "consistently declines to provide immediate emergency medical care . . . and instead permits inmates to die or suffer serious injuries," and he identified examples of failures to secure emergency care for *other* medical conditions, such as "sepsis, pneumonia, starvation, [and] hemorrhaging."  *Id.* at 1307.  The court rejected Armor's argument that these conditions were not sufficiently similar to the head injury at issue, because

the other cases identified by the plaintiff supported the plaintiff's claim that Armor "habitually delays taking inmates who require emergency medical care to the hospital for treatment," which was the relevant *Monell* issue in the case. *Id.* at 1310.

In this case, Plaintiff has made allegations closely analogous to those in *Bost* and *Davies*. He alleges that the defendants have instituted practices that discourage the provision of outside medical care to jail detainees. Just as in *Bost* and *Davies*, it does not matter whether the condition at issue was chest pain or something else; the claim is that, whatever the condition, the detainee should have received outside medical care but did not. The complaint thus identifies a problem (discouraging provision of outside medical care) and identifies examples of that problem (instances in which outside medical care was indicated but not provided). That is enough at the pleading stage, but the complaint has gone even further, setting out the motivations that ACH and Monroe County have to avoid providing outside medical care, even when a person needs it. The complaint's allegations easily survive under Rule 12(b)(6).

Between ACH's national practices and the care delivered at the Monroe County jail, Plaintiff's complaint identifies 39 cases–19 at Monroe County and 20 at other, ACH facilities. The defendants argue that 7 of these cases do not plausibly identify inadequate medical care. *See* ECF 106 at 13-15; ECF 108 at 20-21 (challenging Monroe County cases EB, JH2, TM, AS, CX, EO, and RD; not challenging DD, NH, ML, EC, KH, JH1, JM, MS, AD, CC, YD, RK; not challenging any of the "national" cases, *see* ECF 102 ¶¶ 40-75). As an initial matter, the defendants leave unchallenged more than enough similar cases for purposes of *Monell*, even if every one of the challenged cases were struck from consideration. *Cf. Est. of Robinson ex rel. Irwin v. City of Madison*, *Wisc.*, No. 15-cv-502-JDP, 2017 WL 564682, at *23 (W.D. Wis. Feb. 13, 2017) ("[T]he complained-of conduct must have occurred more than once, if not more than

three times." (citing *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010)).

The defendants claim generally that Plaintiff should have identified even more cases, *see* ECF

106 at 8, but they do not identify any decisions saying either 12 cases (at the jail) or an additional

20 (at other ACH facilities) are insufficient for purposes of *Monell*. That is because *Monell* does

not require it. *See Cohn v. Wexford Health Sources, Inc.*, No. 3:19-CV-00376-NJR, 2022 WL

2802304, at *7 (S.D. Ill. July 18, 2022) ("evidence that Wexford disrupted [prisoner's] lithium

prescription on *more than three occasions*" sufficient to state a *Monell* claim against Wexford,

which is contracted to provide medical care across the entire Illinois Department of Corrections).

The defendants' focus on outcomes is also misplaced. The relevant question is whether

the defendants have a practice of indifference to the medical needs of the people in their care, not

whether each of those persons suffered a catastrophic medical injury while they were at the jail.

*Cf. Bradford v. City of Chicago*, No. 16-cv-1663, 2017 WL 2080391, at *5 (N.D. Ill. May 15,

2017) ("[A]n absence of similar injuries may 'simply show that [the jail's healthcare contractor]

was fortunate, not that it wasn't deliberately indifferent.'" (quoting *Woodward v. Correctional*

*Medical Services of Ill., Inc.*, 368 F.3d 917 (7th Cir. 2004) (brackets original)). *Accord J.K.J. v.*

*Polk Cnty.*, 960 F.3d 367, 383 (7th Cir. 2020) (*en banc*) (citing *Woodward* to hold that in

widespread practice claim, the fact that other misconduct by municipal employees did not result

in bad outcome "is no liability shield; it was good fortune."). Thus the fact that not all the people

identified in the example cases ultimately had catastrophic medical outcomes does not lessen

their value as examples.

In all events, the defendants' challenges to the cases are incorrect. At the pleading stage,

the information regarding each of the challenged patients is sufficient.

- EB (ECF 102 ¶ 76). The allegations permit the plausible inference that EB's chest pain
  called for a referral to the hospital to ensure EB was not in danger. The defendants focus

on the outcome, but that is not the standard–failing to ensure EB's chest pain was not caused by a heart problem needlessly placed EB in danger.

- JH2 (ECF 102 ¶ 87).  JH was denied a prescribed medication, indicating a desire to reduce outside costs, here pharmacy costs.

- TM (ECF 102 ¶ 82).  As with EB, the allegations with respect to ™ permit the plausible inference that TM's chest pain called for a referral to the hospital to ensure TM was not in danger.  The defendants focus on the outcome, but that is not the standard–failing to ensure TM's chest pain was not caused by a heart problem needlessly placed TM in danger.

- AS (ECF 102 ¶ 82)  AS reported chest pain yet was not sent out.  Combined with policies discouraging referral for chest pain, it is plausible that AS was placed at unnecessary risk, which can be explored in discovery.

- CX (ECF 102 ¶ 84).  CX reported chest pain but was not sent out until a guard vouched for his credibility.  He was having a heart attack.  That CX was only sent out after a guard vouched for his credibility; and that the guard knew he *should* vouch for CX's credibility in order to ensure CX received treatment for chest pain, indicate practices in which detainee complaints of chest pain are commonly discounted.

- EO (ECF 102 ¶ 89).  EO complained of tooth pain, which, the complaint explains, "requires prompt evaluation because if the pain is caused by an abscess that is not treated, the infection can spread to other areas of the body and cause septic shock."  Yet he was not referred out to a provider for more than a month, placing him at unnecessary risk.

- RD  (ECF 102 ¶ 93).  RD had a history of heart disease and told staff he was experiencing chest pain, but he was told to rest and drink fluids.  Such treatment of a person with heart disease placed RD at unnecessary risk that should have been addressed with hospital care.

### 2.    The defendants' claim that they did not have actual notice of the actual comparators is irrelevant to *Monell*.

The defendants also argue that they could not have had notice regarding a number of the medical events that the complaint identifies, either because the complaint does not allege that an official complaint was made about this or that medical incident, *see* ECF 108 at 22, or because some of the alleged incidents occurred after Ms. Boyer's death.  *See id*; ECF 106 at 14.  This argument misunderstands the nature of liability under *Monell*'s widespread practice theory.

The defendants' "notice" arguments amount to a claim that in order for an incident to support a *Monell* widespread practice theory, there must be evidence (or here, an allegation) that

24

a municipality's policymaker was notified about that particular incident.  It is certainly true that "[e]vidence of a policymaking official's acquiescence to the unconstitutional practice is sufficient to establish a custom" under a widespread-practice theory.  *Reed v. Wexford Health Sources, Inc.*, No. 18-cv-01182-JPG, 2022 WL 4483940, at *6 (S.D. Ill. Sept. 27, 2022).  But "[i]t is *also* sufficient to present proof that the practice is 'so long standing or widespread' that it would 'support the *inference* that policymaking officials 'must have known about it but failed to stop it.'" *Id.* (quoting *Broaddus v. Wexford Health Sources Inc.*, No. 15-cv-01339, 2018 WL 1565603 (S.D. Ill. Mar. 30, 2018) (emphasis added)); *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 511 (7th Cir. 1993) ("The longstanding or widespread nature of a particular practice would support the inference that policymaking officials must have known about it but failed to stop it." (quotation omitted)).  Where a practice is widespread, "municipal liability can . . . be demonstrated indirectly by showing a series of bad acts and inviting the court to infer from them that the policy making level of government was bound to have noticed what was going on," *Woodward*, 368 F.3d at 927, and that, "by failing to do anything[,] must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers." *Id.*

It is for this reason as well that "[t]o prove a *Monell* claim, post-event evidence . . . . may be admitted to demonstrate that there may be a continuity in municipal policy so that what happens after the event may cast some light on what the policy was prior to the event."  *Gabor v. Dozier*, No. 15-cv-8508, 2021 WL 5882205, at *9 (N.D. Ill. Dec. 13, 2021) (quotation omitted; cleaned up).  "[P]ost-incident evidence is relevant to the *existence* of a custom or policy, from which a plaintiff may argue it was the *moving force* in the alleged unconstitutional violation." *Whitt v. City of St. Louis*, No. 4:18-CV-1294 RLW, 2020 WL 7122615 (E.D. Mo. Dec. 4, 2020), 2020 WL 7122615, at *7 (emphasis original; collecting cases).  Allegations that a challenged

practice is widespread—coming before or after the incident at issue—permits the *inference* that the practice represents the municipality's policy. The "notice" evidence that defendants claim to be missing is not necessary. (The complaint does also make allegations of actual notice, as to ACH, which Plaintiff reviews *infra*.)

### 3. ACH's national practices are relevant to Plaintiff's *Monell* claims.

The complaint identifies numerous incidents of inadequate care at other facilities serviced by ACH. ECF 102 ¶¶ 40, 42, 44, 46, 48, 50, 52, 54, 56, 58, 60, 62, 64, 66, 68, 70, and 72-75. And it alleges that in many of these incidents, ACH was notified of the inadequate care before Ms. Boyer's death. *Id.* ¶¶ 41, 43, 45, 47, 49, 51, 53, 55, 57, 59, 61, 63, 65, 67, 69, and 71. ACH argues these examples are insufficient, but it misunderstands the law.

***First***, ACH suggests that medical incidents at other facilities in the country cannot support a claim against it. ECF 106 at 2, 11. The courts, however, have repeatedly held that the national practices of private healthcare vendors like ACH *are* probative of the vendor's widespread practices under *Monell*. *See, e.g.*, *Shadrick v. Hopkins Cnty., Ky.*, 805 F.3d 724, 744 (6th Cir. 2015) (noting with respect to a *Monell* plaintiff's "argument that a pattern of tortious or unconstitutional conduct . . . existed, evidence about similar incidents of inmate deaths in jail facilities served by [private healthcare vendor] SHP may be relevant to whether SHP acted with deliberate indifference to the medical needs of inmates with whom its nurses came into contact at HCDC [the jail where plaintiff's decedent was housed]."); *Herr v. Armor Corr. Health Servs.*, Inc., No. 6:19-cv-394, 2019 WL 12021672, at *5 (M.D. Fla. Sept. 9, 2019) (holding that alleged incidents of inadequate care by private jail healthcare vendor "around the country" supported a claim that the vendor "has a policy or custom of repeated delayed or denied medical care that directly resulted in the constitutional violation and Mr. Herr's death."). In *Shields v. Prince*

*George's County*, No. 15-cv-1736, 2016 WL 4581327 (D. Md. Sept. 1, 2016), a *Monell* plaintiff

suing healthcare vendor Corizon made "allegations related to previous lawsuits and complaints

regarding Corizon employees in 14 different states." *Id.* *8. Corizon claimed such incidents were

irrelevant as "none of these allegations relate to the facility or even the state at issue in this case,"

*id.* at *9, but *Shields* rejected that argument.  It was of course true, the court explained, that

incidents used to show a widespread practice are usually "tied to the same geographical locale as

the instant allegation."  *Id.*  But "[t]hat was to be expected as . . . most cases applying the *Monell*

framework[] involve local police departments or other municipalities," in which the customs of

one jurisdiction "would have no bearing on establishing a custom or practice" of another.  *Id.*  By

contrast, "Corizon is a company that provides healthcare services to state and county correctional

facilities and jails nationwide.  Thus, its activities in a variety of states can be, and in this case

are, relevant to the issue of custom and policy here."  *Id.* (quotations omitted).

ACH is a national healthcare vendor like Armor and Corizon, *see* ECF 102 ¶¶ 39, 97,

making its practices in other jurisdictions relevant to Plaintiff's *Monell* claims against it in this

case.  And indeed Plaintiff has alleged that ACH's inadequate provision of medical care—both

nationally and at the Monroe County jail—are the result of practices instituted by ACH to reduce

the provision of outside medical care at facilities it services across the country.  *Id.* ¶¶ 96-105;

109-116.  Plaintiff's "national" allegations against ACH are relevant to *Monell*.

**Second**, ACH argues that the various national cases identified in the complaint merely

amount to allegations that complaints were filed against ACH, which cannot form the basis of a

*Monell* claim against it.  *See* ECF 106 at 9.  The complaint, however, alleges that the medical

incidents described in ECF 102 ¶¶ 40, 42, 44, *et seq.* occurred.  ACH's argument regarding the

consideration that should be given to complaints is inapposite.  The complaint *also* alleges that

before Ms. Boyer's death in December 2019, ACH was specifically notified about many of these medical incidents by way of a complaint filed against it. *See* ECF 102 ¶¶ 41, 43, 45, *et seq*. But contrary to ACH's argument, other complaints may form the basis of a widespread practice claim—particularly where, as Plaintiff has alleged here, they were met with indifference by the municipal defendant. *See, e.g.*, *Hoskin v. City of Milwaukee*, 994 F. Supp. 2d 972, 981-82 (E.D. Wis. 2014) (Stadtmueller, J.) (allegations that city had "received numerous complaints of illegal searches prior to the incident in question" supported a *Monell* claim, since "[h]aving received those complaints, the City necessarily had knowledge or notice that aggressive searches were occurring and was deliberately indifferent" in not changing its policies and practices). In each of the cases in which Plaintiff alleges that a complaint was filed against ACH, Plaintiff also alleges that "ACH supervisors took no steps to determine whether the care provided to [the person] was the result of deficiencies in ACH's practices or processes regarding the delivery of medical care." *See* ECF 102 ¶¶ 41, 43, 45, *et seq*. These allegations are in line with the complaints *Hoskin* held are relevant for proving widespread practice claims.

ACH argues the Court should exercise "judicial experience and common sense," and ignore all of these factual allegations. ECF 106 at 10. Its reasons are not convincing. ACH argues the complaint "presume[es] that a settlement constitutes an ACH admission of a constitutional violation," which is "unfounded speculation." *Id.* But the complaint alleges that ACH itself has stated it only settles suits in which it concludes its employees provided inadequate medical care. Tacitly conceding this point, ACH says that it "may settle a case . . . out of concern its employee may have exercised professional discretion erroneously or failed to follow ACH instructions." *Id.* That proposed explanation ignores what the complaint alleges: "ACH supervisors took *no steps* to determine whether the care provided to [to the person] was

the result of deficiencies in ACH's practices or processes regarding the delivery of medical care." *See* ECF 102 ¶¶ 41, 43, 45, *et seq.* What is more, multiple incidents in which personnel committed catastrophic torts in violation of ACH's written instructions suggest the kind of *de facto* policy that *Monell* is designed to capture. The complaints and settlements are relevant.

### 4. Plaintiff has sufficiently pleaded that Monroe County is liable under *Pembaur*.

The complaint alleges, pursuant to *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), that in addition to having a *de facto* policy of providing inadequate healthcare to people detained in its jail, Monroe County is liable because its relevant final decision maker, Capt. Hendrickson, personally endorsed the policy of discouraging the provision of outside care in order to reduce costs, to a level of care below that offered in the outside community. The complaint alleges that Hendrickson was the Captain of the Monroe County Jail. ECF 102 ¶ 9. The complaint alleges that he was responsible for the implementation, oversight, and supervision of policies and practices at the Monroe County Jail, *id.* and was thus Monroe County's final decision maker at the jail for purposes of policies in question. *Id.* ¶ 135.

The complaint alleges that Capt. Hendrickson approved of Ms. Fennigkoh's request to contact Ms. Pisney's supervisor in order to pressure her not to refer people suffering from "elevated blood pressures and or chest pain" to the hospital, specifically in order to save money. *Id.* ¶ 106. And on another occasion, the complaint alleges, Capt. Hendrickson was aware that Ms. Fennigkoh had instructed staff to push back on orders by Ms. Pisney to provide medical attention that might be time-consuming for staff, such as instructions from Ms. Pisney to measure blood pressure every hour. *Id.* ¶ 107. Decisions applying *Pembaur* hold that "'municipal liability may be imposed for a single decision by municipal policymakers' to adopt 'a course of action . . . whether that action is to be taken only once or to be taken repeatedly.'"

*Bradley v. Vill. of Univ. Park, Illinois*, 929 F.3d 875, 884–85 (7th Cir. 2019) (quoting *Pembaur*, 475 U.S. at 480-81)).  And the relevant inquiry is not whether an official "is a policymaker on all matters for the municipality, but whether he is a policymaker "in a particular area, or on a particular issue." *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 676 (7th Cir. 2009).

Here, that issue is the operation of the jail.  The complaint has alleged that Capt. Hendrickson is the jail's administrator and that he is responsible for the implementation, oversight, and supervision of policies and practices at the jail.  ECF 102 ¶ 9.  It is plausible that he is Monroe County's final decision maker for the relevant policy choices at issue in this case. At the motion to dismiss stage, it is the defendant's burden to show otherwise.  *Donald v. City of Chicago*, 539 F. Supp. 3d 912, 919-20 (N.D. Ill. 2021) ("Defendants have the burden on a motion to dismiss to establish . . . that, as a matter of state and local positive law, or as a matter of custom or usage having the force of law, the defendant was not a final policymaker." (quotation omitted; cleaned up)).  Monroe County has made no effort to do this.

Monroe County also focuses on Ms. Fennikoh's conduct in going over Ms. Pisney's head to pressure her to reduce hospital referrals for chest pain, *see* ECF 102 ¶ 106 arguing that Ms. Fennigkoh was merely concerned about "unnecessary" referrals and that "cost" is a legitimate concern in the prison setting.  ECF 108 at 15, 24.  Ms. Pisney, however, is a practitioner.  ACH's contract with Monroe County treats her position as interchangeable with that of a physician.[2] Ms. Fennigkoh is a nurse, charged with carrying out a practitioner's medical orders, not with second-guessing them.  In this context, Ms. Fennigkoh's claim that Ms. Pisney's referrals were "unnecessary" can plausibly read as a pretext to impose cost controls rather than the result of a

---

[2]  Plaintiff offers this information pursuant to *Geinosky v. City of Chicago*, 675 F.3d 743 (7th Cir. 2012), which noted that a plaintiff responding to Rule 12 motions may submit information that "elaborate[s] on his factual allegations so long as the new elaborations are consistent with the pleadings." *Id*. at 745 n.1.

medical disagreement. Indeed she admits as much when stating medical care in jails is more sensitive to costs than would be acceptable in the community. ECF 102 ¶ 106. And "[a]lthough . . . costs may be, in appropriate circumstances, permissible factors for correctional systems to consider in making treatment decisions, the Constitution is violated when they are considered to the exclusion of reasonable medical judgment about inmate health." *Roe v. Elyea*, 631 F.3d 843, 863 (7th Cir. 2011). The complaint permits the inference that Ms. Fennigkoh was not making judgments about inmate health but rather was attempting to pressure the jail's medical practitioner to cut down on costs, even when the practitioner had made a medical judgment that certain people required treatment at the hospital rather than the cheaper methods identified by Ms. Fennigkoh. And it is plausible–more than plausible, unavoidable–that a jail administrator like Capt. Hendrickson appreciated this difference. The complaint states a claim under *Pembaur*.

### 5.     Plaintiff has pleaded a claim for conspiracy.

The complaint charges Fennigkoh, Pisney, Hendrickson, ACH, and Monroe County with conspiracy. *See* ECF 102 ¶ 108. The defendants dismiss this as conclusory, *see* ECF 106 at 16; ECF 108 at 25, but Plaintiff's allegations of conspiracy refer specifically to the previous paragraphs, *see* ECF 102 ¶ 108 ("In this way . . . ."), in which the complaint lays out both the financial arrangements and incentives between ACH and Monroe County, and Ms. Fennigkoh's and Capt. Hendrickson's *specific* agreement to pressure Ms. Pisney to reduce medical care at and referrals from the jail in order to cut down on costs, rather than for medical reasons. *Id.* ¶¶ 107-08. Ms. Boyer's death permits the plausible inference that Ms. Pisney heeded their call.

### CONCLUSION

For the foregoing reasons the defendants' motions to dismiss should be denied in  its entirety.

Dated: October 21, 2022                     Respectfully submitted,

                                            By: _*Stephen H. Weil*_

                                            Steven A. Art
                                            Arthur Loevy *admitted pro hac vice*
                                            Stephen H. Weil *admitted pro hac vice*
                                            Loevy & Loevy
                                            311 N. Aberdeen Street
                                            Chicago, IL 60607
                                            312-243-5900
                                            weil@loevy.com