IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

GREGORY BOYER, as administrator of the
Estate of Christine Boyer, and on his own
behalf,

Plaintiff,

v.

ADVANCED CORRECTIONAL HEALTHCARE,
INC., LISA PISNEY, AMBER FENNIGKOH, STAN
HENDRICKSON, DANIELLE WARREN, SHASTA
PARKER, AND MONROE COUNTY, WISCONSIN,

Defendants.

OPINION and ORDER

20-cv-1123-jdp

---

GREGORY BOYER, as administrator of the
Estate of Christine Boyer, and on his own
behalf,

Plaintiff,

v.

USA MEDICAL & PSYCHOLOGICAL STAFFING,
NORMAN JOHNSON, TRAVIS SCHAMBER,
WESLEY HARMSTON, AND JILLIAN BRESNAHAN,

Defendants.

OPINION and ORDER

22-cv-723-jdp

---

Christine Boyer had a history of congestive heart failure and high blood pressure, for which she took numerous medications. After a day in the Monroe County jail futilely asking for her medications, she suffered a heart attack in the jail and died at the age of 41. Her husband, plaintiff Gregory Boyer, filed these two closely related lawsuits on his own behalf and as the administrator of Christine's estate.

Boyer contends that Christine's death was not an unavoidable and isolated incident, but the result of deliberate indifference to Christine's health needs and unconstitutional

policies of the jail and its contracted medical service providers. Defendants fall into three groups. I'll refer to the first group as the ACH defendants: Advanced Correctional Healthcare, Inc., and nurses Lisa Pisney and Amber Fennigkoh. The second group is the county defendants: Stan Hendrickson, Danielle Warren, and Shasta Parker. The third is the USA Medical defendants: USA Medical & Psychological Staffing (ACH's subsidiary and subcontractor), and its shareholders.

Several matters are before the court.

First, for efficiency, I will sua sponte consolidate the cases for all purposes and put them on a single schedule.

Second, defendants move to dismiss: (1) Boyer's *Monell* claims; (2) Boyer's constitutional claim against Henrickson in his individual capacity; and (3) Boyer's state-law claims against the USA Medical defendants. I'll deny the motions to dismiss for the most part, because Boyer has alleged factually plausible claims that defendants have maintained unconstitutional policies that pressure individual health care providers to provide cheap and inferior health care. I will dismiss the individual capacity claim against Henrickson, because Boyer doesn't allege that he was personally involved in Christine's care.

Third, Boyer appeals a discovery order by Magistrate Judge Crocker, which granted ACH's motion to quash subpoenas seeking certain litigation documents and denied Boyer's motion to compel ACH's settlement agreements. I'll set aside Judge Crocker's ruling and allow Boyer to pursue the litigation documents and settlement agreements, because those documents are reasonably likely to be relevant to Boyer's *Monell* claims.

ALLEGATIONS OF FACT

In considering a motion to dismiss under Rule 12(b)(6), the court accepts all factual allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). The court draws the following facts from Boyer's complaints in both cases. The operative pleading in the '1123 case is the third amended complaint, Dkt. 102. The complaint in the '723 case is nearly identical, except that it adds allegations about USA Medical's corporate relationship to ACH. Dkt. 1.

**A. Background**

Captain Stan Hendrickson oversees the Monroe County jail and implements its policies and practices. ACH is a private company that contracts to provide healthcare to jail detainees, including detainees of the Monroe County jail.

ACH outsources or subcontracts medical services on all its jail contracts to its subsidiary, USA Medical. ACH exercises control over the manner in which USA Medical and its employees and officers perform their medical duties. ACH, through USA Medical, employed Amber Fennigkoh, a registered nurse, and Lisa Pisney, a nurse practitioner, at the Monroe County jail.

Boyer alleges that ACH's deficient healthcare practices, which USA Medical has adopted, caused his wife's death and the deaths or injuries of other incarcerated individuals throughout the United States during the time period relevant to this lawsuit. He also alleges that the county and Hendrickson adopted these policies and have their own policies and practices that denied Christine and other detainees adequate medical care for serious medical conditions. Additional factual allegations regarding the specific policies and practices will be discussed in conjunction with the *Monell* claims.

3

**B.  Christine Boyer's death**

Christine Boyer was booked into the Monroe County jail in the evening of Saturday, December 21, 2019. At booking, she told jail staff that she suffered from congestive heart failure and high blood pressure and took numerous medications for these conditions. Christine did not have her medications with her.

The arresting officer told Fennigkoh that Christine had a long history of medical conditions. But Fennigkoh's shift was ending, so she told jail staff to call Pisney, who was working off-site. Pisney made no effort to identify or obtain Christine's medications. Instead, she instructed jail staff to wait until Monday to contact Christine's pharmacy.

On Sunday, Christine developed shortness of breath and extremely high blood pressure. The jail did not provide nurses on Sundays. But Fennigkoh was at the jail that afternoon on special assignment, so jail staff told Fennigkoh about Christine's condition. Fennigkoh made no effort to contact Christine's pharmacist or physician and did not send Christine to the hospital for an evaluation. Instead, Fennigkoh instructed jail staff to contact Pisney. Jail staff did not contact Pisney until four hours later.

Around 8:00 p.m., Christine alerted jail staff that she had constant, stabbing chest pain and pain in her left shoulder, that she was short of breath, and that she was nauseated and dizzy—all signs of a potential heart attack. Christine reiterated that she had congestive heart failure and high blood pressure, and she identified multiple, specific medications for those conditions that she was prescribed but was not receiving. She told jail staff that when she had previously experienced these symptoms, she needed emergency treatment because she was in imminent danger of a heart attack. Jail staff did not take Christine to the emergency room.

Instead, they filled out a pre-printed "chest pain" report and contacted Pisney, who told them to give Christine aspirin. Christine suffered a fatal heart attack a few hours later.

## ANALYSIS

### A. Consolidation

Boyer has filed two nearly identical lawsuits. Case no. 20-cv-1123 alleges that ACH employed the nurses involved in his wife's care at the Monroe County jail. The ACH defendants denied those allegations and alleged that it was USA Medical who employed Fennigkoh and Pisney.

Boyer sought information on the relationship between ACH and USA Medical. Boyer now contends that USA Medical and its shareholders also may be liable for Christine's death. *See* '1123 case, Dkt. 121. So in December 2022, Boyer sought leave to amend his complaint a fourth time to add USA Medical and its shareholders as defendants. *Id.* When Boyer learned that the ACH defendants planned to oppose the motion to amend, he withdrew his motion and filed a new lawsuit against the USA Medical defendants to avoid running afoul of statute of limitations. '1123 case, Dkt 123 (motion for leave to amend); '723 case, Dkt. 1.

Boyer confirms that the complaint in his second lawsuit is identical to the third amended complaint in his first lawsuit, except for additional allegations regarding ACH's relationship to the USA Medical defendants. '723 case, Dkt. 17, at 1.

A court may order consolidation on its own motion under Federal Rule of Civil Procedure 42(a), and if need be, over the parties' objections. *Disher v. Citigroup Glob. Markets, Inc.*, 487 F. Supp. 2d 1009, 1013-14 (S.D. Ill. 2007) (citing, *e.g.*, *Connecticut Gen. Life Ins. Co. v. Sun Life Assur. Co. of Canada*, 210 F.3d 771, 774 (7th Cir. 2000)).

Because the '1123 case and the '723 case involve the same common questions of law and fact, and neither case has proceeded beyond the initial discovery stage, the court will consolidate them for all purposes. The parties should file all future submissions in case no. 20-cv-1123, but each submission must bear both case captions. The pretrial schedule and trial set in case no. 22-cv-723 will apply to the consolidated cases. '723 case, Dkt. 21.

The ACH defendants must, by June 30, 2023, confirm to the court that they are available for trial the week of September 9, 2024. If they are not, their filing must explain why.

## B. Motions to dismiss

Boyer brings constitutional claims for inadequate medical care under 42 U.S.C. § 1983 and state-law claims for medical malpractice, survival, wrongful death, and intentional and negligent infliction of emotional distress. On a motion to dismiss, the question is whether Boyer provided defendants with fair notice of his claims and alleged facts plausibly suggesting that he is entitled to relief. *McCray v. Wilkie*, 966 F.3d 616, 620 (7th Cir. 2020). Defendants have moved to dismiss the following claims: (1) the *Monell* claims against ACH, USA Medical, and the county; (2) the § 1983 individual capacity claim against Hendrickson; and (3) the state law claims against the USA Medical defendants.

### 1. *Monell* claims

#### a. Legal standard

Because I take Boyer to be saying that his wife was a pretrial detainee during the events in question and not a convicted prisoner, the medical care claims fall under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Kingsley v. Hendrickson*, 576 U.S. 389, 396-400 (2015). To succeed on a Fourteenth Amendment claim of inadequate medical care on behalf of his wife, Boyer must show four things: (1) he had a serious

medical need; (2) defendants made an intentional decision regarding Christine's medical care; (3) defendants' actions were objectively unreasonable; and (4) defendants' actions caused Christine's death. *Cirves v. Syed*, No. 19-cv-725-jdp, 2022 WL 7458760, at *3 (W.D. Wis. Oct. 13, 2022).

Municipalities and private corporations providing essential government services can be liable under § 1983 if the constitutional violation was caused by: (1) the enforcement of an express policy; (2) a widespread practice that is so permanent and well-settled as to constitute a custom or policy (which is referred to as a "*de facto* policy"); (3) an official with final policymaking authority; (4) a conscious decision not to take action; or (5) a failure to train employees that amounts to deliberate indifference to constitutional violations committed by those employees. *See Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (citations omitted); *Helbachs Cafe, LLC v. City of Madison*, 571 F. Supp. 3d 999, 1008 (W.D. Wis. 2021), *aff'd*, 46 F.4th 525 (7th Cir. 2022) (citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)). Boyer seeks to hold defendants liable under the widespread practice, failure to train, and policymaker decision theories of liability. (Boyer has also identified one written policy implemented by the county. But the parties discuss this policy together with their discussion of the *de facto* policies, so the court will do the same.)

To prevail on his *Monell* claims on summary judgment or at trial, Boyer will have to prove: (1) action or inaction by defendants that can be fairly described as defendants' custom or policy; (2) notice to defendants that their conduct would lead to a constitutional violation; and (3) a direct causal connection between the defendants' policy and the constitutional injury. *Calderone v. City of Chicago*, 979 F.3d 1156, 1163 (7th Cir. 2020). At the pleading stage, the allegations in the complaint must plausibly suggest that a municipal or corporate policy or

custom, rather than individual acts of the entities' employees, caused the constitutional injury. *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc); *see also Dean*, 18 F.4th at 235 (municipal action must be "moving force" behind federal-rights violation).

There is no heightened pleading standard for *Monell* claims. *Leatherman v. Tarrant Cnty. Narcotics Intel. and Coordination Unit*, 507 U.S. 163, 164 (1993); *White v. City of Chicago*, 829 F.3d 837, 843-44 (7th Cir. 2016). But the Seventh Circuit has recognized that "[t]he required level of factual specificity rises with the complexity of the claim." *McCauley v. City of Chicago*, 671 F.3d 611, 616-17 (7th Cir. 2011) (citation omitted).

### b. Alleged policies

Boyer's *Monell* claims are based primarily on alleged *de facto* policies regarding inmate medical care that the ACH and USA Medical defendants, Monroe County, and Hendrickson agreed to implement. He identifies the following widespread practices as a cause of his wife's death:

(1)   ACH uses a "volume business model" in which it underbids rivals by cutting back on referrals of sick detainees to outside care providers.

(2)   ACH trains all of its new employees, and the correctional staff at the facilities it services, to discount the medical concerns of jail detainees.

(3)   ACH pressures its medical practitioners to reduce care, medications, or testing that requires payment to outside medical providers, even when such treatment is medically necessary.

(4)   ACH pressures its practitioners to delay care and medication in hopes the detainee is released from the jail before costs are incurred.

(5)   ACH identifies detainees with medical conditions that are expensive to treat and encourages the jail to transfer or discharge them to avoid medical costs.

(6)   ACH avoids discovering problems with delivery of care by not tracking deaths or conducting mortality reviews following a death or catastrophic event, as recommended by National Commission on Correctional Healthcare.

(7)   ACH offers insurance coverage to indemnify jails in the event of a lawsuit for inadequate medical care.

(8)   The county and Hendrickson do not employ medical staff at the jail on weekends, so no in-person medical evaluations are provided during those periods, even for emergent conditions.

(9)   The county and Hendrickson enforce a written policy that requires jail staff to call an off-site nurse employed by ACH for serious medical conditions instead of referring the detainee to the emergency room across the street.

(10)  The county and Hendrickson fail to train jail staff to identify emergent conditions and seek outside medical help immediately.

To support his contention that these practices were so permanent and well-settled as to constitute *de facto* policies, Boyer has identified 20 settled lawsuits involving incidents that occurred in various facilities that ACH serviced around the country between 2013 and 2020. *See* Dkt. 102, at ¶¶ 40-75. In each of those cases, the detainee was seriously injured or died, allegedly because they received only limited treatment and were not referred to outside care. Boyer also identifies 19 incidents that occurred at the Monroe County jail between 2015 and 2021, in which the detainee allegedly did not receive adequate medical care. *Id.*, at ¶¶ 76-95.

### c.  Defendants' arguments

Defendants make several arguments that can be grouped in two categories: (1) Boyer's allegations of *de facto* policies are conclusory, speculative, and not plausibly linked to Christine's death; and (2) the other incidents that Boyer identifies are not sufficiently similar to plausibly suggest any *de facto* policy resulting in unconstitutional conduct. The county defendants also raise a few specific arguments with respect to the failure to train and policymaker theories of liability. I first will address the arguments regarding the *de facto* policies and then briefly discuss the other theories of liability.

i.   **Boyer's allegations are conclusory or speculative**

Defendants argue that Boyer's vague allegations of defendants' cost-cutting measures and ACH's business model are mere speculation. But Boyer has provided specific examples with sufficient factual details.

Boyer alleges that ACH's CEO has explained to potential customers that ACH keeps costs down by reducing hospital visits. The ACH defendants attempt to dispute this allegation by pointing to ACH's contract with Monroe County, which they say shows that ACH does not profit by refusing medical care to inmates. But defendants' argument relies on documents not in the record and outside the pleadings. Resolution of this type of factual issue is not appropriate on a motion to dismiss.

Boyer also alleges that Fennigkoh and ACH's regional supervisor told Monroe County jail staff to push back on instructions from practitioners that would impose additional duties, such as measuring blood pressure every hour. He says that Hendrickson and other jail administrators were aware of these communications and approved them to save money.

Boyer further alleges that even though Fennigkoh is a nurse, she emailed Hendrickson in July 2019, to express concern that the nurse practitioner, Pisney, sent detainees to the emergency room too quickly.[1] Specifically, Fennigkoh wrote that "we have several occurrences where patients have had elevated blood pressures/and or chest pain, instead of providing a medication to attempt to lower the blood pressure or help with the chest pain we have sent

---

[1] The copy of an email submitted by the county defendants, Dkt. 108-1, shows that Boyer incorrectly identified the year of the email communications as 2015 in his third amended complaint, case '1123, Dkt. 102, at ¶ 106. The court may consider the email because the email is specifically referred to in the complaint and is central to Boyer's claim. *See Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012).

them into the ER." Dkt. 102, at ¶ 106. She explained that Pisney needed to learn to be more "cost effective as correctional healthcare does focus a bit more on cost than traditional hospital care," *id.*, and obtained Hendrickson's permission to complain to Pisney's supervisor at ACH—USA Medical defendant Travis Schamber.[2] The county defendants argue that Fennigkoh merely was expressing concern for inmates who may incur higher costs for emergency room visits when less expensive treatment may be sufficient. But reading Fennigkoh's statements to jail and corporate administrators in the most favorable light to Boyer, they plausibly suggest that ACH and USA Medical pressures its staff to cut back on emergency room referrals to save costs and that the county is aware of and approves this practice.

The county defendants point out that the Constitution does not require jails to provide perfect medical care and the minimum is "a function of both objective need and cost." *See Knight v. Wiseman*, 590 F.3d 458, 467 (7th Cir. 2009). But the court in *Knight* discussed this balancing test in the context of a summary judgment decision. Defendants' arguments are premature and are more appropriately addressed after the record has been developed in this case.

Contrary to defendants' contentions, Boyer's allegations tie his wife's death to the cost-saving practices and policies. The allegations are not like those in *Taylor v. Wexford Health Sources, Inc.*, No. 15-cv-5190, 2016 U.S. Dist. LEXIS 76341, at *13-14 (N.D. Ill. June 13, 2016), in which the court held that the plaintiffs' vague and broad "laundry list of ten alleged policies" did not support *Monell* claims in absence of facts allowing inference that policies affected the care plaintiff received. Boyer alleges that when his wife arrived at the jail, the ACH

---

[2] This statement appears to come from a different email around the same time period.

nurses and jail staff discounted her medical concerns and put off identifying and obtaining her heart and blood pressure medications, as their health care training should have led them to do. When Christine started developing significant symptoms of a potential heart attack the next day, there were no medical staff working at the jail to monitor her, per Hendrickson's decision to have no medical staff on site. Instead of seeking emergency help, jail staff contacted two different ACH nurses who took no action, except to order that Christine be given aspirin. These allegations plausibly suggest that the alleged policies constrained or directed the jail staff's response and the nursing care provided by Fennigkoh and Pisney, prevented Christine from receiving the care and emergency intervention to which she was constitutionally entitled, and amounted to a moving force behind her death.

### ii.    Other incidents are irrelevant

The county and USA Medical defendants contend that to state a *de facto* policy claim under *Monell*, Boyer must identify a series of similar constitutional violations that put defendants on notice of a widespread practice of unconstitutional conduct. Most of the decisions defendants cite in support of this contention involve summary judgment or post-trial rulings. Defendants are correct that some case law suggests that a *Monell* plaintiff should allege more than his or her own single experience of an unconstitutional act to survive a motion to dismiss. *See, e.g., Calderone*, 979 F.3d at 1164 (stating that plaintiff would need to identify "a series of constitutional violations" in absence of allegations demonstrating that policy itself was unconstitutional); *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017) (affirming dismissal where plaintiff did not provide examples of other officers taking similar actions or plausibly allege that such examples exist). But context matters. "[T]here is no blanket

requirement that a *Monell* plaintiff must allege multiple instances of wrongdoing." *Jackson v. Vill. of Just.*, No. 17-cv-07739, 2020 WL 1530734, at *4 (N.D. Ill. Mar. 31, 2020).

As Boyer points out, the Seventh Circuit considered this issue in *White*, holding that a plaintiff is not required to identify in his complaint "every other or even one other individual" who was subjected to the same conduct. *White*, 829 F.3d at 844 (relying on *Leatherman* in holding allegations that police officer arrested plaintiff without probable cause using conclusory, pre-printed warrant application was enough to satisfy Rule 8). Since *White*, some courts in this circuit have concluded that a plaintiff must allege more than his own single occurrence, "absent context creating an inference of a widespread policy or custom, as in *White*." *Hutton v. City of Chicago*, No. 20-cv-3997, 2021 WL 809731, at *4 (N.D. Ill. Mar. 3, 2021) (collecting cases). But many others "have declined to grant motions to dismiss that are premised on the argument that the complaint does not contain allegations beyond those relating to the plaintiff." *Mack v. City of Chicago*, No. 19-cv-4001, 2020 WL 7027649, at *5 (N.D. Ill. Nov. 30, 2020) (collecting cases). The court concludes that Boyer has met his pleading burden under either interpretation of *White*. He has identified numerous other incidents and provided context for his policy and practice allegations.

Defendants argue that the lawsuits that ACH settled in other states and the alleged instances of inadequate medical care in the Monroe County jail are nothing more than unrelated anecdotes of alleged "bad medicine" that fail to suggest a pervasive and persistent practice that would have put ACH, USA Medical, or the county on notice of a pattern of unconstitutional conduct. They argue that Boyer is merely speculating about whether the care in these cases fell below a constitutional minimum, and in the case of the other Monroe County jail incidents, whether the detainees suffered any injury as a result. They also point out that

most of the incidents at the jail did not involve cardiac issues, and the few incidents involving chest pain do not identify any misdiagnosis, delayed treatment, or bad result for the detainee. But defendants' focus on the factual differences in these other cases is misplaced, particularly at this stage of the proceedings.

The alleged policies at issue in this case all relate to whether defendants had a pattern and practice of discouraging the provision of off-site emergency care for detainees whose symptoms suggested such care was medically necessary. So it makes no difference whether the inmate's need for outside emergency care or treatment in these other cases was the result of a cardiac issue or some other medical condition, or even if it resulted in a similar injury. *See Bost v. Wexford Health Sources, Inc.*, No. 15-cv-3278, 2022 WL 4290528, at *53 (D. Md. Sept. 16, 2022) (finding similar on summary judgment with respect to factual differences in other medical incidents identified by plaintiff). Each of the ACH lawsuits identified by Boyer involved ACH's alleged failure to refer a detainee with a serious or emergent medical condition for outside care, resulting in a catastrophic outcome for the detainee. Boyer also has identified several detainees at the Monroe County jail who were provided only minimal treatment and not referred for outside care despite an apparent need for further treatment or evaluation.

Whether these incidents are sufficiently similar to each other or the circumstances leading to Christine's death and are otherwise relevant to the alleged policies at issue in this case are not questions to be resolved at the pleading stage. *See Swanson*, 614 F.3d at 404 ("[T]he court will ask itself could these things have happened, not did they happen."). The ACH defendants argue that unlike most plaintiffs at the pleading stage, Boyer has conducted discovery on his *Monell* claims and should have all of the information he needs regarding ACH's

policies and trainings. But defendants cite no support for this exception to the rule against heightened pleading for *Monell* claims.

Defendants also point out that some of the incidents post-dated Christine's death, meaning they could not have notified defendants of any unconstitutional practice relevant to Christine. But the fact that some incidents occurred after Christine's death plausibly suggests "a continuity in municipal policy so that what happens after the event may cast some light on what the policy was prior to the event." *Gabor v. Dozier*, No. 15 C 8508, 2021 WL 5882205, at *9 (N.D. Ill. Dec. 13, 2021) (summary judgment decision discussing relevancy of post-event evidence to *Monell* claim).

In sum, even if some of the incidents identified by Boyer are sufficiently distinct from the facts pertaining to this case, he has alleged more than enough examples to create a plausible inference that defendants have a policy or pattern of discouraging outside medical care. The court also concludes that Boyer has alleged enough details about the medical treatment of his wife, other detainees at the same jail, and the treatment of other detainees in ACH's care across the country to "present a story that holds together" regarding defendants' potential liability for his wife's death. *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010).

### iii.    County was not aware of any failure to train

The county defendants argue that Boyer has not alleged a pattern of prior misconduct stemming from deficient training that would put them on notice of a need for more or different training for jail staff. *See Flores v. City of S. Bend*, 997 F.3d 725, 731 (7th Cir. 2021) ("[F]ailure-to-train (or inadequate-training) liability arises when a municipality adheres to a training program 'that they know or should know has failed to prevent tortious conduct by employees,' thereby demonstrating deliberate indifference to this known risk."). But Boyer clearly alleges

that his wife died because jail staff were not trained to transport detainees with obvious symptoms of acute, life-threatening conditions to the hospital. He alleges that this lack of training was consistent with the ACH/USA Medical business model and cost-saving measures, as well as the jail's written policy requiring jail staff to call off-site nurses instead of transporting detainees to the emergency room across the street. Boyer also has identified other examples of how these practices harmed detainees.

For the same reasons discussed above, Boyer's allegations plausibly suggest that the need for more or different training with respect to transporting detainees with emergent conditions to the hospital was or should have been plainly obvious to the county. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989) ("City policy" may arise "if the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonable be said to have been deliberately indifferent to the need."). No more is required of Boyer at the pleading stage. *See Mack*, 2020 WL 7027649, at **5-6 ("At summary judgment or trial, Plaintiff will have to offer evidence of widespread unlawful practices and [the city's] failure to train jail staff, and demonstrate how those practices and failures caused the alleged wrongdoing in this case. He need not do so at the pleading stage.").

### iv.    Relevant decisions were not by county policymakers

The county defendants argue that Boyer's general allegations that Hendrickson and other individuals had final policymaking authority for jail policies and practices are insufficient to establish *Monell* liability. A municipal official is considered a final policymaker only if he has *final* decision-making authority in a particular area or on a particular issue. *See Helbachs Cafe, LLC v. City of Madison*, 571 F. Supp. 3d 999, 1012 (W.D. Wis. 2021), *aff'd*, 46 F.4th 525 (7th

16

Cir. 2022) (citing *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 676 (7th Cir. 2009)). Whether a particular official has final policymaking authority is a question of state law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). To make this determination, a court may consider: "(1) whether the official is constrained by policies of other officials or legislative bodies; (2) whether the official's decision on the issue in question is subject to meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority." *Helbachs*, 571 F. Supp 3d at 1012.

Defendants say that Hendrickson is a subordinate to the Monroe County Sheriff and that there are no allegations suggesting that Hendrickson's actions were not subject to review by other officials. But the county defendants have not cited Wisconsin law clearly establishing who has final policymaking authority for jail staffing or jail staff response to detainees' medical conditions. This determination is best made at a later stage of the lawsuit. For now, Boyer's allegations that Hendrickson and/or other individuals made final decisions for the jail regarding emergent inmate medical needs are sufficient.

## 2. Individual claim against Hendrickson

Boyer says in his third amended complaint that he is suing Hendrickson in his individual capacity. But a supervisor, such as the jail administrator, cannot be liable for the actions of other jail staff simply because he is a supervisor. *Burks v. Raemisch*, 555 F.3d 592, 593-94 (7th Cir. 2009). A government official is liable only for his or her own misconduct. *Taylor v. Ways*, 999 F.3d 478, 493 (7th Cir. 2021) (citations omitted). As the county defendants point out, Boyer fails to allege that Hendrickson was personally involved in the direct care or treatment of Christine. Boyer has not responded to defendants' argument. So the individual capacity claim against Hendrickson will be dismissed.

### 3.  State-law claims against USA Medical defendants

Boyer brings state law claims against defendants based on the same conduct at issue in his medical care claims. The USA Medical defendants argue that Boyer has failed to state medical malpractice claims against them based on supervisory or respondeat superior liability because none of them are responsible for directing or controlling the actions of the ACH nurses.

Under Wisconsin's doctrine of respondeat superior, an employer is responsible for the negligent conduct of any "servant" acting within the scope of his or her employment. *See Pamperin v. Trinity Mem'l Hosp.*, 144 Wis. 2d 188, 198-99, 423 N.W.2d 848, 852 (1988) (citations omitted); *Est. of Hegarty ex rel. Hegarty v. Beauchaine*, 2001 WI App 300, ¶ 59, 249 Wis. 2d 142, 176, 638 N.W.2d 355, 372. A "servant" is someone "employed to perform service for another" and subject to "the other's control or right to control." *Kashishian v. Port*, 167 Wis.2d 24, 33, 481 N.W.2d 277, 280 (1992).

Boyer has alleged that the USA Medical defendants employed Pisney and Fennigkoh while acting as the alter ego of ACH, which exercises control over the medical duties of all USA Medical employees. He explains in his response brief that he sued the USA Medical defendants to prevent ACH from using a different corporate form to escape liability. At this stage, Boyer's allegations plausibly suggest that USA Medical and its shareholders may have controlled or had the right to control the actions of Pisney and Fennigkoh. Accordingly, the USA Medical defendants' motion to dismiss the medical malpractice claim against them will be denied.

The USA Medical defendants also seek dismissal of Boyer's claims for survival, wrongful death, and intentional and negligent infliction of emotional distress on the ground that Boyer has not stated a § 1983 or medical malpractice claim. Because the court has found that Boyer

has stated both types of claims, it will deny defendants' motion to dismiss these remaining state law claims.

## C.  Objections to magistrate judge's discovery order

On March 28, 2023, Magistrate Judge Crocker issued an order regarding several discovery motions filed by the parties in case no. 20-cv-1123. Dkt. 130. He denied on the merits two of Boyer's attempts to obtain *Monell* discovery concerning ACH's settlement of previous lawsuits involving inmate medical care and denied Boyer's remaining discovery motions without prejudice to renewal after the court ruled on the pending motions to dismiss. Boyer objects to two rulings in that order: (1) granting ACH's motion to quash Boyer's subpoenas to 12 non-party law firms seeking case files related to their representation of ACH in 24 previous lawsuits, *see* Dkts. 66-67; and (2) denying as irrelevant the production of documents reflecting settlements or judgments in 25 previous lawsuits against ACH, *see* Dkt. 65. Dkt. 131.

A magistrate judge's ruling on a non-dispositive issue will be modified or set aside only if it is "clearly erroneous or contrary to law." Fed. R. Civ. P. 72(a). This standard is extremely deferential and will be met only when the reviewing court is "left with the definite and firm conviction that a mistake has been committed." *Pinkston v. Madry*, 440 F.3d 879, 888 (7th Cir. 2006) (citation omitted). For the reasons below, the court concludes that the magistrate judge erred in failing to consider key facts and law supporting Boyer's requests for subpoenas and settlement documents.

### 1.  Case documents

ACH told Boyer that it did not track previous cases involving inmate deaths or serious medical failures of its staff. So Boyer conducted an extensive public records search, identifying

25 lawsuits in which the plaintiffs alleged that ACH provided inadequate medical care similar to that experienced by Christine. Dkt. 75, at 4. Boyer then served a Rule 34 request on ACH for "case documents" in those 25 lawsuits.[3] *Id.* ACH produced some documents but objected to the discovery on numerous grounds, including that it did not have possession, custody, or control over most of those documents. *Id.* So Boyer issued subpoenas seeking case files from 12 non-party law firms that represented ACH in 8 states. Dkt. 67, at 1. ACH moved to quash those subpoenas on behalf of the law firms, arguing that they were disproportionate under Rule 26(b)(1) because they did not seek relevant information and were unduly burdensome. *Id.*

The magistrate judge held that this case discovery was "off the table" because the likelihood of its relevance is "infinitesimal, while the burden of retrieving, reviewing and privilege-checking potentially responsive information would be extraordinarily disproportionate to the paltry value of the information obtained." Dkt. 130, at 3. He characterized the discovery as an effort to obtain information about other ACH lawsuits. The ruling was limited to one paragraph and only generally cited the relevance and proportionality requirements of Rule 26(b)(1).

---

[3] This discovery sought production of:

  a. All documents filed on the court's docket in the case, including all documents filed under seal;
  b. All documents filed with the Court in the case, including all documents filed under seal;
  c. All written discovery requests and written discovery responses;
  d. All documents produced or gathered pursuant in discovery, including subpoenas and expert materials;
  e. All deposition transcripts;
  f. All documents reflecting settlements or judgments in the case, by any party;
  g. All exhibits (including demonstrative exhibits and animations) offered during trial or hearing, or submitted at the to the court for pretrial / motion in limine review; and
  h. All video or audio recordings of depositions.

Boyer argues that he seeks only to gather information about the adequacy of medical care that other detainees received and ACH's knowledge of the same in an effort to show that ACH had a pattern or practice of constitutional violations related to not referring inmates out for emergency care. In its motion to quash, and to a more limited extent in its response to Boyer's appeal, ACH cites the same arguments about isolated incidents of bad medicine and unrelated circumstances that it included in its motion to dismiss Boyer's *Monell* claims. But for the reasons discussed above in conjunction with the motions to dismiss, the court concludes that the case documents from these previous lawsuits may well include information relevant to inadequate medical care similar to that experienced by Christine.

ACH's argument that delving into other medical incidents would result in a number of mini trials also is unpersuasive at this stage of the litigation. Evidence of other incidents is often the only way a plaintiff can prove a pattern of unconstitutional conduct and deliberate indifference. *See Thompson v. City of Chicago*, 722 F.3d 963, 972 (7th Cir. 2013). And as Boyer points out, the subpoenas are the most efficient means of gathering this information.

In any event, the crux of the parties' dispute in this appeal is the magistrate's decision that the subpoenas on balance impose too heavy of a burden on the non-party law firms. The magistrate judge adopted ACH's representations that the law firms would face considerable burden in gathering and reviewing the discovery. But courts typically require that a party objecting to discovery as unduly burdensome make a specific showing of what the burden is. *See, e.g., Heraeus Kulzer, GmbH, v. Biomet, Inc.*, 633 F.3d 591, 598 (7th Cir. 2011) (collecting cases); *Hum. Rts. Def. Ctr. v. Jeffreys*, No. 18-cv-1136, 2022 WL 4386666, at *3 (N.D. Ill. Sept. 22, 2022) (rejecting defendants' burden objection where they did "not offer any specifics or even an estimate of the burden involved in producing discovery related to the unnamed

21

facilities" and observing that there was no "affidavit or declaration explaining the burden"). Neither ACH nor any of the subpoenaed law firms offered such specific evidence.

Moreover, Federal Rule of Civil Procedure 45(d)(B)(3) provides that "the court for the district where compliance is required" has the authority to quash or modify a subpoena that requires disclosure of privileged or protected matter or subjects a person to undue burden. Thus, any specific objections that a subpoenaed law firm has to its subpoena should be brought to the federal district court in its own state. ACH points out that Rule 45(f) provides that the court where compliance is required "may transfer a motion under this rule" to the court issuing the subpoena. But transfer is not inevitable; it is permitted under Rule 45(f) only "if the person subject to the subpoena consents or if the court finds exceptional circumstances." *See also* Rule 45 Comm. Notes, 2013 Amend., Subdiv. (f) ("Transfer is appropriate only if such interests outweigh the interests of the nonparty served with the subpoena in obtaining local resolution of the motion."). To be clear, the court would be happy to hear any dispute about the burdens of compliance, should the responding party or the court in the district of compliance transfer the matter.

Accordingly, the court concludes the quashing of the non-party law firm subpoenas was erroneous and contrary to the Federal Rules of Civil Procedure in this instance.

### 2.  Settlement documents

To resolve the parties' specific dispute about the relevance of the requested settlement documents, the magistrate judge conducted an *in camera* review of 16 settlement agreements produced *ex parte* by ACH. He held that none of them contained anything relevant to Boyer's *Monell* claim and noted that all of the agreements include a non-admission of liability, most have confidentiality clauses, and none recites any facts that would allow a reader to infer or

determine facts that led to the lawsuit and settlement. But Boyer is seeking these documents for other reasons not discussed by the magistrate judge.

Boyer says that ACH represented publicly to law enforcement agencies that: (1) it never settled cases for nuisance value, and never settled cases unless it had concluded that its employees had provided improper medical care; and (2) when it did settle a case, it takes "ownership of what went wrong," makes the plaintiff whole, and goes on to change its practices in light of the problems identified. Dkt. 65, at 4-5. He argues that the settlement agreements are relevant for three reasons: (1) to show incidents that ACH considered to be serious medical failures because it admittedly took ownership of the wrongdoing; (2) to permit Boyer to test the truth of ACH's public statements about why it settles cases and the policy changes it makes in response; and (3) to assess what amount of punitive damages is necessary to induce ACH to actually change its behavior in the future.

The court finds Boyer's asserted grounds for relevance to be well founded. The agreements are relevant to Boyer's claim that ACH knew that Christine's inadequate care was not an isolated accident and acted with indifference by not changing its policies to prevent such incidents from occurring. Even though the contents of the agreements do not contain admissions of liability or detailed facts about the underlying lawsuits, their existence is likely to provide relevant but otherwise hard to obtain information about ACH's knowledge of allegedly unconstitutional care in the facilities it serves, the actions it did or did not take in response, and the amount of punitive damages that may be necessary to induce policy changes.

The ACH defendants argue that Boyer relies on non-specific statement from ACH's website in speculating that ACH must be admitting to substandard care by settling a matter

for a substantial amount. But ACH made detailed statements about its settlement policy for years.

ACH also contends that introduction into evidence of the facts and resolution of two dozen contested matters would result in a series of mini trials. It argues that if the settlements are relevant, it should be allowed to demonstrate its lack of culpability with the thousands of meritless cases that have been filed against it. But the admissibility of this evidence is not at issue; information need not be admissible in evidence to be discoverable. Fed. R. Civ. P. 26(b)(1).

Finally, ACH refers to the confidential nature of the agreements and their general inadmissibility as evidence. Federal Rule of Evidence 408 generally excludes settlement agreements or settlement discussions for the purpose of proving or disproving "the validity or amount of a disputed claim." But "Rule 408 does not require the exclusion of evidence regarding the settlement of a claim different from the one litigated," as in this case. *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 689 (7th Cir. 2005) (citation omitted). It also does not forbid disclosure of settlement information for another purpose, such as proving knowledge and intent and showing a continuing course of conduct. *Id.* So even if Boyer's claims about the reasons behind ACH's settlements are marginal, he is not foreclosed from attempting to develop evidence to support them. *Constar Int'l, Inc. v. Ball Plastic Container Corp.*, No. 05-cv-669, 2006 WL 6021150, at *1 (W.D. Wis. Mar. 27, 2006) (finding same with respect to tortious interference claim).

### 3.  Next steps

The court will set aside the magistrate judge's order denying on the merits Boyer's attempts to obtain settlement discovery and his Rule 45 discovery requests aimed at ACH's

law firms in other lawsuits. The court will grant plaintiff's motion to compel ACH to produce the requested settlement documents and deny ACH's motion to quash the non-party subpoenas. If the parties continue to disagree about the scope of the settlement discovery, after meeting and conferring in good faith to resolve their disputes, they may raise those disputes with the court for a decision by the presiding judge.

ORDER

IT IS ORDERED that:

1. Case nos. 20-cv-1123 and 22-cv-723 are consolidated for all purposes under Federal Rule of Civil Procedure 42(a).

   a. The parties should file all future submissions in case no. 20-cv-1123, but each submission must bear both case captions.

   b. The ACH defendants shall have until June 30, 2023, to inform the court whether they are available for trial the week of September 9, 2024. If they are not available that week, they should explain why in a letter to the court.

2. The motions to dismiss filed by defendants ACH, Lisa Pisney, and Amber Fennigkoh in case no. 20-cv-1123, Dkt. 105; defendants Monroe County and Stan Hendrickson in case no. 20-cv-1123, Dkt. 107; and defendants USA Medical & Psychological Staffing, Norman Johnson, Travis Schamber, Wesley Harmston, and Jillian Bresnahan in case no. 22-cv-723, Dkt. 14, are GRANTED IN PART and DENIED IN PART:

   a. Defendants' motions to dismiss plaintiff Gregory Boyer's *Monell* claims are DENIED.

   b. The county defendants' motion to dismiss the individual capacity claim against defendant Hendrickson is GRANTED. That claim is DISMISSED.

   c. The USA Medical defendants' motion to dismiss Boyer's state law claims against them is DENIED.

3. Plaintiff's objections to the Magistrate Judge's March 28, 2023 order, case no. 20-cv-1123, Dkt. 131, are SUSTAINED.

    a.   The Magistrate Judge's order is SET ASIDE as to plaintiff's request for ACH's settlement agreements and the issuance of subpoenas.

    b.   Boyer's motion to compel ACH to produce settlement documents, Dkt. 65, is GRANTED.

    c.   ACH's motion to quash subpoenas, Dkt. 66, is DENIED.

Entered June 13, 2023.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge