# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| GREGORY BOYER, as Administrator of the Estate of Christine Boyer, and on his own behalf,<br><br>　　　　Plaintiff,<br>　　v.<br><br>ADVANCED CORRECTIONAL HEALTHCARE, INC., LISA PISNEY, AMBER FENNIGKOH, MONROE COUNTY, WISCONSIN, STAN HENDRICKSON, DANIELLE WARREN, SHASTA PARKER, AND DOES 1-3,<br><br>　　　　Defendants. | No. 20-cv-1123-jdp<br><br>**JURY TRIAL DEMANDED** |
| GREGORY BOYER, as Administrator of the Estate of Christine Boyer, and on his own behalf,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>USA MEDICAL & PSYCHOLOGICAL STAFFING, NORMAN JOHNSON, TRAVIS SCHAMBER,WESLEY HARMSTON, AND JILLIAN BRESNAHAN,<br><br>　　　　Defendants. | No. 22-cv-723-jdp |

## THE COUNTY DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S THIRD AMENDED COMPLAINT

1

As and for their answer and affirmative defenses to plaintiff's Third Amended Complaint in Case No. 20-cv-1123 (ECF No. 102),[1] defendants Monroe County,[2] Stan Hendrickson, Danielle Warren, and Shasta Parker (collectively, the "County Defendants"), state as follows:[3]

## INTRODUCTION

1.    Christine Boyer was a 41-year-old woman who suffered from congestive heart failure and high blood pressure. When she was admitted to the Monroe County Jail on a Saturday evening, she told staff there that she took a variety of medications to control these serious conditions. This information was relayed to two members of the medical staff who worked for a private contracting company, Defendant Advanced Correctional Healthcare, Inc. But instead of ensuring that Ms. Boyer had the medicine she needed, the nurses decided that she could go without those medications until after the weekend.

**ANSWER**: The County Defendants admit that Ms. Boyer was a 41-year-old woman and was admitted to the Monroe County Jail (the "Jail") on a Saturday evening. The County Defendants admit that Ms. Boyer vaguely and unclearly told staff that she took some medications, and that information was relayed to medical staff. The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore deny them.

---

[1] Per the Court's June 13, 2023 Order (ECF No. 134), this Answer is being filed in Case No. 20-cv-1123 but also bears the caption of the consolidated Case No. 22-cv-723. The County Defendants are not parties to the latter case, however, and therefore do not file an answer or otherwise respond to the operative complaint in Case No. 22-cv-723.

[2] The original complaint named the Monroe County Sheriff's Office as a defendant. The First Amended Complaint removed the Monroe County Sheriff's Office as a defendant and substituted Monroe County in its place. The Third Amended Complaint does likewise. Accordingly, the Monroe County Sheriff's Office is no longer a party to this lawsuit and does not respond to the Third Amended Complaint.

[3] This pleading restates, in numbered paragraphs, each paragraph in the Third Amended Complaint, followed by the County Defendants' answer to the allegations in each paragraph. Except for the sections entitled "Affirmative Defenses" and "Jury Demand," all headings below are taken from the Third Amended Complaint. The County Defendants are quoting and including the headings and allegations from the Third Amended Complaint solely for the purpose of making their answers clearer to the reader. The County Defendants do not thereby endorse or adopt any of the headings or allegations in the Third Amended Complaint, except as may be expressly stated in the County Defendants' answers below.

2.    The next day, Ms. Boyer's blood pressure went up, and she informed the Jail's staff that she was suffering numerous symptoms of an impending heart attack, including acute chest pain, pain under the left shoulder, shortness of breath, and other similarly serious symptoms. There was a fully functioning hospital with an emergency room across the street. But instead of referring Ms. Boyer there, the two private nurses did virtually nothing, permitting Ms. Boyer access only to an over-the-counter dose of Aspirin. A few hours later, Ms. Boyer suffered a massive heart attack and died.

**ANSWER**: The County Defendants admit that Ms. Boyer reported having pain, that she was prescribed aspirin, and that there is a hospital near the Jail. The County Defendants also admit that Ms. Boyer later died. The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore deny them.

3.    In this action, Ms. Boyer's husband, Greg Boyer, seeks to hold the Defendants in this case accountable for their failure to care for Ms. Boyer and prevent her death.

**ANSWER**: The County Defendants admit upon information and belief that plaintiff was Ms. Boyer's husband and that he has filed this action against the named defendants. Any remaining allegations are denied.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1367.

**ANSWER**: Admitted.

5.    Venue is proper under 28 U.S.C. § 1391(b). On information and belief, one or more Defendants reside in this judicial district, and a substantial portion of the events giving rise to the claims asserted herein occurred within this district.

**ANSWER**: Admitted.

6.    Plaintiff Gregory Boyer is the husband of Christine Boyer and is the duly appointed Administrator of the Estate of Christine Boyer. Christine Boyer's estate was filed in the Probate Division of the Circuit Court of Monroe County.

**ANSWER**: The County Defendants admit on information and belief that plaintiff Gregory Boyer was the husband of Christine Boyer. The County Defendants lack

knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore deny them.

7.      At all times relevant to the events at issue in this case, Christine Boyer, the decedent in this case, was in the custody of Monroe County, which operates the Monroe County Jail.

**ANSWER**: The County Defendants admit that Ms. Boyer was in the custody of the Monroe County Jail for a period of time between December 21 and 23, 2019. Any remaining allegations are denied.

8.      Defendant Advanced Correctional Healthcare, Inc. ("ACH") is a private company that contracted to provide healthcare to detainees of the Monroe County Jail. In this capacity, ACH also employed defendants Pisney and Fennigkoh.

**ANSWER**: The County Defendants admit that Advanced Correctional Healthcare, Inc. ("ACH") is a private company that contracted to provide certain medical services to inmates at the Monroe County Jail. The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding Pisney and Fennigkoh and therefore deny them.

9.      At all times relevant to his involvement in the case, Defendant Captain Stan Hendrickson was the Captain of Monroe County Jail and was responsible for the implementation, oversight, and supervision of policies and practices at Monroe County Jail. Defendant Hendrickson is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Hendrickson was acting under the color of law and within the scope of his employment with Monroe County.

**ANSWER**:  The County Defendants admit that Captain Stan Hendrickson was the Captain of the Monroe County Jail, with certain supervisory responsibilities.  Further, the County Defendants admit that plaintiff purports to proceed against Hendrickson in his individual capacity; however, plaintiff's individual capacity claim against Hendrickson was dismissed by the Court; therefore, Hendrickson is no longer properly a party to this

action. The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore deny them.

10.     At all times relevant to their involvement in the case, Defendant Sgt. Danielle Warren was a correctional sergeant at Monroe County Jail. Defendant Warren is sued here in her individual capacity. At all times relevant to the events at issue in this case, Defendant Warren was working under the color of law and within the scope of her employment with Monroe County.

**ANSWER**: The County Defendants admit that Danielle Warren was a correctional sergeant at the Monroe County Jail and that plaintiff purports to proceed against Warren in her individual capacity. The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore deny them.

11.     At all times relevant to her involvement in the case, Defendant Sgt. Shasta Parker was a correctional sergeant at Monroe County Jail. Defendant Parker is sued here in her individual capacity. At all times relevant to the events at issue in this case, Defendant Parker was acting under the color of law and within the scope of her employment with Monroe County.

**ANSWER**: The County Defendants admit that Shasta Parker was a correctional sergeant at the Monroe County Jail and that plaintiffs purport to proceed against Parker in her individual capacity. The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore deny them.

12.     At all times relevant to her involvement in the case, Defendant Lisa Pisney was the Nurse Practitioner employed by ACH. At all times relevant to the events at issue in this case, Defendant Pisney was acting under the color of law and within the scope of her employment with ACH.

**ANSWER**: The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny them.

13.     At all times relevant to her involvement in the case, Defendant Amber Fennigkoh was a Registered Nurse employed by ACH at the Monroe County Jail. At all

5

times relevant to the events at issue in this case, Defendant Fennigkoh was acting under the color of law and within the scope of her employment with ACH.

**ANSWER**: The County Defendants lack knowledge or information  sufficient to

form a belief as to the truth of the allegations and therefore deny them.

### FACTS

### A. **Ms. Boyer's medical care.**

14.    Christine Boyer was a 41-year-old woman who lived in Tomah, Wisconsin with her husband Greg. She was outgoing and loved road trips. She was an auxiliary in the local Combat Veterans Motorcycle Association and organized charity events for veterans. She also enjoyed hunting, fishing, going to concerts, and was a friend to many.

**ANSWER**: The County Defendants admit that Ms. Boyer was a 41-year-old

woman at the time of the incident. The County Defendants lack knowledge or information

sufficient to form a belief as to the truth of the remaining allegations and therefore deny

them.

15.    On the evening of Saturday, December 21, 2019, Ms. Boyer was arrested and brought to the Monroe County Jail in Sparta, Wisconsin.

**ANSWER**: Admitted.

16.    As Ms. Boyer was being admitted to the Jail, staff at the jail filled out an intake form to assess her medical condition.

**ANSWER**: The County Defendants admit that the Jail staff completed an Intake

Medical Screening Report form. The County Defendants deny any remaining allegations.

17.    Ms. Boyer had suffered from cancer as an infant, and the resulting care and surgeries had led to numerous, serious medical problems. She told the Jail's staff about her medical history. She explained that she had congestive heart failure. She also told them that she had high blood pressure and asthma, and that she was subject to both chemotherapy and radiation.

**ANSWER**: The County Defendants admit that Ms. Boyer told the Monroe County

Jail correctional staff that she had medical issues due to cancer, chemotherapy/radiation,

and congestive heart failure. The County Defendants lack knowledge or information

sufficient to form a belief as to the truth of the remaining allegations and therefore deny them.

18.     She told the staff that she took numerous medications to address her medical conditions, including medications to regulate her blood pressure. She reported that she did not have most of those medications with her. However, Ms. Boyer gave jail staff the name of her pharmacy, her primary care physician, and her local clinic. Her clinic was part of the regional Gundersen health system.

**ANSWER**: The County Defendants admit that Ms. Boyer told Jail staff that she had taken blood pressure medication that day and had some of the medications with her. The County Defendants also admit that Ms. Boyer provided the name of her pharmacy, physician, and local clinic. The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore deny them.

19.     In short, the Jail's staff learned that Ms. Boyer had several very serious medical conditions, that she took numerous medications to address those conditions, and that she did not have those medications with her.

**ANSWER**: Denied.

20.     This information called for immediate medical attention. But nothing was done. Defendant Amber Fennigkoh, who was a registered nurse and worked at the Jail, participated in Ms. Boyer's intake. Ms. Fennigkoh had been told by the arresting officer that Ms. Boyer's situation presented "a medical mess," or words to that effect, and that Ms. Boyer had a long history of medical conditions. Instead of taking action to ensure that Ms. Boyer's obvious health needs were addressed, Ms. Fennigkoh, whose shift was ending, took no meaningful action. She left the Jail, and told the staff to call Defendant Lisa Pisney, an on-call nurse practitioner employed by ACH.

**ANSWER**: The County Defendants admit that Ms. Fennigkoh spoke with Ms. Boyer on the night of December 21-22, 2019. The County Defendants deny that "nothing was done." The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore deny them.

21.     The Jail staff called Ms. Pisney and relayed what they had learned during intake. Ms. Pisney did nothing. She did not instruct Jail staff to ensure that Ms. Boyer had

the medications she needed. She did not contact Ms. Boyer's physician or the Gunderson health system to identify Ms. Boyer's precise medical conditions, her prescriptions, or the risk of going without her medications. And she did not contact a physician to determine whether a person suffering from congestive heart failure and high blood pressure could safely be denied her medications for any period, or what effect abrupt withdrawal from multiple, unknown medications might have on a person with Ms. Boyer's conditions. Instead, she told the Jail's staff to wait until Monday, and then contact Ms. Boyer's pharmacy to see what medications she was taking. Ms. Boyer was admitted to the Jail.

**ANSWER**: The County Defendants admit that Ms. Pisney was contacted and Ms. Boyer was admitted to the Jail. The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore deny them.

22.    It was obvious even to a lay person that Ms. Pisney's instructions were reckless and put Ms. Boyer's life in imminent danger, but the Defendant Does 1-3 and Defendant Danielle Warren, who were on duty, aware of Ms. Boyer's medical condition, and who communicated with Ms. Pisney at the time, failed to intervene to secure appropriate medical care for Ms. Boyer.

**ANSWER**: Denied.

23.    On the following day, Sunday, December 22, Ms. Boyer developed high blood pressure, which remained high all day. She also developed pain and other symptoms indicative of Angina, which indicated the possibility of heart attack and is described below.

**ANSWER**: The County Defendants admit that Ms. Boyer reported experiencing pain on December 22, 2019. The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore deny them.

24.    The Jail did not employ a nurse on Sundays, and instead left care up to non-medical jail staff. Defendant Does 1-3 are Jail staff who "cared" for Ms. Boyer that Sunday.

**ANSWER**: The County Defendants admit that the Jail did not schedule a nurse to be physically present on Sundays, but they deny the remaining allegations in the first sentence of this paragraph. The County Defendants lack knowledge or information

sufficient to form a belief as to the truth of the allegations in the second sentence of this paragraph and therefore deny them.

25.     Does 1-3 were aware that Ms. Boyer was suffering high blood pressure and symptoms of Angina, that she had been designated as having special medical needs, that she had congestive heart failure, and that she did not have her prescribed medications for these serious conditions. But they did not take the necessary action to ensure that Ms. Boyer received prompt medical attention for her emergent symptoms.

**ANSWER**: The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny them.

26.     Finally, at or about 4:00 p.m. on Sunday, Defendant Does 1-3 alerted Ms. Fennigkoh to Ms. Boyer's condition. Ms. Fennigkoh, who happened to be in the Jail on a contract assignment to treat a particular detainee, was made aware that Ms. Boyer had suffered from high blood pressure all day. And from the intake the day before, Ms. Fennigkoh knew both that Ms. Boyer suffered from congestive heart failure, and that she did not have the medications she had been prescribed for this and other serious medical conditions.

**ANSWER**: The County Defendants admit that Ms. Fennigkoh was present at the Jail at or about 4:00 PM on Sunday, December 22, 2019, to assist a different inmate and was made aware that Ms. Boyer reported symptoms of high blood pressure. The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore deny them.

27.     Despite this knowledge, Ms. Fennigkoh did not contact Ms. Boyer's doctor or the Gunderson health system to gather Ms. Boyer's prescription list or to get a list of Ms. Boyer's diagnoses. There was a hospital with a 24/7 emergency room across the street from the Jail, but Ms. Fennigkoh did not instruct the jail staff to send Ms. Boyer out for an evaluation. Instead, Ms. Fennigkoh again told the jail staff to contact Ms. Pisney, the on-call nurse.

**ANSWER**: The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny them, except they admit that there is a hospital near the Jail.

28.     Does 1-3, however, waited four more hours to contact Ms. Pisney. At this point, around 8:00 p.m., they filled out a pre-printed "chest pain" report, which gathered information about Ms. Boyer's conditions for transmission to a practitioner.

**ANSWER**: The County Defendants admit that a form labeled "Chest Pain" was completed. The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore deny them.

29.     The information on the chest pain report was alarming. Ms. Boyer told Jail staff that she suffered from congestive heart failure, heart disease, high blood pressure, and asthma. She told them that she was on multiple heart medications. These included Lisinopril (an ACE inhibitor that works by relaxing blood vessels so blood can flow more easily and is used to treat both high blood pressure and heart failure), Amlodipine (a channel blocker that helps blood flow more easily and is used to treat high blood pressure and heart failure), and Coreg (another drug used to treat both high blood pressure and heart failure)—none of which she had received at the Jail.

**ANSWER**: The County Defendants admit that Ms. Boyer reported a history of congestive heart failure, heart disease, high blood pressure, and asthma. The County Defendants also admit that Ms. Boyer reported she was taking certain medications including Lisinopril and Amlodipine. Answering further, the "Chest Pain" form is a document that speaks for itself. The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore deny them.

30.     Ms. Boyer told Jail staff that the pain had been on and off all day but by the evening, had become constant. She reported that the pain was achy and stabbing, and that it was emanating from underneath her left shoulder and her left breast and rib area. These are signs of Angina, which occurs when the heart muscle is not receiving enough oxygen in the coronary artery blood supply. It is the precursor to a heart attack. She also told them that she had been suffering nausea—another sign of Angina. And she told them that she was short of breath and dizzy—yet more signs of Angina.

**ANSWER**: The County Defendants admit that Ms. Boyer reported information that was recorded on the "Chest Pain" form, which speaks for itself. The County

Defendants lack knowledge or information sufficient to form a belief as to the truth of the

remaining allegations and therefore deny them.

31.    In short, in response to every question asked of her by Jail staff about her chest pain, Ms. Boyer gave an alarming answer indicating that she was in imminent danger of a heart attack. Indeed she told staff that she had experienced these symptoms before, and when that had occurred, she had been treated emergently.

**ANSWER**: Denied.

32.    Even if the lay person does not know of the medical term "Angina" or its precise relationship to a heart attack, it was obvious to a lay person that the symptoms Ms. Boyer was describing indicated an emergent medical condition that required emergency medical attention.

**ANSWER**: Denied.

33.    After completing the pre-printed "chest pain" report, Jail staff contacted Ms. Pisney and relayed the information they had learned.

**ANSWER**: The County Defendants admit that Ms. Pisney was contacted. The

County Defendants lack knowledge or information sufficient to form a belief as to the

truth of the remaining allegations and therefore deny them.

34.    Ms. Pisney knew that chest pain, accompanied by the other symptoms that Ms. Boyer had reported, was an emergent medical issue that required immediate evaluation and treatment by medical staff. Ms. Pisney further knew that Ms. Boyer had been prescribed multiple medications for her heart condition, none of which she had access to since her admission to the Jail.

**ANSWER**: The County Defendants lack knowledge or information sufficient to

form a belief as to the truth of the allegations and therefore deny them.

35.    Despite this knowledge, Ms. Pisney failed to take (or instruct Jail staff to take) any meaningful response to Ms. Boyer's medical emergency. She did not instruct the Jail staff to transport Ms. Boyer to the emergency room across the street from the Jail. Instead, she told them to give Ms. Boyer the cheapest possible "remedy"—an over-the-counter dose of Aspirin—and call back if her vital signs changed.

**ANSWER**: The County Defendants admit that Ms. Pisney ordered that Boyer be

given aspirin and that her vital signs be checked again. The County Defendants lack

knowledge or information sufficient to form a belief as to the truth of the remaining

allegations and therefore deny them.

36.    It was obvious that Ms. Pisney's instructions were incorrect and reckless, but the Defendant Does 1-3 and Defendant Shasta Parker, who were on duty, aware of Ms. Boyer's medical condition, and who communicated with Ms. Pisney at the time, failed to intervene to secure appropriate medical care for Ms. Boyer.

**ANSWER**: Denied.

37.    A few hours later, Ms. Boyer suffered a heart attack. She was transported via helicopter to a regional medical center in LaCrosse, Wisconsin, but could not be revived. She died on December 27, 2019.

**ANSWER**: The County Defendants admit that Ms. Boyer died on December 27,

2019. The County Defendants lack knowledge or information sufficient to form a belief as

to the truth of the remaining allegations and therefore deny them.

38.    Ms. Boyer's serious medical needs were ignored because of the policies and practices of ACH, Monroe County, and Mr. Hendrickson, pursuant to which the serious medical needs of people detained at the Monroe County Jail are routinely ignored.

**ANSWER**: Denied.

### B.  National Practices.

39.    ACH's deficient healthcare practices have injured incarcerated individuals throughout the country during the time period relevant to this lawsuit:

**ANSWER**: No answer is required because this paragraph does not contain any

allegations concerning the County Defendants. Further, the County Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in

this paragraph. To the extent a further response is required, the allegations are denied.

40.    ***Danny Ray Burden.*** Danny Ray Burden informed ACH medical staff in Grant County Jail in Kentucky upon his arrest in 2013 that he was diabetic and needed insulin injections. Medical staff failed to treat him with insulin, and he was sent back to the booking bench. As his booking continued, Mr. Burden began exhibiting extreme signs of the effects of low blood sugar. After much delay, emergency services were called. ACH staff failed to provide Burden with appropriate care while they waited for emergency

services. When emergency services did finally arrive, Burden was in asystole rhythm. He eventually died at a hospital five days later on April 4, 2013.

**ANSWER**: No answer is required because this paragraph does not contain any allegations concerning the County Defendants. Further, the County Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph. To the extent a further response is required, the allegations are denied.

41.   ACH received notice of complaints that Mr. Burden had received inadequate medical care when it was served with a lawsuit captioned *Burden v. Grant County Fiscal Court*, 14-cv-54 (E.D. Ky.) (2014). ACH later settled the lawsuit. ACH advertised for years that it analyzes the medical care at issue in lawsuits filed against it, and that it only settles lawsuits in which it concludes that its employees provided inadequate medical care. Yet ACH supervisors took no steps to determine whether the care provided to Mr. Burden was the result of deficiencies in ACH's practices or practices regarding the delivery of medical care.

**ANSWER**: No answer is required because this paragraph does not contain any allegations concerning the County Defendants. Further, the County Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph. To the extent a further response is required, the allegations are denied.

42.   ***Tanisha Jefferson.*** Tanisha Jefferson died two weeks after her arrest and booking at Madison County Jail in Alabama in October 2013 due to complications related to a bowel obstruction/extreme constipation. Throughout her detention she made multiple complaints of extreme stomach pain and inability to have a bowel movement. Yet despite her increasingly serious symptoms, ACH staff merely prescribed her laxatives and sent her back to her cell. Shortly afterward, she was in extreme pain and passed out in her cell. Rather than contact EMS, officers and ACH staff put her in a wheelchair and brought her to medical for observation. An ambulance was not called until she was unresponsive that evening.

**ANSWER**: No answer is required because this paragraph does not contain any allegations concerning the County Defendants. Further, the County Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph. To the extent a further response is required, the allegations are denied.

43.    ACH received notice of the complaint that Ms. Jefferson had received inadequate medical care when it was served with a lawsuit captioned *Jefferson v. Madison County*, 14-cv-1959 (N.D. Ala.) (2014). ACH later settled the lawsuit. ACH advertised for years that it analyzes the medical care at issue in lawsuits filed against it, and that it only settles lawsuits in which it concludes that its employees provided inadequate medical care. Yet ACH supervisors took no steps to determine whether the care provided to Jefferson was the result of deficiencies in ACH's practices or practices regarding the delivery of medical care.

**ANSWER**: No answer is required because this paragraph does not contain any

allegations concerning the County Defendants. Further, the County Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in

this paragraph. To the extent a further response is required, the allegations are denied.

44.    ***Lance Jones.*** In June 2013, Lance Jones was transferred from Sangamon County Jail in Illinois to St. John's Hospital for experiencing symptoms consistent with a heart attack. Staff provided Mr. Jones with medication while he was in the emergency room. When Mr. Jones was returned to the jail that evening, ACH staff made the judgment that Jones was suffering from heartburn and gave him heartburn medication and antacids. Still, Jones continued to feel discomfort and chest pains following his emergency visit. He was not permitted to see medical staff right away without submitting a request, even though his symptoms were urgent and required immediate attention. After five days, Jones died.

**ANSWER**: No answer is required because this paragraph does not contain any

allegations concerning the County Defendants. Further, the County Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in

this paragraph. To the extent a further response is required, the allegations are denied.

45.    ACH received notice of the complaints that Mr. Jones had received inadequate medical care when it was served with a lawsuit captioned *Quinn v. Sangamon County,* 14-cv-3260 (C.D. Ill.) (2014). ACH later settled the lawsuit. ACH advertised for years that it analyzes the medical care at issue in lawsuits filed against it, and that it only settles lawsuits in which it concludes that its employees provided inadequate medical care. Yet ACH supervisors took no steps to determine whether the care provided to Jones was the result of deficiencies in ACH's practices or processes regarding the delivery of medical care.

**ANSWER**: No answer is required because this paragraph does not contain any

allegations concerning the County Defendants. Further, the County Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in

this paragraph. To the extent a further response is required, the allegations are denied.

46.     ***Scarlette Glover.*** In September 2014, Scarlette Glover was detained at
Howard County Jail in Indiana where ACH provided medical care. Over the next month,
Glover filed multiple medical requests to see a doctor for increasing pain. Medical staff
responded merely by informing Glover that she needed to buy Tylenol from the jail
commissary. Her pain and fever failed to dissipate, yet medical staff still denied her
request to receive medical treatment offsite. ACH staff claimed she was lying about her
symptoms and being over dramatic, over-using the emergency call button in her cell.
Eventually Glover was transferred to the local hospital where she was diagnosed with
acute Leukemia.

__ANSWER__: No answer is required because this paragraph does not contain any

allegations concerning the County Defendants. Further, the County Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in

this paragraph. To the extent a further response is required, the allegations are denied.

47.     ACH received notice of the complaints that Glover had received inadequate
medical care when it was served with a lawsuit captioned *Glover v. Rogers,* 15-cv-734
(S.D. Ind.) (2015). ACH later settled the lawsuit. ACH advertised for years that it analyzes
the medical care at issue in lawsuits filed against it, and that it only settles lawsuits in
which it concludes that its employees provided inadequate medical care. Yet ACH
supervisors took no steps to determine whether the care provided to Glover was the result
of deficiencies in ACH's practices or processes regarding the delivery of medical care.

__ANSWER__: No answer is required because this paragraph does not contain any

allegations concerning the County Defendants. Further, the County Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in

this paragraph. To the extent a further response is required, the allegations are denied.

48.     ***Sentoria McMillon.*** In 2015, Sentoria McMillon was pregnant with a
healthy baby when she was arrested due to missing a prior court date. She was taken to
Cole County Jail in Missouri. During booking, she informed jail staff that she was
pregnant and two weeks away from her due date. During her first few days of detention,
she expressed that she was experiencing abdominal pain and hadn't felt her baby move
since her initial booking. Yet, jail staff did not put in an order for her to see an OB/GYN.
Approximately a week after her initial complaint of abdominal pain, she was released
from jail. When she went to the doctor, she was immediately admitted, and the doctors

induced labor. McMillon had a stillbirth. It was determined that her baby had died a week earlier – coinciding with when she had been complaining to jail staff of abdominal pain.

**ANSWER**: No answer is required because this paragraph does not contain any allegations concerning the County Defendants. Further, the County Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph. To the extent further response is required, the allegations are denied.

49.    ACH received notice of the complaints that McMillon had received inadequate medical care when it was served with a lawsuit captioned *McMillon v. Cole County,* 15-cv-4277 (W.D. Mo.) (2015). ACH later settled the lawsuit. ACH advertised for years that it analyzes the medical care at issue in lawsuits filed against it, and that it only settles lawsuits in which it concludes that its employees provided inadequate medical care. Yet ACH supervisors took no steps to determine whether the care provided to McMillon was the result of deficiencies in ACH's practices or processes regarding the delivery of medical care.

**ANSWER**: No answer is required because this paragraph does not contain any allegations concerning the County Defendants. Further, the County Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph. To the extent a further response is required, the allegations are denied.

50.    ***Whitney Foster.*** During the time Whitney was arrested in 2014, she had been receiving treatment at a methadone clinic (80 mg of methadone a day). Staff at the Madison County Jail in Alabama had noted in her records that she was taking methadone, but there ACH staff did not take the time to reach out to the clinic about her treatment status. During her detention, Whitney started exhibiting extreme signs of withdrawal. Despite these serious symptoms, ACH staff only provided her limited treatment and didn't refer her out to outside care. By the time Whitney was sent to offsite care she was blind and partially paralyzed due to multiple minor strokes and seizures. She was diagnosed with an irreversible case of PRES (posterior reversible encephalopathy syndrome).

**ANSWER**: No answer is required because this paragraph does not contain any allegations concerning the County Defendants. Further, the County Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph. To the extent a further response is required, the allegations are denied.

51.     ACH received notice of the complaints that Foster had received inadequate medical care when it was served with a lawsuit captioned *Foster v. Advanced Correctional Healthcare, Inc.,* 16-cv-521 (N.D. Ala.) (2016). ACH later settled the lawsuit. ACH advertised for years that it analyzes the medical care at issue in lawsuits filed against it, and that it only settles lawsuits in which it concludes that its employees provided inadequate medical care. Yet ACH supervisors took no steps to determine whether the care provided to Foster was the result of deficiencies in ACH's practices or processes regarding the delivery of medical care.

**ANSWER**: No answer is required because this paragraph does not contain any

allegations concerning the County Defendants. Further, the County Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in

this paragraph. To the extent a further response is required, the allegations are denied.

52.     ***Tammy Perez.*** From September 28, 2015, through October 1, 2015, Tammy Perez was struggling with heroin addiction while at Morgan County Jail in Indiana. She had heroin in her system when booked at the jail. Perez also had a chronic adrenal gland disorder and needed daily medication to substitute in place of her adrenal glands - she had taken the medication every day since her birth. Over the next couple days, Perez suffered incredibly intense withdrawal symptoms. However, ACH staff did not provide adequate medical care or referral to an outside physician. Instead, Perez was placed in a holding cell. The next day she was found dead in her cell.

**ANSWER**: No answer is required because this paragraph does not contain any

allegations concerning the County Defendants. Further, the County Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in

this paragraph. To the extent a further response is required, the allegations are denied.

53.     ACH received notice of the complaints that Perez had received inadequate medical care when it was served with a lawsuit captioned *Estate of Tammy Perez v. Morgan County Sheriff,* 16-cv- 645 (S.D. Ind.) (2016). ACH later settled the lawsuit. ACH advertised for years that it analyzes the medical care at issue in lawsuits filed against it, and that it only settles lawsuits in which it concludes that its employees provided inadequate medical care. Yet ACH supervisors took no steps to determine whether the care provided to Perez was the result of deficiencies in ACH's practices or processes regarding the delivery of medical care.

**ANSWER**: No answer is required because this paragraph does not contain any

allegations concerning the County Defendants. Further, the County Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in

this paragraph. To the extent a further response is required, the allegations are denied.

54.     ***Gina Lenora White.*** Gina Lenora White had a history of mental health issues, high blood pressure, and hypertension. She was initially transferred to the hospital for mental health evaluations, and afterwards was discharged to Henderson County Criminal Justice Center in Tennessee with a list from the hospital of medications she needed to take. For five days, Henderson County and the ACH staff employed there did not provide White with any of her required medication. Around February 1, 2015, she began exhibiting symptoms due to her lack of medication and treatment: excessive sweating, hallucinations, inability to sleep, and tremors, among others. On February 7, White was found dead in her cell, covered in her own excrement and bodily fluids.

**ANSWER**: No answer is required because this paragraph does not contain any

allegations concerning the County Defendants. Further, the County Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in

this paragraph. To the extent a further response is required, the allegations are denied.

55.     ACH received notice of the complaints that White had received inadequate medical care when it was served with a lawsuit captioned *White v. Henderson County,* 16-cv-1020 (W.D. Tenn.) (2016). ACH later settled the lawsuit. ACH advertised for years that it analyzes the medical care at issue in lawsuits filed against it, and that it only settles lawsuits in which it concludes that its employees provided inadequate medical care. Yet ACH supervisors took no steps to determine whether the care provided to White was the result of deficiencies in ACH's practices or processes regarding the delivery of medical care.

**ANSWER**: No answer is required because this paragraph does not contain any

allegations concerning the County Defendants. Further, the County Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in

this paragraph. To the extent a further response is required, the allegations are denied.

56.     ***Ricky DeAngelo Hinkle.*** Ricky DeAngelo Hinkle died while in the custody of the Jefferson County Jail in Alabama in 2014. He was an alcoholic yet was not provided any treatment by jail or ACH staff despite demonstrating terrible withdrawal symptoms.

**ANSWER**: No answer is required because this paragraph does not contain any

allegations concerning the County Defendants. Further, the County Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in

this paragraph. To the extent a further response is required, the allegations are denied.

57.    ACH received notice of the complaints that Hinkle had received inadequate medical care when it was served with a lawsuit captioned *Hunter v. Jefferson County,* 16-cv-1521 (N.D. Ala.) (2016). ACH later settled the lawsuit. ACH advertised for years that it analyzes the medical care at issue in lawsuits filed against it, and that it only settles lawsuits in which it concludes that its employees provided inadequate medical care. Yet ACH supervisors took no steps to determine whether the care provided to Hinkle was the result of deficiencies in ACH's practices or processes regarding the delivery of medical care.

**ANSWER**: No answer is required because this paragraph does not contain any

allegations concerning the County Defendants. Further, the County Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in

this paragraph. To the extent a further response is required, the allegations are denied.

58.    ***Mark Ivey.*** Mark Ivey was transported to emergency services after arrest after experiencing shortness of breath and was released to Audrain County Jail in Missouri with records stating the seriousness of his asthma and withdrawal symptoms. ACH staff at the jail did not appropriately treat Ivey despite these instructions and the seriousness of his symptoms. He died in July 2016, a few days after his booking.

**ANSWER**: No answer is required because this paragraph does not contain any

allegations concerning the County Defendants. Further, the County Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in

this paragraph. To the extent a further response is required, the allegations are denied.

59.    ACH received notice of the complaints that Ivey had received inadequate medical care when it was served with a lawsuit captioned *Ivey v. Audrain County,* 17-cv-82 (E.D. Mo.) (2017). ACH later settled the lawsuit. ACH advertised for years that it analyzes the medical care at issue in lawsuits filed against it, and that it only settles lawsuits in which it concludes that its employees provided inadequate medical care. Yet ACH supervisors took no steps to determine whether the care provided to Ivey was the result of deficiencies in ACH's practices or processes regarding the delivery of medical care.

**ANSWER**: No answer is required because this paragraph does not contain any

allegations concerning the County Defendants. Further, the County Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in

this paragraph. To the extent a further response is required, the allegations are denied.

60.     ***Christopher Snapp.*** Christopher Snapp, paralyzed and in a wheelchair, was booked and detained at the Johnson County Jail in Missouri in August 2014. During his intake, jail staff noted that he was paralyzed, wheelchair-bound, and had a colostomy bag and catheter, among other chronic medical issues. Also during his intake Snapp requested that he receive necessary sterile medical supplies, a physician's evaluation, and diagnostic testing due to his declining medical condition. He did not receive such care. His health deteriorated rapidly while at the jail over the coming days, and he did not receive the necessary care from ACH staff until he almost died and was taken for emergency surgery at the local hospital.

**ANSWER**: No answer is required because this paragraph does not contain any

allegations concerning the County Defendants. Further, the County Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in

this paragraph. To the extent a further response is required, the allegations are denied.

61.     ACH received notice of the complaints that Snapp had received inadequate medical care when it was served with a lawsuit captioned *Snapp v. Heiss,* 17-cv-313 (W.D. Mo.) (2017). ACH later settled the lawsuit. ACH advertised for years that it analyzes the medical care at issue in lawsuits filed against it, and that it only settles lawsuits in which it concludes that its employees provided inadequate medical care. Yet ACH supervisors took no steps to determine whether the care provided to Snapp was the result of deficiencies in ACH's practices or processes regarding the delivery of medical care.

**ANSWER**: No answer is required because this paragraph does not contain any

allegations concerning the County Defendants. Further, the County Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in

this paragraph. To the extent a further response is required, the allegations are denied.

62.     ***Benny Pemberton.*** Benny Pemberton was arrested in early July 2016 and detained at Scott County Jail in Tennessee. In mid-July, he was found dead in his cell - naked, on the dirty floor, in his own excrement and urine. An autopsy showed he died as a result of sepsis, and medical records make clear that Pemberton had exhibited and complained of numerous symptoms consistent with sepsis but was never treated by ACH staff.

**ANSWER**: No answer is required because this paragraph does not contain any allegations concerning the County Defendants. Further, the County Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph. To the extent a further response is required, the allegations are denied.

63.    ACH received notice of the complaints that Pemberton had received inadequate medical care when it was served with a lawsuit captioned *Pemberton v. Scott County,* 20-cv-2 (E.D. Tenn.) (2020). ACH later settled the lawsuit. ACH advertised for years that it analyzes the medical care at issue in lawsuits filed against it, and that it only settles lawsuits in which it concludes that its employees provided inadequate medical care. Yet ACH supervisors took no steps to determine whether the care provided to Pemberton was the result of deficiencies in ACH's practices or processes regarding the delivery of medical care.

**ANSWER**: No answer is required because this paragraph does not contain any allegations concerning the County Defendants. Further, the County Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph. To the extent a further response is required, the allegations are denied.

64.    ***Heidi Williams.*** Heidi Williams was arrested on October 12, 2017. She had rheumatoid arthritis that was in remission at the time. Her doctor had instructed her to stay on an aggressive treatment and medication regimen to remain in remission. During booking she told staff Racine County Jail in Wisconsin about her disease and that she had her medication in her purse, yet she did not receive her medication. As a result, later in the evening she began to experience an attack of palindromic rheumatism. Despite other inmates attempting to get medical staff's attention to treat her, she received no medical care and was forced to continue to finish her booking. She was released a few hours later when her husband posted her bond; as they were leaving the jail, she collapsed and was not given any medical assistance by the jail. She sustained permanent damage as a result.

**ANSWER**: No answer is required because this paragraph does not contain any allegations concerning the County Defendants. Further, the County Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph. To the extent a further response is required, the allegations are denied.

65.    ACH received notice of the complaints that Williams had received inadequate medical care when it was served with a lawsuit captioned *Williams v. Racine*

*County,* 18-cv-1020 (E.D. Wis.) (2018). ACH later settled the lawsuit. ACH advertised for years that it analyzes the medical care at issue in lawsuits filed against it, and that it only settles lawsuits in which it concludes that its employees provided inadequate medical care. Yet ACH supervisors took no steps to determine whether the care provided to Williams was the result of deficiencies in ACH's practices or processes regarding the delivery of medical care.

**ANSWER**: No answer is required because this paragraph does not contain any

allegations concerning the County Defendants. Further, the County Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in

this paragraph. To the extent a further response is required, the allegations are denied.

66.     ***David Brown.*** David Brown died while in custody at Woodford County Jail in Illinois in April 2017. Prior to his death, he had benign prostatic hyperplasia requiring him to self-catharize. He had complained to jail staff about being unable to catharize, experiencing debilitating pain, and believing something was wrong. He requested to be taken to an offsite doctor multiple times, yet ACH staff refused to listen to him.

**ANSWER**: No answer is required because this paragraph does not contain any

allegations concerning the County Defendants. Further, the County Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in

this paragraph. To the extent a further response is required, the allegations are denied.

67.     ACH received notice of the complaints that Brown had received inadequate medical care when it was served with a lawsuit captioned *Brown v. Smith,* 18-cv-1168 (C.D. Ill.) (2018). ACH later settled the lawsuit. ACH advertised for years that it analyzes the medical care at issue in lawsuits filed against it, and that it only settles lawsuits in which it concludes that its employees provided inadequate medical care. Yet ACH supervisors took no steps to determine whether the care provided to Brown was the result of deficiencies in ACH's practices or processes regarding the delivery of medical care.

**ANSWER**: No answer is required because this paragraph does not contain any

allegations concerning the County Defendants. Further, the County Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in

this paragraph. To the extent a further response is required, the allegations are denied.

68.    ***Devin Nugent.*** Devin Nugent was arrested and detained at Franklin County Adult Detention Center in Missouri in November 2017. While detained, he developed appendicitis. Despite his clear symptoms of pain and distress, ACH staff failed to act urgently to provide him the care he needed, and his appendix ruptured while in the detention center. On November 26, 2017, Devin passed away in his cell from not being treated for appendicitis.

**ANSWER**: No answer is required because this paragraph does not contain any

allegations concerning the County Defendants. Further, the County Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in

this paragraph. To the extent a further response is required, the allegations are denied.

69.    ACH received notice of the complaints that Nugent had received inadequate medical care when it was served with a lawsuit captioned *Nugent v. Advanced Correctional Healthcare Inc.,* 18- cv-2042 (E.D. Mo.) (2018). ACH later settled the lawsuit. ACH advertised for years that it analyzes the medical care at issue in lawsuits filed against it, and that it only settles lawsuits in which it concludes that its employees provided inadequate medical care. Yet ACH supervisors took no steps to determine whether the care provided to Nugent was the result of deficiencies in ACH's practices or processes regarding the delivery of medical care.

**ANSWER**: No answer is required because this paragraph does not contain any

allegations concerning the County Defendants. Further, the County Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in

this paragraph. To the extent a further response is required, the allegations are denied.

70.    ***Jordan Kirkwood.*** Jordan Kirkwood was arrested and detained at Hopkins County Jail in Kentucky in March 2018. He had also been detailed at Hopkins previously in 2016, at which time he had suffered a heart attack. Following this heart attack, he required monitoring and various treatments. In March 2018 at the jail, Kirkwood submitted multiple sick call requests – all were denied. On March 23, he submitted a request that his chest hurt, that he had difficulty breathing, and that he needed his medication. This request was also denied. That request was also denied. His condition worsened throughout the day, yet he still wasn't given any case. Later that day he collapsed and died.

**ANSWER**: No answer is required because this paragraph does not contain any

allegations concerning the County Defendants. Further, the County Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in

this paragraph. To the extent a further response is required, the allegations are denied.

71.     ACH received notice of the complaints that Kirkwood had received inadequate medical care when it was served with a lawsuit captioned *Messamore v. Hopkins,* 19-cv-36 (W.D. Ky.) (2019). ACH later settled the lawsuit. ACH advertised for years that it analyzes the medical care at issue in lawsuits filed against it, and that it only settles lawsuits in which it concludes that its employees provided inadequate medical care. Yet ACH supervisors took no steps to determine whether the care provided to Kirkwood was the result of deficiencies in ACH's practices or processes regarding the delivery of medical care.

**ANSWER**: No answer is required because this paragraph does not contain any

allegations concerning the County Defendants. Further, the County Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in

this paragraph. To the extent a further response is required, the allegations are denied.

72.     ***Doug Marsillet.*** Doug Marsillett had a seizure in December 2018 while in Kosciusko County Jail in Indiana and fell from the bunk and hit their face, which severely disfigured it. The ACH nurse did not send him out of the jail for treatment, and merely gave him painkillers. When he was finally sent out, he required reconstructive surgery.

**ANSWER**: No answer is required because this paragraph does not contain any

allegations concerning the County Defendants. Further, the County Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in

this paragraph. To the extent a further response is required, the allegations are denied.

73.     ***Bilal Hisanie Hill.*** Despite providing health information upon his intake, ACH staff at the Phelps County Jail in Missouri ignored Bilal Hisanie Hill's signs of cancer in 2019 and 2020 and did not refer him for outside treatment until it was too late, and he died.

**ANSWER**: No answer is required because this paragraph does not contain any

allegations concerning the County Defendants. Further, the County Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in

this paragraph. To the extent a further response is required, the allegations are denied.

74.    ***James Parsons.*** James Parsons was an individual with Multiple Sclerosis (MS) who had been successfully managing his MS with medication prior to his detention at the Jefferson County Jail in Alabama in June 2018. Parsons and his family had informed prison and ACH staff that he had MS and required medication to treat it. Parsons's mother even arrived at the jail with medication in an attempt to leave it for him, and his personal doctor wrote a letter to the jail stating that Parsons was an MS patient in need of treatment. Despite filling out a medical request form, Parsons was not treated for his illness. Due to ACH staff's failure to treat him, Parsons' condition is now significantly worse – he has trouble walking and has discovered lesions on his brain that were not previously there.

**ANSWER**: No answer is required because this paragraph does not contain any allegations concerning the County Defendants. Further, the County Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph. To the extent a further response is required, the allegations are denied.

75.    ***Jeffrey Nottstead.*** In 2020 Jeffery Nottstead, a man who required a cane and brace for medical reasons, was denied a can, brace, or wheelchair and left in his cell to sit on the floor in his own urine in feces in La Crosse County Jail in Wisconsin. Over the course of several days, he complained to jail staff of increasing pain and other symptoms yet was ignored. On February 2, Nottstead complained to Amber Fennigkoh of his pain – despite him begging her to go to the hospital and knowing that he was not eating, she did not take any action to treat him. On February 4, 2020, he died. The autopsy revealed that he died from multiple transmural duodenal ulcers.

**ANSWER**: No answer is required because this paragraph does not contain any allegations concerning the County Defendants. Further, the County Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph. To the extent a further response is required, the allegations are denied.

### C.  **Monroe County Practices.**

76.    Furthermore, ACH and Monroe County have allowed to flourish numerous instances of inadequate medical care in the Monroe County Jail itself, both before and after their mistreatment of Ms. Boyer.

**ANSWER**: Denied.

77.    ***EB.*** EB was a patient with Hepatitis C. On February 2, 2020, EB reported chest pain and arm numbness and was prescribed 20mg Omeprazole, an acid reflux/heartburn medication, by a nurse practitioner Lisa Pisney. EB had reported that

he had been experienced the chest pain coming and going about three to five times each day for the past four days.

**ANSWER**: This paragraph does not identify the individual that is the subject of

the allegations. The County Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations and therefore deny them. Further, the County's

inmate and medical files speak for themselves.

78.    *DD.* DD suffered from severe mental health issues and in December 2019 was witnessed shaking on the floor and hit his head on the ground yet was not sent for outside medical or mental health. He was witnessed having a similar episode a few days later, falling and hitting his head again, yet was also not sent out of the hospital in this instance. DD suffered from muscle spasms, depression and anxiety, and was put on suicide watch.

**ANSWER**: This paragraph does not identify the individual that is the subject of

the allegations. The County Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations and therefore deny them. Further, the County's

inmate and medical files speak for themselves.

79.    *NH.* On March 18, 2019, NH complained of a painful lump on his back. The nurse who saw him on March 19 reported that the lump was moveable and so "diagnosed" it as "unlikely" malignant, declined to send NH offsite for further investigation of the lump.

**ANSWER**: This paragraph does not identify the individual that is the subject of

the allegations. The County Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations and therefore deny them. Further, the County's

inmate and medical files speak for themselves.

80.    *JH.* On March 17, 2017, JH was treated for hemoptysis (coughing up blood). His discharge instructions stated that he was to receive prompt medical attention if he experienced chest pain or chest pressure, among other symptoms, as those symptoms indicated a potentially fatal condition. Yet, when JH reported chest pain on March 31, 2017, the nurse evaluating him only gave him TUMS for 'possible acid reflux".

**ANSWER**: This paragraph does not identify the individual that is the subject of

the allegations. The County Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations and therefore deny them. Further, the County's

inmate and medical files speak for themselves.

81. **ML.** ML was discovered by medical providers to have possible Cellulitis on July 1, 2019. If left untreated, Cellulitis can spread to the rest of the body and become very dangerous. However, he was not sent to an outside provider to address his condition until two days later.

**ANSWER**: This paragraph does not identify the individual that is the subject of

the allegations. The County Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations and therefore deny them. Further, the County's

inmate and medical files speak for themselves.

82. **TM.** TM reported chest pain multiple times but was not sent out to the hospital for evaluation or testing. On June 11, 2019, he reported chest pain, and was prescribed aspirin and TUMS. On June 14, TM reported pressure-like pain beneath his bilateral breast area. He was prescribed Lisinopril (blood pressure and heart failure medication). On June 17, he reported right side chest pain. His Omeprazole medication was changed to 20mg twice a day. TM again reported chest pain on July 4, and on July 5 was treated with milk of magnesium and an additional dose of Omeprazole.

**ANSWER**: This paragraph does not identify the individual that is the subject of

the allegations. The County Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations and therefore deny them. Further, the County's

inmate and medical files speak for themselves.

83. **AS.** On October 13, 2015, AS reported chest pain but was not sent to an outside provider in response to that report.

**ANSWER**: This paragraph does not identify the individual that is the subject of

the allegations. The County Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations and therefore deny them. Further, the County's

inmate and medical files speak for themselves.

84. **CX.** In December 2016 CX reported significant chest pain. Even though he indicated that the pain was on his left side and his arm—an indicator of a heart attack— he was given Tums. CX only received appropriate medical attention after a guard who

knew him personally as a person "who was never known to ask or complain about anything" heard CX's reports of chest pain was CX taken to the hospital, where it was determined he was suffering a heart attack. 85. EC. EC had a history of seizures and multiple sclerosis. She experienced a seizure in 2020 but was not sent out from the jail for further assessment treatment.

**ANSWER**: This paragraph does not identify the individual that is the subject of the allegations. The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny them. Further, the County's inmate and medical files speak for themselves.

86.    *KH.* KH reported that he was experiencing excessive bleeding in his bowel movements beginning on August 9, 2019. Yet, he was not sent to an outside medical provider until November 23.

**ANSWER**: This paragraph does not identify the individual that is the subject of the allegations. The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny them. Further, the County's inmate and medical files speak for themselves.

87.    *JH.* In 2019, JH was denied Suboxone by ACH staff, even though it had been prescribed to him to treat his substance dependence, and his prescription had been verified by his pharmacy.

**ANSWER**: This paragraph does not identify the individual that is the subject of the allegations. The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny them. Further, the County's inmate and medical files speak for themselves.

88.    *JM.* JM reported that he had been sexually assaulted on March 13, 2017 and reported soreness from the assault. He was seen by medical, yet a nurse dismissed his reports as a "possible wet dream." He was not sent out for further treatment or evaluation.

**ANSWER**: This paragraph does not identify the individual that is the subject of the allegations. The County Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations and therefore deny them. Further, the County's

inmate and medical files speak for themselves.

89.    ***EO.*** EO reported tooth pain on both November 23, 2019, and then again on December 11, December 25, December 26, and December 31. Persistent tooth pain requires prompt evaluation because an if the pain is caused by an abscess that it not treated, the infection can spread to other areas of the body and cause septic shock. EO was subjected to an unnecessarily long wait, and was not sent out to a dentist until January 2.

**ANSWER**: This paragraph does not identify the individual that is the subject of

the allegations. The County Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations and therefore deny them. Further, the County's

inmate and medical files speak for themselves.

90.    ***MS.*** In November 2021, MS complained of pain and occasional blood from his testicles. The nurse practitioner prescribed him 600 mg of ibuprofen and made no effort to identify the cause of the pain or the bleeding.

**ANSWER**: This paragraph does not identify the individual that is the subject of

the allegations. The County Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations and therefore deny them. Further, the County's

inmate and medical files speak for themselves.

91.    ***AD.*** In December 2020, AD complained to staff of tooth pain and a tooth infection. The nurse practitioner documented visible decay, but instead of sending AD out for treatment, she gave him an oral antibacterial mouthwash. Later, AD reported tingling fingers and feet, and the nurse practitioner prescribed ibuprofen. AD followed up with complaints that the tingling had continued and that the ibuprofen was not helping and asked why nothing more was being done for him. In May and June of 2020, AD complained of further tooth issues, including a broken tooth, and was once again simply prescribed an antibacterial mouthwash again, Orajel, and dental wax.

**ANSWER**: This paragraph does not identify the individual that is the subject of

the allegations. The County Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations and therefore deny them. Further, the County's

inmate and medical files speak for themselves.

92.    ***CC.*** CC reported an infected tooth on September 14, 2017. He was not sent out to see a dentist; instead he was prescribed ibuprofen and a bacterial rinse. A couple weeks he reported that his tooth infection had progressed and he now had a swollen face.

**ANSWER**: This paragraph does not identify the individual that is the subject of the allegations. The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny them. Further, the County's inmate and medical files speak for themselves.

93.    ***RD.*** In December 2021, RD, an individual with a history of heart disease and asthma, reported to Monroe County staff experiences of severe chest pain. Instead of sending him offsite for further treatment and/or evaluation, ACH staff told him to rest and drink fluids and tell them if the pain does not go away within five to seven days.

**ANSWER**: This paragraph does not identify the individual that is the subject of the allegations. The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny them. Further, the County's inmate and medical files speak for themselves.

94.    ***YD.*** In March 2019, YD reported to ACH staff experience hot and cold sweats and his lungs wheezing. Despite these symptoms indicating potential pneumonia, he was not sent offsite for further treatment and/or evaluation.

**ANSWER**: This paragraph does not identify the individual that is the subject of the allegations. The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny them. Further, the County's inmate and medical files speak for themselves.

95.    ***RK.*** In 2020, RK had a dangerous blood sugar level of 400 mg/DL. However, ACH staff failed to have him seen by a doctor immediately.

**ANSWER**: This paragraph does not identify the individual that is the subject of the allegations. The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny them. Further, the County's inmate and medical files speak for themselves.

### D. **The defendants' policies and practices.**

96.     The foregoing events are the result of policies and practices instituted by the defendants which prioritize low costs for jailers, and profits for ACH, at the expense of the health and lives of people who are detained in jails serviced by ACH, including Monroe County.

**ANSWER**: Denied.

97.     ACH is a national provider of jail medical care. Its business model is to increase the volume of its sales by underbidding the competition and implementing severe cost control measures, the necessary result is unnecessary suffering of people detained at the jail.

**ANSWER**: The County Defendants admit that ACH is a national provider of medical care in jails and similar facilities. The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations. Further, the County Defendants deny any imputation of any alleged conduct by ACH or the ACH Defendants to the County Defendants. To the extent a further response is required, the allegations in this paragraph are denied.

98.     ACH CEO, for example, has explained to potential customers that ACH keeps costs to the customers down by reducing visits to hospitals. This, ACH explained, kept its customers happy and helped ACH increase its profits by allowing it to expand its business.

**ANSWER**: The County Defendants lack knowledge or information sufficient to form a belief as to the truth of these allegations. Further, the County Defendants deny any imputation of any alleged conduct by ACH or the ACH Defendants to the County Defendants. To the extent a further response is required, the allegations in this paragraph are denied.

99.     ACH is able to implement such a scheme because jury verdicts from cases involving medical misconduct in jails and prisons are typically a fraction of the verdicts for comparable misconduct in the free world, meaning that ACH can address liability claims via insurance.

**ANSWER**: The County Defendants lack knowledge or information sufficient to form a belief as to the truth of these allegations. Further, the County Defendants deny any imputation of any alleged conduct by ACH or the ACH Defendants to the County Defendants. To the extent a further response is required, the allegations in this paragraph are denied.

100.    ACH indemnifies its jailer-customers, like Monroe County, through substantial insurance coverage, and as a result ACH's customers, including Monroe County, are willing to hire companies like ACH with poor track records in providing appropriate medical care, and they have little financial incentive to address deficiencies in the care provided at the jail.

**ANSWER**: The allegations in this paragraph concerning Monroe County are denied. The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations. Further, the County Defendants deny any imputation of any alleged conduct by ACH or the ACH Defendants to the County Defendants. To the extent a further response is required, the allegations in this paragraph are denied.

101.    In addition to these financial arrangements, ACH implements its cost control measures by training its employees to provide less care to detainees, and by applying pressure to those employees to provide less care.

**ANSWER**: The County Defendants lack knowledge or information sufficient to form a belief as to the truth of these allegations. Further, the County Defendants deny any imputation of any alleged conduct by ACH or the ACH Defendants to the County Defendants. To the extent a further response is required, the allegations in this paragraph are denied.

102.    When ACH hires a new healthcare practitioner, the practitioner must attend a training session regarding the appropriate manner in which to provide medical care to people who are detained in jail. All new hires across the country are flown to ACH headquarters for this multiple-day training. 103. At the outset of the training, ACH trains its medical staff to believe that people who are detained in a jail are different than people

in the free world because, whereas people in the free world seek healthcare because they have legitimate medical needs that require attention, people in jail seek healthcare in order to be comfortable, because they are merely anxious, and for similar trivial and illegitimate reasons.

**ANSWER**: The County Defendants lack knowledge or information sufficient to form a belief as to the truth of these allegations. Further, the County Defendants deny any imputation of any alleged conduct by ACH or the ACH Defendants to the County Defendants. To the extent a further response is required, the allegations in this paragraph are denied.

104.    ACH trains its practitioners to ignore or discount the medical concerns identified by persons in jails as things a person "wants" rather than legitimate medical needs, and it emphasizes that jail is "not a health spa," such that jail staff can ignore many medical concerns raised by the detainees housed there. Trainings of this sort are repeatedly provided alike to ACH employees and correctional staff at facilities serviced by ACH.

**ANSWER**: To the extent this paragraph makes allegations about training at the Monroe County Jail, the allegations are denied. The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations. Further, the County Defendants deny any imputation of any alleged conduct by ACH or the ACH Defendants to the County Defendants. To the extent a further response is required, the allegations in this paragraph are denied.

105.    In addition to training, ACH and its customers apply pressure on ACH employees—even nominally independent practitioners—to cut back on the quality of care provided to jail detainees if such care is likely to increase outside care or staffing costs.

**ANSWER**: To the extent this paragraph alleges that Monroe County applies "pressure on ACH employees . . . to cut back on the quality of care provided to jail detainees," the allegation is denied. The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations. Further, the County Defendants deny any imputation of any alleged conduct by ACH or the ACH

Defendants to the County Defendants. To the extent a further response is required, the allegations in this paragraph are denied.

106.    Defendant Lisa Pisney, for example, was hired in May 2019, a few months before Ms. Boyer's death. In July 2015, Defendant Amber Fennigkoh, who was a long-time ACH nurse, wrote to Defendant Stan Hendrickson. Though Ms. Fennigkoh was a nurse and Ms. Pisney a practitioner, Ms. Fennigkoh nevertheless expressed concern that Ms. Pisney was sending people to the ER too readily, noting "we have several occurrences where patients have had elevated blood pressures/ and or chest pain, instead of providing a medication to attempt to lower the blood pressure or help with the chest pain we have sent them into the ER." Ms. Fennigkoh obtained Mr. Hendrickson's permission to complain to Ms. Pisney's supervisor at ACH, Travis Schamber, explaining that Ms. Pisney needed to learn to be more "cost effective as correctional healthcare does focus a bit more on cost than traditional hospital care."

**ANSWER**: This paragraph purports to quote and characterize the referenced written correspondence, which speaks for itself. The County Defendants deny that "Ms. Fennigkoh obtained Mr. Hendrickson's permission to complain to Ms. Pisney's supervisor at ACH," as well as any implication that such permission was needed. The County Defendants admit that Ms. Fennigkoh and Ms. Pisney were ACH nurses or practitioners who worked at the Monroe County Jail. The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations. Further, the County Defendants deny any imputation of any alleged conduct by ACH or the ACH Defendants to the County Defendants. To the extent a further response is required, the allegations in this paragraph are denied.

107.    On other occasions, Ms. Fennigkoh and the ACH regional supervisor told Monroe County staff that they could push back on instructions from practitioners that would impose additional duties, such as resisting an instruction to measure blood pressure every hour, and instead suggest less frequent measurements. The jail's administrators, including Mr. Hendrickson, were aware of these communications, and approved of them to save money in staffing, even if pushing back against a practitioner's medical instructions could result in unnecessary medical danger to people at the jail.

**ANSWER**: Denied.

108.    In this way the defendants, including ACH, Monroe County, Hendrickson, Pisney, and Fennigkoh agreed and conspired to provide inadequate medical care to detainees at the Monroe County Jail, including Ms. Boyer.

**ANSWER**: Denied as to the County Defendants. The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations. Further, the County Defendants deny any imputation of any alleged conduct by ACH or the ACH Defendants to the County Defendants. To the extent a further response is required, the allegations in this paragraph are denied.

109.    ACH also holds back or refuses to provide medication and treatment to patients with the expectation that they will be released from the jail, and off ACH client's financial responsibility, before their medical condition becomes catastrophic. And in a related money-saving tactic, ACH identifies patients who are likely to have medical conditions that are expensive to treat, and encourages the jail to discharge them from custody or transfer them to a different facility, all to incur fewer medical costs.

**ANSWER**: The County Defendants lack knowledge or information sufficient to form a belief as to the truth of these allegations. Further, the County Defendants deny any imputation of any alleged conduct by ACH or the ACH Defendants to the County Defendants. To the extent a further response is required, the allegations in this paragraph are denied.

110.    Mis-training its employees, pressuring them not to provide medical care they believe is clinically necessary, and delaying the provision of care and medication in hopes a detainee is transferred out first are all tactics ACH uses to control its clients' costs and increase its own profits, as set forth above.

**ANSWER**: The County Defendants lack knowledge or information sufficient to form a belief as to the truth of these allegations. Further, the County Defendants deny any imputation of any alleged conduct by ACH or the ACH Defendants to the County Defendants. To the extent a further response is required, the allegations in this paragraph are denied.

111.    ACH is indifferent to the danger that its practices will result in substandard or even catastrophic medical care.

**ANSWER**: The County Defendants lack knowledge or information sufficient to form a belief as to the truth of these allegations. Further, the County Defendants deny any imputation of any alleged conduct by ACH or the ACH Defendants to the County Defendants. To the extent a further response is required, the allegations in this paragraph are denied.

112.    In the time leading up to Christine Boyer's death, ACH did not track deaths of detainees at facilities it serviced.

**ANSWER**: The County Defendants lack knowledge or information sufficient to form a belief as to the truth of these allegations. Further, the County Defendants deny any imputation of any alleged conduct by ACH or the ACH Defendants to the County Defendants. To the extent a further response is required, the allegations in this paragraph are denied.

113.    ACH also does not conduct clinical mortality reviews following a death or catastrophic medical event involving one of its patients.

**ANSWER**: The County Defendants lack knowledge or information sufficient to form a belief as to the truth of these allegations. Further, the County Defendants deny any imputation of any alleged conduct by ACH or the ACH Defendants to the County Defendants. To the extent a further response is required, the allegations in this paragraph are denied.

114.    The National Commission on Correctional Healthcare ("NCCHC") recommends that healthcare providers conduct clinical mortality reviews to determine the appropriateness of clinical care, to ascertain whether changes to policies, procedures, or practices are warranted, and to identify issues that require future study. ACH does not have a policy encouraging or requiring the conduct of such reviews.

**ANSWER**: The County Defendants lack knowledge or information sufficient to form a belief as to the truth of these allegations. Further, the County Defendants deny any

imputation of any alleged conduct by ACH or the ACH Defendants to the County Defendants. To the extent a further response is required, the allegations in this paragraph are denied.

115. Instead of conducting a clinical mortality review, when a catastrophic medical event occurs, it conducts an assessment of the event, but only for the potential legal exposure it creates for ACH and its employees, not for the purposes identified by the NCCHC, supra.

**ANSWER**: The County Defendants lack knowledge or information sufficient to form a belief as to the truth of these allegations. Further, the County Defendants deny any imputation of any alleged conduct by ACH or the ACH Defendants to the County Defendants. To the extent a further response is required, the allegations in this paragraph are denied.

116. Turning a blind eye to the inadequate and catastrophic instances care that often result from its policies and practices allows ACH to continue providing inadequate care to the detriment of people who find themselves in detention, like Ms. Boyer.

**ANSWER**: The County Defendants deny the allegation that they provided "inadequate care" to Ms. Boyer. The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations. Further, the County Defendants deny any imputation of any alleged conduct by ACH or the ACH Defendants to the County Defendants. To the extent a further response is required, the allegations in this paragraph are denied.

## COUNT I
## 42 U.S.C. § 1983 – DENIAL OF MEDICAL CARE
## (ALL DEFENDANTS)

117. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER**: The County Defendants incorporate their answers to each paragraph of the Third Amended Complaint.

118.    In the manner described more fully above, Defendants were aware of Christine Boyer's medical needs and the seriousness of her medical needs, and knew the risk of harm to Ms. Boyer if she did not receive appropriate medical care. Despite that knowledge, Defendants failed to provide her with proper medical care or access to medical care in violation of the United States Constitution.

**ANSWER**: Denied.

119.    As a result of Defendants' unjustified and unconstitutional conduct, Ms. Boyer experienced injuries, including but not limited to pain, suffering, emotional distress, and death.

**ANSWER**: Denied.

120.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and/or with reckless indifference to Ms. Boyer's rights.

**ANSWER**: Denied.

121.    Alternatively, Defendants were deliberately indifferent to Ms. Boyer's objectively serious medical needs, and their actions were undertaken intentionally, with malice, and/or reckless indifference to Ms. Boyer's health and safety.

**ANSWER**: Denied.

122.    Ms. Boyer's injuries, including but not limited to pain and suffering, emotional distress, and death were proximately caused by the actions of Defendants.

**ANSWER**: Denied.

123.    Ms. Boyer's injuries were also proximately caused by the practices or processes of Defendant ACH.

**ANSWER**: The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations; moreover, the allegations call for a legal conclusion. The County Defendants therefore deny them.

124.    Prior to and during the events giving rise to Plaintiffs' Complaint, ACH maintained practices or processes pursuant to which detainees like Ms. Boyer with serious medical needs were routinely denied medical care and access to medical care.

**ANSWER**: The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations; moreover, the allegations call for a legal conclusion. The County Defendants therefore deny them.

125.    Specifically, there exist policies and widespread practices within the facilities at which ACH is contracted to provide medical care, including the Monroe County Jail, pursuant to which detainees receive unconstitutionally inadequate healthcare, including policies and practices pursuant to which (1) healthcare staff commonly disregard reports by patients of objectively serious medical needs; (2) healthcare staff refuse to provide adequate treatment to patients complaining of serious medical conditions or in need of medications; (3) healthcare staff fail to ensure continuity of care among medical and correctional staff; (4) employees prioritize profits and maintaining a competitive edge as a low-cost vendor at the expense of constitutionally adequate care; (5) inadequate levels of health care staffing are provided, including inadequately qualified staff; and (6) healthcare staff fail or refuse to arrange for prisoners to be treated in outside facilities, even when an outside referral is necessary or proper.

**ANSWER**: The County Defendants deny the allegations as they relate to Monroe County or the Monroe County Jail. The County Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations; moreover, the allegations call for a legal conclusion. The County Defendants therefore deny them.

126.    These policies and practices were allowed to flourish because ACH, which directs the provision of healthcare services at numerous jails including the Monroe County Jail, directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional employees, and failed to adequately punish and discipline prior instances of similar misconduct. In this way, ACH violated Ms. Boyer's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

**ANSWER**: The County Defendants deny the allegations as they relate to Monroe County or the Monroe County Jail. The County Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations; moreover, the allegations call for a legal conclusion. The County Defendants therefore deny them.

127.    The above-described policies and practices were able to exist and thrive because ACH was deliberately indifferent to the problem, thereby effectively ratifying it.

**ANSWER**: The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations; moreover, the allegations call for a legal conclusion. The County Defendants therefore deny them.

128.    ACH also acted to violate Ms. Boyer's constitutional rights through the actions and failures to act by individuals with final policymaking authority for ACH.

**ANSWER**: The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations; moreover, the allegations call for a legal conclusion. The County Defendants therefore deny them.

129.    Ms. Boyer's injuries were additionally proximately caused by the policies and practices of Monroe County at the Jail, which was overseen by Defendant Hendrickson.

**ANSWER**: Denied.

130.    Prior to and during the events giving rise to Ms. Boyer's injuries in this case, the County and Defendant Hendrickson maintained policies and practices pursuant to which persons in Ms. Boyer's position are denied medical care for serious medical conditions.

**ANSWER**: Denied.

131.    Among other things, the County and Defendant Hendrickson do not employ medical staff at the Jail on weekends, and there is no provision for in-person medical evaluations during those periods, even for emergent conditions such as chest pain.

**ANSWER**: Denied.

132.    The County and Defendant Hendrickson additionally fail to train its staff to identify emergent conditions and contact medical personnel or to seek outside medical help immediately.

**ANSWER**: Denied.

133.    Furthermore, by written policy, which is overseen by Defendant Hendrickson, the County does not permit jail staff to make emergency room referrals for serious conditions like those faced by Ms. Boyer. Instead, it requires Jail staff to call an off-site nurse employed by ACH, even when emergency help is available just across the street and the need for such help is obvious to even a lay person. On information and belief, this prohibition does not exist as the result of medical judgment, but rather as a means, advertised by ACH, of managing the County's legal liability for care.

**ANSWER**: Denied.

134.    The above-described policies and practices were able to exist and thrive because the County and Defendant Hendrickson were deliberately indifferent to the problem, thereby effectively ratifying it.

**ANSWER**: Denied.

135.    The County also acted to violate Ms. Boyer's constitutional rights through the actions and failures to act Defendant Hendrickson and other individuals with final policymaking authority for the County.

**ANSWER**: Denied.

136.    Ms. Boyer's injuries were proximately caused by the policies and practices of the County and Defendant Hendrickson.

**ANSWER**: Denied.

137.    Ms. Boyer's injuries were caused by employees of the County and ACH, including but not limited to the individually named Defendants, who acted pursuant to the foregoing policies and practices in engaging in the misconduct described above.

**ANSWER**: Denied.

## COUNT II
## 42 U.S.C. § 1983 – FAILURE TO INTERVENE
## (DEFENDANTS PISNEY, FENNIGKOH, WARREN, PARKER, AND DOES 1-3)

138.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER**: The County Defendants incorporate their answers to each paragraph

of the Third Amended Complaint.

139.    As described more fully herein, Defendants Pisney, Fennigkoh, and Does 1-3 had reasonable opportunities to prevent the violation of Ms. Boyer's constitutional rights as set forth above had they been so inclined, but they failed to do so.

**ANSWER**: Denied.

140.    Defendants' failures to act were intentional, and were objectively unreasonable and/or done with reckless indifference to Ms. Boyer's rights.

**ANSWER**: Denied.

141.    As a direct and proximate result of these failures, Ms. Boyer experienced physical and emotional pain and suffering, and eventually death.

**ANSWER**: Denied.

## COUNT III
## MEDICAL MALPRACTICE
## (ACH, PISNEY AND FENNIGKOH)

142.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**ANSWER**: The County Defendants incorporate their answers to each paragraph of the Third Amended Complaint.

143.    As described more fully herein, Defendants Pisney and Fennigkoh both owed Ms. Boyer a duty of care similar to medical professionals with similar qualifications.

**ANSWER**: No answer is required because plaintiff does not assert Count III against the County Defendants. Further, the County Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations. To the extent a response is necessary, the allegations are denied.

144.    As described more fully herein, Ms. Pisney and Ms. Fennigkoh breached that their duty of care to Ms. Boyer.

**ANSWER**: No answer is required because plaintiff does not assert Count III against the County Defendants. Further, the County Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations. To the extent a response is necessary, the allegations are denied.

145.    As a proximate result of these breaches, Ms. Boyer was injured, suffered pain and emotional damage, and died.

**ANSWER**: No answer is required because plaintiff does not assert Count III against the County Defendants. Further, the County Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations. To the extent a response is necessary, the allegations are denied.

**COUNT IV**
**SURVIVAL**
**(ACH, PISNEY, FENNIGKOH)**

146.     In the manner described more fully above, Defendants' wrongful acts and omissions ultimately caused the death of Ms. Boyer. In the interim, before she ultimately died, Ms. Boyer suffered "other damage" to her person pursuant to Wis. Stat. § 895.01(1)(am).

**ANSWER**: No answer is required because plaintiff does not assert Count IV against the County Defendants. To the extent a response is necessary, the allegations are denied.

147.     The misconduct described in this Count was intentional and undertaken with malice, willfulness, and reckless indifference to the rights of others.

**ANSWER**: No answer is required because plaintiff does not assert Count IV against the County Defendants. To the extent a response is necessary, the allegations are denied.

148.     As a result of these actions, Ms. Boyer suffered severe injuries, including physical pain, emotional distress, and ultimately death.

**ANSWER**: No answer is required because plaintiff does not assert Count IV against the County Defendants. To the extent a response is necessary, the allegations are denied.

149.     This Count is brought by the Estate of Christine Boyer, by personal representative Greg Boyer.

**ANSWER**: No answer is required because plaintiff does not assert Count IV against the County Defendants. To the extent a response is necessary, the County Defendants admit that Count IV is brought by the Estate of Christine Boyer through the personal representative Greg Boyer. Any remaining allegation is denied.

**COUNT V**
**WRONGFUL DEATH**
**(ACH, PISNEY, FENNIGKOH)**

150.    Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

**ANSWER**: The County Defendants incorporate their answers to each paragraph of the Third Amended Complaint.

151.    In the manner more fully described above, the defendants negligently, recklessly, and willfully caused the death of Ms. Boyer. Ms. Boyer therefore had (as alleged in Counts I – III above) a valid claim for damages against the defendants at the time of her death.

**ANSWER**: No answer is required because plaintiff does not assert Count V against the County Defendants. To the extent a response is necessary, the allegations are denied.

152.    As a consequence, Ms. Boyer's husband, Greg Boyer, has suffered, and will continue to suffer, significant emotional distress and harm, including but not limited to the loss off society and companionship with Ms. Boyer.

**ANSWER**: No answer is required because plaintiff does not assert Count V against the County Defendants. To the extent a response is necessary, the allegations are denied.

153.    The misconduct described in this Count was intentional and undertaken with malice, willfulness, and reckless indifference to the rights of others.

**ANSWER**: No answer is required because plaintiff does not assert Count V against the County Defendants. To the extent a response is necessary, the allegations are denied.

154.    This Count is brought by the Estate of Christine Boyer, by personal representative Greg Boyer, and by Greg Boyer, on his own behalf.

**ANSWER**: No answer is required because plaintiff does not assert Count V against the County Defendants. To the extent a response is necessary, the County Defendants admit that Count V is brought by the Estate of Christine Boyer through the personal representative Greg Boyer. Any remaining allegation is denied.

44

## COUNT VI
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## (ACH, PISNEY, FENNIGKOH)

155.    Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

**ANSWER**: The County Defendants incorporate their answers to each paragraph of the Third Amended Complaint.

156.    In the manner described more fully above, by causing the death of Christine Boyer, the Defendants intended to cause both physical and emotional distress.

**ANSWER**: No answer is required because plaintiff does not assert Count VI against the County Defendants. To the extent a response is necessary, the allegations are denied.

157.    In so doing, the Individual Defendants' conduct was extreme and outrageous and caused Ms. Boyer severe, disabling physical distress, emotional distress, and untimely death.

**ANSWER**: No answer is required because plaintiff does not assert Count VI against the County Defendants. To the extent a response is necessary, the allegations are denied.

158.    The Individual Defendants' conduct also imposed harm on Plaintiff Greg Boyer, who suffered, and continues to suffer, severe emotional harm on account of the Individual Defendants' conduct.

**ANSWER**: No answer is required because plaintiff does not assert Count VI against the County Defendants. To the extent a response is necessary, the allegations are denied.

159.    The misconduct described in this Count was intentional and undertaken with malice, willfulness, and reckless indifference to the rights of others.

**ANSWER**: No answer is required because plaintiff does not assert Count VI against the County Defendants. To the extent a response is necessary, the allegations are denied.

160.    This Count is brought by the Estate of Christine Boyer, by personal representative Greg Boyer, and Greg Boyer, on his own behalf.

**ANSWER**: No answer is required because plaintiff does not assert Count VI against the County Defendants. To the extent a response is necessary, the County Defendants admit that Count VI is brought by the Estate of Christine Boyer through the personal representative Greg Boyer. Any remaining allegation is denied.

## COUNT VII
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (ACH, PISNEY, FENNIGKOH)

161.    Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

**ANSWER**: The County Defendants incorporate their answers to each paragraph of the Third Amended Complaint.

162.    In the manner described more fully above, by causing the death of Christine Boyer, the Individual Defendants negligently caused both physical and emotional distress.

**ANSWER**: No answer is required because plaintiff does not assert Count VII against the County Defendants. To the extent a response is necessary, the allegations are denied.

163.    In so doing, the Individual Defendants' conduct was extreme and outrageous and caused Ms. Boyer severe, disabling physical distress, emotional distress, and ultimately death.

**ANSWER**: No answer is required because plaintiff does not assert Count VII against the County Defendants. To the extent a response is necessary, the allegations are denied.

164.    The Individual Defendants' conduct also imposed harm on Plaintiff Greg Boyer, who suffered, and continues to suffer, severe emotional harm on account of the Individual Defendants' conduct.

**ANSWER**: No answer is required because plaintiff does not assert Count VII against the County Defendants. To the extent a response is necessary, the allegations are denied.

165.    The misconduct described in this Count was negligent, willful, and undertaken with reckless indifference to the rights of others.

**ANSWER**: No answer is required because plaintiff does not assert Count VII against the County Defendants. To the extent a response is necessary, the allegations are denied.

166.    This Count is brought by the Estate of Christine Boyer, by personal representative Greg Boyer, and Greg Boyer, on his own behalf.

**ANSWER**: No answer is required because plaintiff does not assert Count VII against the County Defendants. To the extent a response is necessary, the County Defendants admit that Count VII is brought by the Estate of Christine Boyer through the personal representative Greg Boyer. Any remaining allegation is denied.

### COUNT VIII
### STATE LAW INDEMNIFICATION
### (MONROE COUNTY)

167.    Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

**ANSWER**: The County Defendants incorporate their answers to each paragraph of the Third Amended Complaint.

168.    During all times relevant to this complaint, Defendant Does 1-3 and Defendants Hendrickson, were employees of Monroe County, who acted within the scope of their employment in committing the acts described herein.

**ANSWER**: The County Defendants admit that Captain Hendrickson was an employee of Monroe County. The County Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations; further, the allegations call for a legal conclusion. The County Defendants therefore deny them.

47

169.    Wisconsin law, Wisc. Stat. § 895.46, requires public entities to pay any tort judgment for damages for which employees are liable within the scope of their employment activities.

**ANSWER**: The allegations call for a legal conclusion to which no response is required. To the extent a response is required, the allegations are denied.

### AFFIRMATIVE DEFENSES

Based on the foregoing answers, the additional allegations below, and upon information and belief, the County Defendants assert the affirmative defenses enumerated below. The County Defendants' assertion of defenses herein is based on information presently known or available through the exercise of reasonable diligence. The County Defendants reserve the right to amend this answer to assert additional affirmative defenses as may be necessary and appropriate during the course of litigation.

1.    The First Amended Complaint fails, in whole or in part, to state a claim against the County Defendants upon which relief can be granted.

2.    Any injuries or damages sustained by Plaintiff or Ms. Boyer resulted, in whole or in part, from their own acts or omissions. These may include, without limitation: a) Ms. Boyer's consumption of alcohol before her arrest; b) her failure to cooperate with and adequately inform Jail staff of her medical conditions and prescribed medications; c) her failure to comply with doctors' instructions or to take medications as prescribed; d) the Boyers' failure to timely deliver any necessary medications to the Jail; e) the use of any drugs, improper supplements, or inadequate nutrition; and (f) Ms. Boyer's failure to provide her full medical history, including her history of chronically low potassium.

3.    Any injuries or damages sustained by Plaintiff or Ms. Boyer resulted, in whole or in part, from an intervening or superseding cause – such as the actions of

persons other than the County Defendants – precluding any recovery against the County Defendants.

4. Any injuries or damages sustained by Plaintiff or Ms. Boyer resulted from a pre-existing injury to Ms. Boyer or the natural progression of a disease or medical condition of Ms. Boyer beyond the control of, and unrelated to the acts, omissions, or conduct of the County Defendants.

5. The individual County Defendants are entitled to qualified immunity from suit.

6. To the extent Plaintiff attempts to assert any state-law claims against the County Defendants, any such claims are subject to the prerequisites, limitations, and immunities contained in Wis. Stat. § 893.80.

7. Plaintiff's claim for punitive damages is barred or limited by the laws and Constitutions of the state of Wisconsin and the United States.

8. Plaintiff may have failed to mitigate his damages.

**WHEREFORE**, the County Defendants respectfully request dismissal of this action with prejudice, an award of their costs and attorneys' fees, and any further relief the Court deems just and proper.

### JURY DEMAND

The County Defendants demand a trial by jury pursuant to Fed. R. Civ. P. 38 on all issues so triable.

June 27, 2023                          Respectfully submitted:

                                       HANSEN REYNOLDS LLC

                                       */s/ Andrew A. Jones*
                                       Andrew A. Jones
                                       301 N. Broadway, Suite 400
                                       Milwaukee, WI 53202
                                       (414) 455-7676 (phone)
                                       (414) 273-8476 (fax)
                                       ajones@hansenreynolds.com

                                       John W. McCauley
                                       10 East Doty Street, Suite 800
                                       Madison, WI 53703
                                       608.841.1351 (phone)
                                       414.273.8476 (fax)
                                       jmccauley@hansenreynolds.com

                                       *Counsel for Defendants Monroe County,*
                                       *Stan Hendrickson, Danielle Warren, and*
                                       *Shasta Parker*