## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

—————————————————————————————————————————————————

**GREGORY BOYER**, as Administrator of the
Estate of Christine Boyer, and on his own behalf,

      Plaintiff,

v.                                                                      Lead Case No. 20-CV-1123

**ADVANCED CORRECTIONAL
HEALTHCARE, INC.,** *et al.*,

      Defendants.

—————————————————————————————————————————————————

**GREGORY BOYER**, as Administrator of the
Estate of Christine Boyer, and on his own behalf,

      Plaintiff,

v.                                                                      Case No. 22-CV-723

**USA MEDICAL & PSYCHOLOGICAL
STAFFING**, *et al.*,

      Defendants.

—————————————————————————————————————————————————

### DEFENDANTS ADVANCED CORRECTIONAL HEALTHCARE, INC., AMBER FENNIGKOH AND LISA PISNEY'S BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

—————————————————————————————————————————————————

Defendants Advanced Correctional Healthcare, Inc. (ACH), Lisa Pisney, and Amber Fennigkoh, by and through their counsel, Leib Knott Gaynor LLC, submit this brief in support of their Motion for Summary Judgment.

### INTRODUCTION

Plaintiff Gregory Boyer brings this action pursuant to 42 U.S.C. § 1983 on behalf of himself and as Administrator for the Estate of Christine Boyer seeking damages for alleged

failure to provide care for Christine in the Monroe County Jail on December 21-22, 2019. Among the thirteen (13) defendants named in two lawsuits are these moving defendants.

Ms. Boyer's unfortunate passing did not arise from reckless neglect of a known risk as required for a constitutional claim. The evidence demonstrates that, contrary to plaintiffs' pleading, Ms. Boyer did not suffer a myocardial infarction, i.e., a "heart attack" caused by a blockage. (Fourth Am. Compl., ECF 161, at ¶¶ 2, 22, 30-32, 37). Rather, she experienced a sudden cardiac arrhythmia triggered by a severe potassium deficiency—a condition that pre-dated her entry into the facility and that the officers and medical providers at the Jail could not have detected. (ECF 232 at 5; Charash Tr. 60:11-16, 66:23-67:3,13-17, 85:4-18). Nurse Fennigkoh and Nurse Practitioner Pisney exercised appropriate and reasonable professional judgment in response to the information known to them. The assertion that they failed to meet the standard of care of their professions is mere negligence and does not support constitutional claims against them. *See Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999)("[T]he Constitution is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences.")

The expansive *Monell*[1] allegations of the Fourth Amended Complaint have, likewise, proven to be baseless. Plaintiff has had more than four (4) years and the Court's backing to conduct unlimited discovery into the care Advanced Correctional Healthcare provides nationwide. His counsel issued dozens of subpoenas to law firms, government agencies, and facilities in at least nine states seeking information on lawsuits filed against ACH dating to 2008. (Knott Decl., ¶ 2). More directly pertinent to this matter, plaintiff's counsel was given more than

---

[1] *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658 (1978).

91,000 pages of records for care given by ACH to more than 1100 inmates at the Monroe County Jail in the years immediately surrounding this event. (*Id*. at ¶ 3).

In total, plaintiff has been provided more than 214,000 pages of records reflecting ACH medical care for his counsel's retained physician experts to study and criticize. (*Id*. at ¶ 4). The result? Plaintiff still cannot demonstrate a relevant pattern and practice as necessary to survive summary judgment. Having widened the aperture of the *Monell* claim he is trying to prove from Monroe County to hundreds of ACH facilities nationwide over the course of nearly a decade, plaintiff cannot meet the "high bar" of proof necessary to demonstrate a cogent pattern that withstands summary judgment. *First Midwest Bank ex rel. Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021); *see McCauley v. City of Chi.*, 671 F.3d 611, 616-617 (7th Cir. 2011)("The required level of factual specificity [to support a *Monell* claim] rises with the complexity of the claim…'[a] more complex case will require more detail." citing, *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404-05 (7th Cir. 2010)).

Plaintiffs' amended pleading alleged nearly forty (40) instances of "bad care" in a ploy to survive defendants' challenges to the sufficiency of the *Monell* pleading. The ploy worked. (*See* Order Denying Motion for Judgment on Pleadings, ECF 134, at 9 (citing "20 settled lawsuits" and "19 incidents" alleged in Third Amended Complaint). Faced now with the obligation to prove the allegations of substandard care, plaintiff discards those claims and instead pushes forward a smattering of dissimilar and anecdotal cases—primarily alleged mistakes in individual provider's judgment that resulted in lawsuits in far flung states. *See* ECF 246 at 4 (listing records for 26 patients "outside Monroe County Jail.") The few cases proffered by plaintiff are statistically infinitesimal in comparison to the millions of patient interactions by ACH providers each year and have nothing to do with Ms. Boyer's care at the Monroe County Jail. (Lynch Decl.

¶ 5, Ex 1.) No thread of commonality unites them to suggest pervasive ACH practices of such persistence and magnitude that professional misconduct can be deemed to have "permeate[d] a critical mass of [ACH's] institutional body." *See Rossi v. Chicago,* 790 F.3d 729, 737 (7th Cir. 2015)("The gravamen is not individual misconduct…but a *widespread practice* that permeates a critical mass of an institutional body.")(emphasis in original).

Ms. Boyer's passing, while indeed tragic, arose from an unfortunate and clinically undetectable metabolic condition that she was aware of but did not report to the officers or healthcare providers at intake. (ECF 232, opinion 2, opinion 3). Her report of symptoms prior to the fatal arrhythmia were consistent with her chronic hypertension and anxiety related to incarceration. Resisting the temptation to invoke "the 20/20 vision of hindsight," as the case law instructs, the initial symptoms did not suggest a medical emergency. *Kingsley v. Hendrickson,* 576 U.S. 389, 397 (2015). Ms. Fennigkoh and Ms. Pisney exercised professional judgment in response to the information known to them. Plaintiffs' effort to attribute the unfortunate outcome to a larger corporate practice or policy fails both factually and as a matter of law. *First Midwest Bank v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021)("These requirements—policy or custom, municipal fault, and 'moving force' causation—must be scrupulously applied in every case alleging municipal liability.")

## STATEMENT OF FACTS

Moving defendants respectfully refer the court to the ACH and Monroe County Joint Proposed Findings of Fact in Support of Defendants' Motions for Summary Judgment ("DJPFOF") for a statement of the material undisputed facts of record. Defendants refer below to the undisputed facts as they are relevant to their arguments in support of summary judgment.

## SUMMARY JUDGMENT STANDARD

Summary judgment should be entered "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material when it affects the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists when the evidence requires a fact finder to resolve the parties' differing versions of the truth at trial. (*Id*. at 249). Further, a factual dispute is genuine only if a reasonable jury could find for either party. *Stokes v. Bd. of Educ.*, 599 F.3d 617, 619 (7th Cir. 2010); *Kuhn v. Goodlow*, 678 F.3d 552, 555 (7th Cir. 2012). Accordingly, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." (*Id*. at 247-48 (emphasis in original)).

The Supreme Court has explained:

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Thus, the burden on the party moving for summary judgment is not to show the "absence of a genuine issue of material fact," but rather to show "that there is an absence of evidence to support the non-moving party's case." (*Id*. at 325).

Once a motion for summary judgment has been made and properly supported, the non-movant has the burden of setting forth specific facts showing the existence of a genuine issue of material fact for trial. (*Id*.) A plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts;" they must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574,

586-87 (1986). The mere existence of an alleged factual dispute will not defeat a summary judgment motion; instead, the non-movant must present definite, competent evidence in rebuttal. *Salvadori v. Franklin Sch. Dist.*, 293 F.3d 989, 996 (7th Cir. 2002). "[B]efore a non-movant can benefit from a favorable view of the evidence, it must show that there is some genuine evidentiary dispute." *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009).

## ARGUMENT

Plaintiff alleges two counts under 42 U.S.C. § 1983 and several state law claims. The claims fail for the reasons discussed herein. (Fourth Am. Compl., ECF 261, *passim*). To the extent plaintiff has asserted claims against Advanced Correctional Healthcare related to corporate structure, formalities, or ego theories, these moving defendants adopt and incorporate the Rule 56 motion and arguments asserted by defendants USA Medical & Psychological Staffing, S.C., Norman Johnson, and Travis Schamber filed in United States District Court for the Western District of Wisconsin Case No.: 22-cv-723.

### I.    APPLICABLE LAW

Ms. Boyer was arrested on December 21 and had not had a probable cause hearing at the time of her medical event. She was an arrestee detained under the Fourth Amendment. *See Pulera v. Sarzant*, 966 F.3d 540, 549-50 (7th Cir. 2020)("Before a finding of probable cause, the Fourth Amendment protects an arrestee; after such a finding, the Fourteenth Amendment protects a pretrial detainee."). The objective reasonableness standard under the Fourth Amendment is the same as the Fourteenth Amendment standard discussed in *Miranda v. County of Lake*, 900 F.3d 335, 352- 354 (7th Cir. 2018). *Pulera,* 966 F.3d at 550; *see also Jump v. Vill. of Shorewood*, 42 F.4th 782, 793 (7th Cir. 2022). Under this standard, the nonmoving plaintiff

has the burden to provide evidence that the defendants' actions were objectively unreasonable and caused her injuries. *Jump*, 42 F.4th at 793. The objective standard is not applied mechanically but in light of the totality of the facts and circumstances of each particular case. *Id.; Kingsley,* 576 U.S. 389 at 397. The totality of circumstances analysis must take into account "the perspective of a reasonable officer on the scene, including what the officer knew at the time." *Id.* The Supreme Court specifically cautions against judging the official with "the 20/20 vision of hindsight." *Id.*

A plaintiff alleging *Monell* liability must meet "rigorous standards" of proof of culpability and "moving force" causation. *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404-05, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997). Even where the underlying claim of liability is premised on the Fourth Amendment the plaintiff must demonstrate the *Monell*-defendant entity was subjectively indifferent. *See Bohanon v. City of Indianapolis,* 46 F.4th 669, 675 (7th Cir. 2022)(describing elements of *Monell* liability arising out of arrestee's Fourth Amendment claim). That is, the plaintiff must demonstrate it was "obvious" the *Monell*-defendant entity's conduct would lead to constitutional violations and that the entity nevertheless "consciously disregarded those consequences." *Id.*, *quoting First Midwest Bank ex. Rel. Est. of LaPorta v. City of Chicago,* 988 F.3d 978, 987 (7th Cir. 2020).

## II.    NURSE FENNIGKOH IS ENTITLED TO SUMMARY JUDGMENT WITH RESPECT TO PLAINTIFFS' § 1983 DENIAL OF MEDICAL CARE CLAIM (COUNT I OF THE FOURTH AMENDED COMPLAINT).

Ms. Fennigkoh, a registered nurse, is sued based upon her interaction with Ms. Boyer the evening of Saturday, December 21, and a report conveyed to her on Sunday, December 22, that Ms. Boyer was experiencing symptoms associated with elevated blood pressure. Her conduct on those occasions was not objectively unreasonable as a matter of law.

### a.     Ms. Fennigkoh's conduct on December 21 was not objectively unreasonable.

The Jail in 2019 was staffed by ACH-contracted nurses on site twelve hours per day from Monday through Saturday. (DJPFOF ¶ 145). The nursing coverage would typically run from approximately 7:00 a.m. to 7:00 p.m. (*Id*. ¶ 146). In addition, the Jail contracted the services of a licensed professional counselor who was on site eight (8) hours per week. (*Id.* ¶ 52, ¶ 144, Ex 23 at 13 §1.24.4; Riley Tr. at 12:23-13:2.) The nurse practitioner or physician provider was on-site at the Jail one day per week and available by telephone twenty-four (24) hours per day, seven (7) days per week. (DJPFOF ¶¶ 147-49).

Nurse Fennigkoh was on duty at the Jail the evening of Saturday, December 21. (DJPFOF ¶ 25). She had completed her 12-hour shift and clocked out at 9:30 p.m. but remained at the Jail after clocking out. (*Id*. Ex. 3). She was just leaving the building at 10:40 p.m. when she encountered officers bringing Ms. Boyer into the Jail. (*Id*.) Ms. Fennigkoh volunteered to return to help determine whether Ms. Boyer had urgent medical concerns. (*Id*. ¶ 26).

Nurse Fennigkoh described in her testimony having "a long discussion" with Ms. Boyer. (ECF 213, Fennigkoh Tr., 100:24-101:5). She recorded a Progress Note stating her impression and conclusions. (DJPFOF ¶ 42, Jones Decl. Ex 4). She observed that Ms. Boyer was distraught, tearful, and tangential in her responses. (*Id*. ¶ 38). Nurse Fennigkoh found it difficult to obtain a clear narrative. (*Id*.) She asked Ms. Boyer for clarification of a statement that she had only one year to live.[2] (*Id*. ¶¶ 27-28). Ms. Boyer responded, "I have all my organs shutting down, radiation back then did me in, I don't have a hip, I pee myself and shit every twenty minutes." (*Id*. ¶ 28). She reported she was "peeing right now." (*Id*., Jones Decl. Ex. 4). Nurse Fennigkoh

---

[2] Plaintiffs' expert, Dr. Bruce Charash, a cardiologist, testified that there is "absolutely nothing" in Ms. Boyer's medical records to suggest there was a valid basis for Ms. Boyer's report that she had one year to live. (ECF 228 at 37:14-23).

observed that Boyer stood with no difficulties, that her legs appeared symmetric, and that Ms. Boyer was wearing tight pants with no visible urine staining or adult diaper or pad. (*Id*. ¶ 29).

Nurse Fennigkoh tried to identify any current health concerns or needs. She asked Ms. Boyer if she had active cancer or whether her cancer was in remission. (*Id*. Jones Decl. Ex 4). Ms. Boyer responded, "[W]hat's it even matter to you?" (*Id.*) Nurse Fennigkoh explained that, despite wearing her winter coat on her way out of the Jail, she was, in fact, a Jail RN. (*Id.*) She determined it was not going to be possible to obtain a cogent description of her medical history from Ms. Boyer at that time. (DJPFOF ¶ 38).

Nurse Fennigkoh also asked Ms. Boyer to describe what medications she was currently taking. (*Id*. ¶ 31) Ms. Boyer did not identify any specific medications or prescriptions other than Oxycodone. (*Id*. ¶ 32). Nurse Fennigkoh explained that because it was the weekend the Jail would not be able to contact her pharmacy to obtain a list of her medications. (*Id*. ¶ 33). She asked Ms. Boyer if she could call her husband to bring her medications to the Jail. (*Id.*) Ms. Boyer stated, initially, "My husband doesn't know where it is! I hide it from him! He has no clue what I take!" (*Id.* ¶ 34). Ms. Boyer ultimately agreed to call her husband to bring in her medications. (*Id*. ¶ 35).

Nurse Fennigkoh concluded based on the information available to her that Ms. Boyer did not have any immediate medical needs that prevented her from being booked into the Jail. (Fennigkoh Decl. at ¶ 6). She advised Jail staff that Ms. Boyer should be placed on a medical watch in one of the cells in the booking area of the Jail with regular wellness checks. (DJPFOF ¶ 40). Nurse Fennigkoh initiated the Observation Log for the officers to follow, indicating Ms. Boyer was to have medical staff ordered status checks every thirty (30) minutes. (*Id.* ¶¶ 40,44; Jones Decl., Ex. 7). Ms. Boyer was put in a cell located directly across from the booking desk

that could be continually monitored directly and by closed circuit camera from the master control desk of the Jail. (DJPFOF ¶¶ 44-45). Nurse Fennigkoh also advised Jail staff that they should alert the on-call medical provider about Ms. Boyer's presence in the Jail when they were able to do so. (*Id.* ¶ 41).

> **b.     Ms. Fennigkoh's conduct on December 21 was objectively reasonable under the totality of circumstances.**

The courts have long held that Fourth Amendment failure to provide medical care claims are subject to the "objectively unreasonable" constitutional standard. *See, e.g., Ortiz v. City of Chicago,* 656 F.3d 523, 530-31 (7th Cir. 2011). The Seventh Circuit Court of Appeals recently modified the "objectively unreasonable" analysis for purposes of medical claims arising under the Fourteenth Amendment. *See Pittman by & through Hamilton v. Madison Cnty. (Pittman IV),* 108 F.4th 561. 564 (7th Cir. 2024). While the Court of Appeals has yet to address the impact of *Pittman IV* on the Fourth Amendment analysis, Ms. Fennigkoh's conduct on December 21 must be considered objectively reasonable under current formulations of the constitutional standard in view of the totality of the circumstances.

Most saliently, Ms. Boyer did not have an immediate medical need on December 21 that was ignored or neglected. While she was intoxicated and had difficulty conveying with clarity her medical history, there was no indication then or now that Ms. Boyer had an urgent medical need on December 21 that prevented her booking into the Jail. Ms. Boyer's state of intoxication did not justify refusing her admission. (DJPFOF 14,). Beyond her intoxication, Ms. Boyer described a complex history with chronic conditions, but she did not describe an immediate need for medical attention or appear in distress.

The traditional Fourth Amendment denial-of-medical-needs analysis requires as an element of proof that "the officer has notice of the detainee's medical needs." *Ortiz,* 656 F.3d at

530, *citing Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007). Plaintiff cannot meet that standard, as there is no evidence Ms. Boyer had an immediate, serious, or urgent medical need on December 21 at all, much less that Nurse Fennigkoh had notice of it. (DJPFOF ¶¶ 27-43). Asked whether he had an opinion that "an acute condition" was present on December 21 when Ms. Boyer was being assessed at intake, plaintiffs' retained physician expert, Dr. Homer Venters, conceded, "I don't know." (ECF 223, Venters Tr., 91:16-21). Plaintiff cannot demonstrate that Ms. Boyer had a serious medical need on December 21 or that Nurse Fennigkoh's response was objectively unreasonable.

The *Pittman IV* Fourteenth Amendment analysis, while removing the subjective "actual notice" requirement, leads to the same result. *Pittman IV* held that for a claim of failure to provide medical care, a plaintiff need prove, in addition to causation, "that the defendants did not take reasonable available measures to abate the risk of serious harm to [the plaintiff], even though reasonable officers under the circumstances would have understood the high degree of risk involved, making the consequences of the defendants' conduct obvious." *Pittman IV,* 108 F.4th at 571. The inquiry "turns on whether an officer in the defendant's shoes would have recognized the plaintiff was seriously ill or injured and thus needed medical care." *Id.* at 570. The purely objective question suggested by courts after *Pittman IV*—whether Nurse Fennigkoh intended her actions—is inconsistent with the language of that case and makes no sense if the government actor was not aware of an immediate need that required addressing. Whether Nurse Fennigkoh *intended* to ask Ms. Boyer to have her husband bring in her medications, put Ms. Boyer on medical watch, start observation, and obtain her records when available does not measure "the high degree of risk involved" in her choice or whether her choice was "obvious" *if* Ms. Boyer did not have an immediate medical need that Ms. Fennigkoh was aware of.

The Supreme Court has held that "mere negligence" is "categorically beneath the threshold of constitutional due process." *King*, 496 F.3d at 819, *quoting Cty. of Sacramento v. Lewis,* 523 U.S. 833, 848 (1998). While the courts of appeal have not provided guidance on the threshold for Fourth Amendment culpability for medical providers after *Pitman IV*, something more than negligence is required. *Id.*; *see also Wilson v. Seiter,* 501 U.S. 305 (1991). Assuming "something more" than negligence means constitutional recklessness, the facts here do not meet that requirement. Whether recklessness is defined "in the criminal law sense" or other formulations of "reckless disregard," these facts do not meet the standard. *Cf. Snipes v. DeTella,* 95 F.3d 586, 590-91 (7th Cir. 1996)(referring to "an act so dangerous [defendant's] knowledge of the risk can be inferred") *and Slade v. Bd. of Sch. Dirs. of Cty. of Milwaukee,* 702 F.3d 1027, 1029-33 (7th Cir. 2012)(defining reckless act as "gratuitously endangering a person resulting in an injury") *and 7th Cir. Pattern Jury Instructions,* 7.28 (Damages: Punitive)(defining reckless disregard as "[d]efendant simply did not care about plaintiff's safety or rights").

The record does not support a conclusion that Nurse Fennigkoh recklessly disregarded Ms. Boyer's rights. In fact, plaintiffs' standard of care expert, Dr. Suzanne Bentley[3], was asked in her deposition, "[D]o you believe that Ms. Fennigkoh violated the standard of care with respect to her interactions with Ms. Boyer on the night of December 21?" Her answer was, "No." (ECF 224 Bentley Tr., at 111:9-14).

Beyond plaintiffs' expert's concession, the facts simply do not suggest constitutional culpability—whether defined vaguely as "reasonableness" or "recklessness." Ms. Boyer was functional at home and not apparently ill at the moment of her arrest. She was distraught about

---

[3] Dr. Bentley is an emergency room physician. (ECF 224, Bentley Tr., at 5:7-14). Plaintiff does not have a qualified nursing expert to testify to the standard of care of Nurse Fennigkoh. Defendant's correctional nursing expert will testify she met the standard of reasonable care for a registered nurse. (Pearson Decl., Ex. 1).

her arrest and detention, but not in medical distress. Once booked into the Jail, she did not complain of, or demonstrate, any medical needs or distress. (DJPFOF ¶ 47). Nor did she ask her husband to bring her medications to the Jail during two (2) calls that evening. (*Id.* ¶ 48). It was an appropriate plan, under the totality of the circumstances, for Nurse Fennigkoh to (1) confirm that Ms. Boyer's husband would bring medications to the Jail, (2) recommend that she be put on a medical watch, under video surveillance, (3) ask the security staff to alert the medical provider as soon as they were able, and (4) plan to obtain a full picture from her health care providers on Monday morning. Even if ultimately mistaken due to the later development of cardiac arrhythmia, the plan for Ms. Boyer was not so grossly inappropriate that it was not a professional judgment. *See Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241-242 (7th Cir. 2021)("But where the evidence shows that a decision was based on medical judgment, a jury may not find deliberate indifference, even if other professionals would have handled the situation differently."), *citing Petties v. Carter,* 836 F.3d 722, 729 (7th Cir. 2016)("[E]vidence that some medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim."); *see also Vickery v. Perez*, 2024 U.S. Dist. LEXIS 44035, *36-37 (S.D. Ind. Mar. 13, 2024)(noting that "managing and prioritizing [a patient's] multiple, complex, and chronic medical issues is a matter requiring professional medical judgment.")

### c. Ms. Fennigkoh's conduct on December 22 was objectively reasonable in the totality of circumstances.

Neither did Ms. Fennigkoh's conduct on Sunday, December 22 violate Ms. Boyer's constitutional rights. She had no direct interactions with Ms. Boyer on that date and was not scheduled for duty at the Jail. (DJPFOF ¶¶ 53, 79-85). She nevertheless attempted in good faith to facilitate Ms. Boyer's care and comfort. (*Id.* ¶¶ 51-53, 56, 72-77). She was not made aware of

facts suggesting Ms. Boyer had a serious medical need or that the staff on duty could not handle their responsibilities appropriately. (*Id*. ¶¶ 43, 82, 83, 86-87).

As noted, the Jail nurses were contracted to be on site twelve hours per day from Monday through Saturday. (*Id.* ¶ 145). No nursing coverage was scheduled for Sunday, December 22. (*Id.* ¶ 79-81, 146). Another inmate in the Jail, however, required daily exercise therapy. (*Id.* ¶ 79). ACH's medical director requested that ACH's president obtain permission from the Jail to provide services outside of the agreed-upon contract. (*Id.* ¶ 80). ACH's president on December 20, 2019 obtained the written agreement from the Jail's administrator to provide temporary Sunday staffing to care for "a specific patient." (*Id.* ¶ 81).

Nurse Fennigkoh was authorized by ACH and Jail administration to provide care for that inmate. (*Id.* ¶ 81; Jones Decl., Ex. 12 (Temporary Staffing Authorization)). Her time report indicates she was clocked in at the Jail from 4:00 p.m. to 5:30 p.m. on December 22 for that purpose. (*Id.* ¶ 82).

Despite being called to work for a limited purpose on Sunday, Nurse Fennigkoh nevertheless communicated with others about Ms. Boyer to attempt to assist the officers and the Boyers. First, at 11:05 a.m. on Sunday, December 22, Nurse Fennigkoh wrote an e-mail to the Jail's mental health counselor, Vicki Riley, asking Ms. Riley to meet with Ms. Boyer that day if she could. (*Id.* ¶ 52). She wrote the email from her home, stating:

> This individual came in last night's (sic) on my way out with claims of numerous medical conditions including cancer and one year to live. She indicated she loses control of her bowels and bladder ever 20 min, but was also intoxicated. Her story somewhat made sense but was also very tangential. I placed her on a 30 min medical watch as a pod wasn't good for her and I was concerned due to her emotional status—pretty distraught. She denied any thoughts of suicide or self harm. Stating (sic) "I'm not taking the easy way out of this disease" but if you have time could you meet with her?

14

Amber

(*See id.*; Jones Decl., Ex. 6; ECF 213, Fennigkoh Tr., at 146:7-20).

Ms. Riley met with Ms. Boyer within the next hour and reported back to Ms. Fennigkoh via email that Ms. Boyer "appears quite frail and distraught about being in jail." (*Id.* ¶ 54, 56). Ms. Riley noted that Ms. Boyer's report of taking Oxycodone and diazepam was "of concern from [a] mental health standpoint." (*Id.* ¶ 54-56, Jones Decl. Ex. 8) She concluded that Ms. Boyer was not demonstrating an immediate mental health concern. (*Id.*) Ms. Boyer did not report chest pain, shortness of breath or similar physical symptoms to Ms. Riley. (*Id.*)

After that email exchange, Ms. Fennigkoh came to the Jail to assist the other inmate at approximately 4:00 p.m. (*Id.* 82). She authored a Progress Note time-stamped at 4:00 p.m. indicating that while she was at the Jail a correctional officer informed her Ms. Boyer's blood pressure had been elevated and that she had required doses of Clonidine. (*Id.* ¶ 83). Nurse Fennigkoh was aware the officers had been in contact with NP Pisney to obtain the order for medication, as would be their protocol on a Sunday in the absence of a scheduled nurse on duty. (*Id.* ¶83-84;  ECF 213, Fennigkoh Tr., at 142:9-13). Nurse Fennigkoh informed the officer that she was handling the situation in the correct manner. (ECF 213, Fennigkoh Tr., at 138:16-24, 142:21 – 143:2.) Nurse Fennigkoh explained that it was appropriate in the circumstance for the officers to continue to communicate directly with NP Pisney. (ECF 213, Fennigkoh Tr., at 138:18-24).

Nurse Fennigkoh's December 22 Progress Note indicates that she was preparing to leave the Jail when she received a call in the nursing office from Mr. Boyer. (DJPFOF ¶¶ 72-5). Per Nurse Fennigkoh's note, Mr. Boyer asked if he could bring Boyer's medications to the Jail. (*Id.*) Fennigkoh told plaintiff he "certainly could" bring Ms. Boyer's medications to the Jail. (*Id.*) Mr.

Boyer informed Ms. Fennigkoh he would bring in the medications and that he would stop at a Gundersen Health facility to bring in a recent copy of her medication list. (*Id.*) Ms. Fennigkoh explained "that would be most helpful" and asked if Mr. Boyer could bring a diagnosis list as well. (*Id.*) Mr. Boyer indicated he could do that. (*Id.*) Ms. Fennigkoh thanked Mr. Boyer for his call. (*Id.*)

At 6:02 p.m. Nurse Fennigkoh wrote an email to several correctional officers and the Jail administrator stating,

> Not sure who else is here tonight?
>
> Christine's husband greg called and said he was going to bring some meds in for her. He also indicated he was going to stop at Gundersen and get a prescription list and bring it in along with a potential diagnosis list. If he brings any of her meds in call Lisa [Pisney] at whatever time as she likely could benefit from them!
>
> Amber Fennigkoh, BSN, RN

(*Id.* ¶ 76, Jones Decl. Ex 11).

Ms. Fennigkoh's email to the Jail staff—authored while she was off duty—advising them to be on the lookout for Mr. Boyer and to "call Lisa [Pisney] at whatever time as she likely could benefit from them" was her last involvement with Ms. Boyer before her emergency in the early hours of December 23. (*Id.* ¶¶ 82, 112).

Nurse Fennigkoh's conduct on December 22 was objectively reasonable under the totality of the circumstances. (ECF 231, 23-24). It cannot be credibly argued that Nurse Fennigkoh "simply did not care" about Ms. Boyer's rights. Again, Nurse Fennigkoh was not made aware of an immediate need that was not being addressed by the staff and NP Pisney per Jail staffing protocol. A reasonable nurse in her shoes would not have concluded she was "seriously ill or injured and thus needed medical care." *Pittman IV,* 108 F.4th at 570. Nor can it

be said that an untoward consequence of her directing the officers to communicate with NP Pisney was "obvious." *Id.* at 571.

Mr. Boyer had been speaking to Ms. Boyer by telephone before speaking with Nurse Fennigkoh, but Mr. Boyer did not report to Nurse Fennigkoh that she was experiencing chest pain because Ms. Boyer did not report chest pain to Mr. Boyer. (DJPFOF ¶ 48, 71). In fact, Ms. Boyer had not reported chest pain to the officers at that time. (*Id.* ¶ 86-87, ECF 213, Fennigkoh Tr., at 223:19-224:1). She would not report symptoms of chest pain until more than 90 minutes later—between 7:25 p.m. and 8:00 p.m. (DJFPOF ¶ 87).

Nurse Fennigkoh's note and her email to the staff demonstrate the extent of her knowledge and, in fact, the extent of Ms. Boyer's reports of symptoms as of that time. Per her note at 4:00 p.m., Nurse Fennigkoh was told Ms. Boyer "has had high BP all day" and "required Clonidine." (*Id.* ¶ 83). If Nurse Fennigkoh had inquired further, she would have been told that Ms. Boyer had reported a concern for her blood pressure, that the officers had measured her blood pressure and spoken to the on-call nurse practitioner, that the nurse practitioner had ordered Clonidine, that the Clonidine had been administered and demonstrated some efficacy, and that the officers were following NP Pisney's instructions to continue to monitor Ms. Boyer and report as necessary. (*Id.* ¶¶ 58-70). Her facilitation of communication between Mr. Boyer, NP Pisney and the correctional staff was objectively reasonable. The fact that she did not anticipate an emergency hours later does not mean she acted unreasonably with respect to the information available to her. *See Gardner v. U.S.,* 184 F.Supp.3d 175, 188-189 (D. Md 2016)(holding medical staff's "failure to anticipate an emergency—*even if negligent*—does not amount to deliberate indifference." (Italics in original)).

      **d.**    **Ms. Fennigkoh inability to clarify Ms. Boyer's diagnoses and current medications is not a constitutional violation.**

Plaintiffs have placed blame on Nurse Fennigkoh for not discovering Ms. Boyer's complete medical history and obtaining a complete medication list. The fault, if any, does not rise to the level of a constitutional violation. Ms. Boyer was initially unable to provide complete information to either the booking officers or Nurse Fennigkoh. (DJPFOF ¶¶ 20, 38). Nurse Fennigkoh believed on leaving the facility on December 21 that Ms. Boyer's husband could supply more information over the weekend. (*Id.* ¶¶ 33-35). She reasonably believed on Saturday night the staff would be able to obtain complete information by Monday morning.

There is no evidence that Nurse Fennigkoh could have obtained Ms. Boyer's records or any other confirming information before Monday morning. Nurse Fennigkoh was familiar with Gundersen Health System's protocol for responding to such requests. (*Id.* ¶ 129). She was aware that the Gundersen medical records department responded to requests for information from the Jail only between 8:00 a.m. and 5:00 p.m. on weekdays. (*Id.*) Nurse Fennigkoh did not fail to take a reasonably available measure to investigate Ms. Boyer's self-report of a complicated history and chronic conditions.

### e.    Ms. Fennigkoh was entitled to rely on the instructions of a licensed provider and her professional judgment.

It remains the law that "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *County of Sacramento v. Lewis,* 523 U.S. 833, 849 (1998); *see also Martin v. Warren Cty.*, 799 F. App'x 329, 342 n.4 (6th Cir. 2020)(noting "[w]hatever Kingsley requires, it is more than negligence"). Plaintiffs' allegations against Nurse Fennigkoh are that she failed to initiate more in-depth medical investigations to obtain Ms. Boyer's diagnoses. The conduct does not rise to the level of a constitutional harm.

Neither of plaintiffs' retained "standard of care" experts are qualified correctional nurses. *See* ECF 224 at 36:14-37:16, 108:12-109:25; *See generally* ECF 246, ECF 249. Assuming for purposes of this motion they are qualified to address her conduct, their reports and criticisms are framed in terms of negligence—that the defendants collectively "breached the standard of care." *See e.g.* ECF 246 at 20, ECF 249 at 11. Defendants will demonstrate—with a qualified correctional nursing expert—that she met the standard of care of her profession. *See* ECF 231 at 1-5; *see also* Pearson Decl. Ex 1. But plaintiffs' experts do not create a triable issue of fact as to whether Nurse Fennigkoh recklessly disregarded Ms. Boyer or acted in a manner so far removed from reasonable that the court could conclude she failed to exercise judgment at all.

Plaintiff and his experts must concede that Ms. Boyer was not demonstrating clinical signs of an impending cardiac arrhythmia on December 21. (DJPFOF ¶¶ 28-42; *see* ECF 232). Nor was she complaining of chest pain when Nurse Fennigkoh was involved on December 22. (DJPFOF ¶ 87). They cannot demonstrate that she turned her back in the face of "obvious" consequences for Ms. Boyer in doing so. *Pittman IV,* 108 F.4th at 571. To the contrary, Nurse Fennigkoh remained involved to confirm that the nurse practitioner was alerted, to make sure the counselor saw Ms. Boyer on a Sunday, to confirm for the officers they were acting appropriately in following the nurse practitioner's directions, to encourage Mr. Boyer to bring to the Jail any medications or health information he could obtain, and to communicate to the staff that they should alert the nurse practitioner when Mr. Boyer arrived at the Jail. Her conduct on both December 21 and December 22 demonstrates, as a matter of law, the exercise of professional judgment.

The court cannot conclude on this record that the medical providers were reckless or exercised no judgment. Even if Nurse Fennigkoh had been alerted to additional symptoms on

Sunday, December 22, she knew the officers had communicated directly with the nurse practitioner and that NP Pisney had issued orders. Nurse Fennigkoh advised the officers to follow the protocol in place for when the Jail was not staffed, i.e., contact the provider directly. She is entitled to defer to the instructions of the licensed provider or to exercise her judgment to defer. *McCann v. Ogle Cnty.,* 909 F.3d 881, 887 (7th Cir. 2018)(holding nurses may rely on treating physician's instructions absent an obvious risk of harm in following those instructions). It certainly was not "obvious" that Ms. Boyer's symptoms were unaddressed at the time of Nurse Fennigkoh's last involvement on Sunday.

**f.     Plaintiff's punitive damage claim against Ms. Fennigkoh must be dismissed.**

Punitive damages may be awarded in a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Green v. Howser*, 942 F.3d 772, 781 (7th Cir. 2019), *quoting Smith v. Wade*, 461 U.S. 30, 56 (1983). To the extent plaintiff is making a claim for punitive damages based upon the conduct of Nurse Fennigkoh, it should be dismissed. (Fourth Am. Compl., ECF 161, at 38). For the reasons cited above, plaintiff has no credible evidence that Nurse Fennigkoh acted with "evil motive or intent" or "reckless or callous indifference." (*See* ECF 231). To the extent plaintiff's claims for punitive damages are premised on state law, they are not recoverable against a health care provider and must be dismissed. *See Lund v. Kokemoore*, 195 Wis.2d 727, 734, 537 N.W.2d 21 (Ct. App. 1995).

**III.     NURSE PRACTITIONER PISNEY IS ENTITLED TO SUMMARY JUDGMENT WITH RESPECT TO PLAINTIFF'S § 1983 DENIAL OF MEDICAL CARE CLAIM (COUNT I OF THE FOURTH AMENDED COMPLAINT).**

Ms. Pisney, an Advanced Practice Nurse Prescriber, is sued based on her role as the on-call provider on Sunday, December 22. Ms. Boyer initially reported a concern for elevated blood pressure in the mid-afternoon, for which Ms. Pisney prescribed an appropriate and efficacious intervention—i.e., the administration of Clonidine. (DJPFOF ¶¶ 61-62). Ms. Boyer much later made a single report of chest pain. (*Id.* ¶¶ 86-87, 101, 106-11). Ms. Pisney attributed the report to continued anxiety related to her arrest and elevated blood pressure and asked for continued close monitoring and a call-back report in 30 minutes. (ECF 218, Pisney Tr., at 188:12-189:1). The report of chest pain immediately resolved, and Ms. Boyer's vitals were measured as within acceptable parameters. (DJPFOF ¶¶ 100-01, 106-11).

### a.    NP Pisney's conduct was not objectively unreasonable in the totality of the circumstances.

Ms. Pisney was initially contacted by the Jail concerning Ms. Boyer at approximately 7:00 a.m. on Sunday, December 22, when Corrections Officer Dempsey called her, as the on-call provider, to verify whether Jail staff could give Ms. Boyer the medications she had with her when she was booked into the Jail. (DJPFOF ¶ 49). Ms. Pisney approved Ms. Boyer's existing prescription for a nausea medication as needed and approved her having access to her inhaler for asthma as needed. (ECF 218, Pisney Tr., at 133:12-135:9; Jones Decl., Ex. 5). Ms. Pisney directed that on Monday, December 23, Jail staff should contact both the Medicine Shoppe to get a complete list of Ms. Boyer's medications and Gundersen Health System to obtain her medical records. (DJPFOF ¶ 50).

Ms. Pisney was next contacted regarding Ms. Boyer after Ms. Boyer told Jail staff that she felt hot and sweaty and asked to have her blood pressure taken. (*Id.* ¶ 60). Ms. Pisney directed the officer to give Ms. Boyer a .2 mg. dose of Clonidine, an antihypertensive drug that lowers blood pressure, and to re-check Ms. Boyer's blood pressure at 3:45 p.m. (*Id.* ¶ 61). When

the officers re-checked Ms. Boyer's blood pressure at 3:45 p.m. it had improved but was still elevated. (*Id*. ¶ 62). Ms. Boyer did not convey any further complaints to the officer when her blood pressure was measured at 3:45 p.m. (*Id*. ¶ 64).

As instructed, the officer called Ms. Pisney again after taking Ms. Boyer's blood pressure at 3:45 p.m. (*Id*. ¶ 65). Ms. Pisney noted the initial dose of medication appeared to be effective in addressing Ms. Boyer's blood pressure. (*Id*. ¶ 66). She was concerned that immediately administering more medication might cause Boyer's blood pressure to drop too far, so decided to allow more time for the initial dose to take effect and to re-check Boyer's response after a little more time. (*Id*.) Ms. Pisney directed the officer to re-check Ms. Boyer's blood pressure again in one hour and, if the diastolic pressure was over 100, to give Ms. Boyer another .1 mg dose of Clonidine. (*Id*. ¶ 67). The officer took Ms. Boyer's blood pressure again at approximately 5:00 p.m. (*Id*. ¶ 68). Ms. Boyer's blood pressure was 164/101, so she gave Ms. Boyer .1 mg of Clonidine as directed by Ms. Pisney at around 3:45 p.m. (*Id*. ¶ 69).

Ms. Boyer's symptoms as reported at 3:00 p.m. appear to have resolved, as she is noted in the officer's Observation Log as "alert and quiet" and "talking, seems fine" in the late afternoon. (Jones Decl., Ex. 7 at 1-2). Ms. Boyer spoke by telephone with her husband three times between 5:50 p.m. and 6:20 p.m. (DJPFOF ¶ 71). During those three calls, Ms. Boyer did not tell Mr. Boyer she was experiencing chest pain. (*Id*.)

Ms. Boyer reported experiencing chest pain between approximately 7:25 and 8:00 p.m. on December 22. (*Id*. ¶ 86). This was the first time Ms. Boyer described what she was experiencing as chest pain. (*Id*. ¶ 87). While gathering further information the officer observed that Ms. Boyer's condition did not present to her as emergent. (*Id*. ¶ 95). The officer described

Ms. Boyer as sitting up, talking, able to provide her with information, responsive, and not doubled over in pain. (*Id.*)

The officer called Ms. Pisney to report the new symptoms. (*Id.* ¶ 96). She was told that Ms. Boyer had some slight shortness of breath, but that she was not sweating. (ECF 218, Pisney Tr., at 27:13-22). She was told that Ms. Boyer's blood pressure was elevated, but not as elevated as previously, and that her heart rate and blood oxygen saturation was normal. (*Id.* at 28:11-29:24). She instructed the officer to Ms. Boyer 81 mg. of aspirin and to re-check her vital signs in thirty minutes. (DJPFOF ¶ 98). Pisney further instructed Moga to call her back again if Boyer's vital signs were again abnormal and she continued to complain of chest pain. (*Id.*)

The officers re-checked Ms. Boyer's vitals at 8:53 p.m. (*Id.* ¶ 100). Her blood pressure was 142/92, her oxygen level was 100%, and her pulse was 84-87 beats per minute. (*Id.*) Ms. Boyer did not ask the officer for help at that time or complain again of chest pain after the initial report around 7:25 p.m. (*Id.* ¶¶ 97, 99-105). Two officers completed at least thirteen (13) wellness checks after 8:00 p.m. with no report of further symptoms. (*Id.* ¶¶ 106-109). The officers' Observation Log indicates Ms. Boyer was observed either "sleeping" or "alert and quiet" from 8:39 p.m. through 1:36 a.m. on December 23. (Jones Decl., Ex. 7 at 2). Ms. Pisney was not contacted after the approximately 8:00 p.m. interaction with the officer. (DJPFOF ¶¶ 100-03).

### b.    Ms. Pisney exercised professional judgment in assessing the potential diagnoses and was not reckless.

Neither of plaintiff's retained standard of care experts are qualified correctional nurse practitioners. *See* ECF 224 at 36:14-37:16, 108:12-109:25; *see generally* ECF 246, ECF 249. Assuming for purposes of this motion they are qualified to address Ms. Pisney's conduct, their reports and criticisms are scopd in terms of negligence—that the defendants collectively

"breached the standard of care." *See e.g.* ECF 246 at 20, ECF 249 at 11. Plaintiff's retained experts allege Ms. Pisney breached the standard of care in her management of the differential diagnoses suggested by Ms. Boyer's clinical presentation. Defendants will demonstrate—with a qualified correctional nursing expert—that she met the standard of care of her profession. (ECF 230 at 14). But, again, plaintiff's experts do not create a triable issue of fact as to whether Ms. Pisney recklessly disregarded Ms. Boyer or acted in a manner so far removed from reasonable that the court could conclude she failed to exercise judgment at all.

Plaintiff's experts' criticisms fall short of the necessary proof to withstand this motion. Dr. Bentley was asked, "Q. And if I understand your opinion with regard to Nurse Pisney, you believe that she did not employ the process of differential diagnosis and follow up appropriately, right?" She responded: "Correct." (ECF 224, Bentley Tr., at 66:16-19). She agreed also that "the formulation of a differential diagnosis requires the provider's exercise of judgment in determining what are the most serious potential causes of a symptom." (*Id.* at 62:17-21). She agreed that providers must "exercise their clinical judgment in determining what are the most likely explanations for []symptoms" and that "reasonable practitioners can disagree on the particular order of diagnoses on a differential." (*Id.* at 62:22-63:10). Another of plaintiff's experts, Dr. Jeffrey Keller, agreed the "ordering of the potential diagnoses on a differential diagnosis [list] involves the application of clinical judgment to the facts and circumstances of the case." (ECF 225, Keller Tr., at 134:6-13; 134:22-135:4).

Plaintiff concedes in criticizing NP Pisney's management of the differential diagnosis that she exercised professional judgment in responding to Ms. Boyer's symptoms. She explained her thought process in her deposition:

> A.    So in my judgment, in my experience treating patients in the jail—in my
>        professional judgment, I didn't feel that cardiac was high on the list of

> differential [diagnoses]. We had been treating her blood pressure and having good responses to the medications. Clonidine is also helpful in use -- in helping with anxiety, and withdrawal, and her blood pressure was improving. It was up a little bit when they called me with the chest pain, so that's why I wanted them to check again in a half an hour, and also to let me know if she'd had any continued chest pain. From the observations that the officers made after that time, they rechecked her blood pressure. It was not elevated. She did not continue to complain of chest pain, and she was resting comfortably throughout the night.

(ECF 218, Pisney Tr., at 188:12-189:1).

Whether Ms. Pisney exercised judgment has not been contested, and her conduct does not rise to the level of "something more than negligence" (i.e., reckless disregard) as a matter of law. "[E]vidence that *some* medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim." *Petties v. Carter,* 836 F.3d 722, 729 (7th Cir. 2016). The Court of Appeals in *Stockton v. Milwaukee Cnty.,* 44 F.4th 605, 616 (7th Cir. 2022), addressed a similar circumstance in which a nurse was criticized for failing to include a cardiac condition within the differential diagnosis. The appellate court affirmed summary judgment, holding that the nurse's decision to forego tests (such as blood work or an EKG) to rule out that condition is "'a classic example of a matter of for medical judgment.'" (*Id.* at 616). Plaintiff alleges here that NP Pisney should have obtained those same tests. While plaintiff's experts dispute her decision, their criticisms do not rise to the level of constitutional recklessness and plaintiff cannot credibly dispute that Ms. Pisney exercised her judgment. *See Davis v. Harding*, No. 12-cv-559-wmc, 2014 U.S. Dist. LEXIS 151406, at *4-6, 2014 WL 5454216 (W.D. Wis. Oct. 24, 2014)(declining reconsideration of dismissal where plaintiff claimed physician failed to timely perform required suicide risk assessment, noting conduct may fall short of standard of care, "but was not the type of grievous error" that would demonstrate lack of professional judgment).

It should be noted also in the context of this discussion that there is no evidence that Ms. Boyer's chest pain the evening of December 22 was the result of an ischemic "heart attack" as plaintiff has alleged. (Fourth Am. Compl., ECF 161, at ¶¶ 2, 22, 30-32, 37). Defendants' expert, a cardiologist affiliated with the University of Wisconsin-Madison, has demonstrated Ms. Boyer's respiratory arrest in the early hours of December 23 was the result of a cardiac arrhythmia, not ischemic blockage. (ECF 232 at 5-8). Plaintiff's retained cardiologist does not dispute that conclusion; he cannot say with reasonable certainty that Ms. Boyer's symptoms during the evening of December 22 were the result of ischemia. (ECF 229, Charash Tr., at 44:11-46:9). Her symptoms may well have resulted from situational anxiety and chronic hypertension, in which case there was no cardiac condition that required treatment and Ms. Boyer was appropriately treated with Clonidine. *Wilson v. Adams*, 901 F.3d 816, 822 (7th Cir. 2018)(affirming summary judgment where prison physician declined to follow specialist instruction, but "decided the best course of action was to continue providing pain medication and monitoring the numbness in [plaintiffs'] hand; holding plaintiff failed to present evidence that his decision was "a substantial departure from accepted professional judgment, practice, or standards.")(Citation omitted).

### c.    Plaintiff's punitive damage claim against Ms. Pisney must be dismissed.

The punitive damage claim against NP Pisney should be dismissed for the reasons stated above with respect to Nurse Fennigkoh. (Fourth Am. Compl., ECF 161, at 38). There is insufficient evidence to present a triable issue of fact that Ms. Pisney was "motivated by evil motive or intent" or that her conduct was "reckless or callous[ly] indifferen[t]." *Green*, 942 F.3d at 781. To the extent plaintiff's claims for punitive damages are premised on state law, they are

not recoverable against a health care provider and must be dismissed. *See Lund*, 195 Wis.2d at 734.

IV.     **ADVANCED CORRECTIONAL HEALTHCARE IS ENTITLED TO SUMMARY JUDGMENT WITH RESPECT TO PLAINTIFF'S § 1983 DENIAL OF MEDICAL CARE CLAIM (COUNT I OF THE FOURTH AMENDED COMPLAINT).**

To succeed on a *Monell* claim, plaintiff must prove three elements: (1) an action pursuant to the defendant entity's policy, (2) culpability, meaning that policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations, and (3) causation, meaning the municipal action was the "moving force" behind the constitutional injury. *Hall v. City of Chicago*, 953 F.3d 945, 950-51 (7th Cir. 2020), *citing Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404-07 (1997). The "critical question" is whether the municipality (or corporate entity) had a policy or practice that gave rise to the harm. *Glisson v. Ind. Dep't of Corr.,* 849 F.3d 372, 379 (7th Cir. 2017)(en banc). A "rigorous application of the proof requirements is especially important" where, as here, plaintiff does not contend the entity directly caused the harm but caused an employee to do so. *Bohannon v. City of Indianapolis*, 46 F.4th 669, 676 (7th Cir. 2022)(providing that *Monell* criteria "'must be scrupulously applied' to prevent backsliding into an impermissible claim for vicarious liability.")

Importantly, the "requisite degree of culpability"—regardless of the constitutional standard applicable to the underlying claim—is "conscious disregard for a known or obvious risk" of causing a constitutional deprivation, i.e., subjective deliberate indifference. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 236 (7th Cir. 2021). The Supreme Court stated, "As we have observed in *Monell* and have repeatedly reaffirmed, Congress did not intend municipalities to be held liable unless *deliberate* action attributable to the municipality directly

caused a deprivation of federal rights." *Bd. Of Comm'rs of Bryan Cnty. v. Brown*, 570 U.S. 397, 415 (1997)(emphasis in original).

Plaintiff fails to demonstrate the existence of a genuine issue of material fact with respect to all three required elements.

> a.   **Plaintiff fails to create a triable issue of fact as to the existence of widespread ACH practices that were the moving force behind Ms. Boyer's death.**

The Seventh Circuit Court of Appeals have identified three ways in which a municipality or entity might violate § 1983: (1) through an express policy that, when enforced, causes a constitutional deprivation; (2) through a "wide-spread practice" that although not authorized by written law and express policy, is so permanent and well-settled as to constitute a "custom or usage" with the force of law; or (3) through an allegation that the constitutional injury was caused by a person with "final decision policymaking authority." *Calhoun v. Ramsey,* 408 F.3d 375, 379 (7th Cir. 2005), *quoting McTigue v. City of Chicago,* 60 F.3d 381, 382 (7th Cir. 1995).

Plaintiff proceeds here under the second approach—the assertion that ACH has endorsed unconstitutional practices by its employees that are so widespread and pervasive that ACH must be deemed to be aware of the unlawful practices and deliberately adopted those practices as company "policy." *Jackson v. Marion Cty.,* 66 F.3d 151, 152 (7th Cir. 1995)(noting *Monell* defendant "must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers.) The Seventh Circuit has cautioned that "the word 'widespread' must be taken seriously." *Phelan v. Cook Cnty.,* 463 F.3d 773, 789-90 (7th Cir. 2006). Plaintiff fails to meet "the high bar" required to withstand summary judgment as to this initial element. *LaPorta,* 988 F.3d at 987

     1.       **Plaintiff cannot demonstrate the existence of relevant customs, patterns or practices at the Monroe County Jail.**

To succeed plaintiff must demonstrate ACH was aware of a widespread practice of unconstitutional conduct and failed to take steps to remedy the practice. Plaintiff must also demonstrate the practice constituted a policy choice that was "the *moving* force behind the [plaintiff's] constitutional violation." *Thomas v. Cook Cty. Sheriff's Dept.*, 604 F.3d 293, 306 (7th Cir. 2009)(italics in original). Logically, if the practice was so pervasive as to have the force of a *de facto policy* decision, plaintiff would be able to demonstrate its existence with a significant number of illustrative cases among the 1100+ patient charts obtained from the Monroe County Jail. Plaintiff cannot meet the high bar necessary to show the existence of a relevant policy or practice at Monroe County Jail.

First, to be clear, the vast majority of the cases and instances plaintiff plead as comparators in the Third and Fourth Amended Complaints are no longer being pursued. Defendants' motions challenging the sufficiency of the *Monell* pleadings were denied, in part, because plaintiff was able to recite nineteen (19) incidents that allegedly occurred at the Monroe County Jail between 2015 and 2021. (*See* ECF 134, at 9 Order Denying Motion for Judgment on Pleadings). As the Court noted in its decision, defendants challenged the pleading because plaintiff—whose counsel possessed the Monroe County Jail patient files at the time of pleading—failed to clarify in the pleading whether the detainees identified in those incidents *suffered a medical complication at all*. (*Id.* at 13). The Court concluded defendants' challenge was premature at the pleading stage. Not surprisingly, when called on to prove the allegations that allowed plaintiff to survive dismissal on the pleadings, plaintiff has abandoned eighteen (18)

of the nineteen (19) Monroe County Jail incidents he pled.[4] *Compare* ECF 246 *with* ECF 161 ¶¶ 76-95.

Now plaintiffs' comparators are minimal. From the 1100+ inmate medical files for care provided by ACH at the Jail, plaintiffs' *Monell* expert cites only four (4) instances of alleged substandard inmate care at the Jail ranging from 2015 to 2020. ECF 246. Even if the cases were factually similar, which they are not, the showing is insufficient to withstand summary judgment as a matter of law. The Court should dismiss the *Monell* claim on this well-established basis. *See Bridges v. Dart*, 950 F.3d 476, 480 (7th Cir. 2020) (*quoting Connick v. Thompson*, 563 U.S. 51, 61 (2011)); *Hildreth v. Butler*, 960 F.3d 420, 427 (7th Cir. 2020) ("Three instances of prescription delays over nineteen months involving solely one inmate fail to qualify as a widespread unconstitutional practice so well-settled that it constitutes a custom or usage with the force of law."); *Doe v. Vigo County*, 905 F.3d 1038, 1045 (7th Cir. 2018) (holding that a "handful of incidents of misconduct," including three incidents of sexual contact, two incidents of inappropriate comments, and two allegations of harassment over two decades "is not enough to establish a custom or practice"); *Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016) ("Monell claims based on allegations of an unconstitutional municipal practice or custom — as distinct from an official policy — normally require evidence that the identified practice or custom caused multiple injuries."); *Wilson v. Cook County*, 742 F.3d 775, 780 (7th Cir. 2014) ("Although this court has not adopted any bright-line rules for establishing what constitutes a

---

[4] The single instance of alleged bad care asserted in the Fourth Amended Complaint that plaintiff still contends is evidence of a *Monell* pattern is Inmate CX, discussed below. There is no evidence that CX suffered a medical complication or that his care at the Jail was deficient. (Kafka Decl., Ex. 2 MONROE_COUNTY 3047-3146; ECF 233 at 21-22).

widespread custom or practice, it is clear that a single incident — or even three incidents — do not suffice.")

The dearth of material specific to the Monroe County Jail is not surprising, as only one individual died in the Jail (or after being transported from the Jail for medical reasons) in the 10-year period before Ms. Boyer's death. (DJPFOF ¶ 153). Two individuals died by suicide at the Jail in that same period. (*Id.* ¶ 154). There is no evidence either had a medical concern.

ACH began providing services at the Jail in 2012. (*Id.* ¶ 144). If, as plaintiff alleges, it was ACH's *policy and practice* to provide substandard care for the last 12 years, plaintiff should be able to identify more than a handful of cases where ACH's alleged practices resulted in bad outcomes among 1100+ in-patient encounters at the Jail. *See Strauss*, *See Strauss v. City of Chicago*, 760 F.2d 765, 769-70 (7th Cir. 1985) (holding that the plaintiff must allege facts showing a "systemic" problem based on prior, similar instances of misconduct). There is certainly not a pattern visible with such clarity that it would be "plainly obvious" to ACH. *Stockton,* 44 F.4th at 617.

> **2.      The Monroe County cases cited by plaintiff's expert do not credibly support the existence of a cognizable pattern of deficient care at the Monroe County Jail.**

In addition to being simply insufficient in number to demonstrate a pervasive pattern under well-established *Monell* precedents, the Monroe County cases cited by plaintiff's expert are too dissimilar to put ACH administrators on actual notice of alleged deficient practices. The challenged practice in a *Monell* case must be comprised of incidents of *unconstitutional conduct* that share common features. *Connick v. Thompson*, 563 U.S. 51, 62, 131 S.Ct. 1350, 179 L.Ed. 2d 417 (2011) ("A pattern of similar constitutional violations" is ordinarily required to support a finding of deliberate indifference); *Dean,* 18 F.4th at 236 (requiring "a prior pattern of similar

constitutional violations"); *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017) (faulting the plaintiff for failing to allege examples of misconduct similar to that undertaken by the defendants). Plaintiff's recitation of anecdotal cases proves nothing pertinent to the medical decision-making in Ms. Boyer's case. *See Tillman v. Burge*, 813 F.Supp. 2d 946, 978 (N.D. Ill. 2011) (explaining that a "splatter-paint [] picture of scattered violations" and "collateral accusations of marginally related incidents" does not suffice to establish policy or practice); *Williams v. Milwaukee Cty.*, No. 18-CV-1045-JPS, 2019 U.S. Dist. LEXIS 5979, at *14-15 (E.D. Wis. Jan. 14, 2019) (commenting that *Monell* claim "should be aimed at discrete, definable practices which directly caused plaintiffs' injury.")

**Inmate LS**. Plaintiff's expert, Dr. Venters, cites the death of a 69-year old gentleman, *LS,* as demonstrating a "pattern" of inadequate medical screening by ACH and the Jail.[5] (ECF 246 at p. 17). LS is the only Monroe County case (other than Ms. Boyer's case) cited to support the allegation that ACH had a nationwide practice of conducting inadequate screenings and that it was the moving force behind Ms. Boyer's death. (*Id*. at pp. 12-17). LS was not intoxicated at the time of his detention in 2016 and was able to provide a complete and accurate medical history, including the names, dosages and prescribers for thirteen medications he was taking. (ECF 233 at 12). He reported, among other things, COPD and emphysema, for which he was given a nebulizer and inhalation solutions to keep in his cell. (*Id*. at 13). LS refused to cooperate to allow a physician to complete a health assessment and physical at his 14th day of incarceration. (*Id*.) He refused other treatments and was informed of the risks of refusing care. LS passed in the night, apparently of natural causes, after thirty days in the Jail. (*Id*.) He did not submit sick call

---

[5] The inmate-patients referred to as comparators by plaintiffs' expert will be referred to by initials. LS's available records are filed under seal as Ex. 1 to the Declaration of Daniel A. Kafka.

requests or articulate any complaints about his care. (*Id.*) There is no basis to conclude he received constitutionally-deficient medical care or that his passing four years prior to Ms. Boyer's death—the only passing of an inmate from medical causes in a decade—should have alerted ACH to a pattern of deficient care.

**Inmate JL**. Dr. Venters cites the suicide in 2015 of a 50-year old woman, **JL,** as evidence of substandard attention to drug and alcohol withdrawal at the Jail.[6] (ECF 246 at p. 34). Dr. Venters notes JL "had substance use documented during intake." (*Id.*) He notes also that "[w]ithdrawal increases the risk of suicide." (*Id.*) The "substance use" Dr. Venters referred to is JL's preliminary breath test measurement of .089 at arrest. (Kafka Decl., Ex. 13 at MC 002473). Importantly, Dr. Venters concedes he has no basis to believe JL actually suffered withdrawal or that it contributed to her suicide in any way. (ECF 223, Venters Tr., at 143:21-144:4). Nor is Dr. Venters able to testify that Ms. Boyer was suffering from withdrawal during the time she was in the Jail. (*Id.* at 93:10-94:10). His opinion about JL is irrelevant: he cannot say JL suffered withdrawal and received deficient care, nor can he say the Jail's withdrawal monitoring was in any way pertinent to Ms. Boyer's death.

**Inmate KW.** Dr. Venters cites an attempted suicide at the Jail in 2020 for the same reasons. (ECF 246 at 34). **KW** was booked at the Jail in September 2020.[7] His incarceration occurred <u>after</u> Ms. Boyer's passing, so could not have put ACH on notice of a pattern of unconstitutional care at the Jail. He attempted suicide shortly after incarceration and was cleared at the hospital. He returned to the Jail and was placed on suicide watch, at which time he reported, for the first time, opiate withdrawal. (Kafka Decl., Ex. 13 at MC 2280). The withdrawal

---

[6] JL's available records are filed under seal as Ex. 13 to the Declaration of Daniel A Kafka.

[7] KW's available records are filed under seal as Ex. 12 to the Declaration of Daniel A. Kafka.

protocol was initiated, and detox medications were provided. (*Id.*) Dr. Venters concedes he has no basis to believe withdrawal contributed to KW's suicide attempt. (ECF 223, Venters Tr., at 141:16-23, 143:6-20). Again, Dr. Venters cannot testify that Ms. Boyer was suffering from withdrawal during the time she was in the Jail, making his concerns about KW's withdrawal monitoring moot. (*Id.* at 93:10-94:10).

**Inmate CX.** Finally, Dr. Venter's written report cites care rendered in 2016 to a gentleman, *CX,* as evidence of a pattern of failing to send inmates to a hospital for emergency care.[8] (ECF 246 at p. 28). Notably, the Court previously understood plaintiffs' *Monell* case to be based on "whether defendants had a pattern and practice of discouraging the provision of off-site emergency care." (*See* Order Denying Motion for Judgment on Pleadings, ECF 134, at 14). CX is now the only Monroe County case cited to support the allegation that ACH discouraged off-site emergency care. (ECF 246 at 27-28). Of additional note, Dr. Venter apparently rendered his opinion without having access to CX's medical records. (Knott Decl., ¶¶ 5-21).

Regardless, CX's care does nothing to suggest ACH had a pattern or practice of unconstitutional care. CX, age 48, complained of chest pain, which he attributed to having eaten "hot sauce and noodles." (Kafka Decl., Ex. 2 at MC 3074). The on-call physician was consulted, and he was provided two tums or Mylanta. (*Id.*) The next morning, CX reported chest pain and was promptly sent to the hospital. (*Id.* at 3069). There is no evidence available about what occurred at the hospital. There is no basis to speculate that CX suffered a cardiac event or that his care was in any way deficient. (Kafka Decl., Ex. 2; ECF 233 at 21-22).

In short, plaintiff's collection of four cases of dissimilar nature, involving different types of health care encounters, spread over at least five years, and drawn from a universe of more than

---

[8] CX's available records are filed under seal as Ex. 2 to the Declaration of Daniel A. Kafka.

1100 patient charts, fails to demonstrate a relevant pattern at work at the Jail. *See Thomas v. City of Markham.*, No. 16 CV 08107, 2017 U.S. Dist. LEXIS 160635, 2017 WL 4340182, at *4 (N.D. Ill. Sep. 29, 2017) ("[A]llegations of general past misconduct or allegations of dissimilar incidents are not sufficient to allege a pervasive practice and a defendant's deliberate indifference to its consequences.").

The fallacy of plaintiff's theory is further demonstrated by undisputed evidence that there are thousands of bookings at the Jail each year, resulting in thousands of intake medical screenings each year, and that detainees at the Jail are transported routinely and consistently to off-site providers for emergency medical care, specialist care, and for other medical reasons. (DJPFOF ¶¶ 157-171). The fact that thousands of bookings occur each year and that plaintiff's expert can locate only one case—patient LS—of alleged inadequate screening suggests it is not pervasive at the Jail. The fact that hundreds of detainees are transported for off-site care without incident or complaint suggests it is not ACH's practice to discourage or delay such care.

### 3.    Plaintiff has failed to demonstrate the existence of *de facto* policies governing care at ACH facilities nationwide.

As demonstrated, plaintiff has had ample opportunity in access to patient records at the Monroe County Jail to identify instances of care suggesting a widespread pattern at that facility. Plaintiff fails to meet the threshold numerically or to demonstrate substantial similarities in the few cases cited to credibly suggest the functioning of an ACH-endorsed policy there. But plaintiff has broadened the scope of his search to encompass instances of alleged bad care at

ACH facilities nationwide. Having expanded the search, plaintiff cites eight (8) additional instances of alleged substandard care at ACH facilities nationwide.[9] (ECF 246 at 26-28).

While nominally increasing the number of cases he can cite as evidence of a widespread pattern, widening the lens of patient encounters under examination takes plaintiff much further away from demonstrating a recognizable pattern and practice. ACH has agreements to provide services at more than 285 jails in at least 19 states nationwide. (DJPFOF ¶ 180). It serves a patient population of over 22,000 detainees daily. (*Id.* ¶ 181). It estimates that it performs at least 340,000 initial medical assessments and has more than 488,000 patient encounters yearly. (*Id.* ¶¶ 182-83). Spread over the window of time plaintiff has posited as relevant (2016-2020), ACH has had, quite conservatively, millions of patient encounters. Lynch Decl. ¶ 5 Ex 1. Of those encounters, plaintiff has cited 12 cases *total* (Monroe County and nationwide) as evidence of *four* separate and distinct widespread practices. (ECF 246 at pp. 26-29).

While plaintiff's recitation of eight cases from other ACH facilities would meet a formulaic standard for the required minimal instances of proof, *see, e.g., Hildreth v. Butler,* 960 F.3d 293, 303 (7th Cir. 2010)(noting court has not adopted "bright line rules" but frequency of conduct "must be more than three"), the reliance on a quantitative benchmark directly contradicts the appellate courts' rationale and holdings. Those cases instruct that context and common sense is necessary. *See, e.g., First Midwest Bank v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021)("These requirements—policy or custom, municipal fault, and 'moving force' causation— must be scrupulously applied in every case alleging municipal liability.")

---

[9] Plaintiff's expert makes passing reference to an alleged ninth comparator, RI, but concedes he has no medical records and therefore no ability to assess the care given to that individual. Dr. Venters does not identify the facility where RI was housed or the year. It is nothing more than speculation to assume he was ACH's patient or that his care was substandard. *Kenosha Liquor Co. v. Heublein*, 895 F.2d 418, 420 (7th Cir. 1990)(holding expert cannot carry evidentiary burden without proof of necessary foundation for his conclusion).

The *Monell* analysis cannot be applied mechanically. By opening the lens of his argument to include the entire night sky, plaintiff has not made a connected pattern among millions of stars more obvious; he has done the opposite. The expansion of scope obliterates the pattern attributed to a few points of data. *McCauley*, 671 F.3d at 616-617 ("The required level of factual specificity rises with the complexity of the claim")

The district court's discussion in *Story v. Dart*, 2023 U.S. Dist. LEXIS 49400 (N.D. Ill. March 23, 2023) is useful. In that case a detainee at the Cook County Jail claimed the County's failure to have an on-site oral surgeon and dentistry staff caused him to suffer unnecessary delays in getting a painful tooth extracted. The County, faced with professional staffing shortages, attempted to outsource dental surgeries to a hospital. Plaintiff claimed that the policy of outsourcing—a discernable entity decision—gave rise to a pattern of similar harms. He claimed that, in addition to himself, five other inmates had experienced delays in getting extractions at the hospital. (*Id.* at *23). The district court commented that "the number is not so numerous." (*Id*). It noted that "the span of time waters down the number" and that plaintiff's evidence amounted to "a few detainees each year." *Id.* The court continued:

> The examples appear especially insubstantial given the number of inmates who are incarcerated at Cook County Jail as a whole. Thousands of detainees are at Cook County Jail at any one time, with tens of thousands coming and going each year.
> …
>
> **When evaluating frequency, the raw number of incidents is not the entire universe. The *denominator* matters, too. The percentage sometimes says more than the absolute number.**
> …
>
> It's hard to imagine any problem at a large facility like Cook County Jail that isn't experienced by more than one inmate. Given the numbers, problems are bound to repeat themselves. If six examples are enough in a large institutional setting, *Monell* claims would be the rule rather than the exception.

37

*Id.* at *23-25 (italics in original; bolding supplied).

The court concluded the incidents of delayed treatment were "so few and far between that they could not plausibly be described as 'so persistent and widespread as to practically have the force of law.'" *Id.* at * 24-25, *quoting Bridges v. Dart*, 950 F.3d 476, 480 (7th Cir. 2020)(internal cite omitted). Six examples arising from a single large jail over multiple years did not illuminate a pattern. Defendants were granted summary judgment.

Plaintiff's argument here is even more attenuated than *Story*. The plaintiff in *Story* identified six individuals impacted by the same cognizable practice: the Cook County's decision to outsource dental care. Here, plaintiff uses eight comparators to prove *four* alleged patterns that are held together only by plaintiffs' expert's supposition. (ECF 246 at 26-29). The comparators are spread across five years (2016-2020), implicating thousands upon thousands of patient contacts at 285 ACH-served facilities. (*Id.* at pp. 26-29; DJPFOF ¶¶ 180-183). There is no evidence that the nursing and medical staff at the facilities in Alabama, Indiana, Kentucky, and Michigan received training similar to Nurse Fennigkoh or Ms. Pisney, or that their conduct was attributable to an ACH practice. The medical complication that arose in those cases, if any, may have resulted from the providers' individual exercise of judgment. Not every medical complication (or resulting litigation) can be attributed to institutional policies rather than individuals' decisions.

Plaintiff's argument is unprecedented. Defendants can locate no case authority discussing a *Monell* claim against a corporation doing business at multiple facilities in multiple states where the alleged pattern is discernable only at the highest level of abstraction, i.e., a few inmates had bad results. In contending ACH has a nationwide policy at each of 285 facilities, plaintiff

expands "the denominator" by many multiples and obliterates the evidentiary value of the cited cases.

### 4. Cases cited from other states do not demonstrate pervasive patterns that ACH can be deemed to have adopted.

Plaintiffs' expert, Dr. Venters, attempts to distill a few bad outcomes at ACH-served facilities into discernable "policies" that he alleges are relevant to Ms. Boyer's care at the Monroe County Jail. (ECF 246 at 26-29). His effort to make connections between those instances—primarily settled lawsuits—and Ms. Boyer's case is strained beyond plausibility. A plaintiff may not "splatter-paint a picture of scattered violations" without common features. *Terry v. Cty. of Milwaukee*, No. 17-cv-1112, 2018 WL 2567721, at *8 (E.D. Wis. Jun. 4, 2018) (citation omitted). That is what Dr. Venters and plaintiff have done here.

### a. Plaintiff fails to demonstrate a widespread pattern of inadequate receiving assessments.

Dr. Venters cites just *two patients* (other than Ms. Boyer) as evidence that ACH has a nationwide custom, policy or practice of failing to perform adequate receiving screenings. (ECF 246 at 12-20). As noted above, he contends that only one patient at the Monroe County Jail, LS, fits the "pattern." (*See* Sect. IV.a.2., *supra*). As asserted above, LS was not intoxicated at the time of his arrest and, unlike Mr. Boyer, gave a complete medical history and complete list of thirteen medications, which were timely addressed by the medical staff. (ECF 233 at 12). LS died thirty days after his initial assessment and booking, apparently of natural causes. (*Id.* at 13).

**Inmate MI (Missouri 2016)**. Nor does the one patient event from outside Wisconsin bear any relevance to Ms. Boyer's case. That inmate, **MI**, was arrested in Audrain County,

Missouri, in 2016.[10] (ECF 246 at 26). He was taken by the arresting officers to an emergency department before he was brought to the jail. (Kafka Decl., Ex. 3 at 19). He was thoroughly assessed in the emergency room and certified in writing as "Fit for Confinement." (*Id*.).

The futility of Dr. Venters' effort is demonstrated by MI's case. He was seen by an emergency room doctor and deemed fit for incarceration before coming to the jail, which is the very process Dr. Venters argues should have occurred in Ms. Boyer's case. Dr. Venters is, paradoxically, using an instance where outside medical clearance was obtained as evidence that ACH has a "policy" of not obtaining medical clearance from a hospital. Even if Dr. Venters' criticism is that a jail doctor did not confirm the emergency room doctor's conclusion (ECF 246 at 26), Dr. Venters is not illustrating a discernable custom, policy or practice relevant to either LS or Ms. Boyer's cases.

The circumstance of Ms. Boyer's intake further dispels the contention that an ACH policy was "the moving force" behind Ms. Boyer's death. Nurse Fennigkoh's participation in the medical screening was not an ACH policy or Jail custom. To the contrary, it was an exception to normal practices. Wisconsin jails are not required to have nurses complete health screenings at booking. *See* Wis. Admin. Code § DOC 350.13(1). Rather, the health screening form is reviewed by health care staff within 72 hours. *Id*. at DOC 350.13(3). A physician sees each inmate within fourteen (14) days. *Id*. at DOC 350.13(5). Nurse Fennigkoh participated in the initial screening because as she was leaving the Jail she saw a circumstance that she thought she could improve. She volunteered to help with the intake screening. (DJPFOF ¶¶ 25-26). The process bears no similarity to LS's booking or to MI's medical clearance at a hospital. *See Howell v. Wexford*

---

[10] MI's available records are filed under seal as Ex. 3 to the Declaration of Daniel A. Kafka.

*Health Sources, Inc.*, 987 F.3d 647, 657 (7th Cir. 2021) (explaining "the comparator[s] need not be perfect" but the "similarities" must be sufficient to "show a widespread practice"); *Foy v. City of Chicago*, No. 15 C 3720, 2016 U.S. Dist. LEXIS 63346, at \*27 (N.D. Ill. May 12, 2016) (dismissing *Monell* claim based on series of deaths at a police station where the circumstances of the deaths did not "share substantive similarities" and thus could not rise to the level of a "well-settled" practice).

**b.     Plaintiff fails to demonstrate that a policy of failing to monitor patients for substance abuse withdrawal was the moving force behind Ms. Boyer's passing.**

Dr. Venters marshals a similarly meager numerical argument for the existence of a pattern in support of his concerns about substance abuse withdrawal. (ECF 246 at 26-27). He cites five inmates from three states who allegedly had untreated withdrawal issues between 2016 and 2019. (*Id.*) The discussion is irrelevant and, frankly, nonsensical. Dr. Venters concedes he cannot state that Ms. Boyer was suffering from active withdrawal at any time during her stay in the Jail. (ECF 223, Venters Tr., at 93:10-94:10). If Ms. Boyer did not experience withdrawal, ACH's alleged monitoring practices are irrelevant. *See Estate of Robinson ex rel. Irwin v. City of Madison*, No. 15-cv-502-jdp, 2017 U.S. Dist. LEXIS 20733, at \*64-66 (W.D. Wis. Feb. 13, 2017)(noting, "[C]ritically, the practice 'must be the moving force behind the constitutional violation.' The causal connection is critical: without showing that the practice actually caused []the violation, the municipality would effectively be vicariously liable for all the actions of its employees.")(citation omitted).

Of note, Ms. Boyer denied abusing drugs or alcohol and did not believe she would experience withdrawal. (DJPFOF ¶ 18). Mr. Boyer testified his wife was a social drinker and that he had never witnessed her get drunk. (ECF 210, Boyer Tr., at 111:5-17). Plaintiff did not allege

41

a systemic failure to treat substance use withdrawal. (Fourth Am. Compl, ECF 261, *passim*). In truth, many mishaps related to substance abuse occur in jails. ACH-serviced jails are not immune. But Dr. Venters fails to demonstrate with five cases either a pattern so obvious it had to have been intentionally ignored or a decision about withdrawal driven by ACH policy that is relevant to Ms. Boyer.

**Inmate AM (Missouri 2018). AM** was arrested in Missouri in 2018.[11] The parties do not have complete records of his incarceration. Dr. Venters appears to be critical because the records, which are incomplete, do not demonstrate that he was monitored for withdrawal using a standardized assessment. (ECF 246 at 26). The records demonstrate he was placed on medical watch and monitored, assessed and treated for withdrawal. (Kafka Decl., Ex. 4 at 1-7). There is no evidence he suffered a complication due to withdrawal. Whether a standardized tool was used for monitoring is not of constitutional significance. *See Dean,* 18 F.4th at 236 (requiring both "a prior pattern of similar constitutional violations" *and* sufficient instances of "similar constitutional violations" that the defendant is culpable for "continued adherence" to the policy rising to the level of "conscious disregard" for the consequences).

**Inmate DN (Missouri 2017). DN** was arrested in Missouri in 2017.[12] (ECF 246 at 26). There were no signs of withdrawal noted at intake and so no clinical indication for initiating withdrawal protocols. (Kafka Decl., Ex. 5 at 2-3). Monitoring and treatment for opioid withdrawal were started a short time later when DN reported a concern for withdrawal. (*Id*. at 4-5). There is no evidence he experienced acute withdrawal or that his symptoms were not

---

[11] AM's available records are filed under seal as Ex. 4 to the Declaration of Daniel A. Kafka.

[12] DN's available records are filed under seal as Ex. 5 to the Declaration of Daniel A. Kafka.

managed adequately. He died, unfortunately, of a complication of appendicitis unrelated to substance use. (*Id*. at 71). Dr. Venters includes DN solely because he experienced withdrawal in an ACH-serviced facility. There's no basis to believe his care was substandard or that he fits a pattern of related outcomes.

**Inmate JR (Alabama 2019). JR** was arrested in Alabama in 2019.[13] Dr. Venters again makes gratuitous use of an unfortunate medical incident that is irrelevant to this matter. (ECF 246 at 27). JR reported opiate withdrawal concerns and was treated with a detoxification protocol, including medications. (Kafka Decl., Ex. 6 at 1, 13). He developed an infection from a hip prosthesis and died of sepsis in a hospital long after his admission to the jail. There is no evidence or argument his infection was managed inappropriately. Dr. Venters includes JR solely because he experienced withdrawal in an ACH-serviced facility. There's no basis to believe his care was substandard or that he fits a pattern of related outcomes.

**Inmate MI (Missouri 2016).** Dr. Venters cites **MI**, discussed above at Sect. IV.a.4a., for a second time because MI self-reported potential substance abuse. (ECF 246 at 27) There is no evidence he experienced withdrawal or that his care was mismanaged. (*See* Kafka Decl., Ex. 3).

**Inmate OM (Nebraska 2019).** Dr. Venters cites **OM** apparently for no reason other than he "reported alcohol use." (ECF 246 at 27). OM was arrested in Nebraska in 2019.[14] He was medically cleared by a physician for admission to the jail. (Kafka Decl., Ex. 7 at 10). He denied a history of alcohol abuse, reporting that he used alcohol "once a month" and had never experienced withdrawals. (*Id*. at 6-7). He was given a history and physical and denied using

---

[13] JR's available records are filed under seal as Ex. 6 to the Declaration of Daniel A. Kafka.

[14] OM's available records are filed under seal as Ex. 7 to the Declaration of Daniel A. Kafka.

drugs or alcohol. (*Id*. at 66-67). There is no evidence that OM suffered withdrawals or any complication whatsoever.

### c. Plaintiff fails to demonstrate a *de facto* policy of failing to respond to medical emergencies.

Dr. Venters cites three (3) additional instances of alleged "bad care" to suggest ACH has a custom, policy and practice of failing to respond to medical emergencies. (ECF 246 at 27). He includes three previously referenced cases, CX, AM and DN, also. (*Id*.)

**Inmate BL (Indiana 2017). BL** was arrested in Indiana in 2017.[15] Dr. Venters is critical because BL allegedly was "not evaluated at the hospital" and "did not have a chest x-ray" to investigate his asthma exacerbation. (ECF 246 at 27). Dr. Venters is simply wrong about the facts. BL reported no symptoms of exacerbation until February 17, when he reported intermittent shortness of breath. He refused to be seen by the medical staff the next day. (Kafka Decl., Ex. 8 at 000536, 00538). He again reported symptoms on February 19 and was seen by the jail physician on February 20, 2017. (*Id*. at 54). The physician ordered, among other things, a chest x-ray and EKG. (*Id*. at 54 55, 57-58). BL was sent to the hospital immediately after the results were received by Dr. Silbert. *(See id.* at 66).

Dr. Venters' criticism is, again, gratuitous. There is no evidence BL's case was mismanaged. More importantly, for the current analysis, there is no evidence that any alleged mismanagement of BL's case was the result of an accepted practice. Medical professionals make hundreds of discretionary judgments per day. Very few are guided by their employers' policies. *See* Young Decl., at ¶ 5 (noting ACH "[m]edical and nursing professionals…are instructed to utilize their professional experience and training to direct patient care.").

---

[15] BL's available records are filed under seal as Ex. 8 to the Declaration of Daniel A. Kafka.

**Inmate JK (Kentucky 2018).** Dr. Venters bases his opinions about **JK** on a legal complaint. (ECF 246 at 27 (referencing JK's "legal complaint")).[16]  He concedes he does not have records of the incarceration that is the subject of the legal complaint. (*Id*.) Dr. Venters' opinion on the contents of a legal complaint is inadmissible. *Kenosha Liquor Co. v. Heublein*, 895 F.2d 418, 420 (7th Cir. 1990)(holding expert cannot carry evidentiary burden without proof of necessary foundation for his conclusion).

**Inmate JH (Michigan 2019). JH** was arrested in Michigan in 2019. (ECF 246 at 28).[17] JH suffered from a gastrointestinal condition that eventually led to his hospitalization. He was seen by a provider on the day of his first reported concern. (Kafka Decl., Ex. 10 at 10). He reported feeling better (*Id*.). Lab studies were ordered. (*Id*. at 9). He was put on medical observation when he again felt ill. (*Id*. at 7). He was transferred to the hospital shortly thereafter. (*Id*. at 6). His diagnosis and outcome at the hospital are not apparent from the medical record.

Dr. Venters again offers opinions without adequate information. There is no evidence that JH's care was substandard, nor can that be judged without a diagnosis and answers from his hospitalization. There is no basis to conclude his management was delayed due to an ACH policy. To the contrary, the record demonstrates that he was seen by providers, labs were ordered and he was transferred to the hospital when he did not improve. (*Id*. at 7-11).

In summary, plaintiff survived dismissal by convincing the Court it could supply evidence of thirty-nine instances of unconstitutional care by ACH at Monroe County Jail and nationwide. (*See* Order Denying Motion for Judgment on Pleadings, ECF 134, at 9). Plaintiff

---

[16] JK's available records are filed under seal as Ex. 9 to the Declaration of Daniel A. Kafka.

[17] JH's available records are filed under seal as Ex. 10 to the Declaration of Daniel A. Kafka.

then continued its search for "bad outcomes" at ACH-served facilities. It obtained and was provided in discovery 1361 individual inmate patient files and over 200,000 pages of records. (Knott Decl., ¶¶ 2-3). In the end, plaintiff can point to just four (4) cases of alleged inadequate care at the Monroe County Jail and eight (8) cases involving other ACH facilities nationwide.

Dr. Venters' *Monell* opinions are both factually suspect, as discussed above, and legally insufficient. The various instances are connected only from the perspective that they involve ACH. A policy of "failing to obtain emergency care" promptly enough is no more specific or actionable than an allegation that the company "provides bad care."

"The custom or policy underlying a *Monell* claim cannot be so amorphous that it effectively exposes a municipality to *respondeat superior* liability." *Chaparro v. Powell*, No. 07 C 5277, 2008 U.S. Dist. LEXIS 834, 2008 WL 68683, at *6-7 (N.D. Ill. Jan. 2, 2008). As observed by Judge Stadtmueller, it is insufficient to recite anecdotes, no matter the number, if they are united only "through the refrain that they all involve medical needs being 'simply ignored.'" *Terry*, 2018 U.S. Dist. LEXIS 93298, at *18-19. He observed with respect to the *Monell* pleading in that matter:

> ***It is indeed hard to say what connects these occurrences except the 10,000-foot observation that they concerned inmates' medical needs being "ignored,"*** though one instance of being "ignored" appears to mean something vastly different from the next—sometimes it is being denied medication, other times it is a failure to appreciate suicidal ideation or monitor inmate behavior, and still other times it is failing to respond properly to an injury or an inmate hunger strike…***This is not how Monell liability is supposed to work.***

*Id.* at *19 (emphasis supplied).

Plaintiff's collection of comparator cases holds together only at the "10,000 foot" perspective. The various anecdotal and random outcomes are connected only "at the highest level of generality," which fails to suggest a pervasive practice of which ACH should have had notice.

46

*Terry*, 2018 U.S. Dist. LEXIS 93298 at *23 ("If a practice is too expansively defined…it becomes nonsensical to charge a municipal [or corporate] entity with notice of such a practice.")

### d. Failing to conduct mortality reviews is not a constitutionally-actionable *Monell* policy.

Dr. Venters' claims an ACH *de facto* policy of not completing mortality reviews was a moving force behind Ms. Boyer's death. (ECF 246 at 24-27). He cites as evidence of the alleged pervasive practice three (3) events at the Monroe County Jail, none of which bears any similarity or relevance to Ms. Boyer's death. (*Id.*).

First, he cites **Inmate JL**, the 50-year old woman who committed suicide in the Jail in 2015. As discussed above at Sect. IV.a.2., Dr. Venters speculates, without basis, that JL had a substance abuse disorder because she was intoxicated at the time of her arrest. (Kafka Decl., Ex. 13 at 1). He speculates further that "[w]ithdrawal increases the risk of suicide." (ECF 246 at 34). JL had no unaddressed medical issues when she elected to commit suicide.  (*See* Kafka Decl., Ex. 13). Dr. Venters speculates, however, that if ACH and the Jail had conducted a "mortality review" of her death in 2015 Ms. Boyer's death would have been averted.

There is no constitutional duty to perform a mortality review. *See Starks v. St. Louis Cnty.*, 2024 U.S. Dist. LEXIS 38226, *51-52 (E.D. Mo. March 5, 2024)(holding failure of county to conduct mortality review is not a constitutional violation). The failure, even if it were the entity's express policy, would not give rise to a constitutional remedy.

Second, Dr. Venters' chain of causal logic is simply nonsense: If, hypothetically, JL's suicide was investigated, it would have been determined that withdrawal (a condition no one believes JL was in) contributed to her suicide, which would have led to corrective action that would prevent Ms. Boyer (who was not withdrawing) from experiencing a cardiac arrhythmia. The allegation fails the "rigorous standards" of *Monell* culpability and "moving force" causation.

*Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404-05, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997).

Neither of the other two inmates cited by Dr. Venters as demonstrating a pattern, **CX** and **KW**, died. There is no credible evidence that CX suffered a medical complication that would require review at all. (*See* Sect. IV.a.4.2., *supra*.; Kafka Decl., Ex. 2; ECF 233 at 21-22). The standard Dr. Venters cites as authority for the requirement, the National Commission on Correctional Health Care's Standard J-A-10 ("Procedure in Event of Inmate Death"), does not speak to mortality reviews of incidents short of death. (ECF 223, Venters Tr., at 134:9-139:10). KW attempted suicide in 2020, <u>after</u> Ms. Boyer's passing. Dr. Venters concedes a review of his suicide attempt in 2020 would not have impacted Ms. Boyer's care. (*Id*. at 143:16-20).

Plaintiff has failed to credibly suggest the existence of a *de facto* policy that was the moving force behind Ms. Boyer's death.

> **b.** **Plaintiff's allegations of ACH's alleged "business practices" are unsubstantiated and do not provide a basis for *Monell* liability.**

Just as plaintiff cannot substantiate the dozens of instances of bad outcomes alleged in the complaint, he also cannot substantiate the brazen allegations that ACH's "business model" has led to a pattern of unconstitutional outcomes such that ACH can be deemed to have deliberately acquiesced in those outcomes as policy. (Fourth Am. Compl., ECF 161, at ¶¶ 96-148). Plaintiff points to no additional instances of conduct it attributes to ACH's business model as supporting a *Monell* claim. The vague allegations of the complaint, offered without evidence connecting the alleged business practices to Ms. Boyer, are not evidence and are not sufficient to allow them to go forward. *Black v. City of Chi.*, No. 18-cv-6518, 2022 U.S. Dist. LEXIS 24845, at *13 (N.D.

Ill. Feb. 11, 2022)("Allegations suffice at the pleading stage, but summary judgment requires evidence.").

Plaintiff has no evidence to substantiate the allegation that it is ACH's business model to "prioritize low costs for jailers and profits for ACH" "at the expense of the health and lives of the people who are detained in jails serviced by ACH." (Fourth Amended Complaint, ECF 261, at ¶ 96). The allegation is baseless. (J. Young Decl., ¶ 3).

Plaintiff has no evidence to substantiate the allegation that it is ACH's business model to increase its volume of sales by underbidding the competition and implementing severe cost control measures resulting in the suffering of people served by ACH. (Fourth Amended Complaint, ECF 261, ¶ 97). The allegations is baseless. (J. Young Decl., ¶ 4). ACH is often not the lowest cost proposal but is selected because of the services it offers, and ACH's customers often increase their health service expenditures when retaining ACH services. (*Id.*)

Plaintiff has no evidence to substantiate the allegation that it is ACH's business model to increase profits by reducing visits by inmates to hospitals. (Fourth Amended Complaint, ECF 261, ¶ 98). The allegations is baseless. (J. Young Decl., ¶ 5). Medical and nursing professionals affiliated with ACH are instructed to utilize their professional experience and training to direct patient care. (*Id.*) All such professionals are instructed that they should send patients for emergency treatment if, in their professional judgment, it is appropriate and necessary for the patient. (*Id.*) ACH instructs its professionals that, "When in doubt, send them out." (*Id.*)

Plaintiff has no evidence to substantiate the allegation that it is ACH's business model to take advantage of the size of jury verdicts and use insurance to insulate itself in order to decrease patient care. (Fourth Amended Complaint, ECF 261, ¶¶ 99-123). The allegations is baseless. (J. Young Decl., ¶ 6).

Plaintiff has no evidence to substantiate the allegation that it is ACH's business model to implement cost control measures by training professionals to provide less care to detainees or by pressuring professionals to provide less care. (Fourth Amended Complaint, ECF 261, ¶ 132). The allegations is baseless. (J. Young Decl., ¶ 7).

Plaintiff has no evidence to substantiate the allegation that it is ACH's business model to train professionals to ignore or discount medical concerns of the people they serve. (Fourth Amended Complaint, ECF 261, ¶¶ 133-34). The allegations is baseless. (J. Young Decl., ¶ 7).

### c. Plaintiff's failure to train allegations against ACH are unsubstantiated and must be dismissed.

The allegations about ACH's training in the Fourth Amended Complaint mirror the allegations about its alleged business model, discussed above. The allegations that ACH trains its professionals on a "business model" "to provide less care to detainees" is nonsense. (Fourth Amended Complaint, ECF 261, at ¶ 132). It is obviously baseless. (J. Young Decl., ¶ 7).

Plaintiff's expert, Dr. Bentley, has interpreted ACH's orientation materials—particularly a training slide—as suggesting "implicit bias" against detainees. (ECF 224 Bentley Tr., at 136:15-23). She testified to her belief that ACH's training instructs its employees to treat detainees differently than other patients in the community. The criticism is not actionable.

There's no constitutional standard governing the training that corporations provide employees in orientation. A physician's criticism of the manner in which a private entity deals with implicit bias is not of constitutional significance. Nor is there evidence that "implicit" bias was ACH's deliberate choice. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983." *Canton*, 489 U.S. at 389. There is no such evidence here.

More to the point, however, plaintiff cannot demonstrate any flaw in ACH's training was the "moving force" and "catalyst" for Ms. Boyer's death. The criticism is meritless. Ms. Pisney testified, "I treat patients and inmates the same." (ECF 218 Pisney Tr., at 219:4-11). "[F]or liability to attach…the identified deficiency in the [municipality's] training program must be closely related to the ultimate injury." *Canton*, 489 U.S. at 391.  The possibility that that the training may contribute to an outcome is not sufficient. *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010)(training or policy changes that "might" have had an effect on plaintiff's treatment did not satisfy causation requirement). Plaintiff cannot meet their burden of demonstrating that a flaw in ACH's training caused Ms. Boyer's passing.

Finally, plaintiff cannot demonstrate a need for training in response to a pattern of misconduct by ACH staff.  *Dunn v. City of Elgin, Ill*., 347 F.3d 641, 646 (7th Cir. 2003). Plaintiff fails to demonstrate a causal connection between ACH training and the comparator cases Dr. Venters identified. There is no evidence, for example, that ACH employees at facilities in other states received the same training as Ms. Pisney.

To the extent plaintiff has asserted constitutional claims based on alleged deficiencies in ACH training those claims must be dismissed.

## V.    PLAINTIFF'S STATE LAW CLAIM FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS MUST BE DISMISSED (COUNT VII).

Mr. Boyer's and the Estate's negligent infliction of emotional distress claims must be dismissed as a matter of law. Negligent infliction of emotional distress is a Wisconsin common law tort. *See Bowen v. Lumbermans Mut. Cas. Co.*, 517 N.W.2d 432, 442-43 (Wis. 1994). Naturally, Wisconsin law governs such common law tort claims. *See Phelps v. Physicians Ins. Co. of Wis., Inc.*, 2009 WI 74 ¶ 65, 768 N.W.2d 615, 635. Additionally, the Wisconsin

Legislature has determined that Wisconsin Statutes Chapter 655 "constitutes the exclusive procedure and remedy for medical malpractice in Wisconsin against health care providers, as that term is defined in Wis. Stat. § 655.001(8), and their employees." *Id*. ¶ 64. Specifically, "Chapter 655 does not permit claims other than those listed in Wis. Stat. §§ 655.005(1) and 655.007." *Id*. Wis. Stat. § 655.007 expressly subjects "any patient or the patient's representative having a claim or any spouse, parent, minor sibling or child of the patient having a derivative claim for injury or death on account of malpractice" to Wis. Stat. Ch. 655.

Further, Wisconsin caselaw defines a derivative claim as one that "arises from the tort injury to another[, but] does not have its own elements of proof that are distinct from the negligence claim to which it attaches." *Phelps,* 2009 WI ¶ 63. But negligent infliction of emotion distress of the type brought by plaintiffs here is a bystander claim, i.e. a claim brought by a "plaintiff who alleges emotional distress arising from an [alleged] tortfeasor's negligent infliction pf physical harm on a third person." *Bowen*, 517 N.W.2d, 434. Wisconsin Chapter 655 does not authorize bystander claims; by its plain language it permits only derivative claims. *See* Wis. Stat. § 655.007.

*Phelps v. Physicians Ins. Co. of Wis., Inc.*, answered this question definitively: "(1) Does Wis. Stat. ch. 655 bar bystander negligent infliction of emotional distress claims made against health care providers?" 2009 WI ¶ 33. In *Phelps*, the parents and siblings of the decedent sued the doctor (and his insurer) alleging negligence, loss of society and companionship, wrongful death and negligent infliction of emotional damages arising from the death of newborn Adam Phelps. *Id*. ¶ 11. The trial court found the doctor 80% causally negligent and awarded $200,000 to each of decedent's surviving parents. *Id*. ¶ 13 On appeal, the physician argued that plaintiffs' claims for negligent infliction of emotional distress were barred by Wis. Stat. Ch. 655; however,

the case was remanded for new trial on other grounds and the argument was not addressed by the court of appeals. *Id.* ¶ 15.

On remand, the circuit court struggled with determining the contours of a bystander claim but ultimately concluded that the parents had asserted viable claims. *Id.* ¶¶ 28-29. The doctor appealed, and the circuit court affirmed after reviewing the case *de novo.* ¶¶ 30-33. The Wisconsin supreme court granted the doctor's petition for review to answer whether "Wis. Stat. ch. 655 bar[s] bystander negligent infliction of emotional distress claims made against health care providers[.]" *Id.* ¶ 33. The Wisconsin supreme court concluded that "a claim of bystander emotion distress has elements that, while arising from the underlying negligence, are distinct and subject to separate proof." *Id* ¶ 63 (quoting Sykes, J. *Bowen*, 517 N.W.2d 432).

> The Wisconsin supreme court states it best
>
> Because Chapter 655 exclusively governs <u>all</u> claims <u>arising</u> out of medical malpractice against health care providers and their employees, and because the legislature did not include bystander claims in Wis. Stat. §§ 655.005(1) or 655.007, negligent infliction of emotional distress claims arising out of medical malpractice <u>are not actionable</u> under Wisconsin law.

*Id.* ¶ 65.

Plaintiffs' negligent infliction of emotional distress claims must be dismissed as a matter of law because the claims are not actionable under Wisconsin law.

But even if this court concludes that Mr. Boyer can proceed on a negligent infliction of emotional distress claim (which it should not), Mr. Boyer's claim would still fail. Negligent infliction of emotional distress requires proof that (1) the defendants were negligent with respect to the incident involved in the case, (2) the plaintiff suffered severe emotional distress "so severe that no reasonable person could be expected to endure it," (3) and the incident caused by defendants' negligence was a cause of plaintiffs' emotional distress. *See* WI JI-Civil 1510; *see*

53

*also* WI JI-Civil 1005 (negligence), WI JI-Civil 1500 (cause). Additionally, because Mr. Boyer brings a bystander claim, *see Bowen*, *supra* 434, he must first satisfy three "prerequisite elements" "to ensure that [his] claim is genuine and that allowing recovery would not place an unreasonable burden upon the defendant." *Jackson v. McKay-Davis Funeral Home*, *Inc.*, 830 F.Supp.2d 635, 652 (E.D. Wis. Nov. 2011). Mr. Boyer, preliminarily, must show (1) the victim was seriously injured or killed, (2) he is the spouse, parent, child, grandparent, grandchild, or sibling of the victim, and (3) that he observed an extraordinary event. Mr. Boyer has failed to satisfy this third preliminary requirement, and his claim should not be allowed to proceed as contrary to public policy. *Id*. Furthermore, Mr. Boyer has failed to produce evidence that he suffered a severe emotional distress that no reasonable person could be expected to endure.

To the extent Ms. Boyer's Estate brings a claim for negligent infliction of emotional distress, Wisconsin public policy compels dismissal. *Bowen*, *supra*, 446 (finding it would be mere speculation to assert that [decedent] knew of the impending impact or suffered severe emotional distress in the moments before impact). The Court held that permitting an estate to claim damages for negligently inflicted emotional distress upon the decedent "would be too likely to open the way to fraudulent claims." *Id*.

## VI.     WISCONSIN LAW DOES NOT PERMIT CLAIMS FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ARISING FROM ALLEGED MEDICAL MALPRACTICE OF HEALTHCARE PROVIDERS AND THEIR EMPLOYEES

Just as his negligent infliction of emotional distress claims are foreclosed by Wisconsin law, Mr. Boyer's claims for intentional infliction of emotional distress must be dismissed as a matter of law. Wisconsin Statutes Chapter 655 is the exclusive remedy for claims arising out of the alleged medical malpractice of a healthcare provider or its employees. *Phelps*, *supra*. Relevant here, Chapter 655 contemplates "direct claims" from the patient who has suffered

medical malpractice. *Pierce v. Physicians Ins. Co. of Wis., Inc.*, 2005 WI 14 ¶ 15, 278 Wis. 2d 82, 93, 692 N.W.2d 558, 563. At the same time, Chapter 655 forecloses any claim brought by the spouse that is not derivative. *Phelps*, *supra*; *see also* Wis. Stat. § 655.007. Mr. Boyer's claim for intentional infliction of emotional distress is not a derivative claim, rather it is bystander claim arising from the death of Ms. Boyer which Mr. Boyer attributes to the negligent practice of medicine of Ms. Fennigkoh and Ms. Pisney. [cite 4AC]. Accordingly, plaintiffs' intentional infliction of emotional distress must be dismissed as a matter of Wisconsin law.

Moreover, in order for plaintiffs to succeed on a claim for intentional infliction of emotional distress plaintiffs must show that (1) the conduct was *intended* to cause emotional distress, (2) the conduct was *extreme and outrageous*, (3) the conduct was a cause of the person's emotional distress, and (4) the emotional distress was *extreme and disabling*. WI JI-Civil 2725. In other words, "[t]here must be something more than a showing that the defendant intentionally engaged in the conduct that gave rise to emotional distress in the plaintiff; the plaintiff must show that the conduct was engaged in for the purpose of causing emotional distress." *Rabideau v. City of Racine*, 2001 WI 57 ¶ 36, 243 Wis. 2d 486, 503, 627 N.W.2d 795, 803 (Wis. 2001).

No further analysis is required for the court to dismiss plaintiffs' intentional infliction of emotional distress claims. Plaintiff cannot show that any of the defendants acted "for the purpose of causing emotional distress." Nor can plaintiff meet his burden with respect to the other elements. Mr. Boyer has not produced any evidence from which a reasonable jury could conclude that the defendants' actions were "extreme and outrageous," i.e., something a reasonable person would conclude completely deprived the plaintiff of the individual's dignity as person. Similarly, Mr. Boyer has failed to produce any evidence that he suffered extreme

emotional distress that rendered him "unable to function in other relationships because of the emotional distress caused by the conduct." WI JI-Civil 2725.

In short, Mr. Boyer has failed to produce evidence to support any of the elements of an intentional infliction of emotional distress claim for which he will bear the burden of proof at trial. Accordingly, plaintiffs' claims for intentional infliction of emotional distress must be dismissed.

CONCLUSION

Defendants respectfully request that plaintiff's claims against ACH, Amber Fennigkoh and Lisa Pisney be dismissed for the foregoing reasons, with prejudice, on the merits, with costs and fees, and any other relief the Court deems just.

Dated this 14th day of February, 2025.

**LEIB KNOTT GAYNOR LLC**

By: */s/ Douglas S. Knott*
  Douglas S. Knott, SBN 1001600
  Daniel A. Kafka, SBN 1122144
  Attorneys for the ACH, Lisa Pisney
  and Amber Fennigkoh
  219 N. Milwaukee Street, Suite 710
  Milwaukee, WI 53202
  Telephone: (414) 276-2102
  Fax: (414) 276-2140
  Email: dknott@lkglaw.net
       dkafka@lkglaw.net