

# KENTUCKIANA
## — COURT REPORTERS —

**Case No. 3:20-cv-1123-JDP**

**Gregory Boyer**

**V.**

**Advanced Correctional Healthcare, Inc., et al.**

**Case No. 3:22-cv-00723-JDP**

**Gregory Boyer**

**V.**

**USA Medical & Psychological Staffing, Inc., et al.**

**DEPONENT:**

**KIMBERLY PEARSON**

**DATE:**

**February 26, 2025**



schedule@kentuckianareporters.com

877.808.5856 | 502.589.2273

www.kentuckianareporters.com

```
 1        IN THE UNITED STATES DISTRICT COURT

 2        FOR THE WESTERN DISTRICT OF WISCONSIN

 3  --------------------------------------------------

 4  Gregory Boyer,

 5          Plaintiff,

 6    -VS-                  Case No. 3:20-cv-1123-JDP

 7  Advanced Correctional Healthcare, Inc., et al.,

 8          Defendants.

 9  --------------------------------------------------

10  Gregory Boyer,

11          Plaintiff,

12    -VS-                  Case No. 3:22-cv-00723-JDP

13  USA Medical & Psychological Staffing, Inc., et al.,

14          Defendants.

15  --------------------------------------------------

16

17

18        *       *       *       *       *

19    VIDEOCONFERENCE DEPOSITION OF KIMBERLY PEARSON

20      TAKEN ON THE 26TH DAY OF FEBRUARY, 2025

21                10:02 A.M. CST

22              REMOTELY VIA ZOOM

23        *       *       *       *       *

24

25
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1              APPEARANCES:

2

3         MARIA MAKAR and MADISON IRENE, of the firm of

4    LOEVY & LOEVY, 311 North Aberdeen Street, 3rd Floor,

5    Chicago, Illinois 60607, appeared remotely via Zoom

6    representing the Plaintiff.

7

8         DOUGLAS KNOTT and DANIEL KAFKA, of the firm

9    of LEIB KNOTT GAYNOR, 219 North Milwaukee Street,

10   Suite 710, Milwaukee, Wisconsin 53202, appeared

11   remotely via Zoom representing the Defendants Advanced

12   Correctional Healthcare, Inc., Lisa Pisney, and Amber

13   Fennigkoh.

14

15        MARK W. HARDY, of the firm of GERAGHTY

16   O'LOUGHLIN & KENNEY, P.A., Wells Fargo Place, 30 East

17   Seventh Street, Suite 2750, St. Paul, Minnesota 55101,

18   appeared remotely via Zoom representing the Defendants

19   USA Medical & Psychological Staffing, Inc., Travis

20   Schamber, and Norman Johnson.

21

22        ANDREW A. JONES, of the firm of HANSEN

23   REYNOLDS, LLC, 301 North Broadway, Suite 400,

24   Milwaukee, Wisconsin 53202, appeared remotely via Zoom

25   representing the Defendants Monroe County, Stan

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Hendrickson, Danielle Warren, and Shasta Parker.


                ALSO PRESENT VIA ZOOM:  Alecia Richards

                                        Lauren Hill

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1                          INDEX

2

3  EXAMINATION                                   Page

4  Of Kimberly Pearson

5       By Ms. Irene                               7

6       By Mr. Knott                             120

7

8

9

10

11

12 EXHIBITS

13 1    Curriculum Vitae

14 2    Case testimony list

15 3    Report

16 4    Narrative Note - previously marked Exhibit 6

17 5    Intake medical screening report - previously

18      marked Exhibit 3

19

20      (Original exhibits were retained by Attorney

21 Irene)

22

23

24

25
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      THE VIDEOGRAPHER:  My name is Talia

2  Jackson.  I'm the online video technician

3  representing Kentuckiana Court Reporters

4  located at 730 West Main Street, Suite 101,

5  Louisville, Kentucky 40202, and Terri Stacken

6  is the court reporter today.

7      Today is the 26th day of February,

8  2025, and the time is 10:02 a.m. Central.

9      We are convened by videoconference to

10  take the deposition of Kim Pearson in the

11  matter of Gregory Boyer vs. Advanced

12  Correctional Healthcare, Inc., et al., and in

13  Gregory Boyer vs. USA Medical & Psychological

14  Staffing, Inc., et al., pending in the United

15  States District Court for the Western

16  District of Wisconsin.  Case No.

17  3:20-cv-1123-JDP and Case No.

18  3:22-cv-00723-JDP.

19      Will everyone but the witness please

20  state your appearance, how you're attending,

21  and the location you're attending from

22  starting with Plaintiff's counsel.

23      MS. IRENE:  Hi.  My name is Madison

24  Irene.  I am representing Plaintiff Christine

25  Boyer, and I'm appearing virtually over Zoom

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  from Chicago, Illinois.

2      MR. KNOTT:  Hi.  This is Doug Knott.

3  I'm appearing along with my colleagues Lauren

4  Hill, who's a paralegal, Daniel Kafka, who's

5  an associate.  We appear for the witness.  We

6  appear for Advanced Correctional Healthcare,

7  for Lisa Pisney, and for Amber Fennigkoh.

8      MR. JONES:  I am Andrew Jones.  I'm

9  appearing by Zoom from Milwaukee.  I

10  represent Monroe County, Stan Hendrickson,

11  Danielle Warren, and Shasta Parker.

12      MR. HARDY:  I am Mark Hardy.  I'm

13  appearing on behalf of USA Medical &

14  Psychological Staffing, Norman Johnson, and

15  Travis Schamber, and I'm appearing by Zoom

16  from Minneapolis, Minnesota.

17      THE VIDEOGRAPHER:  All right.  And I

18  believe Ms. Richards is joining.  I think

19  that's the intern, so I'm just going to let

20  her in before we continue.

21      Now, Ms. Pearson, can you please state

22  your name for the record.

23      THE WITNESS:  Yes.  Kimberly Pearson.

24      THE VIDEOGRAPHER:  Thank you.  And,

25  Counsel, once again, off record you indicated

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          that we would stipulate to the identity of

2          Ms. Pearson.

3                    Is that still true?

4                    MS. IRENE:  Yes.

5                    MR. KNOTT:  Yes.

6                    THE VIDEOGRAPHER:  All right.  Then

7          Ms. Pearson, can you please raise your right

8          hand to be sworn in by the court reporter.

9                    KIMBERLY PEARSON,

10     after having been first duly sworn on oath by

11     Terri Stacken deposes and says as follows:

12                    EXAMINATION

13   BY MS. IRENE:

14   Q     Okay.  Good morning, Ms. Pearson.

15   A     Good morning.

16   Q     I want to begin just by covering a few ground

17         rules.  As you're aware, there's a court reporter

18         here and she's going to be taking down everything

19         that we're saying.  So we like to try to give

20         loud and verbal answers.  Try not to head nod or

21         shake your head.  Respond verbally.  And try your

22         best not to respond with things like uh-hum

23         because it will just make it easier for the court

24         reporter to understand you.

25                    I will try my best to talk one at a time so

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  as to not confuse the court reporter as well.  If

2  I interrupt you accidentally, please tell me,

3  because I want you to finish all of your answers

4  completely.

5        Does that make sense?

6  A  Yes.

7  Q  And if you don't understand a question, please

8  say that or ask for further clarification.  If

9  you do answer a question, I will assume that you

10  did understand the question.

11       You may hear counsel objecting throughout

12  this.  That's okay.  Please still answer the

13  question even if it's been objected to unless

14  counsel otherwise instructs you not to.

15       Do you have any conditions that affect the

16  truthfulness or accurateness of your memory?

17  A  No.

18  Q  Are you on any medications?

19  A  No.

20  Q  Okay.  I'm going to ask you about the opinions

21  listed in your report, and I'm not going to ask

22  you to offer opinions that are not already

23  disclosed in that report.

24       Does that make sense?

25  A  Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    Q    Have you been deposed before?
2    A    Yes.
3    Q    About how many times have you been deposed
4         before?
5    A    Somewhere between 30 to 40 times.
6    Q    And have you ever been a main party in a
7         deposition, so a plaintiff or a defendant?
8    A    Yes.
9    Q    When was that?
10   A    It was approximately I would estimate 2016 or
11        '17.
12   Q    And were you the plaintiff or the defendant?
13   A    Defendant.
14   Q    And what was that case regarding?  What was it
15        about?
16   A    It was regarding a death in a jail.
17   Q    And what was the outcome of that case?
18   A    I don't recall.  I was dismissed.
19   Q    And do you remember the name of that case?
20   A    Not as I sit here today, no.
21   Q    Have you ever been -- so in that case were you
22        being sued?
23   A    I was named in that suit again and then
24        dismissed.
25   Q    And is that the only case in which you've been a
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    defendant?

2  A   To the best of my recollection, yes.

3  Q   Did you prepare for your deposition today?

4  A   Yes.

5  Q   And how did you prepare for your deposition?

6  A   I reviewed my case file, reviewed the records,

7    reviewed my report.

8  Q   Did you meet with any attorneys?

9  A   Yes, I did.

10 Q   Who did you meet with?

11 A   Mr. Knott.

12 Q   And how many times did you meet with Mr. Knott?

13 A   For deposition preparation, once.

14 Q   Yes.  And when was that?

15 A   Yesterday.

16 Q   And for about how long did you meet?

17 A   Couple of hours.

18 Q   And was anyone else present at your meeting with

19    him?

20 A   No.

21 Q   And you said that you reviewed some materials for

22    your deposition.

23        You said you reviewed your report?

24 A   Yes, among other -- anything in the case file;

25    the records, anything that I had received in

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1         order to write my report.
 2   Q     And about how many times did you review these
 3         materials?
 4   A     I don't understand that question.
 5               How many times?
 6   Q     Yes.  Did you look over your report once, did you
 7         look it over twice, three times in preparation
 8         for this deposition?
 9   A     I couldn't put an answer to that.  I prepared for
10         two and a half hours, so.  I would be going back
11         and forth between documents.  It's hard to put a
12         number on how many times I read one specific
13         document.
14   Q     Okay.  Did you speak with anyone else about your
15         deposition today?
16   A     No.
17   Q     And aside from reviewing the -- those materials
18         that you mentioned and meeting with Mr. Knott did
19         you do anything else to prepare?
20   A     No.  I don't believe so.
21   Q     What is your current rate for your services?
22   A     My current rate for review of records, writing
23         reports, is $450 per hour.  For deposition it's
24         $500 per hour.
25   Q     And did you sign a retainer agreement with any of
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1            the defendants in this case?

 2    A      No, I did not.

 3    Q      And when you've worked as an expert in cases in

 4           the past how do you typically bill your

 5           clients?

 6    A      I bill them for work and services provided.

 7    Q      And how do you give them -- how do you tell them

 8           what work and services you provided?

 9    A      I provide a detailed invoice.

10    Q      And as you work on a project how do you keep

11           track of your hours?

12    A      I have a software program that has a timer and I

13           use the timer anytime I'm reviewing anything, and

14           I document exactly what I've reviewed so that I

15           can provide that detail in the invoice.

16    Q      Do you remember the name of the software program

17           that you use?

18    A      I believe it's MyCase.

19    Q      And in a typical case about how often do you

20           issue a bill?

21    A      My main -- my typical practice is to bill

22           monthly.

23    Q      And what's the total amount you've billed in this

24           case to date?

25    A      Well, prior to deposition preparation, over the
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1          course of almost three years, I've billed

 2          approximately 45 hours.

 3    Q     **And do you know what the amount would be?**

 4    A     I'd need to get my calculator out to do that.

 5    Q     **That's fine.  And so you've already issued bills**

 6          **to Defendants in this case?**

 7    A     I've submitted bills to Mr. Knott's firm.

 8    Q     **So when you said that you worked about 45 hours**

 9          **on this case before the deposition today, over**

10          **what period of time -- you said that period --**

11          **sorry.  I withdraw that question.**

12                **You previously stated you worked about 45**

13          **hours of this case, and did you say that that was**

14          **over a period of three years?**

15    A     Not quite three years, but close.  It would have

16          been May of '22.

17    Q     **And were those 45 hours mostly worked on at one**

18          **time 40 hours a week or has it been spread out**

19          **across three years?**

20    A     No, it's spread out as documents become

21          available, deadlines, report deadlines.

22    Q     **Do you know about how many hours you'll be at**

23          **including the deposition -- or the deposition**

24          **preparation?**

25    A     Approximately maybe an additional five hours.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   Q   So do you have an approximate total bill for this

2       case?

3   A   No, because I bill monthly, so I would have to

4       pull all of those and do the math.

5   Q   Did you bring any record of the hours that you've

6       billed in this case today?

7   A   Did I bring it?  No.  No.

8   Q   And will you bill for every hour that you work on

9       this case?

10  A   Well, honestly, I under bill.  I do a lot of

11      thinking that I don't bill for, frankly, so.  I

12      will bill for legitimate work hours.  I'm very

13      conscientious about being ethical in that

14      arena.

15  Q   What's the reason you feel like you under bill?

16  A   Well, again, I think about things.  You know, I

17      may be getting ready for my day this morning and

18      just thinking as I was preparing getting dressed

19      this morning about the case.  I'm not billing for

20      that.

21  Q   Are those things that to your knowledge other

22      experts typically bill for?

23  A   I don't ask.  I don't -- I don't know.  It's just

24      my practice.

25  Q   Are there any other reasons that you feel like



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      you under bill?

2  A  Well, again, I'm just trying to answer the

3      question as you asked it.  You wanted to know if

4      I bill for every single thing that I've done, and

5      I'm just letting you know that I think about

6      these cases and I don't always bill for the time

7      that I may be thinking about something.  Again,

8      this morning getting ready I was thinking about

9      the deposition.  I'm not billing for that, so.

10      I bill for time of exactly what's on my fee

11      schedule; records reviewed, development of

12      report, preparation, those types of things.

13  Q  Thank you.  Yes, I'm just -- I'm -- I don't bill

14      like that, so I'm just trying to get a better

15      understanding of your -- of your billing

16      practices and what you do and don't bill for.

17      Okay.  I'm now going to briefly -- I'm going

18      to take myself off and pause for a moment to

19      share my screen.

20      Can you see my screen clearly?

21  A  Yes, ma'am.

22  Q  I'm marking this as Plaintiff Exhibit 1.

23      Do you know what this is?

24  A  That's the first page of my CV.

25  Q  And is this your most current and up-to-date

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1    CV?

 2  A    Can you -- can you stop?

 3  Q    **Yes, I'll go slower.  Sorry.**

 4  A    I just need to see the date on the second page.

 5       1-1-25.  Yes, it is.

 6  Q    **And is everything on it true and accurate?**

 7  A    Yes.  To the best of my knowledge, yes.

 8  Q    **What degrees do you have?**

 9  A    As on page 2, a master in business

10       administration, a master of science in healthcare

11       administration, a Bachelor of Science in health,

12       and a diploma in nursing.

13  Q    **Were you ever put on academic probation at any**

14       **time?**

15  A    No.

16  Q    **Can you talk to me a bit more about the first job**

17       **that you had.**

18       **What were your responsibilities there?**

19  A    Which one are you referring to?

20  Q    **Well, I guess I'll ask you.  Is this El Camino**

21       **Hospital-Mountain View, the psychiatric unit,**

22       **assistant nurse manager, was that your first**

23       **job?**

24  A    No.  I've worked since I was in high school.

25       These are relevant nursing positions.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   Q    So was that your first job that you worked after

2        you got your diploma in nursing?

3   A    I -- I may have worked for a nursing home for a

4        few months while I was in transition moving to

5        California. But essentially, yes, this was my

6        first nursing job.

7   Q    Why did you leave the nursing home position?

8   A    Well, again, I was moving from Illinois to

9        California, so it was -- I just was paying my

10       bills and getting ready to move and moved and

11       then took this position in California.

12   Q    So this position at the El Camino Hospital was

13       your second job after receiving your diploma in

14       nursing?

15   A    Perhaps.

16   Q    Is there some reason that you believe you would

17       have worked other jobs in between that?

18   A    No.

19   Q    And what were your responsibilities there?

20   A    Well, I worked, as is noted there, on the medical

21       unit, the nephrology unit, the psychiatric unit,

22       and then was an assistant nurse manager for a

23       time.

24   Q    And why did you leave that position?

25   A    I relocated to Illinois.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1　Q　And when you relocated to Illinois was your first

2　　　job there at this Proctor Hospital as a nurse

3　　　manager?

4　A　Yes.

5　Q　And what were your responsibilities as a nurse

6　　　manager?

7　A　I was the nurse manager of the medical

8　　　respiratory unit.  I was responsible for all of

9　　　the patient care in that unit, for nurse hiring,

10　　 nurse training, budget, all of the things that a

11　　 nurse manager is responsible for.

12　Q　Okay, yes.  Thank you.  Sorry, I'm asking these

13　　 questions because I don't know all the things

14　　 that nurse managers are responsible for, so it's

15　　 helpful to clarify.

16　　　　　　And why did you leave that position?

17　A　I had an opportunity at OSF Saint Francis that I

18　　 wanted to take.

19　Q　And what made that opportunity more attractive to

20　　 you?

21　A　It's where I went to school and it's where I

22　　 wanted to ultimately work.  It's a trauma center.

23　　 It gave me extensive clinical experience, much

24　　 more well-rounded.

25　Q　And after that you have listed OSF Saint Francis

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Medical Center, so the same place, but emergency

2    medical services systems manager.

3  A    Yeah.

4  Q    Was that change in job a promotion or was it just

5    a change to a different department, different

6    responsibilities?

7  A    I guess I would say it's a change in

8    responsibilities, different department.

9  Q    And what were your responsibilities in emergency

10    medical services?

11  A    I was responsible for the largest EMS system in

12    the State of Illinois in terms of EMS provision

13    to the communities.  I believe I had 2100

14    paramedics and EMTs in my system.  I was

15    responsible to ensure their training and

16    licensure was adequate.  We provided training.

17    I also headed up -- it was shortly after

18    9-11.  Homeland Security dollars were flowing for

19    systems to create disaster response teams, so I

20    put together disaster response teams to provide

21    services to the outlying communities in the

22    region.

23  Q    And why did you leave that position?

24  A    I relocated to New Mexico.

25  Q    And in New Mexico it says you worked at Gallup

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Med Flight.

2           Can you talk -- what is Gallup Med Flight?

3    A   Gallup Med Flight's a medical flight program.  It

4        was critical care flight transport out of Gallup

5        to larger facilities.

6    Q   And why did you leave that position?

7    A   That position was 24/7 and -- literally.  I was a

8        flight nurse.  And it just was -- it became

9        somewhat exhausting, honestly, all the hours, so

10       I made a move to something a little more family

11       friendly.

12   Q   And you were in New Mexico until 2009; is that

13       right?

14   A   Yes.

15   Q   And then you went to the Orange County Health

16       Care Agency in Santa Ana, California; is that

17       right?

18   A   Yes.

19   Q   And what made you make that move?

20   A   Moved to California.

21   Q   And why did you want to work for Orange County

22       Health Care Agency in Correctional Health

23       Services?

24   A   I had an interest in serving that population.

25   Q   Can you describe your current role at KP

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Consulting.

2  A    So I provide correctional health care consulting

3      services to jails and prisons across the country.

4      I look at -- I do a lot of things in my

5      consulting program.

6          I have worked on behalf of the Board of

7      Registered Nursing in cases, reviewing cases in

8      correctional settings.  I've worked with private

9      healthcare companies.  I've worked with counties

10     developing their contracts, doing their RFP

11     development, worked with the National Commission

12     on Correctional Health Care doing technical

13     assistance inspections for different counties.

14         It's very varied the projects, but it's all

15     correctional health related.

16 Q    **Just to clarify, everything that KP Consulting**

17     **does is correctional health related or everything**

18     **that you do at KP Consulting is correctional**

19     **health care related?**

20 A    Both.  It's my company.

21 Q    **And how many other people are employed at your**

22     **company?**

23 A    None.

24 Q    **And is my understanding correct that you serve**

25     **both as program consulting regarding**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      **administrative and clinical operations and as**

2      **expert -- an expert witness for correctional**

3      **health care cases?**

4  A    Yes.

5  Q    **And can you estimate about what percentage of**

6      **your work is working as a program consultant.**

7  A    Well, I'm going to answer that in this way.  I

8      have decided to retire, and so I stopped taking

9      new cases last year.  I also stopped taking

10     consulting projects.  I just recently in the last

11     four weeks turned two down.

12        And so at this point I am just trying to

13     finish up depositions and trials that are left on

14     my calendar.

15  Q   **Well, congratulations on retiring.  But so I**

16     **guess before, from 2014 to I guess 2024, can you**

17     **estimate about what percentage of your work was**

18     **working as a program consultant.**

19  A    Oh, that's a little complicated too.  It's not a

20     simple answer, because from 2014 until 2018 I was

21     working at Orange County Health Care Agency, so I

22     was doing some expert work very, very part-time

23     during 2014 to '18.

24        Then I retired from Orange County in 2018,

25     and that's when I started doing both.  I was

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1　　　　doing consulting at that point.

2　　　　　　　Typically, I would -- how it unfolded was I

3　　　　think the most that I would bill is about 40

4　　　　hours.  I worked full-time, so 40 hours in any

5　　　　given month on expert case review and otherwise

6　　　　it was in various consulting projects.  So maybe

7　　　　a fourth of my time.

8　Q　**Looking at -- or thinking about all the jobs that**

9　　　**you've ever worked at, have you ever received any**

10　　　**disciplinary action in any of your jobs?**

11　A　Absolutely not.

12　Q　**And were you ever fired from any of your jobs?**

13　A　No.

14　Q　**I'm marking this as Plaintiff's Exhibit 2.**

15　　　**Do you recognize this?**

16　A　Yes.

17　Q　**And what is this?**

18　A　A case testimony list that's required by

19　　　Rule 26.

20　Q　**So as of now how many cases are you currently**

21　　　**handling?**

22　A　As of right now?

23　Q　**Yes.**

24　A　I would estimate 17 are open.  However, I only

25　　　believe that there are about nine with

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    depositions or trials on the calendar.

2  Q  **And before you retired did you have -- can you**

3     **estimate the amount of cases you handled in your**

4     **capacity as an expert witness.**

5  A  Well, due to the nature, I mean, I have cases

6     that date back to 2015, honestly.  So some of

7     these cases go on, unfortunately, for nine, 10

8     years.  So, you know, some of those cases I

9     hadn't even looked at in multiple years.

10        But I would say before I decided to retire I

11     probably had about 45 total caseload that was

12     open.  Again, many just sit there and there is no

13     action.  And every year I have a practice in

14     January of contacting all of my open case

15     attorneys to see what's going on with the cases

16     because very, very frequently experts are not

17     informed when cases have settled or, and so I

18     typically every January close out multiple.

19  Q  **This case testimony list, this is every case that**

20     **you've ever testified in trial for --**

21  A  No.

22  Q  **-- for the last four -- sorry, I apologize.  For**

23     **the last four years; right?**

24  A  For the last four years, yes.

25  Q  **So before these last four years do you know about**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       how many cases you testified as an expert in

2       trial for?

3  A   No.  I don't recall off the top of my head.

4  Q   Do you know if it was dozens?

5  A   No.  No.

6  Q   In any of these cases were you testifying on

7       behalf of the plaintiff?  I apologize.  I'll

8       withdraw that question.

9           Looking at this, at your case testimony, in

10      any of these cases listed on this document were

11      you testifying on behalf of a plaintiff?

12  A  On the entire document?

13  Q  Yes.  And if you need a minute to look it over,

14      that's more than fine too.

15  A  Right.  Right.  Again, this is a four-year

16      snapshot, so I have certainly testified on behalf

17      of plaintiffs before.  But this four-year

18      snapshot, you know, there is -- there is -- there

19      is a plaintiff case in here definitely.

20  Q  Which case is that?

21  A  Pendermon vs. Hounshell.

22  Q  And is that the only case on this list in which

23      you testified on behalf of a plaintiff?

24  A  Yes.  Again, on this particular four-year list.

25      I have testified on behalf of plaintiffs in other



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      matters.

2  Q  **About how many times have you testified on behalf**

3      **of a plaintiff?**

4  A  I can't provide you an answer to that without

5      going through my entire case file.

6  Q  **Are you able to estimate the proportion of cases**

7      **that you worked on where you were retained by a**

8      **plaintiff?**

9  A  Yes.  Yes, I can estimate.  25 percent.

10  Q  **And looking again at your case testimony sheet,**

11      **have you -- I apologize about that -- have you --**

12      **do any of these cases involve claims of injury**

13      **from a significant delay of medical care?**

14  A  I'd have to go through.  I don't recall all the

15      specifics of these cases.  I apologize.  I don't

16      recall.

17  Q  **Okay.  How do you go about getting your work?**

18  A  I'm sorry, what?

19  Q  **How do you go about getting your work?  How do**

20      **you go about -- how -- how do you go about**

21      **getting these expert witness positions in these**

22      **cases?**

23  A  I'm contacted by an attorney, and then we have a

24      discussion about their needs and my availability

25      and if I can help them, if I have a conflict,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       whatever it may be, and then I either accept the

2       review or not.

3  Q   **And do you advertise?**

4  A   No.

5  Q   **Have you ever been excluded as an expert witness**

6       **in a case before?**

7  A   No, I have not been excluded.

8  Q   **In what subject areas do you consider yourself to**

9       **be an expert in?**

10 A   Well, my focus is solely correctional health.  So

11      correctional health administration, operations,

12      nursing.  I think that covers all of it.

13      Administration, operations, and nursing.

14 Q   **Okay.  Sorry.  And are there any subject areas**

15      **that you do not consider yourself to be an expert**

16      **in?**

17 A   I'm not even sure how to answer that question.

18          Could you ask it in a different way?

19          MR. KNOTT:  Objection.  Overly broad.

20 Q   **(By Ms. Irene, continuing) Is there anything to**

21      **do with, for example, any of the -- sorry, I'll**

22      **withdraw that.**

23      **When it comes to correctional health care**

24      **administration, is there any subject or part of**

25      **that in which you, for example, would say I**



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      really know this stuff, but I don't know this.

2      This is a part of correctional health care that

3      may come up regularly but I've never worked in

4      that, I'm not an expert in it?

5              MR. KNOTT:  Object to the form of the

6          question.  But you may answer.

7  A   Well, it depends.  I really -- I don't know how

8      to answer that question.  I mean, it would depend

9      on the circumstances that were presented.  I

10     would just need to review the facts.  And if it's

11     something that I did not feel I had experience

12     in, then I would certainly relay that information

13     to the attorney.

14 Q   (By Ms. Irene, continuing) Okay.  I'm going to

15     show you Plaintiff's Exhibit 1 again.  This is

16     your CV.

17          Looking at your Professional Affiliations,

18     can you tell me what Jail Accreditation Surveyor

19     is.

20 A   Yes.  So the National Commission on Correctional

21     Health Care provides accreditation to facilities

22     who choose to pursue accreditation.  Similar to

23     if you do medical cases similar to the Joint

24     Commission provides accreditation for hospitals,

25     National Commission provides accreditation for

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     jails.

2         When a jail or a prison wants to pursue

3     accreditation, then an accreditation team of

4     surveyors comes into the facility for several

5     days, does a lot of work in advance as well

6     reviewing policies and procedures, and then looks

7     at all their clinical operations, administrative

8     operations in light of and in comparison to the

9     standards to determine whether they meet

10    accreditation standards.

11  Q  **Okay.  And can you tell me more about your**

12     **association with the American Correctional Health**

13     **Services Association.**

14  A  American Correctional Association?

15  Q  **Yes.**

16  A  Is that what you said?

17  Q  **Yes.  American Correctional Health Services**

18     **Association.**

19  A  Oh, okay.  Yes.  So I was a previous chapter

20     board member for that association for several

21     years.  And the primary goal of that association

22     at the time was to provide educational content

23     for correctional health professionals in

24     California and Nevada and Oregon and Washington,

25     I believe.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     **Q**     **Okay. And looking at your Professional**

2          **Certifications, can you talk to me more about**

3          **what your CCHP certification is?**

4     A     Yes. So the National Commission on Correctional

5          Health Care offers individuals the opportunity or

6          option to be a Certified Correctional Healthcare

7          Professional.

8          And so that requires working in the field as

9          well as sitting for an exam, successfully passing

10         that proctored exam, and then maintaining and

11         submitting annual continuing education hours to

12         support recertification, and with the vast

13         majority of those being in correctional

14         health-specific issues.

15     **Q**     **And what's your Six Sigma Green Belt**

16          **certification?**

17     A     So Six Sigma is a process-driven methodology

18          that -- it's well-known in manufacturing

19          specifically, but it's really about process

20         evaluation. And so when I was at Saint Francis

21         Medical Center in Illinois they developed a Six

22         Sigma team to look at processes.

23         And so the thought is that rather than a

24         nurse manager who's doing a hundred different

25         things over the course of the day and is putting

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    out fires rather than proactively trying to

2    identify and manage and mitigate problems, the

3    Six Sigma team comes in and they are just

4    dedicated to that -- dedicated to that project

5    and problem.

6         So, for instance, if -- one of the projects

7    we worked on was we were seeing an increase in

8    pneumonia in our ICU patients on ventilators.  So

9    this team went in and started going through all

10   of the documents, it's extensive review,

11   analysis, problem-solving, that kind of

12   methodology.  So it's really research and

13   methodology and process management.

14  Q   **Okay.  Looking at your Consulting Contracts, the**

15     **first one that says expert witness and**

16     **correctional health care consultant, is -- what**

17     **is that contract?**

18  A   Well, it's not a contract.  That's just a -- it's

19    just providing information about one of the

20    things that I do.  Some of them have a written

21    contract.  Some of the projects do not.

22  Q   **Okay.  So looking at, for example, Medical**

23     **Horizons Consulting, what -- why do you have that**

24     **listed as a consulting contract?  Can you explain**

25     **to me more about what that is?**



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   A   Sure.  This is just a chronology just showing

2       my -- the history of my clinical experience.

3           And so again, after being in the EMS venue

4       and being a disaster response leader for the

5       State of Illinois, I was hired -- a consulting

6       contract with Medical Horizons back in it says

7       2009-2010, public health and disaster

8       preparedness.  And so I was assisting them with

9       various projects based on my clinical expertise

10      at the time.

11   Q   Okay.  So you've done consulting work also on

12      oncology administration?

13   A   Yes.

14   Q   And on medical malpractice?

15   A   Yes.

16   Q   And have you ever served as an expert witness for

17      any of these other things that you did consulting

18      work for aside from correctional health?

19   A   Could you repeat the question, please?

20   Q   Have you ever served as an expert witness on any

21      of these other things that you did consulting

22      work for aside from correctional health?

23        So, for example, have you ever served as an

24      expert witness on disaster preparedness?

25   A   Understood.  No, I have not.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  Q    Okay.  And looking at your -- the list of

2       Publication Review, Presentations, and Teachings,

3       did you do a manuscript review for The Nurse

4       Practitioner, "The Implications of eDiscovery for

5       the Nurse Practitioner".

6  A    Yes.

7  Q    And what was that about?

8  A    That was --

9            MR. KNOTT:  I'm sorry, could you --

10           could you -- you're on page 4, and could you

11           take me to that?  Tell me approximately where

12           that is.

13           MS. IRENE:  Yes.  At the top of page 4

14           of Plaintiff's Exhibit 1, actually.

15           MR. KNOTT:  Okay.  Thank you.

16  Q    (By Ms. Irene, continuing) You can answer,

17       please.

18  A    So that was from 2019, so I honestly don't recall

19       all of the content in that particular article.

20           However, I will say that because of my

21       extensive work in electronic healthcare records,

22       it was really not so much about a nurse

23       practitioner.  It was more focused on the

24       eDiscovery, electronic record, that type of

25       thing.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              So I just reviewed it from a content

 2       standpoint and then provided my input as to --

 3       well, you provide a lot of different input on

 4       manuscript review in terms of the resources they

 5       used and the content.

 6   Q   And in 2018, in the fall of 2018, were you

 7       interviewed for a journal publication called

 8       "Tales from the Court:  Experienced LNCs at Trial

 9       and Deposition" by the American Association of

10       Legal Nurse Consultants.

11   A   Yes.

12   Q   And what was that interview about?

13   A   I honestly do not recall.

14   Q   And in September of 2017, I'm looking still at

15       page 4 of Plaintiff's Exhibit 1 towards the lower

16       half, were you a speaker at the California-Nevada

17       Chapter Conference for the American Health

18       Services Association at an event called "Clinical

19       Management for High-Risk Patients in this

20       Litigious Environment."

21   A   No, not as you stated it.  It was for the

22       American Correctional Health Services

23       Association, and it was not -- the event was not

24       called "Clinical Management for High-Risk

25       Patients in this Litigious Environment".  That
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       was the name of a presentation.

2   Q   And you were a speaker at that presentation?

3   A   Yes.

4   Q   And do you remember what you spoke about?

5   A   High-risk patients in jail and prison settings.

6   Q   And do you remember anything more specific you

7       were speaking on that subject about?

8   A   Not specifically, no.

9   Q   And looking at the top of page 5, were you a

10      speaker for the California State Association of

11      Counties at their annual conference in Palm

12      Springs, California, December 2016, at a talk

13      that was titled "Responding to Inmate Advocacy

14      Groups and Preventing Jail Lawsuits".

15  A   Yes.

16  Q   And do you remember what you spoke about?

17  A   No, I do not.  It was a panel discussion, so it

18      would have consisted of a lot of questions and

19      answers.

20  Q   Okay.  Sorry.  Just give me one moment.  And in

21      December of 2016, I'm still looking on page 5,

22      did you do a manuscript review of a work that was

23      titled "Being a Culturally Competent Nurse:  A

24      Nursing Student, Why and How".

25  A   Yes.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    And it says Nursing 2016.  Is that a journal?  A
2         magazine?  What is that?
3    A    Yes.  It's a journal slash magazine.  It's
4         Nursing, and every year the title changes to the
5         current year.  So this year it's Nursing 2025.
6         That year it was Nursing 2016.
7    Q    Okay.  And sorry, I only have a few more of these
8         for you.  In -- looking at page 6 now of
9         Plaintiff's Exhibit 1, in April of 2013 did you
10        do a manuscript review for that same Nursing 2013
11        titled "When Patients Are Also Inmates:
12        Providing Nursing at a Correctional Facility".
13   A    Yes.
14   Q    Okay.  And then in July of 2007, looking at the
15        top of page 7, did you do a manuscript review for
16        Nursing 2007 on an article titled "Code STEMI: --
17        S-T-E-M-I -- Better Care for Cardiac Patients".
18   A    Yes.
19   Q    And what is Code STEMI?
20   A    I don't recall anything about this article,
21        frankly, from 2007.
22   Q    Okay.  Thank you.  One moment.  I'm going to stop
23        sharing my screen.
24             Okay.  Ms. Pearson, in your review of
25        materials for this case, were there any materials



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1          that you asked for but were not provided?

2   A      No.

3   Q      And is it fair to say that attorneys selected the

4          documents that you reviewed?

5   A      Yes, I suppose I would say that's fair.  They

6          sent me the records they wanted me to review.

7   Q      Is there any reason that you feel like that's not

8          an accurate statement?

9   A      How this process works for me is I'm sent

10         materials by the retaining attorney.  And if

11         there's something that is referenced that I don't

12         have or that I think I need I ask for that, and

13         they may or may not have it, and that's just how

14         the process works.

15             So I don't know how they determine -- well,

16         let me say this.  There are certainly things if

17         I've been asked to opine on one thing, I may not

18         need 10 things that aren't related to that, and

19         that's their decision.  Again, I accept and

20         review what they send.  And if I need something

21         different, I believe I need something different,

22         I ask.

23  Q      Okay.  And in this case you did not ask for

24         anything additional?

25  A      I don't believe so.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    Q     Is there any reason why you didn't ask to see
2          anything other than the materials that you were
3          given?
4                    MR. KNOTT:  Form.
5    A     Did someone say something?
6                    MR. KNOTT:  I objected to the form.
7                I'm sorry.  I maybe need to speak a little
8                bit to catch my microphone.
9    A     So I received documents that I felt were
10         appropriate for me to formulate my opinion.
11   Q     (By Ms. Irene, continuing) Okay.  I'm going to
12         share my screen again.  Is this -- can you all
13         see this as well?  Is this screen sharing in the
14         way on the top of this document?  I'll just try
15         to move it.  I don't know if you can see it or
16         not.
17               Ms. Pearson, do you recognize this?
18   A     Yes.
19   Q     And what is this?
20   A     That is the report that I authored related to
21         this case and submitted.
22   Q     And is everything in your report true and
23         accurate?
24   A     To the best of my knowledge, yes.
25   Q     Okay.  In general, as serving as an expert
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  witness on correctional health cases, what

2  methodologies do you use to review materials?

3  A  So I review the materials that are provided to

4  me.  And then based on my training, my education,

5  my licensure and scope of practice and my

6  experience, 40 years in nursing, and in

7  correctional health since 2010, then I formulate

8  my opinion based on all of those things

9  combined.

10  Q  And what methodologies did you use in your

11  analysis of this case?

12  A  Same.

13  Q  What does the term "standard of care" mean?

14  MR. KNOTT:  Object to the form of the

15  question.  To the extent it calls for a legal

16  conclusion, but -- or a legal definition.

17  But you can go ahead and answer.

18  A  My -- how I would describe standard of care based

19  on my understanding is what a same or similar

20  individual would do in the same or similar

21  circumstances.

22  Q  (By Ms. Irene, continuing) And what is a

23  differential diagnosis?

24  A  Well, I have an understanding of that based on my

25  nursing education.  I do not provide differential



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    diagnosis.  That's outside of my scope.

2         So I can provide you with my understanding

3    of the definition of differential diagnosis based

4    on my years in nursing if you would like me to

5    provide that, but it's outside of my scope.

6  Q  **Okay.  Yes.  Could you provide me with your**

7    **understanding of what a differential diagnosis is**

8    **from your experience as a nurse.**

9  A  So a differential diagnosis is the various

10   conditions that a physician, nurse practitioner,

11   physician assistant, may be considering in terms

12   of diagnosing a patient.  There may be -- they

13   may have symptoms that are reflective of numerous

14   conditions.

15        And so they, more often than not, they'll

16   list all of those things in their differential

17   diagnosis saying we're going to try to rule this

18   out, rule that out, rule this out until we get to

19   a final diagnosis.

20 Q  **And what is your understanding of why**

21   **differential -- or I'm sorry, are differential**

22   **diagnoses important?**

23 A  This is outside my scope at this point.

24 Q  **Okay.  So you're saying that you don't have an**

25   **understanding of why differential diagnoses are**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    important?

2              MR. KNOTT:  I think she explained the

3         scope of her nursing practice.  It's outside

4         the scope of her opinions in the case.  And

5         it's also an incomplete hypothetical so that

6         someone trained in differential diagnosis

7         would have a hard time answering.  But I

8         guess --

9    A    Yes, I'm not -- I'm not trained in -- in

10        providing differential diagnosis.  I, of course,

11        as a nurse will read that in hospital records or

12        emergency department records.

13             And I understand that the provider -- and

14        when I say "provider" going here forward, I'm

15        talking about a physician, a nurse practitioner,

16        or a physician assistant, people who diagnose and

17        prescribe -- that they utilize differential

18        diagnosis, I read that and know that they're

19        looking at these various things trying to get to

20        their final conclusion.

21             That's the extent of my -- I don't have any

22        training in providing differential diagnoses.

23   Q    (By Ms. Irene, continuing) Okay.  Thank you for

24        that, Ms. Pearson.

25             MS. IRENE:  And, Mr. Knott, I'd just

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1          ask, I'd appreciate no speaking objections in
 2          the future.
 3    Q    **(By Ms. Irene, continuing) Ms. Pearson, are you**
 4         **aware of, do you know what an "anchoring bias"**
 5         **is?**
 6    A    I cannot provide you with a definition of that as
 7         I sit here right now, no.  I may have read about
 8         that in the past, but it's not anything I can
 9         come up with a definition for right now.
10    Q    **And are you aware of or do you know what**
11         **"premature closure" is?**
12    A    I don't even know what that's --
13                   MR. KNOTT:  Objection.  Vague.
14    A    I don't know what that's in reference to.
15    Q    **(By Ms. Irene, continuing) Do you know the**
16         **difference between a nurse and a nurse**
17         **practitioner?**
18    A    Yes.
19    Q    **What is the difference between a nurse and a**
20         **nurse practitioner?**
21                   MR. KNOTT:  Object to the form of the
22         question.  It's vague.  But go ahead.
23    A    Well, at a very basic level, a nurse practitioner
24         has additional education beyond that of a
25         registered nurse and is by education, training,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    and licensure able to diagnose and prescribe

2    medication, whereas a registered nurse cannot.

3  Q  **(By Ms. Irene, continuing) Would you agree with**

4     **me that a nurse serves as the eyes and ears of a**

5     **medical team?**

6          MR. KNOTT:  Object to the form of the

7          question.  It's vague.

8  A  No, I wouldn't word it that way.  I -- a

9     registered nurse gathers information and provides

10    information as clinically necessary to

11    higher-level providers when clinically

12    necessary.

13 Q  **(By Ms. Irene, continuing) Have you ever heard**

14    **the phrase that "nurses are the vanguard", the**

15    **vanguard for observing changes in a patient's**

16    **system -- or symptoms?**

17 A  No, I've never heard that phrase.

18 Q  **And would you agree that nurses act as a sort of**

19    **hub of communication between physicians or**

20    **practitioners and patients and their families?**

21          MR. KNOTT:  Object to the form of the

22          question.

23 A  No, I wouldn't agree.  It depends on the setting.

24    It depends -- it depends on the circumstances.

25 Q  **(By Ms. Irene, continuing) So can you say more**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       why don't you agree with that?

2  A   Well, just one of many issues.  One example would

3      be, as you worded it, nurses in jail settings

4      aren't routinely calling families, whereas that

5      may be more common in another setting.  So I

6      just -- I can't agree with how you worded it.

7  Q   Okay.  Sure.  So I guess I'll take out the

8      families.

9         Would you agree that nurses act as a sort of

10     hub of communication between physicians and

11     patients?

12          MR. KNOTT:  Object to the form of the

13        question.  Vague.  And vague as to

14        circumstance.

15  A   No, I wouldn't agree.  I wouldn't call them a

16      hub.  I would say exactly what I said I think the

17      previous couple of answers ago, that nurses do

18      provide information -- clinically relevant

19      information to a higher-level provider when it's

20      clinically necessary and justified.  So there is

21      that communication that does occur.

22  Q   (By Ms. Irene, continuing) Are nurses a main

23     source of information for physicians about

24     getting information for patients?

25  A   It depends on the setting.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    MR. KNOTT:  Objection.

2  Q  (By Ms. Irene, continuing) Would you agree that

3     effective communication in nursing is important

4     for providing the best and safest possible care?

5         MR. KNOTT:  Object to the form of the

6     question.

7  A  Could you repeat, please.

8  Q  (By Ms. Irene, continuing) Would you agree that

9     effective communication in nursing is important

10    for providing the best and safest patient care

11    possible?

12 A  I think communication is important when it's

13    clinically necessary.

14 Q  And would you agree that clear, accurate, and

15    accessible documentation is an essential element

16    of safe, quality, evidence-based nursing?

17        MR. KNOTT:  Object to the form of the

18    question.  It's vague and overly broad.

19 A  I -- yes.  No, I wouldn't agree to how that was

20    phrased at all.  No.

21 Q  (By Ms. Irene, continuing) Okay.  Why don't you

22    agree?

23 A  Could you repeat all of your qualifiers, please.

24 Q  Yeah.  Would you agree that clear, accurate, and

25    accessible documentation is an essential element

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1           of safe, quality, evidence-based nursing?
 2                    MR. KNOTT:  Object to the form of the
 3           question.  It's vague.  Overly broad.
 4   A    Yeah, again, it depends on -- it depends on the
 5        situation.
 6   Q    (By Ms. Irene, continuing) When would you not
 7        want documentation to be clear, accurate, and
 8        accessible?
 9                    MR. KNOTT:  Object to the form of the
10           question.  It's vague and overly broad.
11   A    Well, it's not that I don't want that.  It's
12        just, again, it depends on the situation.
13           For instance, I have certainly been a part
14        of a telehealth encounter where there's a
15        physician on the other side of the screen and I
16        am the nurse and with the patient.  The physician
17        doesn't have my documentation in front of him.
18           So that's just one of many points that --
19        that's not accessible at that point, but it
20        doesn't mean that that interaction is not
21        appropriate.  It certainly is.
22   Q    (By Ms. Irene, continuing) Yes, I guess I am
23        asking when there -- when there is documentation,
24        do you agree that's important that that
25        documentation be clear, accurate, and made
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        accessible?
 2                MR. KNOTT:  Object to the form of the
 3            question.  It's vague and overly broad.
 4   A    I believe that documentation should be accurate
 5        and I believe it should be maintained.
 6            However, the system in question, and systems
 7        do it differently, however they maintain their
 8        patient records.
 9   Q    (By Ms. Irene, continuing) Would you agree that
10        nurses are one of the primary people who are able
11        to observe a patient's signs and symptoms?
12   A    Well, that --
13                MR. KNOTT:  Object to the form of the
14            question.  It's vague and overly broad.
15   A    That completely depends on the circumstances and
16        the venue.
17   Q    (By Ms. Irene, continuing) As a nurse are you
18        trained to catch changes in a patient's
19        condition?
20   A    Nurses are trained to observe.
21   Q    And what are nurses trained to observe?
22   A    Nurses are trained to consider the subjective
23        information they receive from a patient and then
24        make their observations to determine whether the
25        subjective and the objective information seems
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    accurate.  So it depends on the situation, what

2    they're observing.

3         If someone comes into the emergency

4    department and they think they have a broken

5    finger, we're observing their finger, not

6    necessarily looking at their feet.

7  Q  **And are nurses trained to observe changes in**

8     **symptoms of patients?**

9  A  Well, that -- that's a generality.  Again, of

10    course, it depends on the situation.

11 Q  **What are some of the situations where nurses**

12    **would be told to not observe changes of symptoms**

13    **in patients?**

14        MR. KNOTT:  Object to the form of the

15        question.  It's a vague and overly broad

16        hypothetical.

17 A  Right.  I would not characterize it as nurses

18    being told not to observe.

19        But as you've asked it, for instance, if I

20    walk by a patient that I've never seen before I

21    don't have any prior baseline, so I don't know if

22    there's been a change in that patient or not.

23        So again, it depends on the situation.  You

24    know, are you a nurse that you have eight hours

25    assigned to one patient in a hospital.  I'm

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        assuming when you're dedicating eight hours to
 2        that one patient you might observe -- you would
 3        likely observe changes.
 4              But in a jail, as I'm walking by someone
 5        that I've never seen before, I can't tell you if
 6        they've had a change.  I don't know anything
 7        about them prior to my walking by.  So it
 8        depends --
 9   Q    (By Ms. Irene, continuing) Sure.
10   A    -- on the situation.
11   Q    Sure.  So to clarify, are nurses trained to
12        observe symptom changes in patients that they
13        are -- have already had previous interactions
14        with or that they are assigned to?
15              MR. KNOTT:  It's vague and overly
16           broad, but go ahead.
17   A    Well, nurses are definitely trained to observe.
18        And if they notice clinically relevant changes,
19        then yes, they would report clinically relevant
20        changes.
21   Q    (By Ms. Irene, continuing) In general, and I
22        understand that this may not be in every single
23        case, but in general do nurses see patients more
24        than physicians?
25   A    Well, that completely depends on the venue.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   Q    Okay.  In your experience, do nurses see patients
 2        more than physicians?
 3   A    In 40 years, as we went through my CV, I've been
 4        in so many venues, they're all completely
 5        different.  So again, it depends on the venue.
 6   Q    Okay.  In correctional health care facilities, in
 7        your experience, do nurses typically see patients
 8        more than physicians?
 9   A    So that depends on the size of the facility and
10        how that's staffed.
11   Q    Have you worked at facilities where physicians
12        see patients more than nurses?
13   A    I don't know how to answer that question.  I can
14        tell you that there are often more nurses on
15        staff than physicians in terms of that ratio.
16   Q    Were you unaware at your previous correctional
17        health facility how often nurses as opposed to
18        physicians saw patients?  Are you saying you
19        don't know?
20   A    Am I unaware of what?  Could you reask?
21   Q    Of how often physicians and nurses saw
22        patients?
23   A    I'm aware of how often nurses and physicians saw
24        patients, but I had 10 buildings and 7,000 people
25        and so I don't tally that.  Again, there are more
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     nurses than there are physicians in my system.

2     Again, it depends on the particular facility and

3     how they've staffed it.

4  Q  **Sure.  But if you're aware of how often nurses**

5     **saw patients and how often physicians saw**

6     **patients, all I'm asking is if you're aware of if**

7     **nurses saw patients more than physicians?**

8            MR. KNOTT:  Object to the form of the

9       question.  It's vague, and it's asked and

10      answered.

11  A  So I want to answer your question, I just

12     don't -- it's difficult as you have asked it in

13     that my physicians were seeing patients all day

14     long.  Whereas my nurses, even though there were

15     more of them, may not have been seeing patients

16     all day long.  Or they may have been grouped in

17     one area seeing all the intakes that were coming

18     in and not in the other nine housing units -- or

19     nine buildings.  So it's hard for me to answer as

20     you've asked it.

21     Again, there are more nurses on staff in a

22     larger system than there are physicians, but it

23     still depends on the size of the facility and how

24     they've chosen to staff it.

25  Q  (By Ms. Irene, continuing) Okay.  So as I've

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  **asked it, it's your -- you're unaware of in the**
2  **correctional facilities that you oversaw who saw**
3  **patients more, nurses or physicians?**
4  A   No, I'm not unaware.
5  　　　　　　　MR. KNOTT:  Object to the form of the
6  　　　　　question.  It's argumentative.  Asked and
7  　　　　　answered.
8  　　　　　　　Go ahead.
9  A   I'm not unaware.  I'll repeat it.  There are more
10  nurses, there were more nurses in my system than
11  physicians.  But you're asking me numbers, and my
12  physicians were seeing patients all day long.
13  And there were times when nurses were not, but I
14  had more nurses.  So --
15  Q   **(By Ms. Irene, continuing) Yes, I understand that**
16  **there were more nurses.  And you're right, I'm**
17  **not asking about if there were more nurses.**
18  　　　**I'm asking if you know who had more frequent**
19  **contact with patients, nurses or physicians, or**
20  **do you not know?**
21  A   It completely depended upon the patient.  There
22  were some patients that saw physicians more
23  frequently than nursing staff, and some who saw
24  nursing staff more frequently than physicians,
25  and some who didn't see anybody because they had

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1          no medical needs.
 2     Q    Okay.  So there was no trend?
 3     A    Trend, no.  Again, there are more nurses than
 4          there are physicians.
 5     Q    Is it part of making sure a patient is safe and
 6          receiving adequate care that nurses be good
 7          listeners?
 8     A    Could you repeat the question, please.
 9     Q    Is it part of making sure a patient is safe and
10          receiving adequate care that nurses are good
11          listeners?
12     A    Nurses are trained in the provision of care to be
13          a good listener.
14     Q    And why are they trained to do that?
15     A    Well, back to the subjective and objective
16          information, that's what nurses are trained to do
17          is to gather subjective, which means listening to
18          what the patient says.  And then also observing
19          other information about the patient.
20     Q    And would you agree that it's important for
21          nurses to be good listeners?
22     A    It's important for nurses to gather subjective
23          information.  So to hear what the patient's
24          saying, I guess you could say they need to
25          listen.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   Q   And would you agree that this is important

2       because if nurses are not listening closely to

3       gather that subjective information, there could

4       be dangerous or harmful consequences?

5               MR. KNOTT:  I'll object.  It's vague

6           and overbroad.

7   A   No.  I'm sorry.  Go ahead.

8               MR. KNOTT:  I was objecting that it's

9           vague and overly broad.  Sorry to interrupt.

10  A   No.  Nurses are obtaining subjective information,

11      and only the subjective information provided to

12      them, so you can't tie the two together.  And a

13      patient may not be forthcoming and may not tell

14      the nurse everything.

15          That's certainly not -- that doesn't go down

16      a trail of the nurse didn't do his or her job or

17      didn't do it well.  They're only able to take in

18      the subjective information the patient offers.

19  Q   (By Ms. Irene, continuing) So to be clear,

20      Ms. Pearson, I'm asking about the subjective

21      information that the patient offers.

22          Would you agree that if a nurse does not do

23      a good job taking down that subjective

24      information that the patient offers, that it can

25      lead to harmful or dangerous consequences?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   A   Well, it depends on the situation.  It depends on

2       the situation.

3   **Q**   **One -- one moment.**

4            MR. KNOTT:  Madison, if we get to a

5       breaking point, we've been going at it about

6       an hour and 15 minutes.

7            MS. IRENE:  Yes, I only have a few more

8       questions sort of left in this section, so I

9       think we should be coming up on one soon.

10   **Q**   **(By Ms. Irene, continuing) But, Ms. Pearson, I**

11   **just want to follow up.**

12       **So in what situation would a nurse not**

13   **accurately taking down the information that's**

14   **being told to them not potentially lead to**

15   **harmful or dangerous consequences?**

16            MR. KNOTT:  Object.  It's vague and

17       overly broad.

18   A   So let me give you an example.  If a patient said

19       I'm diabetic and I need insulin, and the nurse

20       said yeah, yeah, yeah, and turned around and

21       walked away, that would be a serious consequence.

22          On the other hand, if a nurse -- or a

23       patient said I need 10 Band-Aids for my foot, I

24       keep these Band-Aids on my foot, and the nurse

25       didn't necessarily write that entire conversation

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       in their note and it really had -- it wasn't a

2       clinical medical issue, it was just something the

3       patient for whatever reason wanted to do, that

4       would not necessarily lead to a serious problem.

5            Again, it completely depends on the

6       scenario.

7    Q   (By Ms. Irene, continuing) Okay.  But,

8       Ms. Pearson, that's not what I'm asking.  I'm not

9       asking if in every single situation that a nurse

10      doesn't write down the subjective information

11      that they're being told that it will lead to

12      harmful consequences.

13           What I'm asking is if a nurse does not

14      accurately write down the subjective information

15      they're being told to them, could it lead to

16      harmful or dangerous consequences for the

17      patient?

18           MR. KNOTT:  I'm objecting to the form

19           of the question.  You're getting

20           argumentative.

21           You asked her to list circumstances in

22           which it would not be harmful, so you were

23           asking her to explain every circumstance.

24           But I object to the form of the

25           question.  It's vague, overly broad, and

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    asked and answered.

2  A    So taking down subjective data consists of, in a

3       medical record, for the purposes of continuity,

4       is to record the clinically relevant information.

5          So when a patient comes in and says -- or

6       you say hi, how are you, and they say fine, we're

7       not writing that in the chart.

8          So again, it's clinically relevant data, as

9       in my example, if a patient provided information

10      about something and the nurse said oh, yeah,

11      whatever, and walked out of the room, that would

12      be a problem.

13         But nurses are trained to write down the

14      clinically relevant subjective information

15      provided by the patient.

16  Q   **(By Ms. Irene, continuing) And if a nurse**

17      **incorrectly writes down or omits parts of the**

18      **clinically relevant subjective information, could**

19      **that lead to harmful and dangerous consequences**

20      **for the patient?**

21         MR. KNOTT:  Object.  It's vague.

22      Overly broad.

23  A   If you'd like to use the example I gave you, that

24      potentially could be a harmful situation if a

25      nurse walked away and didn't write anything down.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  Q    (By Ms. Irene, continuing) But to be clear, even

2       if a nurse writes some things down but does not

3       write down all of the clinically relevant

4       subjective information that a patient provides,

5       it could lead to dangerous or harmful

6       consequences for the patient?

7                MR. KNOTT:  Object to the form of the

8            question.  Asked and answered.  Vague and

9            overly broad.

10 A    It depends.  No, I would say that's not a --

11      that's just not a 100 percent statement at all.

12            Again, you have to understand that the

13      nursing process includes subjective and

14      objective, so it's a combination of the two.

15 Q    (By Ms. Irene, continuing) Okay.  Yes, I've been

16      saying subjective because that's what you've been

17      using.  But to be clear, I'm asking about

18      subjective and objective information.

19            If a nurse fails to write down some of the

20      clinically relevant subjective and objective

21      information, could you --

22 A    You've only been asking subjective.  But --

23 Q    Okay.  So why is that difference important to

24      you?  Why -- what is -- why is that difference

25      important to you?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  A   Well, it's very important.  It's very important.

2        For example, again, the patient is going to

3        tell you what the patient chooses to tell you.

4        And they may be fully forthcoming and they may

5        not and they may be confused.  I mean, there's

6        any number of scenarios.

7        And then the nurse uses objective

8        evaluation.  We'll use this case.  Ms. Boyer told

9        Nurse Fennigkoh that she -- I'm using her

10       words -- she was peeing as she was standing

11       there.  That's her subjective.

12       The objective information that Nurse

13       Fennigkoh documented was that she was standing in

14       front of her, she had on, I don't know if it was

15       tight pants, yoga pants, some sort of formfitting

16       pants, and there was no urine noted.  That's the

17       objective.  So you have to consider both.

18  Q   **Okay.  So in the future, if I'm asking you a**

19       **question that you feel like you can't answer or**

20       **I'm missing something important like that, I**

21       **would just ask that you let me know how the**

22       **question can be changed so that you can better**

23       **answer it.  So I will ask you --**

24            MR. KNOTT:  That's an improper

25            instruction.  You can't put that burden on



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          her.  You have to ask the question and she'll

2          answer it.

3  Q   (By Ms. Irene, continuing) Okay.  So I'll ask you

4      now about objective information.

5          If a nurse omits clinically relevant

6      objective information, could that lead to --

7      could that lead to danger or harm for the

8      patient?

9          MR. KNOTT:  Object to the form of the

10       question.  It's vague and overly broad.

11  A   Again, always depends on the situation and the

12      circumstances.

13          But yes, if the patient is unconscious on

14      the floor and the nurse walks away and does not

15      document that or take action, that would be

16      potentially harmful.

17  Q   (By Ms. Irene, continuing) Okay.  But what I'm

18      asking is not just in the situation where a

19      patient is passed out on the floor and a nurse

20      walks away.

21          I'm asking if in general, if a nurse omits

22      clinically relevant information, could that lead

23      to potential harm or danger for the patient?

24          MR. KNOTT:  I need to object to the

25       form of the question.  It's vague as to



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1             circumstance.  It's overly broad.

2  A    Okay.  As I understand you asked it, if the nurse

3      omits clinically relevant information, could that

4      be harmful?

5  Q   **(By Ms. Irene, continuing) In short, yes.**

6  A    Again, it depends, because there may be

7      clinically relevant information that the patient

8      has not provided.  Therefore, a nurse cannot

9      document something that a nurse is unaware of.

10  Q   **Okay.  And if a nurse omits clinically relevant**

11     **information that a patient has provided, could**

12     **that lead to potential harm or danger for the**

13     **patient?**

14          MR. KNOTT:  Object to the form of the

15      question.  Vague and overly broad.

16  A    Again, it depends on the situation.  Potentially

17      it could be, but not in every case.

18  Q   **(By Ms. Irene, continuing) Okay.  And one of the**

19     **ways that nurses give information is through**

20     **documentation in medical records; is that**

21     **right?**

22  A    Yes.  Nurses document their patient care.

23  Q   **And is one of the reasons why they do this in**

24     **order to make sure that a physician is aware of**

25     **all the information that they have received?**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                    MR. KNOTT:  Object to the form.
 2   A    I would not describe it in that way.  Nurses
 3        document in the record because they have been
 4        trained to do so for purposes of tracking what
 5        has occurred with the patient clinically, and any
 6        number of individuals may look at that record.
 7        It's not specifically for a physician per se.
 8        It's medical team.
 9   Q    (By Ms. Irene, continuing) Okay.  And do nurses
10        rely on physicians reading the documentation that
11        they have put in the medical record?
12                    MR. KNOTT:  Form, vague, and overly
13           broad.
14   A    That would depend nurse to nurse to doctor to
15        doctor to venue.  That depends.
16   Q    (By Ms. Irene, continuing) So you're saying there
17        is venues where it would not be important for the
18        physician to read the documentation that nurses
19        put in the medical record?
20   A    No, that's not -- that's not what I said.  You
21        asked if it was -- that nurses -- I don't recall
22        exactly how you asked it, but expected the
23        physician to look at it, something to that.  And
24        no, that's not always the situation.
25                The example I gave you for telehealth, that
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    physician on the other side of the screen may not

2    see that nurse's documentation.  That's a verbal

3    discussion and observation working with the

4    patient over the screen.  The nurse is not

5    expecting the doctor to ask for her nurse's note

6    to send it over necessarily.

7         So there are definitely venues and

8    situations where that's not the case.

9              MS. IRENE:  Okay.  I think now would

10         probably be a good time to take a break.

11              MR. KNOTT:  Sure.

12              THE VIDEOGRAPHER:  All right.  We're

13         off the record at 11:25.

14              (Off the record)

15              THE VIDEOGRAPHER:  We are back on the

16         record for the deposition of Kim Pearson

17         being conducted by videoconference.  Today is

18         February 26, 2025, and it is 11:32 a.m.

19         Central.

20   Q    **(By Ms. Irene, continuing) Ms. Pearson, did you**

21        **form an opinion in this case about the standard**

22        **of care provided by Nurse Fennigkoh?**

23   A    Yes.

24   Q    **Did you form an opinion in this case about the**

25        **standard of care provided by ACH?**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MR. KNOTT:  Object.  It's vague and
 2          overly broad.
 3   A   Yes, in that the service -- their services are
 4       reflected in Nurse Fennigkoh's care and
 5       actions.
 6   Q   (By Ms. Irene, continuing) Did you form an
 7       opinion in this case about the standard of care
 8       provided by ACH outside of Nurse Fennigkoh's
 9       actions -- Nurse Fennigkoh's care and actions?
10              MR. KNOTT:  I think that's vague and
11          overly broad.
12   A   Well, I don't know how to separate the two.
13       She's employed by ACH, so.
14   Q   (By Ms. Irene, continuing) I guess what I'm
15       asking is, did you form an opinion in this case
16       about the standard of care provided by ACH in
17       anyone else's cares and actions?
18          For example, in Nurse Pisney's care and
19       actions?
20   A   No, I was not --
21              MR. KNOTT:  Object.  Vague.  But if you
22          want to answer the question with respect to
23          Ms. Pisney, go ahead.
24   A   I was not asked to review this matter related to
25       Nurse Pisney.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   Q    (By Ms. Irene, continuing) Do you know when
 2        Ms. Boyer was initially booked in the Monroe
 3        County Jail?
 4   A    Yes.
 5   Q    And when was she booked?
 6   A    December 21st of 2019.
 7   Q    And can I ask, I see you looking down slightly,
 8        are you looking at a document?
 9   A    My report.
10   Q    Okay.  Just because I'm not there with you, in
11        the future, if you are looking at a document to
12        help answer a question, if you could let me know
13        what document you're looking at, that would be --
14   A    I guess I have to refer to my report because I
15        don't have all of the dates and times
16        memorized.
17   Q    Oh, yes.  No, of course.  Refer to your report.
18        It's just because we're not in person --
19   A    Sure.
20   Q    -- otherwise I'd be able to see what you're
21        looking at, and then I could look at it too.
22        Just let -- yes.  So if you -- I understand you
23        have your report in front of you now.  If you
24        switch off or start looking at something else, if
25        you could just let me know.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   A   No problem.

2          MR. KNOTT:  So just so I'm clear, you

3          want her to tell you if she's looking at

4          something other than her report?

5          MS. IRENE:  Yes.  If she's -- if she's

6          looking at another document or something

7          that's in front of her that she's using to

8          rely upon to give her answers.

9          MR. KNOTT:  Okay.  Because I don't want

10         her to interrupt her answer every time she

11         looks down in order to let you know, so.

12   Q   (By Ms. Irene, continuing) Yes.  To be clear, you

13      do not -- I understand that you're looking at

14      your report.  You do not need to say every time

15      I'm looking at my report.  Just if you move on to

16      something, some other different document other

17      than your report.

18   A   Okay.

19   Q   Who was the medical professional who first

20      interacted with Ms. Boyer?

21   A   Based on my review of the records it would be RN

22      Fennigkoh.

23   Q   And what was Nurse Fennigkoh's interactions with

24      Ms. Boyer -- or first interaction with

25      Ms. Boyer?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

| | | |
|---|---|---|
| 1 | A | Well, when she came into the jail. |
| 2 | Q | **Did Nurse Fennigkoh do an intake screening for** |
| 3 | | **Ms. Boyer?** |
| 4 | A | No, she did not do the intake screening document. |
| 5 | | That's done by custody.  So she interviewed |
| 6 | | Ms. Boyer and wrote a nurse's note. |
| 7 | Q | **And during Nurse Fennigkoh's interview with** |
| 8 | | **Ms. Boyer, what did Ms. Boyer say?** |
| 9 | | MR. KNOTT:  Object.  It's vague and |
| 10 | | overly broad. |
| 11 | A | Well, we would need to pull up the note.  It's -- |
| 12 | | she -- RN Fennigkoh wrote what Ms. Boyer said.  I |
| 13 | | can't tell you verbatim without looking at it. |
| 14 | Q | **(By Ms. Irene, continuing) Sure.  One moment.** |
| 15 | | **Sorry, I'm just going to share my screen.** |
| 16 | | MR. KNOTT:  I think it's Exhibit 6. |
| 17 | | MS. IRENE:  Yes, I think. |
| 18 | Q | **(By Ms. Irene, continuing) Ms. Pearson, is this** |
| 19 | | **the note that you're referring to?** |
| 20 | A | Yes. |
| 21 | Q | **So is this the narrative note?** |
| 22 | A | Yes.  I'm sorry, I probably called it a nursing |
| 23 | | note, but it's a narrative note. |
| 24 | Q | **I'll mark this as Plaintiff's Exhibit 4.** |
| 25 | | MR. KNOTT:  Previously marked as |



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

| | | |
|---|---|---|
| 1 | | Exhibit 6. |
| 2 | | MS. IRENE: Thank you. |
| 3 | Q | **(By Ms. Irene, continuing) So during Ms. -- or** |
| 4 | | **Nurse Fennigkoh's interview with Ms. Boyer, was** |
| 5 | | **Nurse Fennigkoh informed by a corrections staff** |
| 6 | | **officer that Ms. Boyer was a medical mess?** |
| 7 | A | I -- that's not my understanding based on what's |
| 8 | | written. There was a Tomah PD officer who made |
| 9 | | that statement, not a correctional officer, |
| 10 | | according to the note. |
| 11 | Q | **Yes, thank you. And what did -- what were some** |
| 12 | | **of the medical concerns that Ms. Boyer relayed to** |
| 13 | | **Nurse Fennigkoh?** |
| 14 | A | Do you want me just to read it to you? |
| 15 | Q | **Sure.** |
| 16 | A | Okay. So Nurse Fennigkoh wrote, patient states I |
| 17 | | only have one year to live. Nurse Fennigkoh |
| 18 | | asked for further clarification. Ms. Boyer |
| 19 | | stated, in quotes, I have all my organs shutting |
| 20 | | down. Radiation back then did me in. I don't |
| 21 | | have a hip. I pee myself and shit myself every |
| 22 | | 20 minutes. I am peeing right now. |
| 23 | | Additional questions were asked by Nurse |
| 24 | | Fennigkoh. Ms. Boyer stated, in quotes, what's |
| 25 | | it matter to you. Also stated I have had bone |

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      cancer, blood cancer, three pelvic surgeries,

2      three bladder lifts, three abdominal surgeries,

3      do you want me to continue.

4          She also reported to -- she stated to Nurse

5      Fennigkoh, my husband doesn't know where my

6      medication is.  I hide it from him.  He doesn't

7      have a clue what I take.  And she said she would

8      call him regarding the medications.

9  Q  **Did Ms. Boyer say if she was on any**

10    **medications?**

11  A  She indicated she was on a blood pressure med and

12    oxycodone and other meds, but did not

13    elaborate.

14  Q  **On this narrative note where it says PT, do you**

15    **know what PT stands for?**

16  A  Patient.

17  Q  **And was Ms. Boyer intoxicated at the time of this**

18    **interview?**

19  A  Yes, that is my understanding.

20  Q  **What is PBT?**

21  A  PBT?

22  Q  **Yes.**

23  A  I believe -- I can't tell you what the letters

24    are.  I believe that's the test that custody uses

25    to determine blood alcohol level.  It's a



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    custody --

2  Q  Oh, I'm sorry.  Were you finished?

3  A  Yeah, just custody test.  It's not something

4     medical is involved in.

5  Q  And was Ms. Boyer's blood alcohol level .133?

6  A  Well, that's what's documented.

7  Q  And is that a high blood alcohol level?

8  A  Well, I don't know Wisconsin's number.  I'm

9     assuming since -- it's not -- how would I answer

10    that.  I mean, she's in the jail, and but it does

11    not reach the level of blood alcohol high enough

12    that she needs to be sent out to the hospital.

13 Q  Okay.  And did Ms. Boyer say where she got her

14    medications in the interview?

15 A  Yes, she did.  Tomah Medicine Shoppe.

16 Q  And did Ms. Boyer have any medications on her?

17 A  She had some loose pills in her purse.

18 Q  And were those pills able to be identified?

19 A  Some of them.

20 Q  And what were the ones that were able to be

21    identified identified as?

22 A  I would need to look at the verification sheet as

23    to which ones were identified.  They were not all

24    identifiable.

25 Q  In her narrative report -- or narrative note did



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          Nurse Fennigkoh write what medications she found

2          on Ms. Boyer?

3     A    Yeah.  Actually, she did.  She wrote ondansetron,

4          aspirin, oxycodone, and other identified --

5          broken unidentified pills were found.

6     Q    What is ondansetron?

7     A    I believe that's Zofran for nausea.

8     Q    One moment.  Ms. Pearson, do you know what this

9          is?

10    A    Intake medical screening report.

11    Q    Is it the intake medical screening report for

12         Christine Boyer?

13    A    Yes.

14    Q    Did you review this?

15    A    Yes.

16    Q    At her intake screening did Ms. Boyer state that

17         she had one year to live?

18    A    They quoted her here as saying some doctors say I

19         have a year to live.

20    Q    And at the top of this --

21              MR. KNOTT:  For the record -- I'm sorry

22         to interrupt.  But for the record, the intake

23         medical screening is Exhibit 3 to the case,

24         just for the record.

25              MS. IRENE:  Yes, thanks.  And I guess

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        I'll mark this Plaintiff's Exhibit 5 for this

2        deposition.

3                MR. KNOTT:  You actually don't need to,

4        but -- and we were also going in sequence.

5        We could try to sort that out at a break, but

6        just keep going.  Do whatever you want to do,

7        Madison.  I'm sorry.

8                MS. IRENE:  No, thanks.  That's

9        helpful.

10   Q   (By Ms. Irene, continuing) And, Ms. Pearson, at

11       the top of this form where it says PBT per, we

12       said PBT and then it says -- sorry, I'll withdraw

13       that question.

14        Ms. Pearson, at the top of this form it says

15       PBT .133.  That is blood alcohol content;

16       right?

17   A   Yes.  That's my understanding.

18   Q   And then next to PBT .133 it says per and then

19       the numbers 1294.

20        Do you know what those numbers 1294 mean?

21   A   I do not definitively know, but I will tell you

22       in my experience working in correctional settings

23       that officers typically sign with their assigned

24       number versus a name.  So it -- that would be

25       logical to me, but I can't unequivocally tell you

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       that.

2   Q   **Did Ms. Boyer stay -- or say in her intake**

3       **screening if she had taken blood medication that**

4       **day?**

5   A   If she had taken what?

6   Q   **Blood pressure medication that day?**

7   A   Oh, yes.  It's written that she did take it that

8       day.

9   Q   **And was Ms. Boyer on any type of special diet?**

10  A   When she was asked that question she said

11      whatever I can keep down.  Also said she was --

12      could not have peanuts or seeds due to her

13      bowel.

14  Q   **And is it your opinion that Ms. Boyer's**

15      **intoxication made it difficult for her to answer**

16      **questions about her medical history?**

17  A   Is it my, did you say opinion or impression?

18      Could you restate the question or reask the

19      question?

20  Q   **Yes.  Sure.  I asked for your opinion, but it**

21      **could also be your impression, that Ms. Boyer's**

22      **intoxication made it difficult for her to answer**

23      **questions about her medical history.**

24  A   Well, based on the note that RN Fennigkoh wrote,

25      she definitely was not forthcoming, often

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     wouldn't answer, it was difficult to get

2     information.

3          And I believe that was -- Sergeant Warren I

4     believe had testified in her deposition of that

5     fact as well, that it was difficult to get good

6     information, get her to answer questions.

7  Q   **And on page 9 of your report, we had in this**

8     **deposition I believe previously marked this as**

9     **Plaintiff's Exhibit 3, sort of in the middle of**

10    **page 9, do you say that it's often challenging to**

11    **obtain a clear and accurate medical history from**

12    **intoxicated individuals newly booked into any**

13    **jail facility.**

14  A   Yes.  I wrote that.

15  Q   **Can you tell me more about your experiences with**

16    **that.  I'll withdraw.  I can clarify.**

17    **Can you tell me more about in your**

18    **experiences the difficulties that you've had with**

19    **taking intake from intoxicated individuals who**

20    **are newly booked into a jail facility.**

21  A   Sure.  It's, as I said, it's challenging, often

22    challenging to obtain clear and accurate medical

23    information.  You get vague information.  You get

24    partial information, incomplete information.  And

25    oftentimes people are -- they don't want to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     cooperate and so they just won't answer

2     questions. I mean, it varies.

3         It's about 69 to 70 percent of the

4     individuals coming in county jails have one or

5     more substance use issues, and so this is a very

6     prevalent population in the jails that we're

7     accustomed to working with. And it's just --

8     it's just known that it's -- it's difficult at

9     times when someone's intoxicated to get those

10     answers and you -- you just have to keep that in

11     mind.

12  Q   **Would Ms. Boyer's blood alcohol content have been**

13     **lower by the following morning?**

14  A   That's outside of my scope of expertise.

15  Q   **You agree that someone is more likely to be able**

16     **to accurately relay information when they are**

17     **sober than when they are under the influence of**

18     **drugs or alcohol?**

19  A   That's quite possible, yes.

20  Q   **Is there any situation that you believe that not**

21     **to be true?**

22  A   Well, you know, again, it depends on the

23     individual. Theoretically, you should be able to

24     get clearer, more accurate information if they're

25     not intoxicated. But you're also then, what else

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     is going on.  Do they have a medical issue.  Do

2     they have a mental health issue.  Do they just

3     not want to cooperate.  I mean, there's all kinds

4     of scenarios there, but.

5  Q  **Okay.  So to clarify, holding all other factors**

6     **constant, do you agree that it's more likely to**

7     **be able to accurately -- or accurately relay**

8     **information when patients are sober than if they**

9     **are under the influence of drugs or alcohol?**

10 A  I think it's more likely.  It's not a given.

11    Because again, you're dealing with patients --

12    I've dealt with hundreds and hundreds of patients

13    who could not relay their history to me clearly.

14    Didn't even know, you know, I'm on a blue pill.

15    I'm on a white pill.  So it really depends on the

16    individual.

17         But yes, in theory, if you're not

18    intoxicated you would like to think that perhaps

19    you would get better, clearer information.

20 Q  **So do you have experiences with patients who are**

21    **able to better relay information to you while**

22    **they were under the influence of drugs or alcohol**

23    **than when they were sober?**

24 A  I don't know that I can come up with any examples

25    of that.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Do you have any experiences that you remember

2        personally with patients who were better able to

3        relay information to you when they were on drugs

4        or alcohol than when they were sober?

5    A    Yeah, I can't think of any situations off the top

6        of my head.

7    Q    Do you agree that it would have been possible for

8        Nurse Pisney to get another medical history from

9        Ms. Boyd (sic) the following day?

10        MR. KNOTT: Object to the form of the

11        question.

12    A    I did not review this case in terms of Nurse

13        Practitioner Pisney.

14    Q    (By Ms. Irene, continuing) Okay. Do you agree

15        that it would have been possible for Nurse

16        Fennigkoh to get another medical history from

17        Ms. Boyd the following day?

18        MR. KNOTT: Object to the form of the

19        question.

20    A    Well, Nurse Fennigkoh wasn't on duty the

21        following day.

22    Q    (By Ms. Irene, continuing) Was Nurse Fennigkoh at

23        the jail the following day on Sunday,

24        December 22nd?

25    A    Yes, she was there late in the afternoon for a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    one-patient assignment, not in her role as an ACH

2    nurse providing the care she typically provided

3    with ACH on a regularly scheduled day.

4  Q  I understand that, Ms. Pearson, but would it have

5    been possible for Nurse Fennigkoh to get another

6    history from Ms. Boyd while she was there the

7    following day?

8            MR. KNOTT:  Object to the form of the

9        question.  It's asked and answered.  Vague

10        and overly broad.

11 A  Well, it's just not even -- it's not even

12    relevant.  The intake screening was done by

13    custody on Saturday night, Saturday night/Sunday

14    morning.

15        And Nurse Fennigkoh -- there would not have

16    been any reason for Nurse Fennigkoh to act

17    outside of the scope of what she was there to do

18    that particular day to do that.

19 Q  (By Ms. Irene, continuing) Ms. Pearson, I

20    think -- I understand that you don't believe it

21    to be relevant, and I understand that you do not

22    think that there was a reason for Nurse Fennigkoh

23    to do so.

24        But what I'm asking you is if you -- is if

25    it was possible for Nurse Fennigkoh to speak to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Ms. Boyer again about her medical history on that

2    day?

3              MR. KNOTT:  Object.  Asked and

4         answered.  Foundation.  Calls for

5         speculation.  Vague and overly broad.

6  A  It just is not part of the process that's in

7     place.  Intake screening is done at the time of

8     intake.  That's one component of correctional

9     health care, and then we move forward and there

10    are other avenues to get further information.

11         Intake screening is a snapshot at that point

12    when they come in to identify urgent and emergent

13    issues.  So it's not part of -- it just is not

14    something that would be done.  It's not standard

15    of care by any means to go back and do an intake

16    screening at that point.

17  Q  (By Ms. Irene, continuing) Ms. Pearson, I'm

18    sorry, but I have to ask you this question again.

19    I'm not asking if it was part of the process.

20    I'm not asking if you believe it was standard of

21    care.  I'm asking -- I'm asking you if it was

22    possible for Nurse Fennigkoh to do so?

23              MR. KNOTT:  Object to the form of the

24         question.  It's vague and overly broad.

25  A  I don't know.  I don't have an answer.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  Q    (By Ms. Irene, continuing) What information to

2       that question would have helped you to be able to

3       answer this question?

4                 MR. KNOTT:  It's vague.  Overly broad.

5  A    Well, it just -- it doesn't make sense.  It's,

6       again, the intake screening is at intake, and

7       then there's other healthcare that follows.  And

8       so -- this is the flow in any jail.  Then

9       additional information is gathered.  Not in an

10      intake screening.  And as in this case,

11      additional information is gathered, discussions

12      with the nurse practitioner.  That's just the

13      flow.

14           It's just not -- you don't go backwards.

15      And it's like at a hospital.  You don't go

16      re-admit someone 24 hours later.  They're already

17      admitted.  You keep moving forward in gathering

18      information.

19 Q    (By Ms. Irene, continuing) Okay.  Do you agree,

20      based off the variety of things that Ms. Boyer

21      said about her health conditions during her

22      interview with Nurse Fennigkoh and during her

23      intake screening, that she could have had any

24      number of different medical conditions?

25                MR. KNOTT:  Object to the form of the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1              question.

2   A    She could have had medical conditions she did not

3        disclose, and then she stated several things that

4        she had undergone in her lifetime.

5   Q    **(By Ms. Irene, continuing) Do you agree that even**

6        **with the things she did disclose that she wasn't**

7        **specifically clear in what her conditions were?**

8   A    Yes.  I mean, she wouldn't answer all of the

9        questions fully.  And you never know if a patient

10       is fully forthcoming or not.  You don't know.

11       You just have to take down the information -- the

12       information they provide, along with your

13       observations, and continue to move forward.

14            It's the same in the emergency department.

15       Patients come into the emergency department and

16       they tell you what they choose to tell you.

17       There's no way to know if they're fully telling

18       you everything about their condition.

19  Q    **And for Ms. Boyer, did a corrections officer**

20       **complete Ms. Boyer's intake medical screening?**

21  A    Yes.  That's my understanding.

22  Q    **And are corrections officers trained medical**

23       **professionals?**

24  A    In general I would say no.  There are some that

25       are.  But in general, no.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   Q   Are intake screenings an important step in

2       patient care?

3              MR. KNOTT:  Form.  It's vague.

4   A   Yes.  Intake screening is the first step when

5       someone arrives at the jail to try to identify if

6       they have any emergent or urgent needs in terms

7       of their healthcare.

8   Q   (By Ms. Irene, continuing) Sorry.  I just want

9       to -- I just want to be clear.  You said that

10      intake screenings are the first step.

11        I'm asking if you believe intake screenings

12      are an important step to patient care?

13            MR. KNOTT:  Vague and overly broad.

14   A   Yes.  It's information that we desire to have

15      when someone comes into a jail.

16   Q   (By Ms. Irene, continuing) And why is it

17      information that you desire to have?

18   A   Well, again, the point of the intake screening is

19      to identify any emergent or urgent medical needs

20      that the patient may have as well as identifying

21      other healthcare issues that need perhaps further

22      investigation, more information.  And we're also

23      wanting to make sure we don't have someone with a

24      contagious disease.  That helps us figure out

25      where to house those people.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   Q    **At her intake screening did Ms. Boyer report**

2        **having congestive heart failure?**

3   A    Not to Nurse Fennigkoh.  But I believe -- I'd

4        have to see the intake screening form again.  But

5        not to Nurse Fennigkoh.

6   Q    **One moment.  Okay, Ms. Pearson.  I'm just going**

7        **to reask the question.**

8            **At her intake interview, did Ms. Boyer**

9        **report having congestive heart failure?**

10           MR. KNOTT:  Object to the form of the

11        question.  It's vague.

12   A    It's -- I'm sorry.

13   Q    **(By Ms. Irene, continuing) You can answer,**

14        **Ms. Pearson.**

15   A    It's documented that she stated she had

16        congestive heart failure to the officer.

17   Q    **And did she say that she had health problems from**

18        **chemo and radiation?**

19   A    It's documented that she stated she had medical

20        issues due to chemo and radiation.

21   Q    **And did she report having asthma?**

22           MR. KNOTT:  Object to the form of the

23        question.

24   A    Could you scroll up, please, one page.

25   Q    **(By Ms. Irene, continuing) Yes.**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   A    It is circled that she reported having asthma.

2   **Q    Was Nurse Fennigkoh aware that there would be no**

3        **medical staff left to provide care for Ms. Boyer**

4        **after she left?**

5              MR. KNOTT:  Vague.

6   A    Well, I believe Nurse Fennigkoh was aware that

7        there was not a nurse coming in for the overnight

8        shift.

9          However, there was healthcare available in

10       that the nurse practitioner was available 24/7 on

11       call.  And Nurse Fennigkoh further directed

12       custody to contact the nurse practitioner, as

13       they would.  This was a process they had in

14       place.

15  **Q    (By Ms. Irene, continuing) So after Nurse**

16       **Fennigkoh left, ended her shift, there was no**

17       **other medical care professional on site at the**

18       **jail?**

19  A    I -- yes, I believe that's accurate.  There was

20       not a nurse following her.  It was the 24/7

21       on-call provider available.

22  **Q    Did Nurse Fennigkoh give Ms. Boyd medical**

23       **clearance?**

24  A    Could you restate that in a different way?

25  **Q    Sure.  Did Nurse Fennigkoh give Ms. Boyd medical**



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        clearance for a physical assessment to be done by
 2        a practitioner?
 3                  MR. KNOTT:  Object to the form of the
 4            question.  I think it's vague.
 5   A    Well, nurses -- I can't answer -- no, because
 6        nurses don't give medical clearance to allow a
 7        practitioner to evaluate.  That's -- it's not
 8        a --
 9   Q    (By Ms. Irene, continuing) Sorry, were you
10        finished?
11   A    Well, it's just not a -- that doesn't exist.
12   Q    Okay.  And did Nurse Fennigkoh recommend that
13        Ms. Boyer be taken to the hospital at any time?
14                  MR. KNOTT:  Recognize?  Object to the
15            form of the question.
16   A    No, I do not believe that she recommended her
17        going to the hospital if she did not have an
18        urgent or emergent need necessitating that.
19   Q    (By Ms. Irene, continuing) Do you know if Nurse
20        Fennigkoh ever wrote down Ms. Boyer's vital
21        signs?
22   A    I do not believe she did.
23   Q    Do you know if Nurse Fennigkoh initiated a
24        withdrawal screening?
25   A    No, she did not.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    **Can patients who have significant medical**

2        **conditions be affected by withdrawal differently?**

3             MR. KNOTT: Object to the form of the

4        question. Foundation. Vague.

5    A    That's outside my scope.

6    Q    **(By Ms. Irene, continuing) Looking at question**

7        **No. 3 on Ms. Boyer's intake medical screening the**

8        **question says, are you or will you be**

9        **experiencing alcohol or drug withdrawal?**

10        **Do you agree with me that this question asks**

11        **the patient to self-assess whether or not they**

12        **will be experiencing withdrawal?**

13    A    Yes, I agree with you in that -- two things. One

14        is, that is what an intake screening is. It's a

15        structured inquiry asked to the patient to get

16        information from the patient.

17        There are many, many people who cycle in and

18        out of jails who cycle on and off of drug use who

19        experience withdrawal, they know they're going to

20        experience withdrawal, they know what it feels

21        like, and that's pertinent information. Again,

22        that's the subjective component. And then we

23        have the objective -- the objective observations

24        that healthcare can look at as well.

25        So this is just one piece of information

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1         that is very important for a patient.  It's very

2         helpful, especially when a patient has had

3         withdrawal and they say yes, I've had withdrawal.

4         That's very important information for us.

5  Q   **Are there patients who may not know if they're**

6       **going to experience withdrawal?**

7  A   Yes, there are.

8  Q   **And do you agree with me that this question does**

9       **not ask, for the patients who have experienced**

10      **withdrawal, what their withdrawal symptoms have**

11      **been in the past?**

12         MR. KNOTT:  Madison, could you restate

13       that again?

14         MS. IRENE:  Yes.  Yes.

15  Q   **(By Ms. Irene, continuing) Do you agree with me**

16      **that this question does not ask, for the patients**

17      **that have experienced withdrawal, that this**

18      **question does not ask what those withdrawal**

19      **experiences have been in the past?**

20         MR. KNOTT:  Object to the form of the

21       question.  It's beyond the scope of the

22       opinions.  Foundation.

23       Go ahead.

24  A   Yes.  The question is asking if they've

25      experienced -- are you currently or have you



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        been, will you be experiencing withdrawal.  It
 2        doesn't go into the details of withdrawal.
 3   Q    (By Ms. Irene, continuing) The question does not
 4        ask about previous withdrawal symptoms?
 5   A    Well, again, it's will you be experiencing, as I
 6        described before.  Because when people have
 7        experienced withdrawal, they are likely to tell
 8        you yes, I will be experiencing withdrawal based
 9        on I have experienced withdrawal.  I mean, that's
10        just logical.
11   Q    Yes, but are there different -- do people have
12        different withdrawal symptoms?
13   A    They do have different withdrawal symptoms.
14        However, those withdrawal symptoms in general
15        are, you know, there's 8, 9, 10, 11.  It depends
16        on which substance we're talking about that are
17        the most common.
18             And so not everyone experiences --
19        everybody's withdrawal is different, and not
20        everyone experiences the same.  And most people
21        don't even experience all of the most common.
22   Q    And does this question, question No. 3, ask
23        people to explain what their withdrawal -- their
24        previous withdrawal symptoms have been?
25   A    No.  It's an intake screening.  And so if they
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   answered yes, then as -- if a withdrawal

2   monitoring were going to be instituted, totally

3   separate piece of paper, totally separate issue,

4   then those things would be discussed at a

5   different time.

6         This is an intake screening.  Snapshot in

7   time.  We're trying to gather emergent/urgent

8   information.

9   **Q**   **Do you agree that practitioners should be**

10   **conducting assessments to ascertain if a patient**

11   **is experiencing withdrawal symptoms?**

12   A   Well, they asked her.  She said no.  There was no

13   observation of objective information that led --

14   would lead a reasonable clinical provider to

15   believe she was in withdrawal.  So at this point

16   in time there's -- this has been answered.

17         As days, hours evolve, I mean, this is part

18   of -- if someone -- let me put it this way.

19   People come in and they say they're not using

20   drugs.  And then two days later they contact

21   medical and say I'm in withdrawal and they didn't

22   report it to us at the time.  So immediately at

23   that point we institute what needs to be done at

24   that point.

25         Withdrawal, these are just the first



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    questions at intake, and then it can expand from

2    there if it's clinically indicated.

3  Q  **Aside from a patient saying that they are**

4    **experiencing withdrawal, what are indicators that**

5    **someone may experience withdrawal?**

6        MR. KNOTT:  I think the question is

7      vague and overly broad.  Could we specify

8      alcohol, drugs --

9        MS. IRENE:  Yes.

10        MR. KNOTT:  -- anything else and the

11      circumstance?

12  Q  **(By Ms. Irene, continuing) Sure.  Can increased**

13    **blood alcohol levels indicate a risk of**

14    **withdrawal?**

15  A  Well, perhaps.  But again, it depends on the

16    situation.  Someone who goes out to a party and

17    gets intoxicated and comes in with a high blood

18    alcohol level but doesn't drink in general, that

19    blood alcohol level is not indicative of the fact

20    that they're going to go into withdrawal.  That's

21    a one-time thing.

22        So again, it depends on the situation, it

23    depends on the patient, and their history.

24  Q  **Yes.  So, Ms. Pearson, to be clear, I'm not**

25    **asking if in every case increased blood level --**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    if increased blood level -- sorry.  Let me

2    withdraw that question.

3         Ms. Pearson, I'm not asking if in every case

4    increased blood alcohol levels are indicative of

5    withdrawal.  I'm asking if increased blood

6    alcohol levels can be indicative of a risk for

7    withdrawal?

8         MR. KNOTT:  Asked and answered and

9         vague, but go ahead.

10   A    I don't think in and of itself that one number

11   alone would -- it depends.  It depends.  It

12   depends on how high that level is.  Is this a

13   patient we know.  Have they been in before.  Have

14   we seen this before.  There's so many

15   variables.

16   Q    (By Ms. Irene, continuing) Okay.  If a patient is

17   filling out an intake screening while

18   intoxicated, are their answers less likely to be

19   reliable than if they were sober?

20   A    Okay.  Well, patients don't fill out intake

21   screening forms.  These are questions that are

22   asked by staff to the patient.

23        And if someone is intoxicated, and someone

24   who's not intoxicated, frankly, we're only going

25   to get as good of information as they are able

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      and willing to provide.

2  Q  **And when a patient is answering questions to an**

3      **intake screening form while intoxicated, are**

4      **their answers less likely to be reliable than if**

5      **they were sober?**

6  A  That's possible.

7           MR. KNOTT:  Object.  But go ahead.

8  A  It's possible they may not provide as accurate or

9      clear of answers.

10  Q  **(By Ms. Irene, continuing) And looking at**

11     **question 13 on this form, do you abuse alcohol or**

12     **drugs, which kinds of alcohol or drugs and how**

13     **often do you use them, do you agree that this**

14     **question does not ask the patient if they know**

15     **what symptoms they have or may experience with**

16     **withdrawal?**

17  A  Well, no, it doesn't ask withdrawal questions.

18     It's not the withdrawal question.  This is a

19     different question.  This is just asking if they

20     abuse alcohol or drugs and what kind.  The

21     withdrawal question was on the previous page.

22  Q  **In your opinion, are individuals who misuse**

23     **substances typically accurate in their**

24     **description of their pattern of substance**

25     **abuse?**



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1   A   Well, I can't definitively answer that question
 2       because only the patient's going to know.  I
 3       mean, if they say they use a half a gram of
 4       heroin a day, that's what I would document.  But
 5       I don't -- I don't know that.  They could be
 6       completely accurate.  I don't know.
 7   Q   Do you have experiences where patients over- or
 8       underestimate their drug use?
 9   A   Well, again, I don't know, because I'm not with
10       them other than in that snapshot of time.
11   Q   How does this intake screening compare to others
12       that you've seen in some of the places that
13       you've worked?
14               MR. KNOTT:  It's vague and overly
15           broad.
16   A   Well, intake screening reports -- intake medical
17       screening reports are -- they're all very
18       different in the order of questions.
19           But in terms of content, it does ask the
20       questions that we would expect -- we would want
21       to ask when an individual comes in at that point.
22   Q   (By Ms. Irene, continuing) Is this intake medical
23       screening report less thorough than others that
24       you've seen?
25               MR. KNOTT:  Vague and overly broad.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1   A    No, I wouldn't say it's less thorough.  Again,

 2        it's different order.  Different questions are

 3        asked a little bit differently.  But the content

 4        and the intent of what we're trying to find out

 5        is on the form.

 6   Q    (By Ms. Irene, continuing) One moment.

 7   A    I believe -- I believe I outlined all that in my

 8        report in terms of what's required by NCCHC and

 9        where it's found, on what question in the intake

10        screening.

11   Q    You may have outlined.  I may be asking you

12        questions about things that you have already said

13        in your report.  But I just have to ask you them

14        sometimes just for my own clarification so I can

15        get a better understanding.

16   A    Sure.

17   Q    Okay.  I'm going to share my screen with you

18        again.  I'm now showing what's been Bates marked

19        Monroe County 000088.

20            Do you recognize this?

21   A    Yes.

22   Q    Did you review this?

23   A    Yes.

24   Q    Is this an email that was sent by Nurse

25        Fennigkoh?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   A    That's what it states, yes.

 2   Q    And was this email -- who was the email sent

 3        to?

 4   A    Danielle Warren, Lucas Runice, Shasta Parker,

 5        Kyle Moga, Ryan Hallman, and Stan Hendrickson.

 6   Q    And when was this email sent?

 7   A    December 22nd of 2019 at 6:02 p.m.

 8   Q    And what does this email say?  Or I guess I'll

 9        withdraw that question.

10            In this email does Nurse Fennigkoh convey

11        that Ms. Boyer's husband had called -- that she

12        had taken a call from Ms. Boyer's husband?

13   A    Yes.

14   Q    And on that call did Ms. Boyer's husband indicate

15        that he would be bringing medications for her?

16   A    Yes.

17   Q    And did Ms. Boyer take this call while she was at

18        the jail on Sunday, December 22nd?

19   A    Yes.

20   Q    And did she take it while she was there for --

21        while she was there for the purposes of seeing a

22        different patient?

23   A    Yes and no.  Yes, she was there to see the one

24        patient.  And she had clocked out and yet took

25        this call because the phone rang after she had
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     clocked out and was getting ready to leave.

2           MR. KNOTT:  For the record, that was

3       Exhibit 9 previously marked.

4           MS. IRENE:  Thank you.

5  Q  **(By Ms. Irene, continuing) What happened after**

6     **Ms. Boyer completed her intake screening?**

7           MR. KNOTT:  Object to the form of the

8       question.  It's vague and overly broad.

9  A  In terms of what?

10  Q  **(By Ms. Irene, continuing) Sure.  So what**

11    **happened -- do you remember Ms. Boyer complaining**

12    **to custody staff about feeling hot and sweaty?**

13  A  Okay.  We're not talking about after -- we're on

14    a different topic now?  Not after an intake

15    screening?

16  Q  **Oh, I'm asking, do you remember her saying that**

17    **she was hot and sweaty after the intake**

18    **screening?**

19           MR. KNOTT:  It's vague as to time.

20  A  No, after the intake screening she was placed on

21    medical observation and monitored by officers all

22    night on Q 30 minutes or more checks, and there

23    were -- she had no concerns and no issues after

24    the intake screening over the course of the

25    night.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   Q   (By Ms. Irene, continuing) Ms. Pearson, if you

2       can look at -- hang on, I'll share my screen

3       again -- your report on page 10, and sort of the

4       middle of the page where you say at some point

5       prior to 4 p.m. Ms. Boyer had complained to

6       custody staff of feeling hot and sweaty,

7       difficulty breathing, and requesting that her

8       blood pressure be taken.

9           Are you referring to -- is that you

10      referring to Ms. Boyer at the intake screening?

11  A   No.  If you go back to page 9, the bottom

12      paragraph, this is a timeline chronology and

13      order of what happened.  We're on Sunday,

14      12-22 --

15  Q   Okay.  So --

16  A   -- at 4 p.m.  So this is far beyond the intake

17      screening.

18  Q   My apologies.  Okay.  So after the intake

19      screening Ms. Boyer did complain to custody staff

20      of feeling hot and sweaty?

21          MR. KNOTT:  Object to the form of the

22          question.  It's vague as to time.  This is

23          asked and answered.  And I think you need to

24          be specific as to a time frame.

25  A   Yeah, the intake screening was on Saturday, the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  21st, in the, you know, 11:30 time range.  And

2  this is now Sunday, the 22nd, 4 p.m.  So that's

3  what this note is about.  It's not -- I mean,

4  it's sometime later.  How many hours that would

5  be, 16 hours later.

6  Q  (By Ms. Irene, continuing) Okay.  So -- sorry.

7       Ms. Pearson, when you write in that

8  paragraph that at some point prior to 4 p.m.

9  Ms. Boyer had complained to custody staff of

10  feeling hot and sweaty, do you know what time she

11  made that complaint?

12  A  Yes.  I believe that was approximately around

13  3 p.m.

14  Q  And was it around that time where Ms. Boyer also

15  complained of having difficulty breathing?

16  A  There are some notes to that effect, and then

17  there's some -- yes, that she complained about

18  that, but Parker's deposition testimony stated

19  she didn't observe that.  She didn't seem to have

20  any difficulty breathing.

21  Q  And was it also around that time, 3 p.m., that

22  Ms. Boyer requested that her blood pressure be

23  taken?

24  A  Yes.  That's my understanding.

25  Q  Was Ms. Boyer's oxygen saturation taken?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1   A    I don't recall.  I would need to look at the

2        records.  I would need to look in the records.

3   Q    Is -- what document in particular would you need

4        to look at?

5   A    I don't know if it's -- I just don't recall if

6        it's documented on the illness reports or not.

7   Q    Is oxygen saturation a vital sign?

8   A    It can be considered a vital sign.

9   Q    What is oxygen saturation?

10  A    The saturation of oxygen in the blood.

11  Q    And why could it be considered a vital sign?

12            MR. KNOTT:  Object to the form of the

13         question.

14  A    I'm not sure how to answer that question.  It's

15       sometimes obtained with other vital signs.

16       Sometimes not.  It's a piece of data.

17  Q    (By Ms. Irene, continuing) Is it an important

18       piece of data?

19            MR. KNOTT:  Object.  Vague.  Overly

20         broad.

21  A    It depends on the situation.

22  Q    (By Ms. Irene, continuing) Are vital signs

23       important pieces of data?

24  A    Are they what?

25  Q    Are vital signs important pieces of data?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 A    Yes, they can be.  It depends on the situation.

2 Q    **Are there situations where vital signs are not**

3      **important pieces of data?**

4 A    So in healthcare we have some scenarios that we

5      call focused assessment.  So rather than doing a

6      full head-to-toe history of someone's entire

7      medical life, let's use an example, I'm just

8      giving you an example of you're at a

9      half-marathon medical tent and somebody fell and

10     they've got an open fracture.  Okay, they're

11     dealing with a fracture.  It's a focused

12     assessment.  They're dealing with the immediate

13     urgent issue at the time.

14         So vital -- vital signs are pieces of

15     information, absolutely, and they can be very,

16     very helpful.  But they're not always obtained in

17     every -- every healthcare encounter because

18     they're not clinically necessary in every

19     clinical encounter.

20 Q    **Do you know if Ms. Boyer's respiratory rate was**

21     **taken?**

22              MR. KNOTT:  Form.

23 A    I believe that -- I believe there was some

24     documentation by the officers on one of the

25     illness reports about a respiratory rate.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  Q  (By Ms. Irene, continuing) And just so I'm clear,

2     when you say "illness reports", what documents

3     are you referring to?

4  A  I believe they're called illness reports.  It's

5     the form that custody uses to document a

6     patient's healthcare concerns, and then as in

7     this situation made a call to Nurse Practitioner

8     Pisney and documented on that form about that

9     call.

10  Q  Okay.  One moment.

11  A  Actually, I'd like to add to my previous answer

12     about oxygen saturation.  I just was -- flipped

13     the page in my report, and I documented in my

14     report that her oxygen saturation had been taken,

15     so.

16  Q  Okay.  So to my question was Ms. Boyer's oxygen

17     saturation taken, your answer is now yes?

18  A  It is, yes.

19  Q  Actually, sorry.  It's too late to withdraw that,

20     but let me just reask the question.

21       Was Ms. Boyer's oxygen saturation taken?

22  A  Yes.

23  Q  When was Ms. Boyer's oxygen saturation taken?

24  A  Well, again, I would need to go back and look at

25     all the records.  I'm just looking at one line

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        item in my report, and it was during the time
 2        when custody staff completed the illness report
 3        at 8:53 in the evening, and it's documented on
 4        there.  It may be other places as well.  I just
 5        don't recall without pulling up the records.
 6   Q    Was Ms. Boyer's heart rate taken?
 7   A    Yes.
 8   Q    Is heart rate a vital sign?
 9   A    Yes.
10   Q    And, sorry, I'm going to share my screen again.
11        Ms. Pearson, I'm showing you the Medication
12        Administration Record for Ms. Boyer.
13             Have you seen this before?
14   A    Yes.
15   Q    Did you review this?
16   A    Yes.
17   Q    Is this one of the things that you were talking
18        about as being part of the illness report?
19   A    No.
20   Q    Okay.  On Sunday, December 22nd, did Officer
21        Shasta Parker speak with Nurse Pisney?
22             MR. KNOTT:  Form.
23   A    I'm -- I just need to look at my report because I
24        don't even know if I wrote which officer spoke to
25        Nurse Pisney, but I may have written custody
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      called.  I'm just not sure which one without
 2      really going through my report and see if I even
 3      noted that.
 4            MR. KNOTT:  Madison, are you referring
 5         to Nurse Practitioner Pisney or Nurse
 6         Fennigkoh?
 7            MS. IRENE:  I am asking about Nurse
 8         Practitioner Pisney.
 9            MR. KNOTT:  Okay.  Thank you.
10   Q    (By Ms. Irene, continuing) And yes, Ms. Pearson,
11        please take however long you need to look over
12        your report.
13   A    Well, again, I don't know that I would have
14        specified which officer called the nurse
15        practitioner.  I know -- I know Parker was on
16        duty.
17            But again, if we want -- if we want to pull
18        up records, I can start to try to figure that
19        out.  But I know Custody did contact Nurse
20        Practitioner Pisney, absolutely.
21   Q    And do you know why officers contacted Nurse
22        Practitioner Pisney?
23   A    Well, again, it was this issue of Ms. Boyer
24        asking to have her blood pressure taken, and her
25        blood pressure was elevated and so they contacted
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       Nurse Practitioner Pisney.

2   Q   **And did Nurse Practitioner Pisney give any**

3       **instructions as to how to help treat the blood**

4       **pressure concerns?**

5   A   Yes.  She gave instructions in terms of

6       medication administration, blood pressure

7       rechecks and parameters to call her back.

8   Q   **Did Nurse Pisney instruct to give a dose of**

9       **Clonidine -- I'm not sure if I'm pronouncing that**

10      **right -- to Ms. Boyer and then to recheck her**

11      **blood pressure at 3:45?**

12  A   I know that she -- let me preface my answer by

13      saying again I was not asked to review Nurse

14      Practitioner Pisney's care, clinical orders,

15      outside of my scope.

16          So yes, I reviewed the timeline and the

17      things that she did, but I don't have all of that

18      committed to memory.

19          I do know, to answer your question, she did

20      order a dose of Clonidine and she did order a

21      blood pressure recheck again with parameters

22      provided for them to call back.

23  Q   **And do you know if Nurse Pisney left instructions**

24      **on what to do if Ms. Boyer's blood pressure was**

25      **still high after five o'clock?**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                MR. KNOTT:  Form.  Scope.  Foundation.
 2   A   Yeah, I don't know about five o'clock.  This was
 3       an ongoing conversation.  So I know that an
 4       additional dose of Clonidine was given and
 5       additional recheck done.  That's documented in
 6       the record.
 7   Q   (By Ms. Irene, continuing) And do you know if
 8       after that second additional recheck if Nurse
 9       Pisney left any instructions for what to do after
10       that second check if Ms. Boyer's blood pressure
11       was still high?
12                MR. KNOTT:  Form.
13   A   Well, it wouldn't -- it wouldn't work that way,
14       so she would have given the instruction before.
15       So it would -- she would say give this Clonidine,
16       recheck the blood pressure, and if it's, whatever
17       her parameters were, if it's below those
18       parameters -- or call me back if it's above those
19       parameters.  And so if it's not, if it's below
20       those parameters, then there's not a need to call
21       back.
22   Q   (By Ms. Irene, continuing) Do you know what a
23       hypertensive crisis is?
24   A   Yes.
25   Q   Is a hypertensive crisis when systolic pressure
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        is over 180 and/or diastolic is over 120?

2  A  You know, that's outside of my scope in terms of

3        the current definition.

4  Q  Okay.  One moment.  I'm going to share my screen

5        again.

6  A  Have I missed a question?

7  Q  I apologize.  I forgot to take myself off of

8        mute.

9        Ms. Pearson, have you seen this before?

10  A  Yes, I have.

11  Q  Did you review this -- have you reviewed this

12       document before?

13  A  Yes, I have.

14  Q  And is this an email that was sent from Shasta

15       Parker?

16  A  Yes, it is.

17  Q  And did Shasta Parker send this email to a jail

18       nurse email?

19  A  Well, there is an email address that says

20       jail.nurse@co.monroe.wi.us.

21  Q  And is one of the people cc'd on this email Amber

22       Fennigkoh?

23  A  Yes.

24  Q  And in this email does Sergeant Shasta Parker say

25       that Ms. Boyer was complaining of feeling hot and

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1           sweaty and not being able to breathe?
2    A      Yes.
3    Q      And does she say that -- does Officer Parker say
4           that Ms. Boyer's blood pressure was really
5           high?
6    A      That's what she wrote.
7    Q      And at the bottom of this email did Officer
8           Parker say that she wanted to make sure that --
9           did Officer Parker say she wanted to make sure
10          you were aware for follow-up purposes, if
11          necessary?
12   A      Yes.
13   Q      Do you know why Sergeant Parker would have sent
14          this email to Amber Fennigkoh?
15                 MR. KNOTT:  Form.  Foundation.
16   A      Well, she actually sent it to the jail nurse
17          email.  So I don't know who the other nurses are
18          who work there, but so Amber is cc'd on that.
19          But this is just a great communication, frankly,
20          just to provide information to the nursing staff
21          when they are back in the building.
22             All of this information is in the record,
23          but she went over and above here and just
24          provided a quick email with an overview of what
25          occurred.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    Q    (By Ms. Irene, continuing) Yes.  My apologies.

2         My question should be, do you know why Amber

3    Fennigkoh was cc'd on this email?

4    A    No.  I don't know -- I would have to speculate,

5    but I don't know.  I don't believe that Shasta

6    Parker testified about why she included her.  But

7    obviously, they had had conversations.

8    Q    In your experience with updates, with health

9    updates like this in a correctional facility, are

10   you aware of any type of protocols for who to cc

11   on health update emails?

12   A    I don't -- the health information is in the

13   medical record.  This is just an additional

14   communication.  It's not to take the place of the

15   record.  It's just an additional communication.

16   Q    Is there anything that you believe Nurse

17   Fennigkoh could have done differently?

18             MR. KNOTT:  Object.  The question is

19        vague and overly broad.

20   A    In regard to something specific or?

21   Q    (By Ms. Irene, continuing) Is there anything that

22   you believe Nurse Fennigkoh could have done

23   differently to provide better care for

24   Ms. Boyer?

25   A    No.  No.  Nurse Fennigkoh exceeded the standard



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    of care, frankly.  She -- she was off duty, had

2    clocked out at 9:30 on Saturday night and stayed

3    off the clock to assist with interviewing and

4    asking questions to Ms. Boyer.

5         And she placed her in medical observation.

6    She initiated medical observation.  She did a

7    referral to mental health just because she felt

8    Ms. Boyer was stressed and had mental health take

9    a look at her.  And she contacted -- she talked

10   with the husband.  She tried to get medication

11   information.  Tried to get diagnosis information.

12   Sent emails to staff saying the husband's coming.

13        When he arrives with the information, which

14   didn't happen until 1 in the morning-ish, she

15   said whenever he gets there, call Nurse

16   Practitioner Pisney with this information.

17        I mean, she did everything that she could do

18   within her scope and licensure and went over and

19   above.  She fielded a phone call at six o'clock

20   after she had clocked out at 5:30.

21        I mean, she's -- it's evident she is

22   dedicated to her patients and was trying to do

23   what she could for Ms. Boyer.

24  Q  **Did you -- did you form an opinion about the**

25     **adequacy of the chest pain protocol form used in**



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     this case?

2  A    No.  No, I did not.

3  Q    Did you form an opinion in this case as to the

4        lack of morbidity and mortality reviews by ACH in

5        this case?

6              MR. KNOTT:  Object to the form.

7  A    I did -- I was asked to review Nurse Fennigkoh's

8        care and treatment.

9  Q    (By Ms. Irene, continuing) So I'm sorry, I'm just

10        going to ask again.

11            So did you form an opinion in this case

12        about the lack of morbidity and mortality reviews

13        by ACH?

14              MR. KNOTT:  Form.

15  A    I did not form an opinion in any way about the

16        presence or lack or anything about a mortality

17        review.

18  Q    (By Ms. Irene, continuing) Did you form an

19        opinion in this case about the use or lack of use

20        of an EKG?

21              MR. KNOTT:  Form.

22  A    No.

23              MS. IRENE:  Okay.  I can just take a

24        break for a couple minutes again so I can go

25        over my notes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          THE VIDEOGRAPHER:  And we are going off

2      the record at 12:48 p.m.

3          (Off the record)

4          THE VIDEOGRAPHER:  We are back on the

5      record for the deposition of Kim Pearson

6      being conducted by videoconference.  Today is

7      February 26th, 2025, and it is 12:59 p.m.

8      Central.

9   Q   **(By Ms. Irene, continuing) Ms. Pearson, I really**

10     **do not have many more questions for you.  We are**

11     **nearing the end.  Like I said, I can't speak for**

12     **everyone else, but we are.**

13         **Did you form an opinion as to the adequacy**

14     **of ACH's training materials?**

15  A   I reviewed some of the training materials.  I did

16     not -- I was not asked to review those from that

17     perspective.

18         What I can say about what I looked at was

19     that based on RN Fennigkoh's actions and

20     treatment, that she clearly had been trained.  So

21     she was, again, performing and meeting the

22     standard of care appropriately.

23  Q   **Okay.  Is my understanding correct that**

24     **independent of Amber Fennigkoh, you did not form**

25     **an opinion -- you did not form an opinion on**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        ACH's training materials?

2                MR. KNOTT:  Object to the form of the

3            question.

4   A    I'm sorry, go ahead.

5                MR. KNOTT:  I objected to the form of

6            the question, but I think you answered.

7   A    Just as I said before, ACH in terms of --

8        reflected in the services reflected in Nurse

9        Fennigkoh's actions and care and treatment,

10       she -- the training was appropriate.

11  Q    (By Ms. Irene, continuing) In your report you

12       don't reference any specific ACH orientations or

13       training policies or manuals and give a

14       conclusion about their adequacy, do you?

15  A    No, I don't believe so.  Again, you know, I was

16       asked to review this in terms of RN Fennigkoh and

17       meeting the standard of care and if there was any

18       evidence that she disregarded in any way

19       Ms. Boyer, so.

20           Again, it all -- her actions and the way she

21       conducted her nursing care is reflective of

22       appropriate training.

23  Q    Looking at page 15 of your report, you cite the

24       National Commission on Correctional Health Care

25       Standards for Health Services in Jails, and I'm

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    referring to where you cite section JA01, Access

2    to Care.

3  A    Yes.

4  Q    And you state, Access to care means that -- I

5    apologize.  I withdraw the question.

6        And when you're citing that you wrote in

7    your report, Access to care means that in a

8    timely manner, a patient can be seen by a

9    clinician, be given a professional clinical

10    judgment, and receive care that is ordered.

11        Do I have that right?

12  A    Yes, that's what I wrote.

13  Q    Was Ms. Boyd ever seen in person by a nurse

14    practitioner?  Or I'm sorry, I apologize.

15    Ms. Boyer.

16            MR. KNOTT:  Form.

17  A    I don't believe so, but that's not what the

18    standard requires.  It's -- actually, I believe

19    the term is "qualified health professional" which

20    includes a nurse, so she was seen by a nurse.

21  Q    (By Ms. Irene, continuing) So to be clear, you're

22    saying that on page 15, looking at the section

23    where it says a patient can be seen by a

24    clinician, you're saying that the term is

25    actually qualified health professional?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   A     Well, I don't have quotes around this, so.  I

2           believe it does say "qualified health

3           professional", which by definition is a nurse, a

4           licensed mental health provider, a nurse

5           practitioner.  It's any number of qualified

6           licensed providers.

7   Q     Okay.  One moment.  And under this -- I

8           apologize.  I withdraw the question.

9               Looking again at the Standards for Health

10          Services in Jail section JA01, is part of the

11          standard of care that a face-to-face exam is

12          given?

13              MR. KNOTT:  Object to the form.  It's

14            vague.

15   A     Well, no, and these standards are not standard of

16           care.  This is not standard of care.  These are

17           accreditation standards.  But the answer is still

18           no.

19   Q     (By Ms. Irene, continuing) Okay.  So when it says

20          access to care means that in a timely manner a

21          patient can be seen by a clinician or a qualified

22          health professional, what does "seen by" mean?

23   A     Well, I did not write the standard.

24   Q     If you do not know, you are more than -- I don't

25          want you to answer something that you don't know

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      the answer to.  If you do not know, that is an

2      acceptable answer.

3   A   Right.  I didn't -- I didn't write the standard.

4      It's just access to care that a patient is seen

5      by a qualified healthcare professional.  So I

6      don't know what they meant when they wrote that.

7          But regardless, she was seen by a qualified

8      health professional.

9   Q   Okay.  I'm going to share my screen again.

10         Ms. Pearson, have you seen this document

11     before?

12  A   Perhaps.  I would need to reread it.

13         Are you going to ask me -- should I read it?

14     Are you going to ask me questions about it?

15  Q   Yes.  Please take a moment to reread it.

16             MR. KNOTT:  Madison, when she's done,

17         would you mind scrolling down for a Bates

18         number?  Wait until she says she's done.

19             MS. IRENE:  Yes.  Thank you.

20  A   Okay.

21  Q   (By Ms. Irene, continuing) Okay.  And for the

22     record, the document that Ms. Pearson was

23     reviewing was Monroe County Bates No. 017959.

24         Is this an email sent to -- or sorry, sent

25     from Amber Fennigkoh?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   A   Yes.

2   **Q**   **And in this email does Ms. Fennigkoh express**

3        **concerns about sending -- about the frequency**

4        **with which the jail is sending inmates to the**

5        **emergency room?**

6              MR. KNOTT:  Vague.  Foundation.

7   A   I'm going to say no to that.  This is -- this

8        email is covering several different things.  I --

9        my -- just reading it now, my take on this is

10       that Nurse Fennigkoh is asking questions that I

11       think she's just trying to be concerned about

12       processes and what's, you know, the best way to

13       handle various situations.  And I just don't have

14       any more context other than this email.

15   **Q**   **(By Ms. Irene, continuing) Ms. Pearson, to be**

16       **clear, have you seen this email before?**

17   A   You know, I believe I did, but it really wasn't

18       related to this, the care, what was going on in

19       this particular case.

20          So I believe I saw it.  I just didn't pick

21       it apart because it really wasn't relevant to

22       this case from my perspective of what I was asked

23       to do.

24   **Q**   **Okay.  One moment.  Did you form an opinion on**

25       **whether or not the -- I'm sorry.  Hang on one**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      second.

2           Have you seen this email before?

3              MR. KNOTT:  Bates number?

4              MS. IRENE:  Yes, I apologize.  Thank

5      you.

6  Q   (By Ms. Irene, continuing) Have you seen this

7      email before?  This is Bates No. Monroe County

8      018773.

9  A   Again, yes.  I believe I reviewed this.  But

10     again, I did not -- I didn't spend any time

11     picking it apart again because it wasn't

12     necessarily relevant to what I was asked to do in

13     this particular case.

14  Q   Have you seen -- sorry.  I'm not sure if you

15     heard my question or if I was on mute again.

16           Have you seen this email before?

17  A   I believe so, yes.

18              MR. KNOTT:  I think she just

19     answered.

20  Q   (By Ms. Irene, continuing) Okay.  And did you

21     consider it in forming your opinions in this

22     case?

23  A   No, in terms of this is a discussion about

24     services in general and the best way to manage

25     that, and it really wasn't applicable per se to



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     this case with Ms. Boyer.

2  Q  **Okay.  And just to be clear in case I was on mute**

3     **when I said this because I'm not sure when I went**

4     **on, but this is Bates Monroe County 056584.**

5        **Ms. Pearson, do you believe that people in**

6     **prison deserve the same access to healthcare as**

7     **those who are not in prison?**

8        MR. KNOTT:  Object to the form.

9  A  In jail and prison, yes.  It's just access to

10    care, as with any venue, looks different based on

11    your resources.

12       So, for instance, if you're in the emergency

13    room and you start to have a stroke there's a

14    doctor right there, you're in the emergency room.

15       If you start to have a stroke at a jail, 911

16    is called and you're transported to the emergency

17    room.  So it's access to care.  It's just

18    accomplished in a different way based on the

19    resources available.

20       But yes, as we call them patients, not

21    inmates, the patients absolutely deserve access

22    to care and their healthcare needs met.  That's

23    the purpose of correctional health care companies

24    providing correctional health.

25 Q  **(By Ms. Irene, continuing) And do you believe**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    that patients who are incarcerated deserve the

2    same standard of medical care as those who are

3    not incarcerated?

4              MR. KNOTT:  Object to the form of the

5         question.  Object to the extent it's vague as

6         to "standard".  If it's standard of care,

7         it's a legal question.  But go ahead.

8  A   Could you repeat the question, please.

9  Q   **(By Ms. Irene, continuing) Do you believe that**

10     **people who are incarcerated deserve the same**

11     **standard of medical care as those who are not**

12     **incarcerated?**

13  A   Well, again, standard of care is what would the

14     same or similar person do in the same or similar

15     situation.  So again, I'm back to it depends on

16     your resources and how you accomplish standard of

17     care.

18          There are -- well, they deserve to have

19     their healthcare needs met, it's just

20     accomplished in different ways based on the

21     venue.  As my example before, if you're in the

22     emergency room versus in a jail, you're having a

23     stroke, that's handled two different ways.

24     You're still getting access to care, it just has

25     to be accomplished differently.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MS. IRENE:  Okay.  I have no further
 2         questions.  Thank you very much for your
 3         time, Ms. Pearson.
 4              MR. JONES:  I do not have questions.
 5              MR. HARDY:  I have no questions.
 6              MR. KNOTT:  Ms. Pearson, I have just a
 7         couple of clarifications.
 8                      EXAMINATION
 9  BY MR. KNOTT:
10  Q    Just prior to the last break a question was asked
11       about whether you had formed an opinion, and I
12       don't remember exactly how it was phrased,
13       whether you had formed an opinion with respect to
14       an EKG, and I think your answer was no.
15            Did you form an opinion as to whether the
16       standard of care required Amber Fennigkoh to send
17       Ms. Boyer to a hospital to get an EKG at any
18       time?
19  A    Yes, I do have an opinion about that.  And my
20       opinion is that no, Nurse Fennigkoh was never in
21       a position where the standard of care would
22       require her to send Ms. Boyer to the hospital for
23       an EKG.  RN Fennigkoh was not even in the
24       building at the time that Ms. Boyer experienced
25       chest pain and she was --
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  Q    Okay.  And the last question, you were asked

2       questions about NCCHC Standard JA01 Access to

3       Care and how you quoted that, or you cited that

4       on page 15 of your report.

5  A    Yes.

6  Q    Do you have that in front of you now?

7  A    Yes.

8  Q    And just with respect -- so the record is clear,

9       with respect to the term "clinician", what is

10      your opinion with respect to the use of the word

11      "clinician" in JA01?

12 A    A licensed healthcare staff member.  NCCHC they

13      do use the term "qualified healthcare

14      professional."

15           In the back of the standards book they

16      define what that is, and it is a licensed

17      healthcare professional such as a nurse, a

18      licensed mental health worker, a physician.  It

19      goes through the gamut of licensed healthcare

20      workers who are able to provide -- who are able

21      to see the patient.

22 Q    And is it my understanding you substituted when

23      you're writing your report "clinician" for

24      qualified healthcare provider -- or "qualified

25      healthcare professional"?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | **And in retrospect, is that a choice you would** |
| 3 | | **make again?** |
| 4 | A | In retrospect, I'm changing that when we're |
| 5 | | finished here today. |
| 6 | Q | **And that's it?** |
| 7 | A | To be clear, yes.  Again, it's not in quotes. |
| 8 | | The standards, the National Commission standards |
| 9 | | book is many, many, many pages long and there's a |
| 10 | | lot of information.  I mean, I can't, short of |
| 11 | | photocopying the book and attaching it, just was |
| 12 | | trying to offer the intent of the standards. |
| 13 | | So clinician covers licensed healthcare |
| 14 | | workers, so.  But I will change that to make that |
| 15 | | clearer in the future. |
| 16 | | MR. KNOTT:  Okay.  That's all I have. |
| 17 | | Thank you. |
| 18 | | THE VIDEOGRAPHER:  Is there any |
| 19 | | follow-up based on that? |
| 20 | | MS. IRENE:  No.  No further questions |
| 21 | | based on that. |
| 22 | | THE VIDEOGRAPHER:  All right.  And just |
| 23 | | before I take us off the record I do have to |
| 24 | | get orders. |
| 25 | | So Madison, would you like the |

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  transcript or the video?

2      MS. IRENE:  Not at this time.  No,

3  thank you.

4      THE VIDEOGRAPHER:  All right.  Douglas,

5  transcript or the video?

6      MR. KNOTT:  Not at this time.  Thank

7  you.

8      THE VIDEOGRAPHER:  All right.  Mark,

9  transcript or the video?

10      MR. HARDY:  No, thank you.

11      THE VIDEOGRAPHER:  And Andrew,

12  transcript or the video?

13      MR. JONES:  Same answer.  No.

14      THE VIDEOGRAPHER:  All right.  Then we

15  are going off record.  It is 1:20 p.m.

16  Central.

17      (Off the video record)

18      MR. KNOTT:  You know, I'm not sure who

19  was asking the question there, but was that

20  transcript?  We need a transcript.  We're not

21  going to pay for the original, so.  That's a

22  thing we play with the Loevy firm, so.

23      I'm going to order a transcript of the

24  deposition, but I'm not going to pay for the

25  original.  So if you're going to insist that

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  I pay for the original, then I'm not going to

2  order the transcript.

3      MS. MAKAR:  That's fine.

4      MR. KNOTT:  So is Loevy going to order

5  the transcript?

6      MS. MAKAR:  Why don't you just tell

7  Talia that you don't want a transcript unless

8  the original is ordered, Doug.

9      MR. KNOTT:  Yeah, that's what I'm

10  saying.

11      MS. MAKAR:  Okay.

12      THE VIDEOGRAPHER:  Okay.  Understood.

13      MR. KNOTT:  Okay.

14      COURT REPORTER:  So I just need to, for

15  my mind, nobody is ordering a paper

16  transcript/electronic transcript of

17  Ms. Pearson; is that correct?

18      MS. MAKAR:  Yes, not at this time.

19      COURT REPORTER:  Mr. Knott; right?

20      MR. KNOTT:  Yep.  We'll be in touch.

21      (The videoconference deposition of

22  Kimberly Pearson came to a close at

23  approximately 1:20 p.m.)

24

25              *  *  *

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   STATE OF WISCONSIN )

2   COUNTY OF ST. CROIX)

3        Be it known that I took the videoconference

4   deposition of Kimberly Pearson, on the 26th day of

5   February, 2025, remotely via Zoom;

6        that I was then and there a Notary Public in and

7   for the County of St. Croix, State of Wisconsin, and

8   that by virtue thereof I was authorized to administer

9   an oath;

10       that the witness, before testifying, was by

11  me first duly sworn to testify to the whole truth and

12  nothing but the truth relative to said cause;

13       that the testimony of said witness was

14  recorded in stenotypy by myself and reduced to print

15  by means of Computer-Assisted Transcription under my

16  direction, and that the deposition is a true record of

17  the testimony given by the witness to the best of my

18  ability;

19       that I am not related to any of the parties

20  hereto nor interested in the outcome of the action.

21       Dated this 24th day of March, 2025.

22

23       Terri Stacken, RPR
         St. Croix County, Wisconsin
24       Commission Expires
         10-29-2026

25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

### EXHIBITS

EXHIBIT 4 - Narrative Note - previously    6
   marked Exhibit

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**$**

**$450** 11:23
**$500** 11:24

**0**

**000088** 94:19
**017959** 115:23
**018773** 117:8
**056584** 118:4

**1**

**1** 15:22 28:15
33:14 34:15
36:9 109:14
**1-1-25** 16:5
**10** 24:7 37:18
50:24 55:23
88:15 97:3
**100** 58:11
**101** 5:4
**10:02** 5:8
**11** 88:15
**11:25** 63:13
**11:30** 98:1
**11:32** 63:18
**12-22** 97:14
**120** 106:1
**1294** 72:19,20
**12:48** 111:2
**12:59** 111:7
**13** 92:11
**133** 70:5 72:15,
18
**15** 55:6 112:23
113:22 121:4
**16** 98:5
**17** 9:11 23:24

**18** 22:23
**180** 106:1
**1:20** 123:15
124:23

**2**

**2** 16:9 23:14
**20** 68:22
**2007** 36:14,16,
21
**2009** 20:12
**2009-2010**
32:7
**2010** 39:7
**2013** 36:9,10
**2014** 22:16,20,
23
**2015** 24:6
**2016** 9:10
35:12,21 36:1,6
**2017** 34:14
**2018** 22:20,24
34:6
**2019** 33:18
65:6 95:7
**2024** 22:16
**2025** 5:8 36:5
63:18 111:7
**2100** 19:13
**21st** 65:6 98:1
**22** 13:16
**22nd** 77:24
95:7,18 98:2
102:20
**24** 80:16
**24/7** 20:7
84:10,20
**25** 26:9
**26** 23:19 63:18
**26th** 5:7 111:7

**3**

**3** 71:23 74:9
86:7 88:22
98:13,21
**30** 9:5 96:22
**3:20-cv-1123-
jdp** 5:17
**3:22-cv-00723-
jdp** 5:18
**3:45** 104:11

**4**

**4** 33:10,13
34:15 67:24
97:5,16 98:2,8
**40** 9:5 13:18
23:3,4 39:6
50:3
**40202** 5:5
**45** 13:2,8,12,17
24:11

**5**

**5** 35:9,21 72:1
**5:30** 109:20

**6**

**6** 36:8 67:16
68:1
**69** 75:3
**6:02** 95:7

**7**

**7** 36:15
**7,000** 50:24
**70** 75:3
**730** 5:4

**8**

**8** 88:15
**8:53** 102:3

**9**

**9** 74:7,10 88:15
96:3 97:11
**9-11** 19:18
**911** 118:15
**9:30** 109:2

**A**

**a.m.** 5:8 63:18
**abdominal**
69:2
**absolutely**
23:11 100:15
103:20 118:21
**abuse** 92:11,
20,25
**academic**
16:13
**accept** 27:1
37:19
**acceptable**
115:2
**access** 113:1,
4,7 114:20
115:4 118:6,9,
17,21 119:24
121:2
**accessible**
45:15,25 46:8,
19 47:1
**accidentally**
8:2
**accomplish**
119:16
**accomplished**
118:18 119:20,
25

**accreditation**
28:18,21,22,24,
25 29:3,10
114:17
**accurate** 16:6
37:8 38:23
45:14,24 46:7,
25 47:4 48:1
74:11,22 75:24
84:19 92:8,23
93:6
**accurately**
55:13 56:14
75:16 76:7
**accurateness**
8:16
**accustomed**
75:7
**ACH** 63:25
64:8,13,16
78:1,3 110:4,13
112:7,12
**ACH's** 111:14
112:1
**act** 43:18 44:9
78:16
**action** 23:10
24:13 60:15
**actions** 64:5,9,
17,19 111:19
112:9,20
**add** 101:11
**additional**
13:25 37:24
42:24 68:23
80:9,11 105:4,
5,8 108:13,15
**address**
106:19
**adequacy**
109:25 111:13
112:14
**adequate**
19:16 53:6,10
**administration**
16:10,11 27:11,
13,24 32:12
102:12 104:6



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

administrative 22:1 29:7

admitted 80:17

advance 29:5

Advanced 5:11 6:6

advertise 27:3

Advocacy 35:13

affect 8:15

affected 86:2

Affiliations 28:17

afternoon 77:25

Agency 20:16, 22 22:21

agree 43:3,18, 23 44:1,6,9,15 45:2,8,14,19, 22,24 46:24 47:9 53:20 54:1,22 75:15 76:6 77:7,14 80:19 81:5 86:10,13 87:8, 15 89:9 92:13

agreement 11:25

ahead 39:17 42:22 49:16 52:8 54:7 64:23 87:23 91:9 92:7 112:4 119:7

alcohol 69:25 70:5,7,11 72:15 75:12,18 76:9, 22 77:4 86:9 90:8,13,18,19 91:4,6 92:11, 12,20

Amber 6:7 106:21 107:14, 18 108:2 111:24 115:25 120:16

American

29:12,14,17 34:9,17,22

amount 12:23 13:3 24:3

Ana 20:16

analysis 31:11 39:11

anchoring 42:4

and/or 106:1

Andrew 6:8 123:11

annual 30:11 35:11

answering 41:7 92:2

answers 7:20 8:3 35:19 44:17 66:8 75:10 91:18 92:4,9

anytime 12:13

apologies 97:18 108:1

apologize 24:22 25:7 26:11,15 106:7 113:5,14 114:8 117:4

appearance 5:20

appearing 5:25 6:3,9,13, 15

applicable 117:25

appropriately 111:22

approximate 14:1

approximately 9:10 13:2,25 33:11 98:12 124:23

April 36:9

area 51:17

areas 27:8,14

arena 14:14

argumentative 52:6 56:20

arrives 82:5 109:13

article 33:19 36:16,20

ascertain 89:10

asks 86:10

aspirin 71:4

assessment 85:1 100:5,12

assessments 89:10

assigned 48:25 49:14 72:23

assignment 78:1

assist 109:3

assistance 21:13

assistant 16:22 17:22 40:11 41:16

assisting 32:8

associate 6:5

association 29:12,13,14,18, 20,21 34:9,18, 23 35:10

assume 8:9

assuming 49:1 70:9

asthma 83:21 84:1

attaching 122:11

attending 5:20,21

attorney 26:23 28:13 37:10

attorneys 10:8 24:15 37:3

attractive 18:19

authored 38:20

availability 26:24

avenues 79:10

aware 7:17 42:4,10 50:23 51:4,6 61:24 84:2,6 107:10 108:10

———

B

Bachelor 16:11

back 11:10 24:6 32:6 53:15 63:15 68:20 79:15 97:11 101:24 104:7, 22 105:18,21 107:21 111:4 119:15 121:15

backwards 80:14

Band-aids 55:23,24

based 32:9 39:4,8,18,24 40:3 66:21 68:7 73:24 80:20 88:8 111:19 118:10,18 119:20 122:19, 21

baseline 48:21

basic 42:23

Bates 94:18 115:17,23 117:3,7 118:4

begin 7:16

behalf 6:13 21:6 25:7,11, 16,23,25 26:2

Belt 30:15

bias 42:4

bill 12:4,6,20, 21 14:1,3,8,10, 11,12,15,22 15:1,4,6,10,13, 16 23:3

billed 12:23 13:1 14:6

billing 14:19 15:9,15

bills 13:5,7 17:10

bit 16:16 38:8 94:3

bladder 69:2

blood 69:1,11, 25 70:5,7,11 72:15 73:3,6 75:12 90:13,17, 19,25 91:1,4,5 97:8 98:22 99:10 103:24, 25 104:3,6,11, 21,24 105:10, 16 107:4

blue 76:14

board 21:6 29:20

bone 68:25

book 121:15 122:9,11

booked 65:2,5 74:12,20

bottom 97:11 107:7

bowel 73:13

Boyd 77:9,17 78:6 84:22,25 113:13

Boyer 5:11,13, 25 59:8 65:2 66:20,24,25 67:3,6,8,12 68:4,6,12,18,24 69:9,17 70:13, 16 71:2,12,16



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

73:2,9 79:1
80:20 81:19
83:1,8 84:3
85:13 95:17
96:6,11 97:5,
10,19 98:9,14,
22 102:12
103:23 104:10
106:25 108:24
109:4,8,23
112:19 113:15
118:1 120:17,
22,24

**Boyer's** 70:5
73:14,21 75:12
81:20 85:20
86:7 95:11,12,
14 98:25
100:20 101:16,
21,23 102:6
104:24 105:10
107:4

**break** 63:10
72:5 110:24
120:10

**breaking** 55:5

**breathe** 107:1

**breathing** 97:7
98:15,20

**briefly** 15:17

**bring** 14:5,7

**bringing** 95:15

**broad** 27:19
45:18 46:3,10
47:3,14 48:15
49:16 54:9
55:17 56:25
57:22 58:9
60:10 61:1,15
62:13 64:2,11
67:10 78:10
79:5,24 80:4
82:13 90:7
93:15,25 96:8
99:20 108:19

**broken** 48:4
71:5

**budget** 18:10

**building**

107:21 120:24

**buildings**
50:24 51:19

**burden** 59:25

**business** 16:9

———

**C**

**calculator**
13:4

**calendar** 22:14
24:1

**California**
17:5,9,11
20:16,20 29:24
35:10,12

**California-
nevada** 34:16

**call** 44:15 69:8
84:11 95:12,14,
17,25 100:5
101:7,9 104:7,
22 105:18,20
109:15,19
118:20

**called** 34:7,18,
24 67:22 95:11
101:4 103:1,14
118:16

**calling** 44:4

**calls** 39:15
79:4

**Camino** 16:20
17:12

**cancer** 69:1

**capacity** 24:4

**Cardiac** 36:17

**care** 18:9 20:4,
16,22 21:2,12,
19 22:3,21
26:13 27:23
28:2,21 30:5
31:16 36:17
39:13,18 45:4,
10 50:6 53:6,
10,12 61:22
63:22,25 64:4,

7,9,16,18 78:2
79:9,15,21
82:2,12 84:3,17
104:14 108:23
109:1 110:8
111:22 112:9,
17,21,24 113:2,
4,7,10 114:11,
16,20 115:4
116:18 118:10,
17,22,23 119:2,
6,11,13,17,24
120:16,21
121:3

**cares** 64:17

**case** 5:16,17
9:14,17,19,21,
25 10:6,24
12:1,19,24
13:6,9,13 14:2,
6,9,19 23:5,18
24:14,19 25:9,
19,20,22 26:5,
10 27:6 36:25
37:23 38:21
39:11 41:4
49:23 59:8
61:17 63:8,21,
24 64:7,15
71:23 77:12
80:10 90:25
91:3 110:1,3,5,
11,19 116:19,
22 117:13,22
118:1,2

**caseload**
24:11

**cases** 12:3
15:6 21:7 22:3,
9 23:20 24:3,5,
7,8,15,17 25:1,
6,10 26:6,12,
15,22 28:23
39:1

**catch** 38:8
47:18

**cc'd** 106:21
107:18 108:3

**CCHP** 30:3

**center** 18:22
19:1 30:21

**Central** 5:8
63:19 111:8
123:16

**certification**
30:3,16

**Certifications**
30:2

**Certified** 30:6

**challenging**
74:10,21,22

**change** 19:4,5,
7 48:22 49:6
122:14

**changed** 59:22

**changing**
122:4

**chapter** 29:19
34:17

**characterize**
48:17

**chart** 57:7

**check** 105:10

**checks** 96:22

**chemo** 83:18,
20

**chest** 109:25
120:25

**Chicago** 6:1

**choice** 122:2

**choose** 28:22
81:16

**chooses** 59:3

**chosen** 51:24

**Christine** 5:24
71:12

**chronology**
32:1 97:12

**circled** 84:1

**circumstance**
44:14 56:23
61:1 90:11

**circumstance
s** 28:9 39:21

43:24 47:15
56:21 60:12

**cite** 112:23
113:1

**cited** 121:3

**citing** 113:6

**claims** 26:12

**clarification**
8:8 68:18 94:14

**clarifications**
120:7

**clarify** 18:15
21:16 49:11
74:16 76:5

**clear** 45:14,24
46:7,25 54:19
58:1,17 66:2,12
74:11,22 81:7
82:9 90:24 92:9
101:1 113:21
116:16 118:2
121:8 122:7

**clearance**
84:23 85:1,6

**clearer** 75:24
76:19 122:15

**clients** 12:5

**clinical** 18:23
22:1 29:7 32:2,
9 34:18,24 56:2
89:14 100:19
104:14 113:9

**clinically**
43:10,11 44:18,
20 45:13 49:18,
19 57:4,8,14,18
58:3,20 60:5,22
61:3,7,10 62:5
90:2 100:18

**clinician**
113:9,24
114:21 121:9,
11,23 122:13

**clock** 109:3

**clocked** 95:24
96:1 109:2,20



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Clonidine 104:9,20 105:4, 15

close 13:15 24:18 124:22

closely 54:2

closure 42:11

clue 69:7

Code 36:16,19

colleagues 6:3

combination 58:14

combined 39:9

Commission 21:11 28:20,24, 25 30:4 112:24 122:8

committed 104:18

common 44:5 88:17,21

communication 43:19 44:10, 21 45:3,9,12 107:19 108:14, 15

communities 19:13,21

companies 21:9 118:23

company 21:20,22

compare 93:11

comparison 29:8

Competent 35:23

complain 97:19

complained 97:5 98:9,15,17

complaining 96:11 106:25

complaint 98:11

complete 81:20

completed 96:6 102:2

completely 8:4 47:15 49:25 50:4 52:21 56:5 93:6

complicated 22:19

component 79:8 86:22

concerned 116:11

concerns 68:12 96:23 101:6 104:4 116:3

conclusion 39:16 41:20 112:14

condition 47:19 81:18

conditions 8:15 40:10,14 80:21,24 81:2,7 86:2

conducted 63:17 111:6 112:21

conducting 89:10

conference 34:17 35:11

conflict 26:25

confuse 8:1

confused 59:5

congestive 83:2,9,16

congratulations 22:15

conscientious 14:13

consequence 55:21

consequences 54:4,25 55:15 56:12,16 57:19 58:6

considered 99:8,11

consisted 35:18

consists 57:2

constant 76:6

consultant 22:6,18 31:16

Consultants 34:10

consulting 21:1,2,5,16,18, 25 22:10 23:1,6 31:14,23,24 32:5,11,17,21

contact 52:19 84:12 89:20 103:19

contacted 26:23 103:21, 25 109:9

contacting 24:14

contagious 82:24

content 29:22 33:19 34:1,5 72:15 75:12 93:19 94:3

context 116:14

continue 6:20 69:3 81:13

continuing 27:20 28:14 30:11 33:16 38:11 39:22 41:23 42:3,15 43:3,13,25 44:22 45:2,8,21

46:6,22 47:9,17 49:9,21 51:25 52:15 54:19 55:10 56:7 57:16 58:1,15 60:3,17 61:5,18 62:9,16 63:20 64:6,14 65:1 66:12 67:14,18 68:3 72:10 77:14,22 78:19 79:17 80:1,19 81:5 82:8,16 83:13,25 84:15 85:9,19 86:6 87:15 88:3 90:12 91:16 92:10 93:22 94:6 96:5,10 97:1 98:6 99:17,22 101:1 103:10 105:7, 22 108:1,21 110:9,18 111:9 112:11 113:21 114:19 115:21 116:15 117:6, 20 118:25 119:9

continuity 57:3

contract 31:17,18,21,24 32:6

contracts 21:10 31:14

convened 5:9

conversation 55:25 105:3

conversations 108:7

convey 95:10

cooperate 75:1 76:3

correct 21:24 111:23 124:17

correctional 5:12 6:6 20:22 21:2,8,12,15, 17,18 22:2

27:10,11,23 28:2,20 29:12, 14,17,23 30:4, 6,13 31:16 32:18,22 34:22 36:12 39:1,7 50:6,16 52:2 68:9 72:22 79:8 108:9 112:24 118:23,24

corrections 68:5 81:19,22

counsel 5:22 6:25 8:11,14

counties 21:9, 13 35:11

country 21:3

county 6:10 20:15,21 22:21, 24 65:3 75:4 94:19 115:23 117:7 118:4

couple 10:17 44:17 110:24 120:7

court 5:3,6,15 7:8,17,23 8:1 34:8 124:14,19

covering 7:16 116:8

covers 27:12 122:13

create 19:19

crisis 105:23, 25

critical 20:4

Culturally 35:23

current 11:21, 22 15:25 20:25 36:5 106:3

custody 67:5 69:24 70:1,3 78:13 84:12 96:12 97:6,19 98:9 101:5 102:2,25 103:19

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**CV** 15:24 16:1 28:16 50:3

**cycle** 86:17,18

---

**D**

**danger** 60:7,23 61:12

**dangerous** 54:4,25 55:15 56:16 57:19 58:5

**Daniel** 6:4

**Danielle** 6:11 95:4

**data** 57:2,8 99:16,18,23,25 100:3

**date** 12:24 16:4 24:6

**dates** 65:15

**day** 5:7 14:17 30:25 51:13,16 52:12 73:4,6,8 77:9,17,21,23 78:3,7,18 79:2 93:4

**days** 29:5 89:17,20

**deadlines** 13:21

**dealing** 76:11 100:11,12

**dealt** 76:12

**death** 9:16

**December** 35:12,21 65:6 77:24 95:7,18 102:20

**decided** 22:8 24:10

**decision** 37:19

**dedicated** 31:4 109:22

**dedicating** 49:1

**defendant** 9:7, 12,13 10:1

**defendants** 12:1 13:6

**define** 121:16

**definition** 39:16 40:3 42:6,9 106:3 114:3

**definitively** 72:21 93:1

**degrees** 16:8

**delay** 26:13

**department** 19:5,8 41:12 48:4 81:14,15

**depend** 28:8 62:14

**depended** 52:21

**depends** 28:7 43:23,24 44:25 46:4,12 47:15 48:1,10,23 49:8,25 50:5,9 51:2,23 55:1 56:5 58:10 60:11 61:6,16 62:15 75:22 76:15 88:15 90:15,22,23 91:11,12 99:21 100:1 119:15

**deposed** 9:1,3

**deposes** 7:11

**deposition** 5:10 9:7 10:3,5, 13,22 11:8,15, 23 12:25 13:9, 23 15:9 34:9 63:16 72:2 74:4,8 98:18 111:5 123:24 124:21

**depositions** 22:13 24:1

**describe** 20:25 39:18 62:2

**description** 92:24

**deserve** 118:6, 21 119:1,10,18

**desire** 82:14, 17

**detail** 12:15

**detailed** 12:9

**details** 88:2

**determine** 29:9 37:15 47:24 69:25

**developed** 30:21

**developing** 21:10

**development** 15:11 21:11

**diabetic** 55:19

**diagnose** 41:16 43:1

**diagnoses** 40:22,25 41:22

**diagnosing** 40:12

**diagnosis** 39:23 40:1,3,7, 9,17,19 41:6, 10,18 109:11

**diastolic** 106:1

**diet** 73:9

**difference** 42:16,19 58:23, 24

**differential** 39:23,25 40:3, 7,9,16,21,25 41:6,10,17,22

**differently** 47:7 86:2 94:3 108:17,23 119:25

**difficult** 51:12 73:15,22 74:1,5 75:8

**difficulties** 74:18

**difficulty** 97:7 98:15,20

**diploma** 16:12 17:2,13

**directed** 84:11

**disaster** 19:19, 20 32:4,7,24

**disciplinary** 23:10

**disclose** 81:3, 6

**disclosed** 8:23

**discussed** 89:4

**discussion** 26:24 35:17 63:3 117:23

**discussions** 80:11

**disease** 82:24

**dismissed** 9:18,24

**disregarded** 112:18

**District** 5:15, 16

**doctor** 62:14, 15 63:5 118:14

**doctors** 71:18

**document** 11:13 12:14 25:10,12 38:14 60:15 61:9,22 62:3 65:8,11,13 66:6,16 67:4 93:4 99:3 101:5 106:12 115:10, 22

**documentation** 45:15,25 46:7, 17,23,25 47:4 61:20 62:10,18 63:2 100:24

**documented** 59:13 70:6 83:15,19 99:6 101:8,13 102:3 105:5

**documents** 11:11 13:20 31:10 37:4 38:9 101:2

**dollars** 19:18

**dose** 104:8,20 105:4

**Doug** 6:2 124:8

**Douglas** 123:4

**dozens** 25:4

**dressed** 14:18

**drink** 90:18

**drug** 86:9,18 93:8

**drugs** 75:18 76:9,22 77:3 89:20 90:8 92:12,20

**due** 24:5 73:12 83:20

**duly** 7:10

**duty** 77:20 103:16 109:1

---

**E**

**ears** 43:4

**easier** 7:23

**ediscovery** 33:4,24

**education** 30:11 39:4,25 42:24,25

**educational** 29:22

**effect** 98:16

**effective** 45:3, 9

**EKG** 110:20



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

120:14,17,23

**EI** 16:20 17:12

**elaborate**
69:13

**electronic**
33:21,24

**element** 45:15,
25

**elevated**
103:25

**else's** 64:17

**email** 94:24
95:2,6,8,10
106:14,17,18,
19,21,24 107:7,
14,17,24 108:3
115:24 116:2,8,
14,16 117:2,7,
16

**emails** 108:11
109:12

**emergency**
19:1,9 41:12
48:3 81:14,15
116:5 118:12,
14,16 119:22

**emergent**
79:12 82:6,19
85:18

**emergent/
urgent** 89:7

**employed**
21:21 64:13

**EMS** 19:11,12
32:3

**EMTS** 19:14

**encounter**
46:14 100:17,
19

**end** 111:11

**ended** 84:16

**ensure** 19:15

**entire** 25:12
26:5 55:25
100:6

**Environment**
34:20,25

**essential**
45:15,25

**essentially**
17:5

**estimate** 9:10
22:5,17 23:24
24:3 26:6,9

**et al** 5:12,14

**ethical** 14:13

**evaluate** 85:7

**evaluation**
30:20 59:8

**evening** 102:3

**event** 34:18,23

**everybody's**
88:19

**evidence**
112:18

**evidence-
based** 45:16
46:1

**evident** 109:21

**evolve** 89:17

**exam** 30:9,10
114:11

**EXAMINATIO
N** 7:12 120:8

**examples**
76:24

**exceeded**
108:25

**excluded** 27:5,
7

**exhausting**
20:9

**Exhibit** 15:22
23:14 28:15
33:14 34:15
36:9 67:16,24
68:1 71:23 72:1
74:9 96:3

**exist** 85:11

**expand** 90:1

**expect** 93:20

**expected**
62:22

**expecting** 63:5

**experience**
18:23 28:11
32:2 39:6 40:8
50:1,7 72:22
86:19,20 87:6
88:21 90:5
92:15 108:8

**experienced**
34:8 87:9,17,25
88:7,9 120:24

**experiences**
74:15,18 76:20
77:1 87:19
88:18,20 93:7

**experiencing**
86:9,12 88:1,5,
8 89:11 90:4

**expert** 12:3
22:2,22 23:5
24:4 25:1 26:21
27:5,9,15 28:4
31:15 32:16,20,
24 38:25

**expertise** 32:9
75:14

**experts** 14:22
24:16

**explain** 31:24
56:23 88:23

**explained** 41:2

**express** 116:2

**extensive**
18:23 31:10
33:21

**extent** 39:15
41:21 119:5

**eyes** 43:4

---

**F**

---

**face-to-face**
114:11

**facilities** 20:5
28:21 50:6,11
52:2

**facility** 29:4
36:12 50:9,17
51:2,23 74:13,
20 108:9

**fact** 74:5 90:19

**factors** 76:5

**facts** 28:10

**fails** 58:19

**failure** 83:2,9,
16

**fair** 37:3,5

**fall** 34:6

**families** 43:20
44:4,8

**family** 20:10

**February** 5:7
63:18 111:7

**fee** 15:10

**feel** 14:15,25
28:11 37:7
59:19

**feeling** 96:12
97:6,20 98:10
106:25

**feels** 86:20

**feet** 48:6

**fell** 100:9

**felt** 38:9 109:7

**Fennigkoh** 6:7
59:9,13 63:22
66:22 67:2,12
68:5,13,16,17,
24 69:5 71:1
73:24 77:16,20,
22 78:5,15,16,
22,25 79:22
80:22 83:3,5
84:2,6,11,16,
22,25 85:12,20,
23 94:25 95:10
103:6 106:22
107:14 108:3,
17,22,25

111:24 112:16
115:25 116:2,
10 120:16,20,
23

**Fennigkoh's**
64:4,8,9 66:23
67:7 68:4 110:7
111:19 112:9

**field** 30:8

**fielded** 109:19

**figure** 82:24
103:18

**file** 10:6,24
26:5

**fill** 91:20

**filling** 91:17

**final** 40:19
41:20

**find** 94:4

**fine** 13:5 25:14
57:6 124:3

**finger** 48:5

**finish** 8:3
22:13

**finished** 70:2
85:10 122:5

**fired** 23:12

**fires** 31:1

**firm** 13:7
123:22

**flight** 20:1,2,3,
4,8

**Flight's** 20:3

**flipped** 101:12

**floor** 60:14,19

**flow** 80:8,13

**flowing** 19:18

**focus** 27:10

**focused** 33:23
100:5,11

**follow** 55:11

**follow-up**

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

107:10 122:19

**foot** 55:23,24

**forgot** 106:7

**form** 28:5 38:4, 6 39:14 42:21 43:6,21 44:12 45:5,17 46:2,9 47:2,13 48:14 51:8 52:5 56:18,24 58:7 60:9,25 61:14 62:1,12 63:21, 24 64:6,15 72:11,14 77:10, 18 78:8 79:23 80:25 82:3 83:4,10,22 85:3,15 86:3 87:20 92:3,11 94:5 96:7 97:21 99:12 100:22 101:5,8 102:22 105:1,12 107:15 109:24, 25 110:3,6,11, 14,15,18,21 111:13,24,25 112:2,5 113:16 114:13 116:24 118:8 119:4 120:15

**formed** 120:11, 13

**formfitting** 59:15

**forming** 117:21

**forms** 91:21

**formulate** 38:10 39:7

**forthcoming** 54:13 59:4 73:25 81:10

**forward** 41:14 79:9 80:17 81:13

**found** 71:1,5 94:9

**Foundation**

79:4 86:4 87:22 105:1 107:15 116:6

**four-year** 25:15,17,24

**fourth** 23:7

**fracture** 100:10,11

**frame** 97:24

**Francis** 18:17, 25 30:20

**frankly** 14:11 36:21 91:24 107:19 109:1

**frequency** 116:3

**frequent** 52:18

**frequently** 24:16 52:23,24

**friendly** 20:11

**front** 46:17 59:14 65:23 66:7 121:6

**full** 100:6

**full-time** 23:4

**fully** 59:4 81:9, 10,17

**future** 42:2 59:18 65:11 122:15

---

**G**

---

**Gallup** 19:25 20:2,3,4

**gamut** 121:19

**gather** 53:17, 22 54:3 89:7

**gathered** 80:9, 11

**gathering** 80:17

**gathers** 43:9

**gave** 18:23 57:23 62:25 104:5

**general** 38:25 49:21,23 60:21 81:24,25 88:14 90:18 117:24

**generality** 48:9

**give** 7:19 12:7 35:20 55:18 61:19 66:8 84:22,25 85:6 104:2,8 105:15 112:13

**giving** 100:8

**goal** 29:21

**good** 7:14,15 53:6,10,13,21 54:23 63:10 74:5 91:25

**gram** 93:3

**great** 107:19

**Green** 30:15

**Gregory** 5:11, 13

**ground** 7:16

**grouped** 51:16

**Groups** 35:14

**guess** 16:20 19:7 22:16 41:8 44:7 46:22 53:24 64:14 65:14 71:25 95:8

---

**H**

---

**half** 11:10 34:16 93:3

**half-marathon** 100:9

**Hallman** 95:5

**hand** 7:8 55:22

**handle** 116:13

**handled** 24:3 119:23

**handling** 23:21

**hang** 97:2 116:25

**happen** 109:14

**happened** 96:5,11 97:13

**hard** 11:11 41:7 51:19

**Hardy** 6:12 120:5 123:10

**harm** 60:7,23 61:12

**harmful** 54:4, 25 55:15 56:12, 16,22 57:19,24 58:5 60:16 61:4

**head** 7:20,21 25:3 77:6

**head-to-toe** 100:6

**headed** 19:17

**health** 16:11 20:15,22 21:2, 12,15,17,19 22:3,21 27:10, 11,23 28:2,21 29:12,17,23 30:5 31:16 32:7,18,22 34:17,22 39:1,7 50:6,17 76:2 79:9 80:21 83:17 108:8,11, 12 109:7,8 112:24,25 113:19,25 114:2,4,9,22 115:8 118:23, 24 121:18

**health-specific** 30:14

**healthcare** 5:12 6:6 16:10 21:9 30:6 33:21 80:7 82:7,21 84:9 86:24

100:4,17 101:6 115:5 118:6,22 119:19 121:12, 13,17,19,24,25 122:13

**hear** 8:11 53:23

**heard** 43:13,17 117:15

**heart** 83:2,9,16 102:6,8

**helped** 80:2

**helpful** 18:15 72:9 87:2 100:16

**helps** 82:24

**Hendrickson** 6:10 95:5

**heroin** 93:4

**hide** 69:6

**high** 16:24 70:7,11 90:17 91:12 104:25 105:11 107:5

**High-risk** 34:19,24 35:5

**higher-level** 43:11 44:19

**Hill** 6:4

**hip** 68:21

**hired** 32:5

**hiring** 18:9

**history** 32:2 73:16,23 74:11 76:13 77:8,16 78:6 79:1 90:23 100:6

**holding** 76:5

**home** 17:3,7

**Homeland** 19:18

**honestly** 14:10 20:9 24:6 33:18 34:13

**Horizons**



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

31:23 32:6

**hospital** 17:12
18:2 41:11
48:25 70:12
80:15 85:13,17
120:17,22

**Hospital-
mountain**
16:21

**hospitals**
28:24

**hot** 96:12,17
97:6,20 98:10
106:25

**Hounshell**
25:21

**hour** 11:23,24
14:8 55:6

**hours** 10:17
11:10 12:11
13:2,8,13,17,
18,22,25 14:5,
12 20:9 23:4
30:11 48:24
49:1 80:16
89:17 98:4,5

**house** 82:25

**housing** 51:18

**hub** 43:19
44:10,16

**hundred** 30:24

**hundreds**
76:12

**husband** 69:5
95:11,12,14
109:10

**husband's**
109:12

**hypertensive**
105:23,25

**hypothetical**
41:5 48:16

——————

**I**

——————

**ICU** 31:8

**identifiable**
70:24

**identified**
70:18,21,23
71:4

**identify** 31:2
79:12 82:5,19

**identifying**
82:20

**identity** 7:1

**Illinois** 6:1
17:8,25 18:1
19:12 30:21
32:5

**illness** 99:6
100:25 101:2,4
102:2,18

**immediately**
89:22

**Implications**
33:4

**important**
40:22 41:1
45:3,9,12 46:24
53:20,22 54:1
58:23,25 59:1,
20 62:17 82:1,
12 87:1,4
99:17,23,25
100:3

**impression**
73:17,21

**improper**
59:24

**incarcerated**
119:1,3,10,12

**included** 108:6

**includes** 58:13
113:20

**including**
13:23

**incomplete**
41:5 74:24

**incorrectly**
57:17

**increase** 31:7

**increased**
90:12,25 91:1,
4,5

**independent**
111:24

**indicative**
90:19 91:4,6

**indicators**
90:4

**individual**
39:20 75:23
76:16 93:21

**individuals**
30:5 62:6
74:12,19 75:4
92:22

**influence**
75:17 76:9,22

**information**
28:12 31:19
43:9,10 44:18,
19,23,24 47:23,
25 53:16,19,23
54:3,10,11,18,
21,24 55:13
56:10,14 57:4,
9,14,18 58:4,
18,21 59:12
60:4,6,22 61:3,
7,11,19,25
74:2,6,23,24
75:16,24 76:8,
19,21 77:3
79:10 80:1,9,
11,18 81:11,12
82:14,17,22
86:16,21,25
87:4 89:8,13
91:25 100:15
107:20,22
108:12 109:11,
13,16 122:10

**informed**
24:17 68:5

**initially** 65:2

**initiated** 85:23
109:6

**injury** 26:12

**Inmate** 35:13

**inmates** 36:11
116:4 118:21

**input** 34:2,3

**inquiry** 86:15

**insist** 123:25

**inspections**
21:13

**instance** 31:6
46:13 48:19
118:12

**institute** 89:23

**instituted** 89:2

**instruct** 104:8

**instruction**
59:25 105:14

**instructions**
104:3,5,23
105:9

**instructs** 8:14

**insulin** 55:19

**intake** 67:2,4
71:10,11,16,22
73:2 74:19
78:12 79:7,8,
11,15 80:6,10,
23 81:20 82:1,
4,10,11,18
83:1,4,8 86:7,
14 88:25 89:6
90:1 91:17,20
92:3 93:11,16,
22 94:9 96:6,
14,17,20,24
97:10,16,18,25

**intakes** 51:17

**intent** 94:4
122:12

**interacted**
66:20

**interaction**
46:20 66:24

**interactions**
49:13 66:23

**interest** 20:24

**intern** 6:19

**interrupt** 8:2
54:9 66:10
71:22

**interview**
34:12 67:7 68:4
69:18 70:14
80:22 83:8

**interviewed**
34:7 67:5

**interviewing**
109:3

**intoxicated**
69:17 74:12,19
75:9,25 76:18
90:17 91:18,23,
24 92:3

**intoxication**
73:15,22

**investigation**
82:22

**invoice** 12:9,
15

**involve** 26:12

**involved** 70:4

**Irene** 5:23,24
7:4,13 27:20
28:14 33:13,16
38:11 39:22
41:23,25 42:3,
15 43:3,13,25
44:22 45:2,8,21
46:6,22 47:9,17
49:9,21 51:25
52:15 54:19
55:7,10 56:7
57:16 58:1,15
60:3,17 61:5,18
62:9,16 63:9,20
64:6,14 65:1
66:5,12 67:14,
17,18 68:2,3
71:25 72:8,10
77:14,22 78:19
79:17 80:1,19
81:5 82:8,16
83:13,25 84:15
85:9,19 86:6
87:14,15 88:3
90:9,12 91:16
92:10 93:22

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

94:6 96:4,5,10
97:1 98:6
99:17,22 101:1
103:7,10 105:7,
22 108:1,21
110:9,18,23
111:9 112:11
113:21 114:19
115:19,21
116:15 117:4,6,
20 118:25
119:9 120:1
122:20 123:2

**issue** 12:20
56:2 76:1,2
89:3 100:13
103:23

**issued** 13:5

**issues** 30:14
44:2 75:5 79:13
82:21 83:20
96:23

**item** 102:1

---

**J**

**JA01** 113:1
114:10 121:2,
11

**Jackson** 5:2

**jail** 9:16 28:18
29:2 35:5,14
44:3 49:4 65:3
67:1 70:10
74:13,20 77:23
80:8 82:5,15
84:18 95:18
106:17 107:16
114:10 116:4
118:9,15
119:22

**jail.nurse@co.
monroe.wi.us.**
106:20

**jails** 21:3 29:1
75:4,6 86:18
112:25

**January** 24:14,
18

**job** 16:16,23
17:1,6,13 18:2
19:4 54:16,23

**jobs** 17:17
23:8,10,12

**Johnson** 6:14

**joining** 6:18

**Joint** 28:23

**Jones** 6:8
120:4 123:13

**journal** 34:7
36:1,3

**judgment**
113:10

**July** 36:14

**justified** 44:20

---

**K**

**Kafka** 6:4

**Kentuckiana**
5:3

**Kentucky** 5:5

**Kim** 5:10 63:16
111:5

**Kimberly** 6:23
7:9 124:22

**kind** 31:11
92:20

**kinds** 76:3
92:12

**Knott** 6:2 7:5
10:11,12 11:18
27:19 28:5
33:9,15 38:4,6
39:14 41:2,25
42:13,21 43:6,
21 44:12 45:1,
5,17 46:2,9
47:2,13 48:14
49:15 51:8 52:5
54:5,8 55:4,16
56:18 57:21
58:7 59:24
60:9,24 61:14
62:1,12 63:11
64:1,10,21

66:2,9 67:9,16,
25 71:21 72:3
77:10,18 78:8
79:3,23 80:4,25
82:3,13 83:10,
22 84:5 85:3,14
86:3 87:12,20
90:6,10 91:8
92:7 93:14,25
96:2,7,19 97:21
99:12,19
100:22 102:22
103:4,9 105:1,
12 107:15
108:18 110:6,
14,21 112:2,5
113:16 114:13
115:16 116:6
117:3,18 118:8
119:4 120:6,9
122:16 123:6,
18 124:4,9,13,
19,20

**Knott's** 13:7

**knowledge**
14:21 16:7
38:24

**KP** 20:25 21:16,
18

**Kyle** 95:5

---

**L**

**lack** 110:4,12,
16,19

**larger** 20:5
51:22

**largest** 19:11

**late** 77:25
101:19

**Lauren** 6:3

**Lawsuits**
35:14

**lead** 54:25
55:14 56:4,11,
15 57:19 58:5
60:6,7,22 61:12
89:14

**leader** 32:4

**leave** 17:7,24
18:16 19:23
20:6 96:1

**led** 89:13

**left** 22:13 55:8
84:3,4,16
104:23 105:9

**legal** 34:10
39:15,16 119:7

**legitimate**
14:12

**letters** 69:23

**letting** 15:5

**level** 42:23
69:25 70:5,7,11
90:18,19,25
91:1,12

**levels** 90:13
91:4,6

**licensed**
114:4,6 121:12,
16,18,19
122:13

**licensure**
19:16 39:5 43:1
109:18

**life** 100:7

**lifetime** 81:4

**lifts** 69:2

**light** 29:8

**Lisa** 6:7

**list** 23:18 24:19
25:22,24 33:1
40:16 56:21

**listed** 8:21
18:25 25:10
31:24

**listen** 53:25

**listener** 53:13

**listeners** 53:7,
11,21

**listening** 53:17
54:2

**literally** 20:7

**Litigious**
34:20,25

**live** 68:17
71:17,19

**LNCS** 34:8

**located** 5:4

**location** 5:21

**Loevy** 123:22
124:4

**logical** 72:25
88:10

**long** 10:16
51:14,16 52:12
103:11 122:9

**looked** 24:9
111:18

**loose** 70:17

**lot** 14:10 21:4
29:5 34:3 35:18
122:10

**loud** 7:20

**Louisville** 5:5

**lower** 34:15
75:13

**Lucas** 95:4

---

**M**

**made** 18:19
20:10,19 46:25
68:8 73:15,22
98:11 101:7

**Madison** 5:23
55:4 72:7 87:12
103:4 115:16
122:25

**magazine**
36:2,3

**main** 5:4 9:6
12:21 44:22

**maintain** 47:7

**maintained**
47:5

**maintaining**



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

30:10

**majority** 30:13

**MAKAR** 124:3, 6,11,18

**make** 7:23 8:5, 24 20:19 47:24 61:24 80:5 82:23 107:8,9 122:3,14

**making** 53:5,9

**malpractice** 32:14

**manage** 31:2 117:24

**management** 31:13 34:19,24

**manager** 16:22 17:22 18:3,6,7,11 19:2 30:24

**managers** 18:14

**manner** 113:8 114:20

**manuals** 112:13

**manufacturing** 30:18

**manuscript** 33:3 34:4 35:22 36:10,15

**mark** 6:12 67:24 72:1 123:8

**marked** 67:25 74:8 94:18 96:3

**marking** 15:22 23:14

**master** 16:9,10

**materials** 10:21 11:3,17 36:25 37:10 38:2 39:2,3 111:14,15 112:1

**math** 14:4

**matter** 5:11 64:24 68:25

**matters** 26:1

**means** 53:17 79:15 113:4,7 114:20

**meant** 115:6

**med** 20:1,2,3 69:11

**medical** 5:13 6:13 17:20 18:7 19:1,2,10 20:3 26:13 28:23 30:21 31:22 32:6,14 43:5 53:1 56:2 57:3 61:20 62:8,11, 19 66:19 68:6, 12 70:4 71:10, 11,23 73:16,23 74:11,22 76:1 77:8,16 79:1 80:24 81:2,20, 22 82:19 83:19 84:3,17,22,25 85:6 86:1,7 89:21 93:16,22 96:21 100:7,9 108:13 109:5,6 119:2,11

**medication** 43:2 69:6 73:3, 6 102:11 104:6 109:10

**medications** 8:18 69:8,10 70:14,16 71:1 95:15

**Medicine** 70:15

**meds** 69:12

**meet** 10:8,10, 12,16 29:9

**meeting** 10:18 11:18 111:21 112:17

**member** 29:20 121:12

**memorized** 65:16

**memory** 8:16 104:18

**mental** 76:2 109:7,8 114:4 121:18

**mentioned** 11:18

**mess** 68:6

**met** 118:22 119:19

**methodologie s** 39:2,10

**methodology** 30:17 31:12,13

**Mexico** 19:24, 25 20:12

**microphone** 38:8

**middle** 74:9 97:4

**Milwaukee** 6:9

**mind** 75:11 115:17 124:15

**Minneapolis** 6:16

**Minnesota** 6:16

**minute** 25:13

**minutes** 55:6 68:22 96:22 110:24

**missed** 106:6

**missing** 59:20

**misuse** 92:22

**mitigate** 31:2

**Moga** 95:5

**moment** 15:18 35:20 36:22 55:3 67:14 71:8 83:6 94:6 101:10 106:4 114:7 115:15

116:24

**monitored** 96:21

**monitoring** 89:2

**Monroe** 6:10 65:2 94:19 115:23 117:7 118:4

**month** 23:5

**monthly** 12:22 14:3

**months** 17:4

**morbidity** 110:4,12

**morning** 7:14, 15 14:17,19 15:8 75:13 78:14

**morning-ish** 109:14

**mortality** 110:4,12,16

**move** 17:10 20:10,19 38:15 66:15 79:9 81:13

**moved** 17:10 20:20

**moving** 17:4,8 80:17

**multiple** 24:9, 18

**mute** 106:8 117:15 118:2

**Mycase** 12:18

———————

**N**

**named** 9:23

**narrative** 67:21,23 69:14 70:25

**National** 21:11 28:20,25 30:4 112:24 122:8

**nature** 24:5

**nausea** 71:7

**NCCHC** 94:8 121:2,12

**nearing** 111:11

**necessarily** 48:6 55:25 56:4 63:6 117:12

**necessitating** 85:18

**nephrology** 17:21

**Nevada** 29:24

**newly** 74:12,20

**night** 78:13 96:22,25 109:2

**night/sunday** 78:13

**nod** 7:20

**Norman** 6:14

**note** 56:1 63:5 67:6,11,19,21, 23 68:10 69:14 70:25 73:24 98:3

**noted** 17:20 59:16 103:3

**notes** 98:16 110:25

**notice** 49:18

**number** 11:12 59:6 62:6 70:8 72:24 80:24 91:10 114:5 115:18 117:3

**numbers** 52:11 72:19,20

**numerous** 40:13

**nurse** 16:22 17:22 18:2,5,7, 9,10,11,14 20:8 30:24 33:3,5,22 34:10 35:23 40:8,10 41:11,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

15 42:16,19,20, 23,25 43:2,4,9 46:16 47:17 48:24 54:14,16, 22 55:12,19,22, 24 56:9,13 57:10,16,25 58:2,19 59:7,9, 12 60:5,14,19, 21 61:2,8,9,10 62:14 63:4,22 64:4,8,9,18,25 66:23 67:2,7 68:4,5,13,16, 17,23 69:4 71:1 77:8,12,15,20, 22 78:2,5,15, 16,22,25 79:22 80:12,22 83:3,5 84:2,6,7,10,11, 12,15,20,22,25 85:12,19,23 94:24 95:10 101:7 102:21, 25 103:5,7,14, 19,21 104:1,2, 8,13,23 105:8 106:18 107:16 108:16,22,25 109:15 110:7 112:8 113:13, 20 114:3,4 116:10 120:20 121:17

**nurse's** 63:2,5 67:6

**nurses** 43:14, 18 44:3,9,17,22 47:10,20,21,22 48:7,11,17 49:11,17,23 50:1,7,12,14, 17,21,23 51:1, 4,7,14,21 52:3, 10,13,14,16,17, 19 53:3,6,10, 12,16,21,22 54:2,10 57:13 61:19,22 62:2, 9,18,21 85:5,6 107:17

**nursing** 16:12, 25 17:2,3,6,7, 14 21:7 27:12,

13 35:24 36:1, 4,5,6,10,12,16 39:6,25 40:4 41:3 45:3,9,16 46:1 52:23,24 58:13 67:22 107:20 112:21

_____

## O

**oath** 7:10

**object** 28:5 39:14 42:21 43:6,21 44:12 45:5,17 46:2,9 47:2,13 48:14 51:8 52:5 54:5 55:16 56:24 57:21 58:7 60:9,24 61:14 62:1 64:1,21 67:9 77:10,18 78:8 79:3,23 80:25 83:10,22 85:3,14 86:3 87:20 92:7 96:7 97:21 99:12,19 108:18 110:6 112:2 114:13 118:8 119:4,5

**objected** 8:13 38:6 112:5

**objecting** 8:11 54:8 56:18

**Objection** 27:19 42:13 45:1

**objections** 42:1

**objective** 47:25 53:15 58:14,18,20 59:7,12,17 60:4,6 86:23 89:13

**observation** 63:3 89:13 96:21 109:5,6

**observations** 47:24 81:13 86:23

**observe** 47:11, 20,21 48:7,12, 18 49:2,3,12,17 98:19

**observing** 43:15 48:2,5 53:18

**obtain** 74:11, 22

**obtained** 99:15 100:16

**obtaining** 54:10

**occur** 44:21

**occurred** 62:5 107:25

**offer** 8:22 122:12

**offers** 30:5 54:18,21,24

**officer** 68:6,8,9 81:19 83:16 102:20,24 103:14 107:3,7, 9

**officers** 72:23 81:22 96:21 100:24 103:21

**oftentimes** 74:25

**omits** 57:17 60:5,21 61:3,10

**on-call** 84:21

**oncology** 32:12

**ondansetron** 71:3,6

**one-patient** 78:1

**one-time** 90:21

**ongoing** 105:3

**online** 5:2

**open** 23:24 24:12,14 100:10

**operations** 22:1 27:11,13 29:7,8

**opine** 37:17

**opinion** 38:10 39:8 63:21,24 64:7,15 73:14, 17,20 92:22 109:24 110:3, 11,15,19 111:13,25 116:24 120:11, 13,15,19,20 121:10

**opinions** 8:20, 22 41:4 87:22 117:21

**opportunity** 18:17,19 30:5

**opposed** 50:17

**option** 30:6

**Orange** 20:15, 21 22:21,24

**order** 11:1 61:24 66:11 93:18 94:2 97:13 104:20 123:23 124:2,4

**ordered** 113:10 124:8

**ordering** 124:15

**orders** 104:14 122:24

**Oregon** 29:24

**organs** 68:19

**orientations** 112:12

**original** 123:21,25 124:1,8

**OSF** 18:17,25

**outcome** 9:17

**outlined** 94:7, 11

**outlying** 19:21

**over-** 93:7

**overbroad** 54:6

**overly** 27:19 45:18 46:3,10 47:3,14 48:15 49:15 54:9 55:17 56:25 57:22 58:9 60:10 61:1,15 62:12 64:2,11 67:10 78:10 79:5,24 80:4 82:13 90:7 93:14,25 96:8 99:19 108:19

**overnight** 84:7

**oversaw** 52:2

**overview** 107:24

**oxycodone** 69:12 71:4

**oxygen** 98:25 99:7,9,10 101:12,14,16, 21,23

_____

## P

**p.m.** 95:7 97:5, 16 98:2,8,13,21 111:2,7 123:15 124:23

**pages** 122:9

**pain** 109:25 120:25

**Palm** 35:11

**panel** 35:17

**pants** 59:15,16

**paper** 89:3 124:15

**paragraph** 97:12 98:8

**paralegal** 6:4

**paramedics**



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

19:14

**parameters** 104:7,21 105:17,18,19, 20

**Parker** 6:11 95:4 102:21 103:15 106:15, 17,24 107:3,8, 9,13 108:6

**Parker's** 98:18

**part** 27:24 28:2 46:13 53:5,9 79:6,13,19 89:17 102:18 114:10

**part-time** 22:22

**partial** 74:24

**parts** 57:17

**party** 9:6 90:16

**passed** 60:19

**passing** 30:9

**past** 12:4 42:8 87:11,19

**patient** 18:9 40:12 45:10 46:16 47:8,23 48:20,22,25 49:2 52:21 53:5,9,18,19 54:13,18,21,24 55:18,23 56:3, 17 57:5,9,15,20 58:4,6 59:2,3 60:8,13,19,23 61:7,11,13,22 62:5 63:4 68:16 69:16 81:9 82:2,12,20 86:11,15,16 87:1,2 89:10 90:3,23 91:13, 16,22 92:2,14 95:22,24 113:8, 23 114:21 115:4 121:21

**patient's** 43:15 47:11,18 53:23

93:2 101:6

**patients** 31:8 34:19,25 35:5 36:11,17 43:20 44:11,24 48:8, 13 49:12,23 50:1,7,12,18, 22,24 51:5,6,7, 13,15 52:3,12, 19,22 76:8,11, 12,20 77:2 81:15 86:1 87:5,9,16 91:20 93:7 109:22 118:20,21 119:1

**pattern** 92:24

**pause** 15:18

**pay** 123:21,24 124:1

**paying** 17:9

**PBT** 69:20,21 72:11,12,15,18

**PD** 68:8

**peanuts** 73:12

**Pearson** 5:10 6:21,23 7:2,7,9, 14 36:24 38:17 41:24 42:3 54:20 55:10 56:8 63:16,20 67:18 71:8 72:10,14 78:4, 19 79:17 83:6, 14 90:24 91:3 97:1 98:7 102:11 103:10 106:9 111:5,9 115:10,22 116:15 118:5 120:3,6 124:17, 22

**pee** 68:21

**peeing** 59:10 68:22

**pelvic** 69:1

**Pendermon** 25:21

**pending** 5:14

**people** 21:21 41:16 47:10 50:24 74:25 82:25 86:17 88:6,11,20,23 89:19 106:21 118:5 119:10

**percent** 26:9 58:11 75:3

**percentage** 22:5,17

**performing** 111:21

**period** 13:10, 14

**person** 65:18 113:13 119:14

**personally** 77:2

**perspective** 111:17 116:22

**pertinent** 86:21

**phone** 95:25 109:19

**photocopying** 122:11

**phrase** 43:14, 17

**phrased** 45:20 120:12

**physical** 85:1

**physician** 40:10,11 41:15, 16 46:15,16 61:24 62:7,18, 23 63:1 121:18

**physicians** 43:19 44:10,23 49:24 50:2,8, 11,15,18,21,23 51:1,5,7,13,22 52:3,11,12,19, 22,24 53:4 62:10

**pick** 116:20

**picking** 117:11

**piece** 86:25 89:3 99:16,18

**pieces** 99:23, 25 100:3,14

**pill** 76:14,15

**pills** 70:17,18 71:5

**Pisney** 6:7 64:23,25 77:8, 13 101:8 102:21,25 103:5,8,20,22 104:1,2,8,23 105:9 109:16

**Pisney's** 64:18 104:14

**place** 19:1 79:7 84:14 108:14

**places** 93:12 102:4

**plaintiff** 5:24 9:7,12 15:22 25:7,11,19,23 26:3,8

**Plaintiff's** 5:22 23:14 28:15 33:14 34:15 36:9 67:24 72:1 74:9

**plaintiffs** 25:17,25

**play** 123:22

**pneumonia** 31:8

**point** 22:12 23:1 40:23 46:19 55:5 79:11,16 82:18 89:15,23,24 93:21 97:4 98:8

**points** 46:18

**policies** 29:6 112:13

**population**

20:24 75:6

**position** 17:7, 11,12,24 18:16 19:23 20:6,7 120:21

**positions** 16:25 26:21

**potential** 60:23 61:12

**potentially** 55:14 57:24 60:16 61:16

**practice** 12:21 14:24 23:13 39:5 41:3

**practices** 15:16

**practitioner** 33:4,5,23 40:10 41:15 42:17,20, 23 77:13 80:12 84:10,12 85:2,7 101:7 103:5,8, 15,20,22 104:1, 2,14 109:16 113:14 114:5

**practitioners** 43:20 89:9

**preface** 104:12

**premature** 42:11

**preparation** 10:13 11:7 12:25 13:24 15:12

**prepare** 10:3,5 11:19

**prepared** 11:9

**preparedness** 32:8,24

**preparing** 14:18

**prescribe** 41:17 43:1

**presence** 110:16



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

present 10:18

presentation 35:1,2

Presentations 33:2

presented 28:9

pressure 69:11 73:6 97:8 98:22 103:24, 25 104:4,6,11, 21,24 105:10, 16,25 107:4

prevalent 75:6

Preventing 35:14

previous 29:19 44:17 49:13 50:16 88:4,24 92:21 101:11

previously 13:12 67:25 74:8 96:3

primary 29:21 47:10

prior 12:25 48:21 49:7 97:5 98:8 120:10

prison 29:2 35:5 118:6,7,9

prisons 21:3

private 21:8

proactively 31:1

probation 16:13

problem 31:5 56:4 57:12 66:1

problem-solving 31:11

problems 31:2 83:17

procedures 29:6

process 30:19 31:13 37:9,14 58:13 79:6,19 84:13

process-driven 30:17

processes 30:22 116:12

Proctor 18:2

proctored 30:10

professional 28:17 30:1,7 66:19 84:17 113:9,19,25 114:3,22 115:5, 8 121:14,17,25

professionals 29:23 81:23

program 12:12,16 20:3 21:5,25 22:6,18

project 12:10 31:4

projects 21:14 22:10 23:6 31:6,21 32:9

promotion 19:4

pronouncing 104:9

proportion 26:6

protocol 109:25

protocols 108:10

provide 12:9, 15 19:20 21:2 26:4 29:22 34:3 39:25 40:2,5,6 42:6 44:18 81:12 84:3 92:1,8 107:20 108:23 121:20

provided 12:6, 8 19:16 34:2

37:1 39:3 54:11 57:9,15 61:8,11 63:22,25 64:8, 16 78:2 104:22 107:24

provider 41:13,14 44:19 84:21 89:14 114:4 121:24

providers 43:11 114:6

providing 31:19 36:12 41:10,22 45:4, 10 78:2 118:24

provision 19:12 53:12

psychiatric 16:21 17:21

Psychological 5:13 6:14

PT 69:14,15

public 32:7

publication 33:2 34:7

pull 14:4 67:11 103:17

pulling 102:5

purpose 118:23

purposes 57:3 62:4 95:21 107:10

purse 70:17

pursue 28:22 29:2

put 11:9,11 16:13 19:20 59:25 62:11,19 89:18

putting 30:25

<hr>

Q

qualified 113:19,25

114:2,5,21 115:5,7 121:13, 24

qualifiers 45:23

quality 45:16 46:1

question 8:7,9, 10,13 11:4 13:11 15:3 25:8 27:17 28:6,8 32:19 39:15 42:22 43:7,22 44:13 45:6,18 46:3,10 47:3,6, 14 48:15 50:13 51:9,11 52:6 53:8 56:19,25 58:8 59:19,22 60:1,10,25 61:15 64:22 65:12 72:13 73:10,18,19 77:11,19 78:9 79:18,24 80:2,3 81:1 83:7,11,23 85:4,15 86:4,6, 8,10 87:8,16, 18,21,24 88:3, 22 90:6 91:2 92:11,14,18,19, 21 93:1 94:9 95:9 96:8 97:22 99:13,14 101:16,20 104:19 106:6 108:2,18 112:3, 6 113:5 114:8 117:15 119:5,7, 8 120:10 121:1 123:19

questions 18:13 35:18 55:8 68:23 73:16,23 74:6 75:2 81:9 90:1 91:21 92:2,17 93:18,20 94:2, 12 109:4 111:10 115:14 116:10 120:2,4, 5 121:2 122:20

quick 107:24

quoted 71:18 121:3

quotes 68:19, 24 114:1 122:7

<hr>

R

radiation 68:20 83:18,20

raise 7:7

rang 95:25

range 98:1

rate 11:21,22 100:20,25 102:6,8

ratio 50:15

re-admit 80:16

reach 70:11

read 11:12 41:11,18 42:7 62:18 68:14 115:13

reading 62:10 116:9

ready 14:17 15:8 17:10 96:1

reask 50:20 73:18 83:7 101:20

reason 14:15 17:16 37:7 38:1 56:3 78:16,22

reasonable 89:14

reasons 14:25 61:23

recall 9:18 25:3 26:14,16 33:18 34:13 36:20 62:21 99:1,5 102:5

receive 47:23 113:10

received 10:25 23:9 38:9 61:25



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

receiving 17:13 53:6,10

recently 22:10

recertification 30:12

recheck 104:10,21 105:5,8,16

rechecks 104:7

recognize 23:15 38:17 85:14 94:20

recollection 10:2

recommend 85:12

recommended 85:16

record 6:22,25 14:5 33:24 57:3,4 62:3,6, 11,19 63:13,14, 16 71:21,22,24 96:2 102:12 105:6 107:22 108:13,15 111:2,3,5 115:22 121:8 122:23 123:15, 17

records 10:6, 25 11:22 15:11 33:21 37:6 41:11,12 47:8 61:20 66:21 99:2 101:25 102:5 103:18

refer 65:14,17

reference 42:14 112:12

referenced 37:11

referral 109:7

referring 16:19 67:19 97:9,10 101:3 103:4 113:1

reflected 64:4 112:8

reflective 40:13 112:21

regard 108:20

region 19:22

registered 21:7 42:25 43:2,9

regularly 28:3 78:3

related 21:15, 17,19 37:18 38:20 64:24 116:18

relay 28:12 75:16 76:7,13, 21 77:3

relayed 68:12

relevant 16:25 44:18 49:18,19 57:4,8,14,18 58:3,20 60:5,22 61:3,7,10 78:12,21 116:21 117:12

reliable 91:19 92:4

relocated 17:25 18:1 19:24

rely 62:10 66:8

remember 9:19 12:16 35:4,6,16 77:1 96:11,16 120:12

repeat 32:19 45:7,23 52:9 53:8 119:8

report 8:21,23 10:7,23 11:1,6 13:21 15:12 38:20,22 49:19 65:9,14,17,23 66:4,14,15,17 70:25 71:10,11 74:7 83:1,9,21

89:22 93:23 94:8,13 97:3 101:13,14 102:1,2,18,23 103:2,12 112:11,23 113:7 121:4,23

reported 69:4 84:1

reporter 5:6 7:8,17,24 8:1 124:14,19

Reporters 5:3

reports 11:23 93:16,17 99:6 100:25 101:2,4

represent 6:10

representing 5:3,24

requested 98:22

requesting 97:7

require 120:22

required 23:18 94:8 120:16

requires 30:8 113:18

reread 115:12, 15

research 31:12

resources 34:4 118:11,19 119:16

respect 64:22 120:13 121:8,9, 10

respiratory 18:8 100:20,25

respond 7:21, 22

Responding 35:13

response 19:19,20 32:4

responsibilities 16:18 17:19 18:5 19:6,8,9

responsible 18:8,11,14 19:11,15

restate 73:18 84:24 87:12

retained 26:7

retainer 11:25

retaining 37:10

retire 22:8 24:10

retired 22:24 24:2

retiring 22:15

retrospect 122:2,4

review 11:2,22 23:5 27:2 28:10 31:10 33:2,3 34:4 35:22 36:10,15,24 37:6,20 39:2,3 64:24 66:21 71:14 77:12 94:22 102:15 104:13 106:11 110:7,17 111:16 112:16

reviewed 10:6, 7,21,23 12:14 15:11 34:1 37:4 104:16 106:11 111:15 117:9

reviewing 11:17 12:13 21:7 29:6 115:23

reviews 110:4, 12

RFP 21:10

Richards 6:18

risk 90:13 91:6

RN 66:21 67:12 73:24 111:19

112:16 120:23

role 20:25 78:1

room 57:11 116:5 118:13, 14,17 119:22

routinely 44:4

rule 23:19 40:17,18

rules 7:17

Runice 95:4

Ryan 95:5

_____

S

S-T-E-M-I 36:17

safe 45:16 46:1 53:5,9

safest 45:4,10

Saint 18:17,25 30:20

Santa 20:16

saturation 98:25 99:7,9,10 101:12,14,17, 21,23

Saturday 78:13 97:25 109:2

scenario 56:6

scenarios 59:6 76:4 100:4

Schamber 6:15

schedule 15:11

scheduled 78:3

school 16:24 18:21

science 16:10, 11

scope 39:5 40:1,5,23 41:3,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

4 75:14 78:17 86:5 87:21 104:15 105:1 106:2 109:18

**screen** 15:19, 20 36:23 38:12, 13 46:15 63:1,4 67:15 94:17 97:2 102:10 106:4 115:9

**screening** 67:2,4 71:10, 11,16,23 73:3 78:12 79:7,11, 16 80:6,10,23 81:20 82:4,18 83:1,4 85:24 86:7,14 88:25 89:6 91:17,21 92:3 93:11,16, 17,23 94:10 96:6,15,18,20, 24 97:10,17,19, 25

**screenings** 82:1,10,11

**scroll** 83:24

**scrolling** 115:17

**section** 55:8 113:1,22 114:10

**Security** 19:18

**seeds** 73:12

**selected** 37:3

**self-assess** 86:11

**send** 37:20 63:6 106:17 120:16,22

**sending** 116:3, 4

**sense** 8:5,24 80:5

**separate** 64:12 89:3

**September** 34:14

**sequence** 72:4

**Sergeant** 74:3 106:24 107:13

**serve** 21:24

**served** 32:16, 20,23

**serves** 43:4

**service** 64:3

**services** 11:21 12:6,8 19:2,10, 21 20:23 21:3 29:13,17 34:18, 22 64:3 112:8, 25 114:10 117:24

**serving** 20:24 38:25

**setting** 43:23 44:5,25

**settings** 21:8 35:5 44:3 72:22

**settled** 24:17

**shake** 7:21

**share** 15:19 38:12 67:15 94:17 97:2 102:10 106:4 115:9

**sharing** 36:23 38:13

**Shasta** 6:11 95:4 102:21 106:14,17,24 108:5

**she'll** 60:1

**sheet** 26:10 70:22

**shift** 84:8,16

**shit** 68:21

**Shoppe** 70:15

**short** 61:5 122:10

**shortly** 19:17

**show** 28:15

**showing** 32:1 94:18 102:11

**shutting** 68:19

**sic** 77:9

**side** 46:15 63:1

**Sigma** 30:15, 17,22 31:3

**sign** 11:25 72:23 99:7,8,11 102:8

**significant** 26:13 86:1

**signs** 47:11 85:21 99:15,22, 25 100:2,14

**similar** 28:22, 23 39:19,20 119:14

**simple** 22:20

**single** 15:4 49:22 56:9

**sit** 9:20 24:12 42:7

**site** 84:17

**sitting** 30:9

**situation** 46:5, 12 48:1,10,23 49:10 55:1,2,12 56:9 57:24 60:11,18 61:16 62:24 75:20 90:16,22 99:21 100:1 101:7 119:15

**situations** 48:11 63:8 77:5 100:2 116:13

**size** 50:9 51:23

**slash** 36:3

**slightly** 65:7

**slower** 16:3

**snapshot** 25:16,18 79:11 89:6 93:10

**sober** 75:17 76:8,23 77:4 91:19 92:5

**software** 12:12,16

**solely** 27:10

**someone's** 75:9 100:6

**sort** 43:18 44:9 55:8 59:15 72:5 74:9 97:3

**source** 44:23

**speak** 11:14 38:7 78:25 102:21 111:11

**speaker** 34:16 35:2,10

**speaking** 35:7 42:1

**special** 73:9

**specific** 11:12 35:6 97:24 108:20 112:12

**specifically** 30:19 35:8 62:7 81:7

**specifics** 26:15

**speculate** 108:4

**speculation** 79:5

**spend** 117:10

**spoke** 35:4,16 102:24

**spread** 13:18, 20

**Springs** 35:12

**Stacken** 5:5 7:11

**staff** 50:15 51:21,24 52:23, 24 68:5 84:3 91:22 96:12 97:6,19 98:9

102:2 107:20 109:12 121:12

**staffed** 50:10 51:3

**Staffing** 5:14 6:14

**Stan** 6:10 95:5

**standard** 39:13,18 63:21, 25 64:7,16 79:14,20 108:25 111:22 112:17 113:18 114:11,15,16, 23 115:3 119:2, 6,11,13,16 120:16,21 121:2

**standards** 29:9,10 112:25 114:9,15,17 121:15 122:8, 12

**standing** 59:10,13

**standpoint** 34:2

**stands** 69:15

**start** 65:24 103:18 118:13, 15

**started** 22:25 31:9

**starting** 5:22

**state** 5:20 6:21 19:12 32:5 35:10 71:16 113:4 125:1

**stated** 13:12 34:21 68:19,24, 25 69:4 81:3 83:15,19 98:18

**statement** 37:8 58:11 68:9

**states** 5:15 68:16 95:1

**stay** 73:2



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

stayed 109:2

STEMI 36:16, 19

step 82:1,4,10, 12

stipulate 7:1

stop 16:2 36:22

stopped 22:8,9

Street 5:4

stressed 109:8

stroke 118:13, 15 119:23

structured 86:15

Student 35:24

stuff 28:1

subject 27:8, 14,24 35:7

subjective 47:22,25 53:15, 17,22 54:3,10, 11,18,20,23 56:10,14 57:2, 14,18 58:4,13, 16,18,20,22 59:11 86:22

submitted 13:7 38:21

submitting 30:11

substance 75:5 88:16 92:24

substances 92:23

substituted 121:22

successfully 30:9

sued 9:22

suit 9:23

Suite 5:4

Sunday 77:23 95:18 97:13

98:2 102:20

support 30:12

suppose 37:5

surgeries 69:1,2

Surveyor 28:18

surveyors 29:4

sweaty 96:12, 17 97:6,20 98:10 107:1

switch 65:24

sworn 7:8,10

symptom 49:12

symptoms 40:13 43:16 47:11 48:8,12 87:10 88:4,12, 13,14,24 89:11 92:15

system 19:11, 14 43:16 47:6 51:1,22 52:10

systems 19:2, 19 47:6

systolic 105:25

--- T ---

taking 7:18 22:8,9 54:23 55:13 57:2 74:19

Tales 34:8

Talia 5:1 124:7

talk 7:25 16:16 20:2 30:2 35:12

talked 109:9

talking 41:15 88:16 96:13 102:17

tally 50:25

Teachings 33:2

team 29:3 30:22 31:3,9 43:5 62:8

teams 19:19,20

technical 21:12

technician 5:2

telehealth 46:14 62:25

telling 81:17

tent 100:9

term 39:13 113:19,24 121:9,13

terms 19:12 34:4 40:11 50:15 77:12 82:6 93:19 94:8 96:9 104:5 106:2 112:7,16 117:23

Terri 5:5 7:11

test 69:24 70:3

testified 24:20 25:1,16,23,25 26:2 74:4 108:6

testifying 25:6,11

testimony 23:18 24:19 25:9 26:10 98:18

Theoretically 75:23

theory 76:17

thing 15:4 33:25 37:17 90:21 123:22

things 7:22 14:16,21 15:12 18:10,13 21:4 30:25 31:20 32:17,21 37:16, 18 39:8 40:16

41:19 58:2 80:20 81:3,6 86:13 89:4 94:12 102:17 104:17 116:8

thinking 14:11, 18 15:7,8 23:8

thought 30:23

tie 54:12

tight 59:15

time 5:8 7:25 13:10,18 15:6, 10 16:14 17:23 23:7 29:22 32:10 41:7 63:10 66:10,14 69:17 79:7 85:13 89:5,7, 16,22 93:10 96:19 97:22,24 98:1,10,14,21 100:13 102:1 117:10 120:3, 18,24 123:2,6 124:18

timeline 97:12 104:16

timely 113:8 114:20

timer 12:12,13

times 9:3,5 10:12 11:2,5,7, 12 26:2 52:13 65:15 75:9

title 36:4

titled 35:13,23 36:11,16

today 5:6,7 9:20 10:3 11:15 13:9 14:6 63:17 111:6 122:5

told 48:12,18 55:14 56:11,15 59:8

Tomah 68:8 70:15

top 25:3 33:13 35:9 36:15

38:14 71:20 72:11,14 77:5

topic 96:14

total 12:23 14:1 24:11

totally 89:2,3

touch 124:20

track 12:11

tracking 62:4

trail 54:16

trained 41:6,9 47:18,20,21,22 48:7 49:11,17 53:12,14,16 57:13 62:4 81:22 111:20

training 18:10 19:15,16 39:4 41:22 42:25 111:14,15 112:1,10,13,22

transcript 123:1,5,9,12, 20,23 124:2,5, 7,16

transcript/ electronic 124:16

transition 17:4

transport 20:4

transported 118:16

trauma 18:22

Travis 6:15

treat 104:3

treatment 110:8 111:20 112:9

trend 53:2,3

trial 24:20 25:2 34:8

trials 22:13 24:1

true 7:3 16:6



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

38:22 75:21

**truthfulness**
8:16

**turned** 22:11
55:20

**type** 33:24 73:9
108:10

**types** 15:12

**typical** 12:19,
21

**typically** 12:4
14:22 23:2
24:18 50:7
72:23 78:2
92:23

---

**U**

**uh-hum** 7:22

**ultimately**
18:22

**unaware**
50:16,20 52:1,
4,9 61:9

**unconscious**
60:13

**underestimate**
93:8

**undergone**
81:4

**understand**
7:24 8:7,10
11:4 41:13
49:22 52:15
58:12 61:2
65:22 66:13
78:4,20,21

**understanding**
15:15 21:24
39:19,24 40:2,
7,20,25 68:7
69:19 72:17
81:21 94:15
98:24 111:23
121:22

**Understood**
32:25 124:12

**unequivocally**
72:25

**unfolded** 23:2

**unidentified**
71:5

**unit** 16:21
17:21 18:8,9

**United** 5:14

**units** 51:18

**up-to-date**
15:25

**update** 108:11

**updates** 108:8,
9

**urgent** 79:12
82:6,19 85:18
100:13

**urine** 59:16

**USA** 5:13 6:13

**utilize** 41:17

---

**V**

**vague** 42:13,22
43:7 44:13
45:18 46:3,10
47:3,14 48:15
49:15 51:9
54:5,9 55:16
56:25 57:21
58:8 60:10,25
61:15 62:12
64:1,10,21 67:9
74:23 78:9
79:5,24 80:4
82:3,13 83:11
84:5 85:4 86:4
90:7 91:9
93:14,25 96:8,
19 97:22 99:19
108:19 114:14
116:6 119:5

**vanguard**
43:14,15

**variables**
91:15

**varied** 21:14

**varies** 75:2

**variety** 80:20

**vast** 30:12

**ventilators**
31:8

**venue** 32:3
47:16 49:25
50:5 62:15
118:10 119:21

**venues** 50:4
62:17 63:7

**verbal** 7:20
63:2

**verbally** 7:21

**verbatim**
67:13

**verification**
70:22

**versus** 72:24
119:22

**video** 5:2
123:1,5,9,12,17

**videoconferen
ce** 5:9 63:17
111:6 124:21

**View** 16:21

**virtually** 5:25

**vital** 85:20
99:7,8,11,15,
22,25 100:2,14
102:8

---

**W**

**Wait** 115:18

**walk** 48:20

**walked** 55:21
57:11,25

**walking** 49:4,7

**walks** 60:14,20

**wanted** 15:3
18:18,22 37:6
56:3 107:8,9

**wanting** 82:23

**Warren** 6:11
74:3 95:4

**Washington**
29:24

**ways** 61:19
119:20,23

**week** 13:18

**weeks** 22:11

**well-known**
30:18

**well-rounded**
18:24

**West** 5:4

**Western** 5:15

**white** 76:15

**Wisconsin**
5:16 125:1

**Wisconsin's**
70:8

**withdraw**
13:11 25:8
27:22 72:12
74:16 91:2 95:9
101:19 113:5
114:8

**withdrawal**
85:24 86:2,9,
12,19,20 87:3,
6,10,17,18
88:1,2,4,7,8,9,
12,13,14,19,23,
24 89:1,11,15,
21,25 90:4,5,
14,20 91:5,7
92:16,17,18,21

**word** 43:8
121:10

**worded** 44:3,6

**words** 59:10

**work** 12:6,8,10
14:8,12 18:22
20:21 22:6,17,
22 26:17,19
29:5 32:11,18,
22 33:21 35:22

105:13 107:18

**worked** 12:3
13:8,12,17
16:24 17:1,3,
17,20 19:25
21:6,8,9,11
23:4,9 26:7
28:3 31:7 50:11
93:13

**worker** 121:18

**workers**
121:20 122:14

**working** 22:6,
18,21 30:8 63:3
72:22 75:7

**works** 37:9,14

**write** 11:1
55:25 56:10,14
57:13,25 58:3,
19 71:1 98:7
114:23 115:3

**writes** 57:17
58:2

**writing** 11:22
57:7 121:23

**written** 31:20
68:8 73:7
102:25

**wrote** 67:6,12
68:16 71:3
73:24 74:14
85:20 102:24
107:6 113:6,12
115:6

---

**Y**

**year** 22:9 24:13
36:4,5,6 68:17
71:17,19

**years** 13:1,14,
15,19 24:8,9,
23,24,25 29:21
39:6 40:4 50:3

**Yesterday**
10:15

**yoga** 59:15



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

## Z

**Zofran** 71:7

**Zoom** 5:25 6:9, 15

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com