IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

GREGORY BOYER, as administrator of the
Estate of Christine Boyer, and on his own
behalf,

                    Plaintiff,

        v.                                                    OPINION and ORDER

ADVANCED CORRECTIONAL HEALTHCARE,                              20-cv-1123-jdp
INC., LISA PISNEY, AMBER FENNIGKOH, STAN
HENDRICKSON, DANIELLE NELSON, SHASTA
MOGA, and MONROE COUNTY, WISCONSIN,

                    Defendants.[1]

---

GREGORY BOYER, as administrator of the
Estate of Christine Boyer, and on his own
behalf,

                    Plaintiff,

        v.                                                    OPINION and ORDER

                                                              22-cv-723-jdp
USA MEDICAL & PSYCHOLOGICAL STAFFING,
NORMAN JOHNSON, TRAVIS SCHAMBER,
WESLEY HARMSTON, and JILLIAN BRESNAHAN,

                    Defendants.

---

Christine Boyer suffered a cardiac arrest and died about 24 hours after being booked

into the Monroe County jail. Christine reported multiple medical problems during her intake,

including a history of cancer, high blood pressure, and congestive heart failure. But jail staff

did not immediately ensure that Christine had access to her prescription medications, nor did

---

[1] Defendants Danielle Nelson and Shasta Moga have changed their last names since this lawsuit
began. Nelson was formerly known as "Danielle Warren" and Moga was formerly known as
"Shasta Parker." The court has updated the caption and will refer to them by their current last
names, but much of the evidence in the record uses their former last names.

they send her to the emergency room when she experienced high blood pressure, shortness of breath, and chest pain the day after her arrest. Christine's husband, plaintiff Gregory Boyer, brought these two closely related lawsuits, asserting that Christine died because jail staff ignored her medical needs and because Monroe County and its contracted healthcare provider Advanced Correctional Healthcare had policies and practices of providing inadequate healthcare to inmates.

Defendants fall into three groups. The first group consists of the county defendants: Monroe County and jail employees Stan Hendrickson, Danielle Nelson, and Shasta Moga. The second group consists of the ACH defendants: Advanced Correctional Healthcare, which contracted with Monroe County to provide healthcare services to jail detainees, and ACH nurses Lisa Pisney and Amber Fennigkoh, who worked at the jail. The third group consists of the USA Medical defendants: USA Medical & Psychological Staffing (ACH's subsidiary and subcontractor) and its shareholders Norman Johnson and Travis Schamber.[2] Boyer seeks to pierce the corporate veil and hold these defendants accountable for ACH's misconduct.

All three groups of defendants move for summary judgment. A reasonable jury could find that Pisney acted objectively unreasonably when she failed to continue treating Christine's high blood pressure and failed to treat Christine's chest pain as a medical emergency, so the court will deny summary judgment on Boyer's constitutional claims against Pisney based on those actions. The court will grant summary judgment to defendants on the constitutional claims against the other individual defendants and on Boyer's municipal liability claims, because Boyer has not adduced evidence that ACH, the county, or the jail were on notice that

---

[2] The two other USA Medical shareholders, Wesley Harmston and Jillian Bresnahan, have been dismissed from the case on stipulation of the parties. Dkt. 228.

any policy or practice would be likely to cause constitutional violations. On Boyer's state-law claims, the court will deny summary judgment on the medical malpractice claims against the ACH defendants. The court will grant summary judgment on the remaining state-law claims and also on the claims against the USA Medical defendants, because none of them were personally involved in these events and Boyer has not shown that USA Medical is a corporate alter ego of ACH to justify piercing the corporate veil. The county and USA Medical defendants will be dismissed. This case will proceed to trial on the constitutional claims against Pisney and on the medical malpractice claims against the ACH defendants.

UNDISPUTED FACTS

The following facts are undisputed except where noted.

Christine Boyer was arrested and booked into the Monroe County jail on the evening of December 21, 2019, which was a Saturday. Christine was intoxicated: a preliminary breathalyzer test registered a 0.133 blood alcohol concentration. Christine told defendant Danielle Nelson, who was working as the booking officer that night, that she had a lot of medical problems and that some doctors said that she had only one year to live. Christine was not able to list all of her medical problems, but she did report high blood pressure, asthma, congestive heart failure, and a history of cancer. She said that she had taken her blood pressure medication that day before her arrest.

Defendant nurse Amber Fennigkoh was finishing her shift when Christine arrived at the jail. Nelson told Fennigkoh about Christine's medical history and Fennigkoh offered to interview Christine before she left for the night. Fennigkoh recorded her observations from that

interview in a progress note. Dkt. 240-4.[3] She observed that Christine was tearful and that her responses to questions were "all over the place." When Fennigkoh asked Christine to clarify her statement that she had only one year to live, Christine responded: "I have all my organs shutting down, radiation [for cancer] back then did me in, I don't have a hip, I pee myself and shit myself every 20 minutes, I am peeing right now." Fennigkoh observed Christine standing normally with no visible urine stain. When asked about her medications, Christine said she was taking oxycodone, blood pressure medication, and "other meds at Tomah medicine shoppe." Fennigkoh asked Christine if she could call her husband to bring her medications because the jail could not call her pharmacy on the weekend. Christine said that her husband "has no clue what I take" because "I hide [the medications] from him," but she ultimately agreed to call him. Christine also said that she had some medications in her purse; when Fennigkoh checked the purse, she found a prescription bottle of oxycodone, a bottle of odansetron (Zofran), an albuterol inhaler, loose aspirin, and one-half of an unknown pill labelled "tiva." Dkt. 240-5 (jail medication form). When she finished her interview, Fennigkoh told jail staff to put Christine on a medical watch and to notify the on-call nurse practitioner about Christine when they were able to do so. Staff put Christine in a cell in the jail's booking area and conducted wellness checks every thirty minutes throughout the night.

The next day was a Sunday. Defendant Lisa Pisney, a nurse practitioner, was the on-call provider. At approximately 7:00 a.m., officer Brooke Dempsey, who is not a defendant, called Pisney about Christine. The parties dispute how much Dempsey told Pisney about Christine's medical conditions: Pisney says Dempsey told her only that Christine "had some sort of cancer,

---

[3] All docket references refer to the docket in case no. 20-1123-jdp.

and that she was told she only had a month to live." Dkt. 218 (Pisney Dep. 127:25–128:1; 22:16–18). Dempsey says that she also told Pisney that Christine had high blood pressure, congestive heart failure, and asthma. In addition to speaking with Dempsey, Pisney reviewed the medications that had been found in Christine's purse and approved her taking the ondansetron and the albuterol inhaler, but not the other medications. Pisney directed jail staff to contact Christine's doctor and pharmacy on Monday to obtain her medical records and medication list.

At approximately 3:00 p.m., Christine told defendant Shasta Moga and other jail staff that she felt hot and sweaty and was having trouble breathing. At Christine's request, staff checked her blood pressure, which measured 177/100. One of the jail staff (the parties don't say who) called Pisney, who told them to give Christine 0.2mg of clonidine and to recheck blood pressure at 3:45 p.m. On recheck, Christine's blood pressure had decreased to 169/105. Pisney told staff to wait an hour and to give Christine another 0.1mg of clonidine if the diastolic reading was still over 100. Moga took Christine's blood pressure again at 5:00 p.m; the reading was 164/101, so Moga administered another 0.1mg of clonidine per Pisney's instructions. Staff did not check Christine's blood pressure again after the second dose of clonidine.

Fennigkoh did not normally work on Sundays, but she was at the jail on the afternoon of December 22 on a special assignment related to a different inmate. Moga told her that Christine's blood pressure was elevated and that Christine had received doses of clonidine. Fennigkoh told Moga that staff were handling the situation correctly and advised them to continue communicating with Pisney. Fennigkoh also spoke with Gregory Boyer on the phone before she left the jail. Fennigkoh told Boyer that he could bring Christine's medications to the jail and asked him if he could get a medication and diagnosis list from Christine's medical

providers. Before she left, Fennigkoh emailed jail staff, including Nelson and Moga, telling them that they should call Pisney if Boyer brought Christine's medications because Christine "likely could benefit from them!" Dkt. 240-11.

Around 7:30 p.m., Christine told Moga that she was experiencing chest pain, so Moga initiated the jail's chest pain protocol, which required jail staff to complete a form about the inmate's symptoms and to contact the on-call provider. Christine told Moga that the pain had been there off and on all day but that it was now constant; she also reported nausea and vomiting, shortness of breath, and dizziness. Moga took Christine's vital signs, including her blood pressure, which was 144/102. While completing the form, Moga observed that Christine was sitting up, talking, responsive, and not doubled over in pain. Moga reported Christine's symptoms to Pisney, who instructed her to give Christine aspirin, to re-check her vital signs again in thirty minutes, and to call back if they were abnormal. During that re-check, Moga recorded a blood pressure of 142/92, normal oxygen level, and normal pulse. Christine did not report any more chest pain at that time.

At 10:00 p.m., Moga's shift ended and she was replaced by Nelson for the night shift. Moga told Nelson that Christine had had chest pain and that Pisney had been notified. Over the next three hours, Nelson and another correctional officer checked on Christine more than ten times; during the last check at 12:49 a.m., Nelson reported that Christine was alert and quiet, sitting on the edge of the bed in her cell. Ten minutes later, a different staff member noticed Boyer lying unresponsive on the floor of her cell. Nelson and other staff began CPR; EMS arrived about 10 minutes later and transported Christine by helicopter to the hospital. Christine died at the hospital four days later.

The parties agree that Christine died of an acute cardiac arrest, but the details of what caused the cardiac arrest are disputed. Doctors at the hospital determined that Christine's cardiac arrest had been caused by a severe potassium deficiency. Christine had previously been diagnosed with low potassium and had been prescribed a potassium supplement. Both parties agree that Christine's low potassium levels contributed to her cardiac arrest. But Boyer's medical experts assert that her preexisting congestive heart failure and her high blood pressure throughout the day on December 22 were also contributing factors.

The court will discuss additional facts as they become relevant to the analysis.


ANALYSIS

Boyer brings claims under 42 U.S.C. § 1983 and Wisconsin state law on behalf of himself and Christine's estate, contending that defendants provided Christine with inadequate healthcare during her brief stay at the Monroe County jail. Boyer's claims fall into four categories. First, Boyer asserts individual-capacity constitutional claims against Nelson, Moga, Fennigkoh, and Pisney based on their personal involvement in Christine's healthcare during her jail stay. Second, Boyer brings municipal liability claims against ACH, Monroe County, and jail administrator Stan Hendrickson in his official capacity, contending that they had policies and practices that caused the constitutionally inadequate healthcare Christine received. Third, Boyer asserts state-law claims for medical malpractice, survival, wrongful death, and intentional and negligent infliction of emotional distress against ACH and the county defendants. Fourth, Boyer asserts claims against USA Medical and its shareholders, contending that the circumstances of ACH and USA Medical's corporate relationship justify piercing the corporate veil and holding USA Medical and its shareholders liable for ACH's conduct.

## A. Constitutional claims against the individual defendants

Boyer's § 1983 inadequate medical care claims against Pisney, Fennigkoh, Nelson, and Moga arise under the Fourth Amendment because Christine had been arrested but had not yet had a judicial probable cause hearing. *Jump v. Vill. of Shorewood*, 42 F.4th 782, 792–93 (7th Cir. 2022). Fourth Amendment inadequate medical care claims are analyzed under an objective reasonableness standard. *Id.* at 793. To defeat summary judgment, Boyer must adduce evidence that: (1) Christine had a serious medical need; (2) defendants made an intentional decision regarding Christine's medical care; (3) defendants' actions were objectively unreasonable; and (4) defendants' actions harmed Christine. *See Pulera v. Sarzant,* 966 F.3d 540, 550 (7th Cir. 2020). Courts assess objective reasonableness in light of the totality of the circumstances known to the defendants, without regard to the defendants' actual intent or subjective beliefs. *Pittman by & through Hamilton v. Madison Cnty., Illinois*, 108 F.4th 561, 572 (7th Cir. 2024). Objective unreasonableness is a higher standard than mere negligence, but a lower standard than subjective intent. *Miranda v. Cnty. of Lake*, 900 F.3d 335, 353 (7th Cir. 2018). The key question is whether the defendant took "reasonable available measures" to address a "risk of serious harm" to an inmate's health or safety. *Pittman*, 108 F.4th at 572.

The court begins with Pisney because as the jail's on-call provider, she was the defendant most responsible for making decisions about Christine's medical care.

### 1. Pisney

Boyer faults nurse practitioner Pisney for failing to adequately screen Christine's medical needs and provide appropriate treatment. Boyer identifies four points during Christine's jail stay when Pisney provided inadequate care: (1) when she learned about Christine's complex medical history on the morning of December 22, but decided not to send

8

Christine to the emergency room for a medical screening; (2) when she told jail staff that they could wait until Monday to get Christine's medical records and medication list from her providers; (3) when she treated Christine's high blood pressure with clonidine, but did not continue monitoring her blood pressure even though it remained high; and (4) when she treated Christine's chest pain with aspirin instead of sending her for emergency care.

### a. Medical clearance

Boyer contends that on the morning of December 22, Pisney acted unreasonably by deciding to monitor Christine at the jail as opposed to taking her to the emergency room for medical screening. Boyer points out that jail staff told Pisney that morning that Christine "had some sort of cancer, and that she was told she only had a month to live." Dkt. 218 (Pisney Dep. 127:25–128:1; 22:16–18). And although Pisney denies it, jail staff assert that they also told Pisney that Christine had asthma, high blood pressure, and congestive heart failure. (The court accepts jail staff's version of events for the purposes of summary judgment.) Boyer argues that any reasonable medical provider in Pisney's position would have recognized that an inmate with a medical history as complex as Christine's needed a medical screening before she could be safely housed in the jail.

The problem with Boyer's argument is that he hasn't identified any serious risk of harm that would have been apparent to a provider in Pisney's position that morning. Although Christine had multiple serious medical conditions, there is no evidence that she was experiencing a medical emergency the morning after her arrest. Christine was not hospitalized prior to her arrest; she did not present with any concerning symptoms other than intoxication on intake; and she did not complain of any new symptoms overnight or into the morning. Nothing in the record suggests that a reasonable provider would have determined that Christine

9

needed emergency care on the morning of December 22, so Pisney did not violate the Constitution by not sending her to be screened at the emergency room.

The opinion of Boyer's emergency medical expert Homer Venters does not change the court's analysis. Venters asserted that Christine's complex medical history meant that she needed medical clearance to determine whether she could be safely cared for in the jail, which would have required a trip to the emergency room because there was no provider on-site on Sundays to conduct a medical clearance. Dkt. 246, at 14. But Venters' opinion merely describes his beliefs about what Pisney should have done to comply with medical best practices; it doesn't create a genuine dispute of fact pertinent to whether Pisney violated the Constitution. *See McCann v. Ogle Cnty., Illinois,* 909 F.3d 881, 887 (7th Cir. 2018) (failure to comply with standard of care was negligent, but not objectively unreasonable when the inmate did not present with any signs that he was at risk of serious harm). The bottom line is that the Constitution did not require Pisney to send Christine for emergency care when she was not experiencing a medical emergency.

### b. Christine's medical history and medications

When Pisney spoke to jail staff about Christine on the morning of December 22, she told them that they should call Christine's medical provider and pharmacy on Monday to get her medical records and full medication list. Boyer argues that it was unreasonable for Pisney to decide that the medical records and medications could wait until Monday, because a reasonable provider in Pisney's position would know that a medically complex patient like Christine might suffer complications without her medication.

Boyer points to *Petties v. Carter*, in which the court of appeals held that an "inexplicable delay in treatment which serves no penological interest" may violate the Constitution. 836

F.3d 722 (7th Cir. 2016). But *Petties* isn't instructive here because the delay in getting Christine's medications is easily explained. The parties agree that Christine's health care provider and pharmacy were not open on the weekend, so jail staff could not get her medical records or verify her medications until Monday. Pisney is not liable under the Constitution for a delay prompted by circumstances outside her control. *See Pittman*, 108 F.4th at 572 (Constitution requires jail staff to take "reasonable available measures" to abate risk of serious harm). The record does not reflect any delay on Pisney's part in acquiring Christine's records and medications. On the contrary, Pisney instructed staff to acquire the records and medications as it was reasonably possible for them to do so.

Boyer argues that the pharmacy being closed didn't relieve Pisney of her obligation to immediately acquire Christine's medications. He asserts that if Pisney couldn't get the medications from the pharmacy, then she needed to send Christine to the emergency room. Boyer would be correct if Christine had been showing symptoms of an emergency medical condition. *See Ortiz v. City of Chicago*, 656 F.3d 523 (7th Cir. 2011) (denying a detainee medications or emergency care for a day was unreasonable when the detainee repeatedly asked for a doctor, became groggy, and eventually could not stand up or speak). But as discussed above, there is no evidence that Christine was suffering from an emergency condition on the morning of December 22. Boyer cites no authority holding that inmates who are not experiencing emergent symptoms must be taken to the emergency room simply to avoid missing a dose of their medication.

Boyer also argues that Pisney could have gotten more details about Christine's medical history and medications from Christine herself. He points out that Christine was intoxicated during her initial intake, so she might have remembered more about her medical conditions

11

and medications in the morning when she had sobered up. It may indeed have been a best practice for Pisney to attempt to get more information from Christine once she was sober. But Boyer doesn't explain why an additional attempt to get information from Christine would have made a difference in this case. Defendants have adduced evidence that the standard practice in many jails is to require medications to either be in original pharmacy packaging or to be verified by a provider, because of the risk that an inmate might not accurately remember the name or dosage of their own medication. Dkt. 230 (expert report of Susan Minter), at 12. Boyer does not take issue with this requirement. So even if Christine had provided additional information about what medications she took, nothing would have required the jail to administer those medications to her before they could be verified with her providers on Monday.

### c. High blood pressure treatment

Boyer next contends that Pisney provided inadequate treatment for Christine's persistent high blood pressure on the afternoon of December 22. Pisney treated Christine with clonidine and ordered jail staff to recheck her blood pressure twice, at 3:45 p.m. and at 5:00 p.m., but then did not order any further monitoring or treatment after that.

It is undisputed that Pisney provided immediate care for Christine's high blood pressure by giving her clonidine, a medication which has the effect of lowering blood pressure and which did in fact lower Christine's blood pressure somewhat. None of Boyer's medical experts say that it was inappropriate for Pisney to give Christine clonidine. However, a problem arises after 5:00 p.m., when Christine's blood pressure remained elevated and Pisney ordered jail staff to give her one more dose of clonidine, but then did not order any further treatment or blood pressure monitoring. Pisney testified in her deposition that the clonidine "looked like it was

12

working," so she "assumed that the next dose would drop [Christine's blood pressure] even further and get her into the normal zone." Dkt. 218 (Pisney Dep. 144:3–145:12). But Pisney provides no reason why she assumed that a second dose would be enough to resolve the problem.

Defendants assert that Pisney exercised reasonable professional judgment in deciding not to monitor or treat Christine further, arguing that because Christine was asymptomatic at 5:00 p.m., there was no requirement that Pisney continue to monitor her blood pressure after that. *See* Dkt. 30 (expert report of Susan Minter), at 10. But Boyer, citing internal medicine expert Suzanne Bentley, says that this is an unreasonable position to take, given that Christine had reported symptoms less than two hours earlier and had been given medication to reduce her blood pressure, which would necessarily require follow-up to determine whether it had the desired effect.[4] Pisney is entitled to rely on her professional judgment, but her treatment decisions are still subject to an objective reasonableness standard. *See Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063 (7th Cir. 2012). If a jury credited the opinions of Boyer's medical experts, it could find that no reasonable provider in Pisney's position would have believed that it was appropriate to stop monitoring Christine under the facts of this case, which is enough

---

[4] Bentley submitted a rebuttal report responding to Minter's assertion that Christine did not need her blood pressure checked because she was asymptomatic. Dkt. 249. Defendants moved to strike Bentley's rebuttal report, as well as two other rebuttal reports submitted by plaintiffs' other experts Homer Venters and Bruce Charash. Dkt. 292. Defendants contend that the scheduling order didn't allow for a third-round of rebuttal reports and that the reports were not true rebuttal reports because they reiterated the experts' original opinions. The court need not address Venters' and Charash's rebuttal reports at this time, because none of the opinions raised in those reports were relevant to the issues on summary judgment. The court will deny the motion to strike Bentley's rebuttal report. Although the scheduling order did not allow for a third-round of rebuttal reports, plaintiffs properly sought leave to submit the report. Dkt. 265. And the rebuttal report does not raise new issues that might prejudice the defendants; it simply provides a clarifying response to an issue raised by defendants' expert.

for a reasonable jury to find that Pisney acted objectively unreasonably. The court will deny summary judgment on Boyer's § 1983 claim based on Pisney's failure to continue monitoring her blood pressure.

### d. Chest pain

A reasonable jury could also find that Pisney acted unreasonably on the evening of December 22, when Christine experienced chest pain and Pisney decided to give Christine an aspirin, retake her vital signs in thirty minutes, but otherwise do nothing. Pisney explained that she believed Christine's chest pain was caused by anxiety as opposed to a more serious condition and defendants assert that this was a reasonable exercise of Pisney's professional judgment, particularly because Christine's vitals had improved thirty minutes later and she didn't report any more chest pain at that time. Defendants say that Boyer has not identified any law holding that it is a constitutional requirement to treat all incidents of chest pain among inmates as a medical emergency.

The court agrees that there is no blanket constitutional mandate to take all inmates with chest pain to the emergency room. But defendants' argument ignores the specific facts of Christine's case. Viewing the facts in the light most favorable to Boyer, Pisney knew that Christine had congestive heart failure, had told jail staff that she had less than a month to live, had had persistent high blood pressure and shortness of breath throughout the afternoon, and had reported to Moga that the chest pain had been "on and off" throughout the day. In light of those facts, Boyer's medical experts asserted that the standard of care required Pisney to send Christine to the emergency room, at minimum so that she could get an EKG to rule out an acute cardiac emergency. Dkt. 249 (Bentley report), at 13–17, Dkt. 246 (Venters report), at 20–21. Pisney has provided no reason why she did not consider that Christine might be

14

experiencing a more severe cardiac event in light of Christine's history of heart problems and her recurrent symptoms throughout the day on December 22. A reasonable jury could find that Pisney acted unreasonably by failing to consider Christine's medical history and symptoms in determining the likely cause of her chest pain, so the court will deny summary judgment to Pisney on Boyer's § 1983 claim about Pisney's treatment of Christine's chest pain.

### 2. Fennigkoh

Boyer contends that nurse Fennigkoh acted unreasonably by not conducting a more thorough intake of Christine on the evening of December 21 and by not getting more information about what medications Christine was taking so that the jail could get them for her. The court will grant summary judgment to defendants on these claims.

As for Christine's intake, Boyer argues that given Christine's serious medical history, Fennigkoh should have sent her to the emergency room for medical clearance, conducted a physical examination, or informed Pisney about Christine's case immediately. Boyer's argument about medical clearance fails for the same reason discussed above for Pisney: Boyer has not adduced evidence that Christine was suffering from an emergency condition when she arrived at the jail, so it was not objectively unreasonable for Fennigkoh not to send her to the emergency room. As for whether Fennigkoh should have conducted a physical examination or informed Pisney, Boyer does not explain why either of those things would have changed the outcome in this case. Boyer does not assert that Fennigkoh would have discovered an emergency condition if she had conducted a physical examination. Nor does Boyer say that anything different would have occurred if Pisney had been alerted about Christine at the time of her intake as opposed to early the next morning.

As for whether Fennigkoh should have gotten more information about what medications Christine was taking, it is undisputed that Fennigkoh asked Christine about her medications, looked in her purse, and asked her to call her husband to get her medications. No reasonable jury could find that Fennigkoh failed to take sufficient measures to find out what medications Christine was taking.

### 3. Nelson and Moga

Boyer contends that Nelson and Moga violated Christine's constitutional rights by not taking her to the emergency room when she needed it and in Nelson's case, by failing to get a complete medical history during Christine's intake.

The court concludes that Nelson and Moga are entitled to summary judgment on Boyer's medical care claims because they reasonably relied on Fennigkoh and Pisney's medical judgment about Christine's treatment. Non-medical staff are presumptively entitled to rely on the judgment of medical personnel about how to treat inmate medical issues. *McGee v. Parsano*, 55 F.4th 563, 572–73 (7th Cir. 2022); *Eagan v. Dempsey*, 987 F.3d 667, 694 (7th Cir. 2021). A plaintiff may rebut the presumption only by showing that the non-medical staff had reason to know that the medical staff's treatment was inadequate. *McGee*, 55 F.4th at 569 (quoting *Miranda v. Cnty. of Lake*, 900 F.3d 335, 343 (7th Cir. 2018)).

Boyer argues that Nelson and Moga are liable because they ignored Christine when she reported medical problems. But on the undisputed facts, no reasonable jury could find that Nelson and Moga ignored Christine's medical complaints. Nelson immediately alerted Fennigkoh when she was booked into the jail, allowing Fennigkoh to conduct her own medical intake of Christine before Fennigkoh left for the night. Nelson then followed Fennigkoh's instructions to put Christine on medical watch. Nelson was not present the next day, but when

she arrived at the jail for night shift, Moga told her that Christine had experienced chest pain and that Pisney had been notified. Nelson then monitored Christine at least ten times between 10:00 p.m. and 1:00 a.m., noticing nothing unusual until Christine's cardiac arrest, which she responded to promptly.

As for Moga, she contacted Pisney multiple times on December 22 about Christine's medical situation and followed Pisney's instructions each time. When Christine reported feeling hot and sweaty and having trouble breathing, Moga checked her blood pressure, called Pisney, and then administered clonidine as Pisney instructed. Later, when Christine reported chest pain, Moga followed the jail's chest pain protocol by recording Christine's symptoms, calling Pisney, and then following Pisney's instructions to give Christine aspirin and to reevaluate her symptoms. On reevaluation, Christine's blood pressure had decreased and Christine didn't report further chest pain, but Moga continued to monitor her and informed Nelson about the chest pain and Pisney's instructions before leaving for the night. Boyer has not identified a single instance where Christine complained about a medical issue and either Nelson or Moga ignored it.

Boyer argues that it would have been obvious to any reasonable officer in Nelson and Moga's position that Christine needed to be taken to the emergency room when she experienced chest pain, because Nelson and Moga knew Christine had a history of heart problems, had not received her medications on Sunday, and had experienced elevated blood pressure for much of the day. But Nelson and Moga knew Pisney was also aware of those facts and that Pisney had not instructed them to take Christine to the emergency room. Boyer points to no precedent holding that jail staff must take inmates with heart problems to the emergency room if they experience chest pain, even if medical staff do not advise them to do so. No

17

reasonable jury could find that Nelson and Moga should have known that the care Pisney was providing to Christine was inadequate, so Nelson and Moga did not violate the Constitution by relying on Pisney's medical judgment.

Nelson is also entitled to summary judgment on Boyer's claim that she violated Christine's rights by failing to get a complete medical history. Fennigkoh helped Nelson take Christine's medical history and did not tell Nelson that any more information was needed. Nelson was presumptively entitled to rely on Fennigkoh's judgment that the medical history was sufficient.

### 4. Failure-to-intervene claims

Boyer also brings failure to intervene claims against Pisney, Fennigkoh, Nelson, and Moga, asserting that they knew about the constitutional violations committed by the other defendants and did nothing to prevent them. The only constitutional claims surviving summary judgment are for Pisney's failure to effectively treat Christine's high blood pressure and failure to get Christine emergency medical care when she experienced chest pain, so any failure-to-intervene claims would have to be based on those actions. *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) ("In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation.").

The court has already concluded that Nelson and Moga did not violate the Constitution in deferring to Pisney's medical decisions, so they are also entitled to summary judgment on the failure-to-intervene claims. As for Fennigkoh, she was not present at the jail when Christine began to experience chest pain, so she could not have intervened in that incident. *See Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (officer must be aware of a constitutional violation to intervene). Fennigkoh did know that Christine had experienced high blood

18

pressure on Sunday afternoon and that Pisney had prescribed clonidine, because Moga told her so when Fennigkoh came to the jail on Sunday for a special assignment related to another inmate. Dkt. 301, ¶ 83–84. But Boyer has not adduced evidence that Fennigkoh knew Christine's blood pressure was still elevated after the clonidine, which Fennigkoh would have needed to know to determine that Pisney had provided inadequate care. No reasonable jury could find that Fennigkoh was aware of any constitutional violations, so she is entitled to summary judgment on Boyer's failure-to-intervene claims.

### 5. Punitive damages

Punitive damages are available in § 1983 cases upon showing of "evil motive or intent, or . . . reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Defendants contend that Boyer cannot meet this standard for any of his claims.

The issue of punitive damages is moot for the claims that the court is dismissing. That leaves the claims that Pisney failed to continue monitoring Christine's blood pressure and failed to send Christine to the hospital when she reported chest pain. The court concludes that a reasonable jury could find that Pisney acted with callous indifference to Christine's rights. The key question is whether Pisney knew that Christine had preexisting congestive heart failure. Pisney says she never knew that, but jail staff testified that they gave Pisney all the information Christine had given them during her intake, including that she had congestive heart failure. If a jury found that Pisney knew Christine had a preexisting cardiac condition, it could find that Pisney acted recklessly or with callous indifference when she dismissed Christine's cardiac symptoms as anxiety as opposed to an emergency condition. The court will deny summary judgment on the issue of punitive damages for the two remaining claims against Pisney.

**B. Municipal liability claims**

Boyer seeks to hold ACH and Monroe County liable for Christine's death under the framework established in *Monell v. New York City Department of Social Services* for constitutional violations by municipalities. 436 U.S. 658 (1978). *See also Glisson v. Indiana Dep't of Corrections*, 849 F.3d 372, 378–79 (7th Cir. 2017) (private corporations providing essential government services can be subject to corporate liability under *Monell* framework). To defeat summary judgment on his *Monell* claims, Boyer must adduce evidence of: (1) action or inaction by defendants that can be fairly described as defendants' custom or policy; (2) notice to defendants that their conduct would lead to a constitutional violation; and (3) a direct causal connection between the defendants' policy and the constitutional injury. *Calderone v. City of Chicago*, 979 F.3d 1156, 1163 (7th Cir. 2020). The notice element is typically established by "a prior pattern of similar constitutional violations." *Bohanon v. City of Indianapolis*, 46 F.4th 669, 677 (7th Cir. 2022). In rare instances, notice can be inferred without a prior pattern if the policy or practice presents a "highly predictable" or "blatantly obvious" risk of constitutional violations. *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 380–81 (7th Cir. 2020) (lack of sexual assault prevention measures); *Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917 (7th Cir. 2004) (failure to follow suicide prevention protocols); *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372 (7th Cir. 2017) (failure to provide coordinated care to inmates with severe chronic illness).

In his response brief, Boyer identifies three policies that form the basis for his *Monell* claims against ACH, Monroe County, and the jail. (Boyer focuses primarily on ACH, but he contends that the county and the jail adopted these policies when they contracted with ACH to provide healthcare at the jail.) First, Boyer says that ACH's intake procedure prevented jail

20

medical providers from getting a full picture of inmates' medical conditions. Second, he says that ACH trained its providers to distrust inmates when they report symptoms of illness. Third, he says that ACH's chest pain protocol "effectively prohibited" jail staff from transporting inmates to the emergency room unless they were unresponsive.

### 1. Intake procedures

Boyer contends that there were systemic deficiencies in ACH's intake procedures, which caused providers to miss emergency medical conditions. Specifically, Boyer says that ACH's intake screening form did not capture key information about inmate health, that ACH did not require providers to repeat intake questions at a later point if an inmate was intoxicated during intake, and that ACH instructed jail staff to verbally share medical information obtained during intake with the provider as opposed to sending the provider the written intake form. Boyer says that because of these screening policies, Pisney didn't know what medications Christine took or that Christine had congestive heart failure, which Pisney said might have led her to make a different decision about sending Christine to the emergency room.

The issues Boyer identifies with ACH's screening form cannot form the basis for a *Monell* claim because they are unrelated to the harm Christine suffered in the jail. Boyer's emergency medicine expert, Venters, said that ACH failed to take Christine's vital signs at intake and did not screen her for drug withdrawal symptoms or pregnancy. Dkt. 246, at 4–6. But Boyer does not say that screening for any of these things would have made a difference. It is undisputed that Christine was not pregnant or experiencing drug withdrawal. And although Christine did have an abnormal vital sign (blood pressure) later in the day, no reasonable jury could find that the failure to take her vital signs at *intake* caused her death. Christine told staff at intake that she had taken her blood pressure medication before her arrest, and there is no

21

evidence that she was experiencing any symptoms suggesting her blood pressure was high at that time.

As for the other problems with ACH's intake procedure, Boyer fails to adduce evidence to show that the problems at ACH-serviced facilities provided notice of a likely constitutional violation. Boyer introduces evidence of ten other inmates who suffered adverse medical outcomes at ACH-serviced facilities nationwide, arguing that these cases demonstrated "similar concerns in patient care" to Christine's case. Dkt. 246 (Venters expert report), at 26–28. But Boyer has adduced no evidence from which a reasonable jury could find that these incidents were caused by the same deficiencies in intake procedures that occurred in Christine's case. In fact, Boyer's expert Venters conceded as much in his expert report, noting that the patient files he reviewed "lacked medical records sufficient to make any determination about adequacy of the areas of deficiency I observed in Ms. Boyer's case." *Id.* at 28.

In his response brief, Boyer characterizes the "pattern of similar cases" requirement more generally, arguing that he can survive summary judgment by providing evidence of a "small number of other incidents where patients received constitutionally inadequate medical care." Dkt. 276, at 33 (citing *Awalt v. Marketti*, 74 F. Supp. 3d 909 (N.D. Ill. 2014) and *Piercy v. Warkins*, No. 14-cv-7398, 2017 WL 1477959 (N.D. Ill. Apr. 25, 2017)). But Boyer's argument misses the key point, which is whether a reasonable jury could infer from Boyer's evidence that ACH was on notice that its policies or practices were likely to cause constitutional violations. *Bohanon*, 46 F.4th at 677. In *Awalt* and *Piercy*, the plaintiffs adduced evidence that a significant proportion of inmates at the same jail where the plaintiff was incarcerated had received inadequate health care. *See* 74 F. Supp. 3d at 938 (seven out of 24 detainees booked into the jail in the three months before Awalt's booking); 2017 WL 1477959, at *12–*13

(thirteen inmates, all but two in 2013). Not all the inmates in those cases experienced the same problems, but the court concluded that a jury could nevertheless infer notice due to the proportion of inmates who had received inadequate care. But Boyer's expert identified only one other inmate at the Monroe County jail who received inadequate care and nine others at ACH-serviced facilities nationwide. A small number of inmates may be sufficient to provide notice when the denominator is small, but ACH serves thousands of inmates per year; ten incidents out of thousands doesn't allow for a reasonable inference that ACH was on notice

Boyer also contends that even without a pattern of similar violations, this is one of those rare cases where it is blatantly obvious that deficient intake procedures would lead to constitutional violations. Boyer points to *Woodward v. Correctional Medical Services of Illinois*, 368 F.3d 917, which held that ignoring suicide prevention policies created a blatantly obvious risk, and *Glisson v. Indiana Department of Corrections*, 849 F.3d 372, which held that not adopting any policies for coordinated chronic disease care created a blatantly obvious risk. 849 F.3d 372. But the policy deficiencies in *Woodward* and *Glisson* were much more serious than in this case. In both of those cases, officials failed to institute any protective measures to guard against events that would be practically certain to occur in the corrections setting. As a result, the plaintiff in *Woodward* received no suicide prevention care for weeks despite repeatedly expressing a desire to kill himself, and the plaintiff in *Glisson* slowly deteriorated in health over the course of more than a month because no provider at the prison had a complete picture of his medical condition. *Woodward*, 368 F.3d at 925–26. *Glisson*, 849 F.3d at 376–78. Boyer's criticisms of ACH's intake procedures are much more subtle. ACH may not have followed best practices for screening and communicating medical intake information to the jail's provider. But its screening practices were not so obviously deficient that the risk of constitutional

23

violations was "highly predictable" even without a pattern of prior incidents. *J.K.J*, 960 F.3d at 380–81.

### 2. Provider training

Boyer contends that ACH trained its providers to distrust inmates when they complained of medical problems. Boyer points to a training presentation from ACH's founder Norman Johnson, which was designed for correctional officers at ACH-serviced facilities and which Pisney admits she saw during her training as an ACH medical provider. In the training, Johnson teaches that many inmates exaggerate medical symptoms and seek medical attention for "instant gratification" as opposed to health. Dkt. 278-19, at 5. He also tells providers that many inmates experience a "perception of illness that may not be entirely accurate" because of drug withdrawal or other consequences of being in jail. *Id.* Boyer argues that the training infected Pisney's thinking when she responded to Christine's reports of high blood pressure and chest pain, leading Pisney to ignore more serious possible diagnoses and conclude that Christine was suffering from anxiety from being in jail.

Boyer has not adduced evidence that ACH officials were aware or should have been aware that the training video would cause constitutional violations. As with his case on ACH's screening policies, he does not identify a pattern of constitutional violations that can be fairly traced to the training. And no reasonable jury could find that constitutional violations were a "highly predictable consequence" of the training. The training does not tell providers to ignore their professional judgment or to withhold or provide a certain type of care to inmates. In fact, the training is not even intended for healthcare providers; it's designed for non-medical jail staff who work at ACH-serviced facilities. And although Johnson includes in the training a number of broad generalizations about why inmates seek healthcare, his ultimate lesson in the

training is that to avoid liability, non-medical staff should always refer medical issues to the jail's medical team. *See* Dkt. 278-19, at 14 ("If you don't want to get sued for preventing somebody from getting adequate care, call the medical team all the time. Get it off your desk. Do not deny care."). No reasonable jury could find that constitutional violations were a highly predictable consequence of a training that explicitly directed jail staff to respond to medical issues by referring them to the jail's medical providers.

### 3. Chest pain protocol

Boyer asserts that ACH's chest pain protocol "effectively prohibited" jail staff from calling emergency services unless an inmate was unresponsive. But this is a mischaracterization of the protocol. The chest pain protocol form, which was available in the jail for non-medical staff to use, told staff to "start CPR immediately if detainee has no pulse or no respiration," to "call 911 if detainee is unresponsive," and, most importantly, to "call the practitioner for all chest pain." Dkt. 240-14. Nothing in the chest pain protocol prohibited calls to emergency services for inmates who were responsive; the protocol simply told jail staff to call the medical practitioner for those inmates, who could then decide the most appropriate course of treatment. No reasonable jury could find that ACH knew or should have known that a protocol urging jail staff to call the on-call medical provider about chest pain would cause constitutional violations.

Boyer has not adduced evidence that defendants were on notice of any policy or practice likely to cause constitutional violations, so defendants are entitled to summary judgment on Boyer's municipal liability claims.

## C. State-law claims

Boyer brings claims against the ACH defendants for medical malpractice, survival, wrongful death, intentional infliction of emotional distress, and negligent infliction of

emotional distress. The medical malpractice, survival, and wrongful death claims are all based on the allegedly negligent medical treatment that defendants provided to Christine. The ACH defendants don't address the issue whether defendants provided Christine with negligent medical care in its briefs, so defendants have forfeited any contention that they are entitled to summary judgment on these claims. *See Doherty v. City of Chicago,* 75 F.3d 318, 324 (7th Cir.1996).

As for the emotional distress claims, defendants contend that these claims brought by Boyer in his individual-capacity are barred by *Phelps v. Physicians Ins. Co. of Wisconsin*, in which the Wisconsin Supreme Court held that Wisconsin law does not recognize a negligent infliction of emotional distress claim brought by a bystander to medical negligence. 2009 WI 74, 319 Wis. 2d 1, 768 N.W.2d 615. In response, Boyer asserts that his emotional distress claims are not based on his witnessing medical negligence perpetrated against Christine; rather, these claims are based on the defendants' treatment of Boyer himself; namely, that they ignored him when he told them that Christine needed her medications. But Boyer says in his brief that the source of his distress was not his personal communications with the defendants, but his knowledge that the jail had delayed administering Christine's medications, failed to adequately respond to her cardiac distress, and refused to transport her for emergency care. There is no meaningful difference between that and a bystander claim, which is barred in Wisconsin under *Phelps*.

Defendants also contend that the emotional distress claims brought by Christine's estate should be dismissed because Boyer has not adduced any evidence that Christine suffered severe emotional distress at any point before her cardiac arrest on December 22. The court agrees. Severe emotional distress must be of "such substantial quantity or enduring quality that

no reasonable person could be expected to endure it." *Hicks v. Nunnery,* 2002 WI App 87, ¶ 26, 253 Wis.2d 721, 643 N.W.2d 809. Boyer says in his response brief that Christine reported "terrifying" symptoms and was "acutely aware that she was dying." Dkt. 276, at 55. But he doesn't point to any facts from which a reasonable jury could infer that Christine was experiencing severe emotional distress. On the contrary, Boyer admits that jail staff did not observe Christine to be in any distress in the hours before her cardiac arrest and that, when jail staff checked on her about ten minutes before the cardiac arrest, she was alert, quiet, and preparing to lie down on her cot. Dkt. 301, ¶¶ 109–10. The court will grant summary judgment to defendants on the claims for intentional and negligent infliction of emotional distress brought by both Christine's estate and Boyer.

Boyer also asserts a state-law indemnification claim against Monroe County. But the court has determined that the Monroe County employees Nelson and Moga are entitled to summary judgment, so the indemnification claim will be dismissed as well.

### D. Claims against the USA Medical defendants

In case number 22-cv-723-jdp, Boyer asserts claims against USA Medical and its shareholders Norman Johnson and Travis Schamber. Boyer seeks to pierce the corporate veil and hold USA Medical, Johnson, and Schamber liable for ACH's misconduct in this case. Boyer also brings § 1983 and state-law malpractice claims against Johnson and Schamber in their individual capacities.

The court will grant summary judgment to Johnson and Schamber on the § 1983 and state-law malpractice claims. Boyer's arguments that Johnson and Schamber were personally involved in Christine's death are based on his assertion that Johnson and Schamber trained ACH's medical providers, including Fennigkoh and Pisney, and developed policies that

governed the healthcare they provided. The court has already held that ACH's policies and procedures are not unconstitutional as applied to this case. And neither Johnson nor Schamber participated in Christine's care at the jail, so they cannot be liable for malpractice. *Ande v. Rock*, 2002 WI App 136, ¶ 10, 256 Wis. 2d 365, 647 N.W.2d 265 (malpractice claim requires showing of physician-patient relationship).

As for the issue whether to pierce the corporate veil, there is a threshold choice-of-law issue. Veil-piercing claims are typically governed by the law of the state of the corporation whose veil is sought to be pierced. *Henry Techs. Holdings, LLC v. Giordano,* No. 14-cv-63-jdp, 2014 WL 3845870 (W.D. Wis. Aug. 5, 2014). Applying this rule, defendants argue in their brief that Wisconsin law should apply to any claims to pierce USA Medical's corporate veil and Illinois law should apply to any claims to pierce ACH's corporate veil, because USA Medical is a Wisconsin corporation and ACH is an Illinois corporation. In response, Boyer applies Wisconsin law without addressing the choice-of-law issue. Boyer also doesn't clarify in his response brief exactly which company's corporate veil he wants to pierce; he simply argues that USA Medical, ACH, Johnson, and Schamber should all be treated as functionally the same entity. Ultimately, the court need not address the choice-of-law issue because Illinois and Wisconsin have similar laws regarding veil piercing. *Compare Consumer's Co-op. of Walworth Cnty. v. Olsen*, 142 Wis. 2d 465, 484, 419 N.W.2d 211 (1988) *with Ted Harrison Oil Co., Inc. v. Dokka*, 617 N.E.2d 898, 901–02 (Ill. App. 4th Dist. 1993). The court's analysis will apply Wisconsin law, but the result would be the same under Illinois law.

Under Wisconsin law, "[p]iercing the corporate veil is not favored and in general, courts are reluctant to do so." *Judson Atkinson Candies, Inc. v. Latini–Hohberger Dhimantec*, 529 F.3d 371, 379 (7th Cir. 2008). But "where applying the corporate fiction would accomplish some

fraudulent purpose, operate as a constructive fraud, or defeat some strong equitable claim, the fiction is disregarded." *Milwaukee Toy Co. v. Indus. Comm'n*, 203 Wis. 493, 234 N.W. 748 (1931). The key question in determining whether to pierce the corporate veil is whether the corporation has a separate existence of its own as opposed to being a mere instrumentality for a shareholder or parent corporation to evade obligations or otherwise commit wrongdoing. *Olsen*, 419 N.W.2d at 484. Factors relevant to whether a corporation has its own separate existence include whether the corporation is sufficiently capitalized, whether the corporation is completely controlled by certain shareholders or a parent corporation, whether corporate formalities are observed, and whether assets are commingled. *Id.*

Boyer contends that ACH's corporate form should be disregarded because ACH is undercapitalized and disregards corporate formalities. As for undercapitalization, Boyer says that ACH's insurance coverage for civil rights lawsuits is limited to $1 million per claim, and that ACH does not maintain sufficient capital to cover the difference if a plaintiff obtains a judgment higher than that. Dkt. 276, at 47. Boyer points to deposition testimony in which Johnson said that he didn't know whether ACH had sufficient funds to pay an $8.5 million judgment, but he thought it "probably" did. Dkt. 226 (Johnson Dep. 258:19–25). As for corporate formalities, Boyer points out that Johnson and his wife serve as the president, vice president, secretary, and treasurer of ACH, that Johnson and Schamber are the owners and directors of both ACH and USA Medical, and that ACH has not held an in-person board meeting in many years.

Boyer's evidence falls far short of establishing that ACH has no independent existence as a corporate form. Johnson's testimony that he didn't know whether ACH could pay an $8.5 million judgment, but that it "probably" could is exceptionally weak evidence that ACH is

undercapitalized; and in any event, undercapitalization alone isn't enough to justify piercing the corporate veil. *Olsen*, 142 Wis. 2d at 483. And Boyer has not shown "egregious" disregard of corporate formalities or "pervasive" control by the shareholders. *Id.* at 488. Boyer does not say that ACH ever commingled assets with its shareholders or affiliate entities. And although ACH did not hold in-person board meetings, it is undisputed that ACH completed annual consent documents signed by all shareholders in lieu of annual meetings. Dkts. 238-8–238-10. All the issues Boyer identifies with ACH's corporate structure are relatively common features of closely held corporations; none is sufficient to justify piercing the corporate veil.

The USA Medical defendants assert that they are only moving for partial summary judgment on Boyer's individual-capacity claims against Johnson and Schamber and on his claims for piercing the corporate veil. But the resolution of these issues appears to resolve all claims against the USA Medical defendants. The court will ask the parties to show cause why the court should not grant summary judgment in full to the USA Medical defendants and dismiss them from the case.

CONCLUSION

This case is proceeding to trial against nurse Pisney on § 1983 claims based on her treatment of Christine's blood pressure and her decision not to send Christine to the emergency room when she experienced chest pain, and against Pisney, Fennigkoh, and ACH on medical malpractice claims related to their treatment of Christine in the jail. Summary judgment is granted to defendants on Boyer's other claims. The Monroe County defendants are dismissed from the case, and the parties are ordered to show cause why the USA Medical defendants should not be dismissed from the case as well.

ORDER

IT IS ORDERED that:

1. Defendants' Advanced Correctional Healthcare, Lisa Pisney, and Amber Fennigkoh's motion for summary judgment, Dkt. 250, is GRANTED in part and DENIED in part, as follows:

   a. The motion is DENIED for Boyer's § 1983 claims against Pisney based on her treatment of Christine's blood pressure and her decision not to send Christine to the emergency room when she experienced chest pain. The motion is also denied for Boyer's medical malpractice, survival, and wrongful death claims against Pisney, Fennigkoh, and ACH.

   b. The motion is GRANTED for Boyer's § 1983 claims against Fennigkoh and Advanced Correctional Healthcare, and for Boyer's § 1983 claims against Pisney based on her decision not to send Christine for medical clearance and to wait until Monday to get Christine's medications. The motion is also granted for Boyer's state-law intentional and negligent infliction of emotional distress claims.

2. Defendants' Monroe County, Stan Hendrickson, Danielle Warren, and Shasta Moga's motion for summary judgment, Dkt. 239, is GRANTED.

3. Defendants' USA Medical, Norman Johnson, and Travis Schamber's motion for partial summary judgment on the individual claims against Johnson and Schamber and on the claims for piercing the corporate veil, Dkt. 234, is GRANTED. The court will give Boyer and the USA Medical defendants until July 14, 2025, to show cause why the court should not grant summary judgment in full to the USA Medical defendants and dismiss them from the case.

4. Defendants' motion to strike plaintiff's rebuttal expert reports, Dkt. 292, is DENIED as moot with regard to the reports of Homer Venters and Bruce Charash. If these reports are relevant to the issues at the trial, the parties may raise any issues with the reports in motions in limine. The motion to strike is DENIED for the rebuttal report of Suzanne Bentley. The motion to grant Dkt. 292, Dkt. 296, is DENIED as moot.

Entered July 7, 2025.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge

31